UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE KROGER CO., | : | Case No. C-1-02-439 |
| | : | |
| Plaintiff, | : | Beckwith, J. |
| | : | Sherman, M.J. |
| v. | : | |
| | : | |
| MALEASE FOODS CORP., | : | |
| | : | |
| Defendant. | : | |

**EXPERT REPORT OF ROBERT D. HOWARD, ESQ.
ON BEHALF OF
MALEASE FOODS CORP.**

I have been retained by the Defendant in connection with the above-entitled action. I was retained to prepare a reply to the nominal "Expert Report" of Messrs. Butler and Price (the "Butler-Price Statement") that was previously submitted to the Court on behalf of Plaintiff.

The Butler-Price Statement completely misses the critical issue in this case, is replete with "red herrings," and can serve only to confuse or mislead the Court. The factual and legal issues in this case are not adequately discussed by the Butler-Price Statement. (See discussion below).

There were three (3) properties involved in the transactions at issue herein. The operative documents, and the issues surrounding them, are identical in all material respects for all of the properties. For purposes of this Statement, the properties and the operative documents will be referred to in the singular.

The principal issues and points of contention in this case are:

A.    The doctrine of "merger of title" (also known as merger of "estates"), upon which the Butler-Price Statement dwells extensively, did not happen and could not have happened in this case. More to the point is that the merger of title doctrine has no relevance or significance to the determination of the issues in this case. (See discussion in Paragraphs 9, 11, 12, and 21 below).

The principal issue in this case is whether Kroger (Plaintiff herein) forfeited the Option under Article XXXV of the Occupancy Lease by purchasing the interest of Balkhouse Associates outside of the Option.

B.    The Butler-Price Statement misconstrues, misstates and misunderstands the definition of "Leased Property" under the Occupancy Lease. (See discussion in Paragraphs 1, 11 and 19 below).

C.    The Butler-Price Statement misconstrues and misstates the relationship between the Occupancy Lease and the Two Party Agreement. (See discussion in Paragraphs 4, 5, 15 and 16, 19 and 23 below).

D.    All references in the Butler-Price Statement to "Rejectable Offers" are entirely irrelevant and are intended to obfuscate the real issues in this case . (See discussion in Paragraphs 4 and 24, below).

E.    The law requires that the terms of an option be strictly construed in determining whether the option is effectively exercised. The approach of the Butler-Price Statement in respect of Plaintiff's ostensible exercise of the Option is "fast and loose" and is not consistent with the law.

F.    The Butler-Price Statement is not an "expert report" but is the statement of fact witnesses who were involved in the creation and consummation of the transactions at issue. It should be viewed as self serving rather than as an objective analysis.

The following comments correspond to the numbered paragraphs in the Butler-Price Statement.

**Paragraph 1**. This paragraph in the Butler-Price Statement shows that Plaintiff, which was an investment banking client of Merrill Lynch (which employed Messrs. Butler and Price at the time the transaction was structured) was well aware, at the inception of the transaction described herein, of the entire structure of that transaction. Plaintiff was represented by able counsel, who would have advised it of the significant aspects of the transaction, including the definition of "Leased Property" and that the Option covered, and was required to cover, all of the interests in the Leased Property, not less than all of such interests.

**Paragraphs 2 and 3**. Plaintiff may not have created the "sandwich lease" structure but it strains credibility to suggest that Plaintiff was unaware of the structure. There were three such transactions being offered by Merrill Lynch at such time in 1983 (i.e., Balkhouse, Aztex and Pennington), and there were three (3) properties involved in the Balkhouse transaction, each with separate Occupancy Leases subject to separate notes and separate mortgages.  It is disingenuous to suggest that Plaintiff "in some cases" did not learn of the structure until a later date.  In transactions of this type, the occupancy tenant (i.e., Plaintiff) would typically be aware at the inception that such a structure would be utilized and would, as part of its due diligence, have blessed the necessary payment schedules to be certain the transaction worked.  Because of the investment banking relationship between Plaintiff and Merrill Lynch, it would have been incumbent upon Messrs. Butler and Price to make clear to Plaintiff the text or the expected content of the schedules.  Whether Plaintiff examined the text of the documents in advance is irrelevant once Plaintiff knew of the schedules and the assumptions upon which such schedules

were based, including all aspects of the transaction arising from the use of "Original Issue Discount", which were peculiar to the 1983 transactions, and were not repeated in the Kroger transactions of 1984.

**Paragraph 4**. It is disingenuous to suggest that Plaintiff was not intimately familiar with the existence and content of the Two Party Agreement at the time it executed the Occupancy Lease, for several obvious reasons:

(a) Any lawyer representing Plaintiff, as a matter of proper due diligence, would have negotiated or approved the language, or the detailed concept, of paragraph "3" of the Two Party Agreement (which dealt with the exercise of the Option under the Occupancy Lease).

(b) The Two Party agreement was created solely to implement the provisions of the Occupancy Lease which were affected by the division of what had been a single estate of the landlord in the Occupancy Lease at the time of its creation into two estates, namely the Master Lease (owned by Defendant) and the fee position (owned by Balkhouse Associates). As such, the Two Party Agreement preserves precisely, and is intended to preserve precisely, the rights of the Occupancy Tenant (Plaintiff) measured against the now separate rights and duties of Defendant and Balkhouse Associates.

It is both irrelevant and disingenuous to suggest that the rights of the parties must be determined by the priority of the execution of the Occupancy Lease over the Two Party Agreement in order to address inconsistencies. The proper construction of the Two Party Agreement is that it was created to be entirely consistent with the Occupancy Lease, and it should be so construed. [*]

The references in Paragraph "4" of the Butler-Price Statement to an "option which [under the Two Party Agreement] the Master Lessee may not reject" is likewise misleading and disingenuous. The Two Party Agreement meticulously tracks the Occupancy Lease. Under the Occupancy Lease, in the event of fire, condemnation or economic abandonment, the tenant (Plaintiff) is required to make an offer which the landlord (originally Balkhouse Properties Corp. and subsequently Defendant and Balkhouse Associates, in that order,) may accept or reject.

Under the Two Party Agreement, all rejectable offers (fire, condemnation, economic abandonment) could not be rejected unless security was provided for the discharge of the mortgage debt contemporaneously with the termination of the Occupancy Lease resulting from the rejection of the offer.

---

[*] By virtue of the Assignment made by Balkhouse Properties Corp. to Malease Foods Corp. (Defendant), Defendant succeeded to the position of lessor under the Occupancy Lease. A termination of the Master Lease will not result in a termination of the Occupancy Lease, as would be the case if the Occupancy Lease was a true sublease under the Master Lease.

The landlord at the time of the creation of the Occupancy Lease was a single entity owning the entire estate comprising the "Leased Property." Subsequently, the landlord's interest was bifurcated into the Master Lease (now owned by Defendant) and the fee interest (now owned by Balkhouse Associates). All that the Two Party Agreement does is to express and implement the mechanics to preserve as against the Occupancy Tenant the same duties and rights contained in the Occupancy Lease, and it should be so construed. The "Option" created under Article XXXV of the Occupancy Lease is separate and distinct from the provisions of the Occupancy Lease that address fire, condemnation and economic abandonment; the latter have no factual or legal relevance to the issues in this case.

**Paragraph 5.**    Paragraph 5 of the Butler-Price Statement is a further attempt to "muddy the waters." There were no conflicts between the terms of the Occupancy Lease and the Two Party Agreement, nor was the Two Party Agreement created to resolve any such conflicts, but only to preserve and implement, without variance, the provisions of the Occupancy Lease. Plaintiff undoubtedly knew that there would be a Two Party Agreement and in the ordinary course of its diligence would have satisfied itself that such agreement would preserve its valuable rights under the Occupancy Lease. Discovery will reveal the details of Plaintiff's foreknowledge.

The critical issue, which Plaintiff's nominal experts deliberately choose not to discuss, is whether Plaintiff was in compliance with the terms of the Occupancy Lease when it attempted to exercise the Option under Article XXXV of the Occupancy Lease. The Option under the Occupancy Lease was exercisable to close no earlier than April 2, 2003. Pursuant to the deed between Balkhouse Properties Corp. and Balkhouse Associates, the latter agreed to be primarily responsible for the mortgage debt. The mortgage debt on the properties would have been repaid in accordance with its terms by no later than April 1, 2003. That payoff of the debt was mandatory as a precondition to Plaintiff's purchase of the properties under the option. As of July 24, 2001, the unpaid balance of the mortgage debt was in excess of $20 million.

**Paragraph 6.** The discussion in Paragraph "6" concerning tax shelter considerations as posed by the Butler-Price Statement is irrelevant to the issues before this Court and is intended to obfuscate the principal issues of the case. It does, however, evidence the prior knowledge of Plaintiff in all material aspects of this transaction, including the Master Lease and the Two Party Agreement.

The issue whether the transaction lacked "economic substance" is unclear. The mortgage debt exceeded the value of the property, which was attributable to the inclusion in principal of the Original Issue Discount. The property was not freely transferable because of the existence of a mortgage debt in excess of value. In fact, it appears that the property was virtually unsalable for much of the mortgage term because amortization of the principal indebtedness did not commence until 1998. The "cross-over point" occurred at approximately the end of the 15th year of the mortgage term.

Further, reiterating my prior statement herein, the typical due diligence of Plaintiff's counsel in 1983 would have caused Plaintiff to know the substance, if not the very language, of the Master Lease at the time Plaintiff became obligated under the Occupancy Lease. The

Schedules attached to the Master Lease and the mortgage amortization schedules and the assumptions upon which all such schedules were based, including assumptions as to accrual and cash basis accounting for such schedules, had to have been reviewed by Plaintiff in detail as to concept.

**Paragraph 7**. This paragraph totally misconstrues the economics of the Master Lessee (Defendant). Contrary to the implications in this paragraph, Defendant undertook substantial economic risk in the Transaction. Because all three properties were covered by one Master Lease, Defendant had to protect its position against the non-performance or termination of any single Occupancy Lease (for example, due to economic abandonment), or forfeit its entire position in all three properties. This is in direct contrast to the obligations of Plaintiff, whose Occupancy Leases and all rights and options therein contained (including the right to terminate the Occupancy Lease because of economic abandonment), were entirely separate and distinct.

**Paragraph 9**. The reference in the Butler-Price Statement to the "No merger of title" provision in the Occupancy Lease is misleading and entirely irrelevant, for two basic reasons:.

(a)    Under basic principles of real estate law, in this case there has not been, and cannot have been, any merger of title. This is because the two property interests to which the Butler-Price Statement refers (the occupancy interest [owned by Plaintiff] and the fee interest [owned by Balkhouse Associates]) are, and at all times have been, separated by the existence of the Master Lease, an independent interest in the Property that was owned by a third party (Defendant).

Second, the essential issue in this case is not one of merger of title but whether Plaintiff's 2001 purchase of the interest of Balkhouse Associates in the Property extinguished its right to exercise the Option under Article XXXV of the Occupancy Lease and thereby acquire the Leased Property.

Article XXXI of the Occupancy Lease addresses only merger of estates and is not relevant to the issues at hand.

I note that Article XIX of the Occupancy Lease contains provisions relating to Plaintiff's purchase of "the Leased Property or any portion thereof from Lessor pursuant to any of the terms of this [Occupancy Lease]. . ." In my opinion, the only circumstance under the Occupancy Lease under which Plaintiff could purchase a portion, as opposed to all, of the Leased Property, is upon exercise of the Option after a prior partial condemnation of the property.

**Paragraph 11**.    Reference to the quoted provision of the July 2001 deeds is intended to obfuscate the real issue, which is not merger of title (referred to in the quoted language as merger of "interests"), but the loss of the right to exercise the Option upon Plaintiff's acquisition of the position of Balkhouse Associates. The definition of "Leased Property" required the Option to be exercised once - simultaneously against the entirety of the interests of both Defendant and Balkhouse Associates, and thus to acquire such interests simultaneously. The inclusion in the deed of the quoted language was an extreme act of caution since there could

be no merger of interests as long as the Master Lease intervened between the two separate interests of Occupancy Tenant (Plaintiff) and fee owner (Balkhouse Associates).

The July 2001 deeds did not transfer the "Leased Property," but only the interest of Balkhouse Associates in the "Leased Property."

**Paragraph 12.**    The quoted language in the Deed and Occupancy Leases both relate to merger of title, which has no relevance to the issues in this case.

**Paragraph 13.**    All parties agree that the Two Party Agreement does not modify the rights of Plaintiff under the Occupancy Lease. In my opinion, the Two Party Agreement is wholly compatible with the Occupancy Lease and the misplaced emphasis upon priority of recording is simply misdirection.

**Paragraph 14.**    All parties agree that Plaintiff's purchase in 2001 did not constitute an exercise of the Option, nor could it have constituted an exercise of the Option because:

(a)    the closing would have had to occur on April 2, 2003, and

(b)    the purchase price was not full "fair market value" as required by the Occupancy Lease.

I cannot comment on the assertion in the Butler-Price Statement that the purchase was an "arm's length negotiated business transaction," but it seems that the purchase price was significantly less than fair market value since Defendant was prepared to pay substantially more for the Leased Property than was offered by Plaintiff, and the existence in November 1999 of the Agreement Related to Sublease and the Agreement Regarding Additional Facility appear to support and justify Defendant's contention.

**Paragraphs 15 and 16.**  These two paragraphs illustrate that Plaintiff is trying to "have its cake and eat it too." On the one hand, Messrs. Butler and Price point to language in the Two Party Agreement to fix the price payable to Defendant. On the other hand, they assert that only the Occupancy Lease governs the right to purchase the Property and ignores Plaintiff's failure to comply with the requirements for exercise of the Option, to wit: (a) the requirement to purchase the entire "Leased Property" and (b) the requirement to pay fair market value. The Option was extinguished by Plaintiff's purchase of the interest of Balkhouse Associates in the Leased Property.

**Paragraph 17.**  By acting outside of the Option without notice to Defendant, Plaintiff assumed the risk of the consequences of its actions which included the possibility of its forfeiture of its right to acquire the interest of Defendant in the Leased Property.

**Paragraph 19.**  Once again, Plaintiff misconstrues Defendant's position. Defendant does not contend that the Two Party Agreement restricts Plaintiff's rights under the Occupancy Lease. Defendant's position is very simple - the only option of Plaintiff to purchase the property is

33960/002/01052648:1-RDH                             - 6 -

contained in the Occupancy Lease, and that Option was a single option to purchase the <u>entire</u> Leased Property. When Plaintiff <u>did</u> purchase the interest of Balkhouse Associates outside of the Option, in order to realize substantial savings upon the cost of such acquisition, it was within its rights in doing so, but by such action, it forfeited its Option rights.

The last sentence in this paragraph is also misleading and incorrect. The italicized language does <u>not</u> provide for purchases outside the terms of the Occupancy Lease. It only covers purchases under the Option made subsequent to a partial condemnation of the subject property which does not result in a termination of the Occupancy Lease.

**Paragraph 21**. The "no merger" provisions in the Occupancy Lease and the 2001 Deed are limited to "merger of title" or "merger of estates" and do not address, and are not relevant to, Plaintiff's forfeiture of the Option contained in the Occupancy Lease by reason of its prior acquisition of less than all of the Leased Property.

**Paragraph 23**. By purchasing in July 2001, Plaintiff forfeited its Option entirely. The Option must be strictly construed as to its exercise and could not be amended without the consent of Defendant. Plaintiff failed to pay fair market value for the interest of Balkhouse Associates and admits purchasing outside the Option. Plaintiff's approach to the issues in this case is to seek to "have its cake and eat it, too". Having purchased outside the Option, Plaintiff attempts to rely on the Two Party Agreement to force a purchase of Defendant's interest at less than fair market value, while contending that other provisions in the Two Party Agreement (including the "simultaneous" provisions) are inapplicable because of the superiority in lien of the Occupancy Lease.

**Paragraph 24**. The Two Party Agreement was designed to implement the applicable provisions of the Occupancy Lease to preserve the rights of Plaintiff as tenant, and to allocate the duties of the respective parties who collectively succeeded to the position of landlord. To this end, the Two Party agreement addressed, in detail, matters pertinent to "rejectable offers" since all such matters were derived directly from the corresponding provisions of the Occupancy Lease. References in the Butler-Price Statement to "Rejectable Offers" are misleading and intended to confuse, and have no relevance to Articles XXXV and XXXVI of the Occupancy Lease.

* * * *

The Butler-Price Statement is submitted as an "Expert Report," but it clearly does not rise to that level. The authors had an active role in the original transaction as well as in Plaintiff's 2001 purchase. The Butler-Price Statement is purely a statement of facts, the authors' interpretations of the relevant documents, and their conclusions of law (neither of the authors is an attorney). In my view it is not an objective analysis, but an attempt to justify the actions of the authors in creating and consummating the various transactions described. The Butler-Price Statement raises doubts as to whether its primary purpose was to place before this Court an accurate history of the events that transpired and their precise and direct bearing upon the rights and duties of the parties in this action, or whether the primary purpose is to justify and protect the

role of the authors in bringing about these transactions in spite of their extensive knowledge of the rights of the parties, including Malease Foods Corp., under the respective documents to which reference has been made.

My compensation for this engagement is at an hourly rate of $350.00.

I have previously served as an expert witness in the United States Bankruptcy Court in the Eastern District of N.Y., in the case entitled In Re Malease 14 FK Corp., Case No. 02-80587-478.

Dated: December 15, 2003

Robert D. Howard

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE KROGER CO., | : | Case No. C-1-02-439 |
| | : | |
| Plaintiff, | : | Beckwith, J. |
| | : | Sherman, M.J. |
| v. | : | |
| | : | |
| MALEASE FOODS CORP., | : | |
| | : | |
| Defendant. | : | |

**EXPERT REPORT OF ROBERT D. HOWARD, ESQ.
ON BEHALF OF
MALEASE FOODS CORP.**

I have been retained by the Defendant in connection with the above-entitled action. I was retained to prepare a reply to the nominal "Expert Report" of Messrs. Butler and Price (the "Butler-Price Statement") that was previously submitted to the Court on behalf of Plaintiff.

The Butler-Price Statement completely misses the critical issue in this case, is replete with "red herrings," and can serve only to confuse or mislead the Court. The factual and legal issues in this case are not adequately discussed by the Butler-Price Statement. (See discussion below).

There were three (3) properties involved in the transactions at issue herein. The operative documents, and the issues surrounding them, are identical in all material respects for all of the properties. For purposes of this Statement, the properties and the operative documents will be referred to in the singular.

The principal issues and points of contention in this case are:

A.     The doctrine of "merger of title" (also known as merger of "estates"), upon which the Butler-Price Statement dwells extensively, did not happen and could not have happened in this case. More to the point is that the merger of title doctrine has no relevance or significance to the determination of the issues in this case. (See discussion in Paragraphs 9, 11, 12, and 21 below).

The principal issue in this case is whether Kroger (Plaintiff herein) forfeited the Option under Article XXXV of the Occupancy Lease by purchasing the interest of Balkhouse Associates outside of the Option.

B.    The Butler-Price Statement misconstrues, misstates and misunderstands the definition of "Leased Property"under the Occupancy Lease. (See discussion in Paragraphs 1, 11 and 19 below).

C.    The Butler-Price Statement misconstrues and misstates the relationship between the Occupancy Lease and the Two Party Agreement. (See discussion in Paragraphs 4, 5, 15 and 16, 19 and 23 below).

D.    All references in the Butler-Price Statement to "Rejectable Offers" are entirely irrelevant and are intended to obfuscate the real issues in this case . (See discussion in Paragraphs 4 and 24, below).

E.    The law requires that the terms of an option be strictly construed in determining whether the option is effectively exercised. The approach of the Butler-Price Statement in respect of Plaintiff's ostensible exercise of the Option is "fast and loose" and is not consistent with the law.

F.    The Butler-Price Statement is not an "expert report" but is the statement of fact witnesses who were involved in the creation and consummation of the transactions at issue. It should be viewed as self serving rather than as an objective analysis.

The following comments correspond to the numbered paragraphs in the Butler-Price Statement.

**Paragraph 1**. This paragraph in the Butler-Price Statement shows that Plaintiff, which was an investment banking client of Merrill Lynch (which employed Messrs. Butler and Price at the time the transaction was structured) was well aware, at the inception of the transaction described herein, of the entire structure of that transaction. Plaintiff was represented by able counsel, who would have advised it of the significant aspects of the transaction, including the definition of "Leased Property" and that the Option covered, and was required to cover, all of the interests in the Leased Property, not less than all of such interests.

**Paragraphs 2 and 3**. Plaintiff may not have created the "sandwich lease" structure but it strains credibility to suggest that Plaintiff was unaware of the structure. There were three such transactions being offered by Merrill Lynch at such time in 1983 (i.e., Balkhouse, Aztex and Pennington), and there were three (3) properties involved in the Balkhouse transaction, each with separate Occupancy Leases subject to separate notes and separate mortgages.  It is disingenuous to suggest that Plaintiff "in some cases" did not learn of the structure until a later date.  In transactions of this type, the occupancy tenant (i.e., Plaintiff) would typically be aware at the inception that such a structure would be utilized and would, as part of its due diligence, have blessed the necessary payment schedules to be certain the transaction worked.  Because of the investment banking relationship between Plaintiff and Merrill Lynch, it would have been incumbent upon Messrs. Butler and Price to make clear to Plaintiff the text or the expected content of the schedules.  Whether Plaintiff examined the text of the documents in advance is irrelevant once Plaintiff knew of the schedules and the assumptions upon which such schedules

were based, including all aspects of the transaction arising from the use of "Original Issue Discount", which were peculiar to the 1983 transactions, and were not repeated in the Kroger transactions of 1984.

**Paragraph 4**. It is disingenuous to suggest that Plaintiff was not intimately familiar with the existence and content of the Two Party Agreement at the time it executed the Occupancy Lease, for several obvious reasons:

(a)    Any lawyer representing Plaintiff, as a matter of proper due diligence, would have negotiated or approved the language, or the detailed concept, of paragraph "3" of the Two Party Agreement (which dealt with the exercise of the Option under the Occupancy Lease).

(b)    The Two Party agreement was created solely to implement the provisions of the Occupancy Lease which were affected by the division of what had been a single estate of the landlord in the Occupancy Lease at the time of its creation into two estates, namely the Master Lease (owned by Defendant) and the fee position (owned by Balkhouse Associates). As such, the Two Party Agreement preserves precisely, and is intended to preserve precisely, the rights of the Occupancy Tenant (Plaintiff) measured against the now separate rights and duties of Defendant and Balkhouse Associates.

It is both irrelevant and disingenuous to suggest that the rights of the parties must be determined by the priority of the execution of the Occupancy Lease over the Two Party Agreement in order to address inconsistencies. The proper construction of the Two Party Agreement is that it was created to be entirely consistent with the Occupancy Lease, and it should be so construed. [*]

The references in Paragraph "4" of the Butler-Price Statement to an "option which [under the Two Party Agreement] the Master Lessee may not reject" is likewise misleading and disingenuous. The Two Party Agreement meticulously tracks the Occupancy Lease. Under the Occupancy Lease, in the event of fire, condemnation or economic abandonment, the tenant (Plaintiff) is required to make an offer which the landlord (originally Balkhouse Properties Corp. and subsequently Defendant and Balkhouse Associates, in that order,) may accept or reject.

Under the Two Party Agreement, all rejectable offers (fire, condemnation, economic abandonment) could not be rejected unless security was provided for the discharge of the mortgage debt contemporaneously with the termination of the Occupancy Lease resulting from the rejection of the offer.

---

[*] By virtue of the Assignment made by Balkhouse Properties Corp. to Malease Foods Corp. (Defendant), Defendant succeeded to the position of lessor under the Occupancy Lease. A termination of the Master Lease will not result in a termination of the Occupancy Lease, as would be the case if the Occupancy Lease was a true sublease under the Master Lease.

The landlord at the time of the creation of the Occupancy Lease was a single entity owning the entire estate comprising the "Leased Property." Subsequently, the landlord's interest was bifurcated into the Master Lease (now owned by Defendant) and the fee interest (now owned by Balkhouse Associates). All that the Two Party Agreement does is to express and implement the mechanics to preserve as against the Occupancy Tenant the same duties and rights contained in the Occupancy Lease, and it should be so construed. The "Option" created under Article XXXV of the Occupancy Lease is separate and distinct from the provisions of the Occupancy Lease that address fire, condemnation and economic abandonment; the latter have no factual or legal relevance to the issues in this case.

**Paragraph 5**.    Paragraph 5 of the Butler-Price Statement is a further attempt to "muddy the waters." There were no conflicts between the terms of the Occupancy Lease and the Two Party Agreement, nor was the Two Party Agreement created to resolve any such conflicts, but only to preserve and implement, without variance, the provisions of the Occupancy Lease. Plaintiff undoubtedly knew that there would be a Two Party Agreement and in the ordinary course of its diligence would have satisfied itself that such agreement would preserve its valuable rights under the Occupancy Lease. Discovery will reveal the details of Plaintiff's foreknowledge.

The critical issue, which Plaintiff's nominal experts deliberately choose not to discuss, is whether Plaintiff was in compliance with the terms of the Occupancy Lease when it attempted to exercise the Option under Article XXXV of the Occupancy Lease. The Option under the Occupancy Lease was exercisable to close no earlier than April 2, 2003. Pursuant to the deed between Balkhouse Properties Corp. and Balkhouse Associates, the latter agreed to be primarily responsible for the mortgage debt. The mortgage debt on the properties would have been repaid in accordance with its terms by no later than April 1, 2003. That payoff of the debt was mandatory as a precondition to Plaintiff's purchase of the properties under the option. As of July 24, 2001, the unpaid balance of the mortgage debt was in excess of $20 million.

**Paragraph 6**. The discussion in Paragraph "6" concerning tax shelter considerations as posed by the Butler-Price Statement is irrelevant to the issues before this Court and is intended to obfuscate the principal issues of the case. It does, however, evidence the prior knowledge of Plaintiff in all material aspects of this transaction, including the Master Lease and the Two Party Agreement.

The issue whether the transaction lacked "economic substance" is unclear. The mortgage debt exceeded the value of the property, which was attributable to the inclusion in principal of the Original Issue Discount. The property was not freely transferable because of the existence of a mortgage debt in excess of value. In fact, it appears that the property was virtually unsalable for much of the mortgage term because amortization of the principal indebtedness did not commence until 1998. The "cross-over point" occurred at approximately the end of the 15th year of the mortgage term.

Further, reiterating my prior statement herein, the typical due diligence of Plaintiff's counsel in 1983 would have caused Plaintiff to know the substance, if not the very language, of the Master Lease at the time Plaintiff became obligated under the Occupancy Lease. The

Schedules attached to the Master Lease and the mortgage amortization schedules and the assumptions upon which all such schedules were based, including assumptions as to accrual and cash basis accounting for such schedules, had to have been reviewed by Plaintiff in detail as to concept.

**Paragraph 7**. This paragraph totally misconstrues the economics of the Master Lessee (Defendant). Contrary to the implications in this paragraph, Defendant undertook substantial economic risk in the Transaction. Because all three properties were covered by one Master Lease, Defendant had to protect its position against the non-performance or termination of any single Occupancy Lease (for example, due to economic abandonment), or forfeit its entire position in all three properties. This is in direct contrast to the obligations of Plaintiff, whose Occupancy Leases and all rights and options therein contained (including the right to terminate the Occupancy Lease because of economic abandonment), were entirely separate and distinct.

**Paragraph 9**. The reference in the Butler-Price Statement to the "No merger of title" provision in the Occupancy Lease is misleading and entirely irrelevant, for two basic reasons:.

(a)    Under basic principles of real estate law, in this case there has not been, and cannot have been, any merger of title. This is because the two property interests to which the Butler-Price Statement refers (the occupancy interest [owned by Plaintiff] and the fee interest [owned by Balkhouse Associates]) are, and at all times have been, separated by the existence of the Master Lease, an independent interest in the Property that was owned by a third party (Defendant).

Second, the essential issue in this case is not one of merger of title but whether Plaintiff's 2001 purchase of the interest of Balkhouse Associates in the Property extinguished its right to exercise the Option under Article XXXV of the Occupancy Lease and thereby acquire the Leased Property.

Article XXXI of the Occupancy Lease addresses only merger of estates and is not relevant to the issues at hand.

I note that Article XIX of the Occupancy Lease contains provisions relating to Plaintiff's purchase of "the Leased Property or any portion thereof from Lessor pursuant to any of the terms of this [Occupancy Lease]. . ." In my opinion, the only circumstance under the Occupancy Lease under which Plaintiff could purchase a portion, as opposed to all, of the Leased Property, is upon exercise of the Option after a prior partial condemnation of the property.

**Paragraph 11**.    Reference to the quoted provision of the July 2001 deeds is intended to obfuscate the real issue, which is not merger of title (referred to in the quoted language as merger of "interests"), but the loss of the right to exercise the Option upon Plaintiff's acquisition of the position of Balkhouse Associates. The definition of "Leased Property" required the Option to be exercised once - simultaneously against the entirety of the interests of both Defendant and Balkhouse Associates, and thus to acquire such interests simultaneously. The inclusion in the deed of the quoted language was an extreme act of caution since there could

be no merger of interests as long as the Master Lease intervened between the two separate interests of Occupancy Tenant (Plaintiff) and fee owner (Balkhouse Associates).

The July 2001 deeds did not transfer the "Leased Property," but only the interest of Balkhouse Associates in the "Leased Property."

**Paragraph 12.**    The quoted language in the Deed and Occupancy Leases both relate to merger of title, which has no relevance to the issues in this case.

**Paragraph 13**.    All parties agree that the Two Party Agreement does not modify the rights of Plaintiff under the Occupancy Lease. In my opinion, the Two Party Agreement is wholly compatible with the Occupancy Lease and the misplaced emphasis upon priority of recording is simply misdirection.

**Paragraph 14**.    All parties agree that Plaintiff's purchase in 2001 did not constitute an exercise of the Option, nor could it have constituted an exercise of the Option because:

(a)    the closing would have had to occur on April 2, 2003, and

(b)    the purchase price was not full "fair market value" as required by the Occupancy Lease.

I cannot comment on the assertion in the Butler-Price Statement that the purchase was an "arm's length negotiated business transaction," but it seems that the purchase price was significantly less than fair market value since Defendant was prepared to pay substantially more for the Leased Property than was offered by Plaintiff, and the existence in November 1999 of the Agreement Related to Sublease and the Agreement Regarding Additional Facility appear to support and justify Defendant's contention.

**Paragraphs 15 and 16**. These two paragraphs illustrate that Plaintiff is trying to "have its cake and eat it too." On the one hand, Messrs. Butler and Price point to language in the Two Party Agreement to fix the price payable to Defendant. On the other hand, they assert that only the Occupancy Lease governs the right to purchase the Property and ignores Plaintiff's failure to comply with the requirements for exercise of the Option, to wit: (a) the requirement to purchase the entire "Leased Property" and (b) the requirement to pay fair market value. The Option was extinguished by Plaintiff's purchase of the interest of Balkhouse Associates in the Leased Property.

**Paragraph 17**. By acting outside of the Option without notice to Defendant, Plaintiff assumed the risk of the consequences of its actions which included the possibility of its forfeiture of its right to acquire the interest of Defendant in the Leased Property.

**Paragraph 19**. Once again, Plaintiff misconstrues Defendant's position. Defendant does **not** contend that the Two Party Agreement restricts Plaintiff's rights under the Occupancy Lease. Defendant's position is very simple - the only option of Plaintiff to purchase the property is

contained in the Occupancy Lease, and that Option was a single option to purchase the <u>entire</u> Leased Property. When Plaintiff <u>did</u> purchase the interest of Balkhouse Associates outside of the Option, in order to realize substantial savings upon the cost of such acquisition, it was within its rights in doing so, but by such action, it forfeited its Option rights.

The last sentence in this paragraph is also misleading and incorrect. The italicized language does <u>not</u> provide for purchases outside the terms of the Occupancy Lease. It only covers purchases under the Option made subsequent to a partial condemnation of the subject property which does not result in a termination of the Occupancy Lease.

**Paragraph 21**.        The "no merger" provisions in the Occupancy Lease and the 2001 Deed are limited to "merger of title" or "merger of estates" and do not address, and are not relevant to, Plaintiff's forfeiture of the Option contained in the Occupancy Lease by reason of its prior acquisition of less than all of the Leased Property.

**Paragraph 23**.        By purchasing in July 2001, Plaintiff forfeited its Option entirely. The Option must be strictly construed as to its exercise and could not be amended without the consent of Defendant. Plaintiff failed to pay fair market value for the interest of Balkhouse Associates and admits purchasing outside the Option. Plaintiff's approach to the issues in this case is to seek to "have its cake and eat it, too". Having purchased outside the Option, Plaintiff attempts to rely on the Two Party Agreement to force a purchase of Defendant's interest at less than fair market value, while contending that other provisions in the Two Party Agreement (including the "simultaneous" provisions) are inapplicable because of the superiority in lien of the Occupancy Lease.

**Paragraph 24**.        The Two Party Agreement was designed to implement the applicable provisions of the Occupancy Lease to preserve the rights of Plaintiff as tenant, and to allocate the duties of the respective parties who collectively succeeded to the position of landlord. To this end, the Two Party agreement addressed, in detail, matters pertinent to "rejectable offers" since all such matters were derived directly from the corresponding provisions of the Occupancy Lease. References in the Butler-Price Statement to "Rejectable Offers" are misleading and intended to confuse, and have no relevance to Articles XXXV and XXXVI of the Occupancy Lease.

* * * *

The Butler-Price Statement is submitted as an "Expert Report," but it clearly does not rise to that level. The authors had an active role in the original transaction as well as in Plaintiff's 2001 purchase. The Butler-Price Statement is purely a statement of facts, the authors' interpretations of the relevant documents, and their conclusions of law (neither of the authors is an attorney). In my view it is not an objective analysis, but an attempt to justify the actions of the authors in creating and consummating the various transactions described. The Butler-Price Statement raises doubts as to whether its primary purpose was to place before this Court an accurate history of the events that transpired and their precise and direct bearing upon the rights and duties of the parties in this action, or whether the primary purpose is to justify and protect the

role of the authors in bringing about these transactions in spite of their extensive knowledge of the rights of the parties, including Malease Foods Corp., under the respective documents to which reference has been made.

My compensation for this engagement is at an hourly rate of $350.00.

I have previously served as an expert witness in the United States Bankruptcy Court in the Eastern District of N.Y., in the case entitled In Re Malease 14 FK Corp., Case No. 02-80587-478.

Dated: December 15, 2003

Robert D. Howard

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE KROGER CO.,                    :        Case No. C-1-02-439
                                   :
        Plaintiff,                 :        Beckwith, J.
                                   :        Sherman, M.J.
            v.                     :
                                   :
MALEASE FOODS CORP.,               :
                                   :
        Defendant.                 :

**EXPERT REPORT OF ROBERT D. HOWARD, ESQ.
ON BEHALF OF
MALEASE FOODS CORP.**

I have been retained by the Defendant in connection with the above-entitled action. I was retained to prepare a reply to the nominal "Expert Report" of Messrs. Butler and Price (the "Butler-Price Statement") that was previously submitted to the Court on behalf of Plaintiff.

The Butler-Price Statement completely misses the critical issue in this case, is replete with "red herrings," and can serve only to confuse or mislead the Court. The factual and legal issues in this case are not adequately discussed by the Butler-Price Statement. (See discussion below).

There were three (3) properties involved in the transactions at issue herein. The operative documents, and the issues surrounding them, are identical in all material respects for all of the properties. For purposes of this Statement, the properties and the operative documents will be referred to in the singular.

The principal issues and points of contention in this case are:

A.      The doctrine of "merger of title" (also known as merger of "estates"), upon which the Butler-Price Statement dwells extensively, did not happen and could not have happened in this case. More to the point is that the merger of title doctrine has no relevance or significance to the determination of the issues in this case. (See discussion in Paragraphs 9, 11, 12, and 21 below).

The principal issue in this case is whether Kroger (Plaintiff herein) forfeited the Option under Article XXXV of the Occupancy Lease by purchasing the interest of Balkhouse Associates outside of the Option.

B.    The Butler-Price Statement misconstrues, misstates and misunderstands the definition of "Leased Property"under the Occupancy Lease. (See discussion in Paragraphs 1, 11 and 19 below).

C.    The Butler-Price Statement misconstrues and misstates the relationship between the Occupancy Lease and the Two Party Agreement. (See discussion in Paragraphs 4, 5, 15 and 16, 19 and 23 below).

D.    All references in the Butler-Price Statement to "Rejectable Offers" are entirely irrelevant and are intended to obfuscate the real issues in this case . (See discussion in Paragraphs 4 and 24, below).

E.    The law requires that the terms of an option be strictly construed in determining whether the option is effectively exercised. The approach of the Butler-Price Statement in respect of Plaintiff's ostensible exercise of the Option is "fast and loose" and is not consistent with the law.

F.    The Butler-Price Statement is not an "expert report" but is the statement of fact witnesses who were involved in the creation and consummation of the transactions at issue. It should be viewed as self serving rather than as an objective analysis.

The following comments correspond to the numbered paragraphs in the Butler-Price Statement.

**Paragraph 1**. This paragraph in the Butler-Price Statement shows that Plaintiff, which was an investment banking client of Merrill Lynch (which employed Messrs. Butler and Price at the time the transaction was structured) was well aware, at the inception of the transaction described herein, of the entire structure of that transaction. Plaintiff was represented by able counsel, who would have advised it of the significant aspects of the transaction, including the definition of "Leased Property" and that the Option covered, and was required to cover, all of the interests in the Leased Property, not less than all of such interests.

**Paragraphs 2 and 3**. Plaintiff may not have created the "sandwich lease" structure but it strains credibility to suggest that Plaintiff was unaware of the structure. There were three such transactions being offered by Merrill Lynch at such time in 1983 (i.e., Balkhouse, Aztex and Pennington), and there were three (3) properties involved in the Balkhouse transaction, each with separate Occupancy Leases subject to separate notes and separate mortgages.   It is disingenuous to suggest that Plaintiff "in some cases" did not learn of the structure until a later date.  In transactions of this type, the occupancy tenant (i.e., Plaintiff) would typically be aware at the inception that such a structure would be utilized and would, as part of its due diligence, have blessed the necessary payment schedules to be certain the transaction worked.  Because of the investment banking relationship between Plaintiff and Merrill Lynch, it would have been incumbent upon Messrs. Butler and Price to make clear to Plaintiff the text or the expected content of the schedules.  Whether Plaintiff examined the text of the documents in advance is irrelevant once Plaintiff knew of the schedules and the assumptions upon which such schedules

were based, including all aspects of the transaction arising from the use of "Original Issue Discount", which were peculiar to the 1983 transactions, and were not repeated in the Kroger transactions of 1984.

**Paragraph 4**. It is disingenuous to suggest that Plaintiff was not intimately familiar with the existence and content of the Two Party Agreement at the time it executed the Occupancy Lease, for several obvious reasons:

(a)     Any lawyer representing Plaintiff, as a matter of proper due diligence, would have negotiated or approved the language, or the detailed concept, of paragraph "3" of the Two Party Agreement (which dealt with the exercise of the Option under the Occupancy Lease).

(b)     The Two Party agreement was created solely to implement the provisions of the Occupancy Lease which were affected by the division of what had been a single estate of the landlord in the Occupancy Lease at the time of its creation into two estates, namely the Master Lease (owned by Defendant) and the fee position (owned by Balkhouse Associates). As such, the Two Party Agreement preserves precisely, and is intended to preserve precisely, the rights of the Occupancy Tenant (Plaintiff) measured against the now separate rights and duties of Defendant and Balkhouse Associates.

It is both irrelevant and disingenuous to suggest that the rights of the parties must be determined by the priority of the execution of the Occupancy Lease over the Two Party Agreement in order to address inconsistencies. The proper construction of the Two Party Agreement is that it was created to be entirely consistent with the Occupancy Lease, and it should be so construed. [*]

The references in Paragraph "4" of the Butler-Price Statement to an "option which [under the Two Party Agreement] the Master Lessee may not reject" is likewise misleading and disingenuous. The Two Party Agreement meticulously tracks the Occupancy Lease. Under the Occupancy Lease, in the event of fire, condemnation or economic abandonment, the tenant (Plaintiff) is required to make an offer which the landlord (originally Balkhouse Properties Corp. and subsequently Defendant and Balkhouse Associates, in that order,) may accept or reject.

Under the Two Party Agreement, all rejectable offers (fire, condemnation, economic abandonment) could not be rejected unless security was provided for the discharge of the mortgage debt contemporaneously with the termination of the Occupancy Lease resulting from the rejection of the offer.

---

[*] By virtue of the Assignment made by Balkhouse Properties Corp. to Malease Foods Corp. (Defendant), Defendant succeeded to the position of lessor under the Occupancy Lease. A termination of the Master Lease will not result in a termination of the Occupancy Lease, as would be the case if the Occupancy Lease was a true sublease under the Master Lease.

The landlord at the time of the creation of the Occupancy Lease was a single entity owning the entire estate comprising the "Leased Property." Subsequently, the landlord's interest was bifurcated into the Master Lease (now owned by Defendant) and the fee interest (now owned by Balkhouse Associates). All that the Two Party Agreement does is to express and implement the mechanics to preserve as against the Occupancy Tenant the same duties and rights contained in the Occupancy Lease, and it should be so construed. The "Option" created under Article XXXV of the Occupancy Lease is separate and distinct from the provisions of the Occupancy Lease that address fire, condemnation and economic abandonment; the latter have no factual or legal relevance to the issues in this case.

**Paragraph 5**.    Paragraph 5 of the Butler-Price Statement is a further attempt to "muddy the waters." There were no conflicts between the Occupancy Lease and the Two Party Agreement, nor was the Two Party Agreement created to resolve any such conflicts, but only to preserve and implement, without variance, the provisions of the Occupancy Lease. Plaintiff undoubtedly knew that there would be a Two Party Agreement and in the ordinary course of its diligence would have satisfied itself that such agreement would preserve its valuable rights under the Occupancy Lease. Discovery will reveal the details of Plaintiff's foreknowledge.

The critical issue, which Plaintiff's nominal experts deliberately choose not to discuss, is whether Plaintiff was in compliance with the terms of the Occupancy Lease when it attempted to exercise the Option under Article XXXV of the Occupancy Lease. The Option under the Occupancy Lease was exercisable to close no earlier than April 2, 2003. Pursuant to the deed between Balkhouse Properties Corp. and Balkhouse Associates, the latter agreed to be primarily responsible for the mortgage debt. The mortgage debt on the properties would have been repaid in accordance with its terms by no later than April 1, 2003. That payoff of the debt was mandatory as a precondition to Plaintiff's purchase of the properties under the option. As of July 24, 2001, the unpaid balance of the mortgage debt was in excess of $20 million.

**Paragraph 6**. The discussion in Paragraph "6" concerning tax shelter considerations as posed by the Butler-Price Statement is irrelevant to the issues before this Court and is intended to obfuscate the principal issues of the case. It does, however, evidence the prior knowledge of Plaintiff in all material aspects of this transaction, including the Master Lease and the Two Party Agreement.

The issue whether the transaction lacked "economic substance" is unclear. The mortgage debt exceeded the value of the property, which was attributable to the inclusion in principal of the Original Issue Discount. The property was not freely transferable because of the existence of a mortgage debt in excess of value. In fact, it appears that the property was virtually unsalable for much of the mortgage term because amortization of the principal indebtedness did not commence until 1998. The "cross-over point" occurred at approximately the end of the 15th year of the mortgage term.

Further, reiterating my prior statement herein, the typical due diligence of Plaintiff's counsel in 1983 would have caused Plaintiff to know the substance, if not the very language, of the Master Lease at the time Plaintiff became obligated under the Occupancy Lease. The

Schedules attached to the Master Lease and the mortgage amortization schedules and the assumptions upon which all such schedules were based, including assumptions as to accrual and cash basis accounting for such schedules, had to have been reviewed by Plaintiff in detail as to concept.

**Paragraph 7**. This paragraph totally misconstrues the economics of the Master Lessee (Defendant). Contrary to the implications in this paragraph, Defendant undertook substantial economic risk in the Transaction. Because all three properties were covered by one Master Lease, Defendant had to protect its position against the non-performance or termination of any single Occupancy Lease (for example, due to economic abandonment), or forfeit its entire position in all three properties. This is in direct contrast to the obligations of Plaintiff, whose Occupancy Leases and all rights and options therein contained (including the right to terminate the Occupancy Lease because of economic abandonment), were entirely separate and distinct.

**Paragraph 9**. The reference in the Butler-Price Statement to the "No merger of title" provision in the Occupancy Lease is misleading and entirely irrelevant, for two basic reasons:.

(a)     Under basic principles of real estate law, in this case there has not been, and cannot have been, any merger of title. This is because the two property interests to which the Butler-Price Statement refers (the occupancy interest [owned by Plaintiff] and the fee interest [owned by Balkhouse Associates]) are, and at all times have been, separated by the existence of the Master Lease, an independent interest in the Property that was owned by a third party (Defendant).

Second, the essential issue in this case is not one of merger of title but whether Plaintiff's 2001 purchase of the interest of Balkhouse Associates in the Property <u>extinguished</u> its right to exercise the Option under Article XXXV of the Occupancy Lease and thereby acquire the Leased Property.

Article XXXI of the Occupancy Lease addresses only merger of estates and is not relevant to the issues at hand.

I note that Article XIX of the Occupancy Lease contains provisions relating to Plaintiff's purchase of "the Leased Property or any portion thereof from Lessor pursuant to any of the terms of this [Occupancy Lease]. . ." In my opinion, the only circumstance under the Occupancy Lease under which Plaintiff could purchase a portion, as opposed to all, of the Leased Property, is upon exercise of the Option after a prior partial condemnation of the property.

**Paragraph 11**.      Reference to the quoted provision of the July 2001 deeds is intended to obfuscate the real issue, which is <u>not</u> merger of title (referred to in the quoted language as merger of "interests"), but the loss of the right to exercise the Option upon Plaintiff's acquisition of the position of Balkhouse Associates. The definition of "Leased Property" required the Option to be exercised <u>once</u> - simultaneously against the entirety of the interests of both Defendant and Balkhouse Associates, and thus to acquire such interests simultaneously. The inclusion in the deed of the quoted language was an extreme act of caution since there could

be no merger of interests as long as the Master Lease intervened between the two separate interests of Occupancy Tenant (Plaintiff) and fee owner (Balkhouse Associates).

The July 2001 deeds did not transfer the "Leased Property," but only the interest of Balkhouse Associates in the "Leased Property."

**Paragraph 12.**     The quoted language in the Deed and Occupancy Leases both relate to merger of title, which has no relevance to the issues in this case.

**Paragraph 13**.     All parties agree that the Two Party Agreement does not modify the rights of Plaintiff under the Occupancy Lease. In my opinion, the Two Party Agreement is wholly compatible with the Occupancy Lease and the misplaced emphasis upon priority of recording is simply misdirection.

**Paragraph 14**.     All parties agree that Plaintiff's purchase in 2001 did not constitute an exercise of the Option, nor could it have constituted an exercise of the Option because:

(a)     the closing would have had to occur on April 2, 2003, and

(b)     the purchase price was not full "fair market value" as required by the Occupancy Lease.

I cannot comment on the assertion in the Butler-Price Statement that the purchase was an "arm's length negotiated business transaction," but it seems that the purchase price was significantly less than fair market value since Defendant was prepared to pay substantially more for the Leased Property than was offered by Plaintiff, and the existence in November 1999 of the Agreement Related to Sublease and the Agreement Regarding Additional Facility appear to support and justify Defendant's contention.

**Paragraphs 15 and 16.**   These two paragraphs illustrate that Plaintiff is trying to "have its cake and eat it too." On the one hand, Messrs. Butler and Price point to language in the Two Party Agreement to fix the price payable to Defendant. On the other hand, they assert that only the Occupancy Lease governs the right to purchase the Property and ignores Plaintiff's failure to comply with the requirements for exercise of the Option, to wit: (a) the requirement to purchase the entire "Leased Property" and (b) the requirement to pay fair market value. The Option was extinguished by Plaintiff's purchase of the interest of Balkhouse Associates in the Leased Property.

**Paragraph 17**.   By acting outside of the Option without notice to Defendant, Plaintiff assumed the risk of the consequences of its actions which included the possibility of its forfeiture of its right to acquire the interest of Defendant in the Leased Property.

**Paragraph 19**.   Once again, Plaintiff misconstrues Defendant's position. Defendant does not contend that the Two Party Agreement restricts Plaintiff's rights under the Occupancy Lease. Defendant's position is very simple - the only option of Plaintiff to purchase the property is

contained in the Occupancy Lease, and that Option was a single option to purchase the entire Leased Property. When Plaintiff did purchase the interest of Balkhouse Associates outside of the Option, in order to realize substantial savings upon the cost of such acquisition, it was within its rights in doing so, but by such action, it forfeited its Option rights.

The last sentence in this paragraph is also misleading and incorrect. The italicized language does not provide for purchases outside the terms of the Occupancy Lease. It only covers purchases under the Option made subsequent to a partial condemnation of the subject property which does not result in a termination of the Occupancy Lease.

**Paragraph 21.**    The "no merger" provisions in the Occupancy Lease and the 2001 Deed are limited to "merger of title" or "merger of estates" and do not address, and are not relevant to, Plaintiff's forfeiture of the Option contained in the Occupancy Lease by reason of its prior acquisition of less than all of the Leased Property.

**Paragraph 23.**    By purchasing in July 2001, Plaintiff forfeited its Option entirely. The Option must be strictly construed as to its exercise and could not be amended without the consent of Defendant. Plaintiff failed to pay fair market value for the interest of Balkhouse Associates and admits purchasing outside the Option. Plaintiff's approach to the issues in this case is to seek to "have its cake and eat it, too". Having purchased outside the Option, Plaintiff attempts to rely on the Two Party Agreement to force a purchase of Defendant's interest at less than fair market value, while contending that other provisions in the Two Party Agreement (including the "simultaneous" provisions) are inapplicable because of the superiority in lien of the Occupancy Lease.

**Paragraph 24.**    The Two Party Agreement was designed to implement the applicable provisions of the Occupancy Lease to preserve the rights of Plaintiff as tenant, and to allocate the duties of the respective parties who collectively succeeded to the position of landlord. To this end, the Two Party agreement addressed, in detail, matters pertinent to "rejectable offers" since all such matters were derived directly from the corresponding provisions of the Occupancy Lease. References in the Butler-Price Statement to "Rejectable Offers" are misleading and intended to confuse, and have no relevance to Articles XXXV and XXXVI of the Occupancy Lease.

* * * *

The Butler-Price Statement is submitted as an "Expert Report," but it clearly does not rise to that level. The authors had an active role in the original transaction as well as in Plaintiff's 2001 purchase. The Butler-Price Statement is purely a statement of facts, the authors' interpretations of the relevant documents, and their conclusions of law (neither of the authors is an attorney). In my view it is not an objective analysis, but an attempt to justify the actions of the authors in creating and consummating the various transactions described. The Butler-Price Statement raises doubts as to whether its primary purpose was to place before this Court an accurate history of the events that transpired and their precise and direct bearing upon the rights and duties of the parties in this action, or whether the primary purpose is to justify and protect the

role of the authors in bringing about these transactions in spite of their extensive knowledge of the rights of the parties, including Malease Foods Corp., under the respective documents to which reference has been made.

My compensation for this engagement is at an hourly rate of $350.00.

I have previously served as an expert witness in the United States Bankruptcy Court in the Eastern District of N.Y., in the case entitled In Re Malease 14 FK Corp., Case No. 02-80587-478.

Dated: December 15, 2003

_____
Robert D. Howard