1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF OHIO
3  WESTERN DIVISION
4  - - -
5  THE KROGER CO.,                      :
6        PLAINTIFF, :
7   -VS-                                : CASE NO.:  C-1-02-439
8  MALEASE FOODS CORP.,                 :
9        DEFENDANT. :
10  - - -
11     Deposition of JAMES E. HODGE, a witness
12 herein, taken by the defendant as upon
13 cross-examination pursuant to the Federal Rules of
14 Civil Procedure, and pursuant to agreement and
15 stipulations hereinafter set forth at the offices
16 of Frost, Brown & Todd, LLC, 2200 PNC Center, 201
17 East Fifth Street, Cincinnati, Ohio at 11:36 a.m.
18 on Wednesday, March 3, 2004, before Britney L.
19 Fisher, a notary public within and for the State of
20 Kentucky.
21  - - -
22
23
24

Page 58

1    A. Oh, sure. Prior to August 27th?
2    Q. Right.
3    A. Absolutely.
4    Q. Okay. You had many discussions?
5    A. Several, I'm sure.
6    Q. Okay. Do you remember any
7  specifically during the month of August, between
8  July 24th the date of the closing and Ed's letter
9  of August 27th?
10    A. Well, it's obvious from my e-mail
11 that a decision was made to pay the $100,000 the
12 very next day after closing, and I know that Ed and
13 I had a conversation about making that payment.
14    Q. I'm sorry, maybe we're confused. I'm
15 talking about now approaching Kadish.
16    A. Say it again then.
17    Q. Okay. What I'm trying to find out is
18 between July, the closing in July.
19    A. Correct.
20    Q. And August 27th when Ed sent the
21 letter, do you remember a discussion about the
22 strategy, if you will, of dealing with Malease and
23 Kadish?
24    A. No.

Page 59

1    Q. Now, this letter of August 27th, did
2  Jim Price ever suggest to you that Ed sent him a
3  letter like this?
4    A. Not to my knowledge.
5    Q. Did Jim Price participate in any way
6  in drafting this letter?
7    A. Don't know.
8    Q. At the time you asked Jim to assist
9  you with your September 17th letter -- I'm sorry,
10 September 13th, I'll give it to you in just a
11 second. This goes with it. I don't have these
12 things on, okay, we'll get it together.
13    A. Okay.
14    Q. Now, Exhibit P is your --
15    A. My letter.
16    Q. The attachment to Exhibit P is a
17 2-page document, the first of which is a Price
18 letter to Kadish, September 17th, 2001, where he
19 says I received the attached letter this morning
20 from my friend, Jim Hodge, at Kroger. Please read
21 it and advise. Then attached to that is your
22 September 13th, 2001 letter.
23       Okay. Now, do you know whether --
24 Withdrawn.

Page 60

1        At the time -- Withdrawn.
2        You tell me, your September 13th
3  letter, how did that come to be prepared?
4    A. Well, my recollection is we had
5  recently closed on the Merrill Lynch transaction,
6  and we wanted to effect the purchase of the Malease
7  position. We thought it best at the time that Jim
8  Price would continue to act as our representative
9  now between Kroger and Kadish. This letter I
10 believe I solicited his thoughts on a letter that
11 we then would send to Mr. Kadish that would start
12 the process of purchasing the Malease interest.
13    Q. And when you say "solicited his
14 thoughts," did the two of you meet together to
15 discuss this?
16    A. No.
17    Q. Was it was done on the phone?
18    A. Correct.
19    Q. You placed the call to Price?
20    A. Most likely.
21    Q. And in terms of timing how close in
22 time to September 13th; how close, your letter is
23 dated September 13th?
24    A. My guess judgement-wise some time

Page 61

1  within the prior two weeks we had a phone
2  conversation about the next step in this
3  transaction. I don't remember exactly the date.
4    Q. What do you remember saying to him
5  about this?
6    A. I'm going to characterize the
7  conversation.
8    Q. Yes, the gist I realize.
9    A. We're interested in buying the
10 Malease position. We've got this feature in our
11 document that, you know, we need to send to Malease
12 notice by April of 2002, is there a chance that we
13 might accelerate the closing of the Malease
14 transaction. And this was to set that process in
15 motion.
16    Q. Well, did Price suggest to you that
17 he write a letter, which you would then sign or did
18 you ask him?
19    A. I'm sure I asked him.
20    Q. Why did you ask him; why didn't you
21 just write a letter?
22    A. Because I wanted to be sure we were
23 as technically correct as we needed to be to effect
24 the purchase option. Jim had knowledge of the

Page 62

1  original transaction, Jim knew Mr. Kadish we
2  understood, and so I wanted the benefit of his
3  thoughts so that we didn't omit something, but I
4  know it was upon my request that he drafted it.
5    Q. During your -- During this
6  discussion, was there more than one discussion with
7  Price about this request that he draft?
8    A. I don't remember more than one, just
9  one.
10   Q. Did Price give you more than one
11 draft of a proposed letter?
12   A. I don't recall.
13   Q. Did Price suggest to you that the
14 letter be fashioned in such a way as to, I don't
15 want to sound perjorative, to withhold certain
16 information from Kadish; was that Price's idea or
17 was it yours?
18       MR. PHILLIPS: Objection.
19   A. To my knowledge, we didn't withhold
20 anything.
21   Q. Well, did Price say to you in words
22 or substance send me a letter that will make it
23 look like I just found out that Kroger had closed
24 on the Bulkhouse transaction?

Page 63

1    A. No.
2    Q. So did that come to you as a bolt out
3  of the blue when he sent you the draft?
4    A. I'm sorry, the draft that this letter
5  is based upon?
6    Q. The draft of what ultimately became
7  the September 13th --
8    A. Not at all. I had asked him for it.
9    Q. And your testimony is that you -- as
10 of September you did not know the nature and scope
11 and extent of the relationship of trust and
12 confidence, if any, that might have existed between
13 Kadish and Price?
14       MR. PHILLIPS: Objection. Asked and
15 answered numerous times. You can answer it yet
16 again.
17   A. You're correct, I did not.
18   Q. Now, as of September 2001, did you
19 and Price ever have any discussion where in words
20 or substance you were troubled that, by purchasing
21 the Bulkhouse position prior to the expiration of
22 the term of the lease, you might have some legal
23 difficulty buying Malease's interest?
24   A. No.

Page 64

1    Q. That never was a topic in your
2  consideration; is that correct?
3    A. Correct.
4    Q. And you certainly didn't ask Price to
5  use his influence with Kadish, because you or
6  Kroger were in any way concerned that you might
7  have, to use a vernacular, blown the option to
8  purchase the Malease piece, correct?
9    A. That is correct. I might add that we
10 did Mr. Kadish a huge favor earlier on. At the
11 time we were making the sublease with H.E. Butt,
12 Mr. Kadish needed a copy of many documents that
13 only we had in our file, and we allowed him to copy
14 the entire set of documentation supporting this
15 transaction. For some reason he and Merrill Lynch
16 had gotten crosswise over the years, and there was
17 not a flow of information between Merrill Lynch and
18 Kadish.
19   Q. So what I take away from what you
20 just said is that you felt that Kroger had behaved
21 honorably and nicely toward Kadish up until
22 September of 2001, right?
23   A. We believe we lived up to the
24 strictest interpretation of the contracts.

Page 65

1    Q. And you'd even gone overboard, you
2  did things for Kadish I think you just said that
3  you didn't have any legal duty to do?
4    A. Absolutely.
5    Q. You were accommodating him?
6    A. That's correct.
7    Q. If that's the case, why didn't you
8  just write him the letter yourself; why did you
9  have to go through this thing with Price?
10       MR. PHILLIPS: Objection. He just
11 testified to that, but do you have anything else to
12 add?
13   A. No. Price knew the structure of this
14 transaction because of his early involvement. He
15 had been involved and assisted us with the Merrill
16 Lynch transaction. Just with everything that we
17 deal with in our corporate office, it's something
18 that you use an agent to help you with or
19 representative to help you with, so we took
20 advantage of his knowledge of the transaction, the
21 history of the transaction to take it to the final
22 step.
23   Q. Well, when you say "you use an
24 agent," do you typically instruct agents to provide

Page 66

1  misinformation?
2      A. No.
3      MR. PHILLIPS: Objection.
4      Q. As far as --
5      A. That's a lead question.
6      Q. As far as you were concerned was this
7  letter of September 13th, 2001 written so as to
8  pull the wool over Kadish's eyes?
9      A. No.
10     Q. As of September 13th, 2001 Price
11 certainly knew that the closing had occurred back
12 in July, right?
13     MR. PHILLIPS: Objection,
14 argumentative. You can answer.
15     A. Yes.
16     Q. Right. He's been paid weeks before.
17        Now, we saw Ed Waldvogel's letter of
18 August 27th, as I said, that's two weeks before
19 your September 13th letter. I believe you told me
20 you didn't see it at the time it was sent, correct?
21     A. Correct.
22     Q. Prior to September 13th, did you see
23 Ed's letter?
24     A. Not to my knowledge.

Page 67

1      Q. Did he tell you about it?
2      A. Not to my knowledge. I don't recall.
3      Q. Then how do you come to make the
4  statement in your September 13th letter at the
5  bottom I was visiting with my associate, Ed
6  Waldvogel, et cetera, et cetera, and it would make
7  it simpler accounting-wise?
8      A. Okay. What's your point?
9      Q. My point is you just told me that
10 you'd never seen the August 27th Waldvogel letter?
11     A. What's it have to do with what you
12 asked me?
13     Q. I'll tell you in a second.
14        Were you visiting with your
15 associate, Waldvogel, some time prior to September
16 13th and having discussions with him?
17     A. I'm sure I was.
18     Q. But you want us to believe that even
19 though you're talking to Waldvogel about this he
20 doesn't say to you, oh, by the way, Jim, I've
21 already sent a letter to Jim Price asking for
22 Malease's help?
23     MR. PHILLIPS: Objection.
24     Q. Right?

Page 68

1      MR. PHILLIPS: Objection.
2      A. That's a transmittal letter. I had
3  no need to see that letter. Ed handled the
4  payment, he used his own verbiage to transmit the
5  check.
6      Q. So when he says but Malease is still
7  out there, I hope you are still planning to finish
8  this piece of the transaction by negotiating a
9  price to buy him out early, we can then buy from
10 you or by direct, whatever works best, in your
11 contemplation that's language of transmittal?
12     A. You're asking the wrong person.
13     Q. I don't know.
14     A. I've not seen that letter.
15     Q. Who should I ask?
16     A. I have no knowledge of that letter.
17 I'm sure that the check that you showed me earlier
18 got processed. I assume it came to my secretary's
19 attention. I assume she took it up to Ed's office
20 and he wrote that letter and enclosed the check.
21 After that or some time between then and this
22 letter we wanted to formalize the process of
23 purchasing the Malease piece, which precipitated
24 this letter.

Page 69

1      Q. So you're telling me about the check
2  and the transmission of the check. I would like to
3  focus you on the sentence that states, this is Ed's
4  letter of August 27, all right, but Malease is
5  still out there, I hope you are still planning to
6  finish this piece of the transaction by negotiating
7  a price to buy him out early, we can then buy from
8  you or buy direct, whatever works best.
9         I want to focus on that language.
10 And I know that you wrote your September 13th
11 letter or Price wrote it for you, but you signed
12 it, right?
13     A. I signed it. I need to read it one
14 more time here.
15     Q. Read the part that says I was
16 visiting with my associate?
17     A. I'm sure I wrote that without any
18 help. That's my style.
19     Q. Was it a true statement?
20     A. I'm sure Ed and I had a meeting and
21 discussed it, what -- where we go next.
22     Q. And it would be sent, and you say
23 here it would make it simpler accounting-wise for
24 us if we purchase Malease Foods Corp. now, right?

18 (Pages 66 to 69)

Page 74

1   A. Correct.
2   Q. Did you instruct Jennifer Jones to
3 send that to Price on September 14th?
4   A. By fax?
5   Q. By fax or mail.
6   A. Yes, most likely. And probably a
7 hard copy in the mail.
8   Q. Okay. Now, you see in the upper
9 right-hand corner Jennifer had printed 9/13, that
10 is Jennifer's printing?
11   A. It is.
12   Q. 9/13/01, that's September 13th?
13   A. Correct.
14   Q. BCC, blind carbon copy?
15   A. Exactly.
16   Q. E Waldvogel, right?
17   A. Correct.
18   Q. That's the gentleman seated down at
19 the end of the table, correct?
20       THE WITNESS: Is that your name?
21       MR. WALDVOGEL: (Nodding head.)
22       MR. CINQUE: Unless there's more
23 than one.
24 BY MR. CINQUE:

Page 75

1   Q. So now we know on September 13th,
2 whether you can remember or not remember the August
3 27th Waldvogel letter, we know that on September
4 13th you let Waldvogel know or through your
5 secretary let him know that you were sending this
6 September 14th letter?
7   A. September 13th.
8   Q. September 13th, right?
9   A. Correct.
10   Q. Now, did Waldvogel come to you on or
11 about September 13th or right after that and
12 discuss this with you?
13   A. I'm sure we discussed it prior to it
14 going out, but I don't have any recollection of it
15 happening after it went out.
16   Q. So now you're saying Waldvogel knew
17 that this September 13th letter was going out,
18 right?
19   A. I can't be absolutely sure, but I
20 would -- Ed and I confer on all of these matters
21 pretty closely.
22   Q. But your testimony, and correct me if
23 I'm wrong, is you had no recollection of discussing
24 Ed's letter with him before you sent your September

Page 76

1 13th letter, right?
2   A. Correct.
3       MR. PHILLIPS: Bob, that's got to be
4 at least 15 times you asked that question. How
5 many more times are you going to ask it, I'm
6 curious?
7       MR. CINQUE: I apologize.
8 BY MR. CINQUE:
9   Q. Okay. And, of course, the facsimile
10 cover sheet, the third page, KSUPP 00180, that's
11 the facsimile cover sheet from Jim Price to Jim
12 Hodge, yourself, right, that's dated September
13 13th, and I represent to you that the second
14 page --
15   A. The third page?
16   Q. The second page, the one that should
17 have followed 180, right, because it says pages
18 including this cover page. And then he says in the
19 memo to you per our conversation attached is a
20 suggested letter that you and Ed can edit that I
21 propose you write to me concerning the purchase of
22 Malease.
23       I represent to you that the
24 attachment has never been produced to me, that this

Page 77

1 is all I have, all right. We'll get to the bottom
2 of that at some point. And the reason I'm making
3 that representation is to give the Kroger attorneys
4 every opportunity to show that I'm wrong and that I
5 got it.
6       Now, so here we have Price, do you
7 know when this document, this KSUPP 180, first
8 surfaced as part of the document production in this
9 lawsuit?
10   A. I don't.
11   Q. Okay. So here's Jim Price telling
12 you per our conversation attached is a suggested
13 letter that you and Ed can edit, right?
14       MR. PHILLIPS: Second time you've
15 read that.
16   Q. Right. Did you -- Forgive me, I want
17 to get the question clear so when the witness
18 answers it, we can see. It states per our
19 conversation attached is a suggested letter that
20 you and Ed can edit. During your conversation with
21 Jim Price, did you talk to him about collaborating
22 with Ed in the editing of a letter that you would
23 now send to Jim Price who in turn would send to
24 Kadish?

20 (Pages 74 to 77)

Page 82

1  representing Kroger in this case?
2      A.  I didn't know that.
3      Q.  Okay. Did you instruct the lawyers
4  to withhold any of the Price & Marshall documents?
5      A.  Absolutely not.
6      Q.  Did you authorize these lawyers to
7  actually physically stamp and produce the Price &
8  Marshall documents?
9      A.  Did not.
10     Q.  Do you know that I served a subpoena
11 on Price & Marshall?
12     A.  Did not.
13     Q.  Now, subsequent to September 13th,
14 did you ever again participate in the drafting of
15 any letter concerning purchase of the Malease
16 interest, which contained any false or misleading
17 information in it?
18     A.  No.
19     Q.  You're sure?
20     A.  Yes.
21     Q.  Sir, isn't it a fact that on February
22 18th, 2002 you wrote another misleading letter to
23 Price?
24         MR. PHILLIPS: Objection,

Page 83

1  argumentative.
2      A.  I don't write misleading letters.
3      Q.  You know the thing about I wanted to
4  advise you that on July 24, 2001 Kroger Co.
5  purchased, you know that's in your September 13th
6  letter; do you see that?
7      A.  I do.
8      Q.  You've repeated it in the later
9  letter, didn't you?
10     A.  I don't remember.
11     Q.  Why did you write it again?
12         MR. PHILLIPS: Objection. He just
13 testified he doesn't remember. You have the
14 letter, why don't you show it to him.
15         MR. CINQUE: I sure do.
16         MR. PHILLIPS: Great. Let's see
17 it.
18 BY MR. CINQUE:
19     Q.  You see at the bottom of that one it
20 says --
21         MR. PHILLIPS: Which one?
22     Q.  I'm talking now about the September
23 13th letter. It says that April 2003 is only 18
24 months away. That seems about right, so you would

Page 84

1  agree with me in February of 2002, April of 2003
2  wouldn't be only 18 months away, right?
3      A.  That is correct.
4      Q.  Are you aware that Price & Marshall
5  and not Kroger and your lawyers produced a letter
6  dated February 18th, 2002 on Kroger letterhead?
7      A.  I am not.
8  (Deposition Exhibit W was marked for
9  identification.)
10 BY MR. CINQUE:
11     Q.  Let me show you this. We've marked
12 that as W. Please explain, if you can, the genesis
13 of Exhibit W.
14     A.  It's a repeat of the September 13th
15 letter.
16     Q.  What's the date of Exhibit W?
17     A.  February 18th, '02.
18     Q.  Did you cause that to be prepared on
19 February 18th, 2002?
20     A.  Don't recall.
21     Q.  Look at the fax heading up at the
22 top?
23     A.  Doesn't show on this one.
24     Q.  Sorry. I apologize, it's cut off.

Page 85

1  Take a look at my copy I'll give you. I think the
2  Xerox cut it off. I'll tell you what it says for
3  the record. The fax header, which my photocopy is
4  cut off somewhat, is March 20th, 2002, 10:52 a.m.
5  FR Kroger to (919) 788-7093, and this shows that
6  it's page 4 in the right-hand corner.
7         And it bears PM, which is Price &
8  Marshall bates stamp number 01538. And the way I
9  obtained this is it was produced to me by the
10 Frost, Brown firm, even though I subpoenaed it from
11 Price & Marshall. Do you recognize the fax header?
12     A.  It looks like it came from Kroger on
13 March the 20th of '02.
14     Q.  Can you enlighten me in any way as to
15 where the remaining pages of this fax transmission
16 might be?
17     A.  I cannot.
18     Q.  Did you authorize anyone to send this
19 to Price on March 20th, 2002?
20         MR. PHILLIPS: Objection.
21     A.  I don't remember.
22     Q.  Can you tell me anything more about
23 this letter, sir, than you already have?
24     A.  Only speculate.

22 (Pages 82 to 85)

Page 86

1  Q. Please speculate?
2  MR. PHILLIPS: I'll object.
3  MR. CINQUE: Your objection is
4  noted.
5  BY MR. CINQUE:
6  A. Someone asked us for another copy of
7  the letter.
8  Q. So you went and changed the date?
9  A. No. The system automatically updates
10  the date. Have you ever used software where you
11  plug in a date and it automatically puts the
12  current date on when you make another copy?
13  Q. Great. Then it should have been
14  March 20th, should it, the date that you sent it?
15  February 18th, does that date stick out in your
16  mind at all?
17  A. Four days after Valentine's Day.
18  Q. Isn't it also the date that Kroger
19  sent a certified letter to Malease Bulkhouse ML
20  Properties? Let's look at it.
21  (Deposition Exhibit X was marked for
22  identification.)
23  BY MR. CINQUE:
24  Q. You recognize the February 18th, 2002

Page 87

1  letter, Exhibit X, correct?
2  A. Yes.
3  Q. That's the old letter where you're
4  notifying Malease and others with the reference to
5  Article 35, right?
6  A. Yes.
7  Q. This is where Kroger is saying in
8  substance pursuant to Article 35 of each of the
9  occupancy leases dated April 1st, 1983 and certain
10  provisions of the two-party agreements, right,
11  Kroger exercises its purchase option, right?
12  A. Correct.
13  Q. Is there any relationship of any kind
14  that you wish to share with us about Exhibit W, the
15  February 18th, 2002 letter to Jim Price and Exhibit
16  X, the February 18th, 2002 option exercise?
17  A. No.
18  Q. No connection whatsoever?
19  A. I cannot recall any connection.
20  MR. PHILLIPS: Bob, do you mind if I
21  see the fax?
22  MR. CINQUE: You can take it and
23  copy it. You'll see it cut off. I'll give you
24  that. My machine does that from time to time.

Page 88

1  MR. PHILLIPS: Thank you. Off the
2  record.
3  (Brief recess.)
4  MR. CINQUE: I'm genuinely finished
5  with Mr. Hodge.
6  THE WITNESS: Very good.
7  MR. PHILLIPS: I want to give you
8  another opportunity to ask questions to Ed about
9  document production. I think in the midst of all
10  that --
11  MR. CINQUE: After you woodshedded
12  him, as we say.
13  MR. PHILLIPS: No. Have we
14  discussed anything about this?
15  MR. WALDVOGEL: (Nodding head.)
16  MR. CINQUE: He doesn't look like
17  it. You want to have him say something?
18  MR. PHILLIPS: You can ask him
19  anything you want to.
20  MR. CINQUE: I don't really have any
21  questions.
22  MR. PHILLIPS: Okay, good. We'll
23  reserve on him, too.
24

Page 89

JAMES E. HODGE
- - -
DEPOSITION CONCLUDED AT 1:25 P.M.
- - -

```
 1                UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF OHIO
 3                     WESTERN DIVISION
 4                         - - -
 5   THE KROGER CO.,              :
 6              PLAINTIFF,:
 7        -VS-                    : CASE NO.:  C-1-02-439
 8   MALEASE FOODS CORP.,         :
 9              DEFENDANT.:
10                         - - -
11        Deposition of JAMES E. HODGE, a witness
12   herein, taken by the defendant as upon
13   cross-examination pursuant to the Federal Rules of
14   Civil Procedure, and pursuant to agreement and
15   stipulations hereinafter set forth at the offices
16   of Frost, Brown & Todd, LLC, 2200 PNC Center, 201
17   East Fifth Street, Cincinnati, Ohio at 11:36 a.m.
18   on Wednesday, March 3, 2004, before Britney L.
19   Fisher, a notary public within and for the State of
20   Kentucky.
21                         - - -
22
23
24
```

Page 58

1    A.   Oh, sure. Prior to August 27th?
2    Q.   Right.
3    A.   Absolutely.
4    Q.   Okay. You had many discussions?
5    A.   Several, I'm sure.
6    Q.   Okay. Do you remember any
7  specifically during the month of August, between
8  July 24th the date of the closing and Ed's letter
9  of August 27th?
10   A.   Well, it's obvious from my e-mail
11 that a decision was made to pay the $100,000 the
12 very next day after closing, and I know that Ed and
13 I had a conversation about making that payment.
14   Q.   I'm sorry, maybe we're confused. I'm
15 talking about now approaching Kadish.
16   A.   Say it again then.
17   Q.   Okay. What I'm trying to find out is
18 between July, the closing in July.
19   A.   Correct.
20   Q.   And August 27th when Ed sent the
21 letter, do you remember a discussion about the
22 strategy, if you will, of dealing with Malease and
23 Kadish?
24   A.   No.

Page 59

1    Q.   Now, this letter of August 27th, did
2  Jim Price ever suggest to you that Ed sent him a
3  letter like this?
4    A.   Not to my knowledge.
5    Q.   Did Jim Price participate in any way
6  in drafting this letter?
7    A.   Don't know.
8    Q.   At the time you asked Jim to assist
9  you with your September 17th letter -- I'm sorry,
10 September 13th, I'll give it to you in just a
11 second. This goes with it. I don't have these
12 things on, okay, we'll get it together.
13   A.   Okay.
14   Q.   Now, Exhibit P is your --
15   A.   My letter.
16   Q.   The attachment to Exhibit P is a
17 2-page document, the first of which is a Price
18 letter to Kadish, September 17th, 2001, where he
19 says I received the attached letter this morning
20 from my friend, Jim Hodge, at Kroger. Please read
21 it and advise. Then attached to that is your
22 September 13th, 2001 letter.
23       Okay. Now, do you know whether --
24 Withdrawn.

Page 60

1       At the time -- Withdrawn.
2       You tell me, your September 13th
3  letter, how did that come to be prepared?
4    A.   Well, my recollection is we had
5  recently closed on the Merrill Lynch transaction,
6  and we wanted to effect the purchase of the Malease
7  position. We thought it best at the time that Jim
8  Price would continue to act as our representative
9  now between Kroger and Kadish. This letter I
10 believe I solicited his thoughts on a letter that
11 we then would send to Mr. Kadish that would start
12 the process of purchasing the Malease interest.
13   Q.   And when you say "solicited his
14 thoughts," did the two of you meet together to
15 discuss this?
16   A.   No.
17   Q.   Was it was done on the phone?
18   A.   Correct.
19   Q.   You placed the call to Price?
20   A.   Most likely.
21   Q.   And in terms of timing how close in
22 time to September 13th; how close, your letter is
23 dated September 13th?
24   A.   My guess judgement-wise some time

Page 61

1  within the prior two weeks we had a phone
2  conversation about the next step in this
3  transaction. I don't remember exactly the date.
4    Q.   What do you remember saying to him
5  about this?
6    A.   I'm going to characterize the
7  conversation.
8    Q.   Yes, the gist I realize.
9    A.   We're interested in buying the
10 Malease position. We've got this feature in our
11 document that, you know, we need to send to Malease
12 notice by April of 2002, is there a chance that we
13 might accelerate the closing of the Malease
14 transaction. And this was to set that process in
15 motion.
16   Q.   Well, did Price suggest to you that
17 he write a letter, which you would then sign or did
18 you ask him?
19   A.   I'm sure I asked him.
20   Q.   Why did you ask him; why didn't you
21 just write a letter?
22   A.   Because I wanted to be sure we were
23 as technically correct as we needed to be to effect
24 the purchase option. Jim had knowledge of the

Page 62

1  original transaction, Jim knew Mr. Kadish we
2  understood, and so I wanted the benefit of his
3  thoughts so that we didn't omit something, but I
4  know it was upon my request that he drafted it.
5      Q. During your -- During this
6  discussion, was there more than one discussion with
7  Price about this request that he draft?
8      A. I don't remember more than one, just
9  one.
10     Q. Did Price give you more than one
11 draft of a proposed letter?
12     A. I don't recall.
13     Q. Did Price suggest to you that the
14 letter be fashioned in such a way as to, I don't
15 want to sound perjorative, to withhold certain
16 information from Kadish; was that Price's idea or
17 was it yours?
18         MR. PHILLIPS: Objection.
19     A. To my knowledge, we didn't withhold
20 anything.
21     Q. Well, did Price say to you in words
22 or substance send me a letter that will make it
23 look like I just found out that Kroger had closed
24 on the Bulkhouse transaction?

Page 63

1      A. No.
2      Q. So did that come to you as a bolt out
3  of the blue when he sent you the draft?
4      A. I'm sorry, the draft that this letter
5  is based upon?
6      Q. The draft of what ultimately became
7  the September 13th --
8      A. Not at all. I had asked him for it.
9      Q. And your testimony is that you -- as
10 of September you did not know the nature and scope
11 and extent of the relationship of trust and
12 confidence, if any, that might have existed between
13 Kadish and Price?
14         MR. PHILLIPS: Objection. Asked and
15 answered numerous times. You can answer it yet
16 again.
17     A. You're correct, I did not.
18     Q. Now, as of September 2001, did you
19 and Price ever have any discussion where in words
20 or substance you were troubled that, by purchasing
21 the Bulkhouse position prior to the expiration of
22 the term of the lease, you might have some legal
23 difficulty buying Malease's interest?
24     A. No.

Page 64

1      Q. That never was a topic in your
2  consideration; is that correct?
3      A. Correct.
4      Q. And you certainly didn't ask Price to
5  use his influence with Kadish, because you or
6  Kroger were in any way concerned that you might
7  have, to use a vernacular, blown the option to
8  purchase the Malease piece, correct?
9      A. That is correct. I might add that we
10 did Mr. Kadish a huge favor earlier on. At the
11 time we were making the sublease with H.E. Butt,
12 Mr. Kadish needed a copy of many documents that
13 only we had in our file, and we allowed him to copy
14 the entire set of documentation supporting this
15 transaction. For some reason he and Merrill Lynch
16 had gotten crosswise over the years, and there was
17 not a flow of information between Merrill Lynch and
18 Kadish.
19     Q. So what I take away from what you
20 just said is that you felt that Kroger had behaved
21 honorably and nicely toward Kadish up until
22 September of 2001, right?
23     A. We believe we lived up to the
24 strictest interpretation of the contracts.

Page 65

1      Q. And you'd even gone overboard, you
2  did things for Kadish I think you just said that
3  you didn't have any legal duty to do?
4      A. Absolutely.
5      Q. You were accommodating him?
6      A. That's correct.
7      Q. If that's the case, why didn't you
8  just write him the letter yourself; why did you
9  have to go through this thing with Price?
10         MR. PHILLIPS: Objection. He just
11 testified to that, but do you have anything else to
12 add?
13     A. No. Price knew the structure of this
14 transaction because of his early involvement. He
15 had been involved and assisted us with the Merrill
16 Lynch transaction. Just with everything that we
17 deal with in our corporate office, it's something
18 that you use an agent to help you with or
19 representative to help you with, so we took
20 advantage of his knowledge of the transaction, the
21 history of the transaction to take it to the final
22 step.
23     Q. Well, when you say "you use an
24 agent," do you typically instruct agents to provide

Page 66

1  misinformation?
2      A.  No.
3          MR. PHILLIPS:  Objection.
4      Q.  As far as --
5      A.  That's a lead question.
6      Q.  As far as you were concerned was this
7  letter of September 13th, 2001 written so as to
8  pull the wool over Kadish's eyes?
9      A.  No.
10     Q.  As of September 13th, 2001 Price
11 certainly knew that the closing had occurred back
12 in July, right?
13         MR. PHILLIPS:  Objection,
14 argumentative.  You can answer.
15     A.  Yes.
16     Q.  Right.  He's been paid weeks before.
17         Now, we saw Ed Waldvogel's letter of
18 August 27th, as I said, that's two weeks before
19 your September 13th letter.  I believe you told me
20 you didn't see it at the time it was sent, correct?
21     A.  Correct.
22     Q.  Prior to September 13th, did you see
23 Ed's letter?
24     A.  Not to my knowledge.

Page 67

1      Q.  Did he tell you about it?
2      A.  Not to my knowledge.  I don't recall.
3      Q.  Then how do you come to make the
4  statement in your September 13th letter at the
5  bottom I was visiting with my associate, Ed
6  Waldvogel, et cetera, et cetera, and it would make
7  it simpler accounting-wise?
8      A.  Okay.  What's your point?
9      Q.  My point is you just told me that
10 you'd never seen the August 27th Waldvogel letter?
11     A.  What's it have to do with what you
12 asked me?
13     Q.  I'll tell you in a second.
14         Were you visiting with your
15 associate, Waldvogel, some time prior to September
16 13th and having discussions with him?
17     A.  I'm sure I was.
18     Q.  But you want us to believe that even
19 though you're talking to Waldvogel about this he
20 doesn't say to you, oh, by the way, Jim, I've
21 already sent a letter to Jim Price asking for
22 Malease's help?
23         MR. PHILLIPS:  Objection.
24     Q.  Right?

Page 68

1          MR. PHILLIPS:  Objection.
2      A.  That's a transmittal letter.  I had
3  no need to see that letter.  Ed handled the
4  payment, he used his own verbiage to transmit the
5  check.
6      Q.  So when he says but Malease is still
7  out there, I hope you are still planning to finish
8  this piece of the transaction by negotiating a
9  price to buy him out early, we can then buy from
10 you or by direct, whatever works best, in your
11 contemplation that's language of transmittal?
12     A.  You're asking the wrong person.
13     Q.  I don't know.
14     A.  I've not seen that letter.
15     Q.  Who should I ask?
16     A.  I have no knowledge of that letter.
17 I'm sure that the check that you showed me earlier
18 got processed.  I assume it came to my secretary's
19 attention.  I assume she took it up to Ed's office
20 and he wrote that letter and enclosed the check.
21 After that or some time between then and this
22 letter we wanted to formalize the process of
23 purchasing the Malease piece, which precipitated
24 this letter.

Page 69

1      Q.  So you're telling me about the check
2  and the transmission of the check.  I would like to
3  focus you on the sentence that states, this is Ed's
4  letter of August 27, all right, but Malease is
5  still out there, I hope you are still planning to
6  finish this piece of the transaction by negotiating
7  a price to buy him out early, we can then buy from
8  you or buy direct, whatever works best.
9          I want to focus on that language.
10 And I know that you wrote your September 13th
11 letter or Price wrote it for you, but you signed
12 it, right?
13     A.  I signed it.  I need to read it one
14 more time here.
15     Q.  Read the part that says I was
16 visiting with my associate?
17     A.  I'm sure I wrote that without any
18 help.  That's my style.
19     Q.  Was it a true statement?
20     A.  I'm sure Ed and I had a meeting and
21 discussed it, what -- where we go next.
22     Q.  And it would be sent, and you say
23 here it would make it simpler accounting-wise for
24 us if we purchase Malease Foods Corp. now, right?

Page 74

1  A. Correct.
2  Q. Did you instruct Jennifer Jones to
3  send that to Price on September 14th?
4  A. By fax?
5  Q. By fax or mail.
6  A. Yes, most likely. And probably a
7  hard copy in the mail.
8  Q. Okay. Now, you see in the upper
9  right-hand corner Jennifer had printed 9/13, that
10 is Jennifer's printing?
11 A. It is.
12 Q. 9/13/01, that's September 13th?
13 A. Correct.
14 Q. BCC, blind carbon copy?
15 A. Exactly.
16 Q. E Waldvogel, right?
17 A. Correct.
18 Q. That's the gentleman seated down at
19 the end of the table, correct?
20      THE WITNESS: Is that your name?
21      MR. WALDVOGEL: (Nodding head.)
22      MR. CINQUE: Unless there's more
23 than one.
24 BY MR. CINQUE:

Page 75

1  Q. So now we know on September 13th,
2  whether you can remember or not remember the August
3  27th Waldvogel letter, we know that on September
4  13th you let Waldvogel know or through your
5  secretary let him know that you were sending this
6  September 14th letter?
7  A. September 13th.
8  Q. September 13th, right?
9  A. Correct.
10 Q. Now, did Waldvogel come to you on or
11 about September 13th or right after that and
12 discuss this with you?
13 A. I'm sure we discussed it prior to it
14 going out, but I don't have any recollection of it
15 happening after it went out.
16 Q. So now you're saying Waldvogel knew
17 that this September 13th letter was going out,
18 right?
19 A. I can't be absolutely sure, but I
20 would -- Ed and I confer on all of these matters
21 pretty closely.
22 Q. But your testimony, and correct me if
23 I'm wrong, is you had no recollection of discussing
24 Ed's letter with him before you sent your September

Page 76

1  13th letter, right?
2  A. Correct.
3      MR. PHILLIPS: Bob, that's got to be
4  at least 15 times you asked that question. How
5  many more times are you going to ask it, I'm
6  curious?
7      MR. CINQUE: I apologize.
8  BY MR. CINQUE:
9  Q. Okay. And, of course, the facsimile
10 cover sheet, the third page, KSUPP 00180, that's
11 the facsimile cover sheet from Jim Price to Jim
12 Hodge, yourself, right, that's dated September
13 13th, and I represent to you that the second
14 page --
15 A. The third page?
16 Q. The second page, the one that should
17 have followed 180, right, because it says pages
18 including this cover page. And then he says in the
19 memo to you per our conversation attached is a
20 suggested letter that you and Ed can edit that I
21 propose you write to me concerning the purchase of
22 Malease.
23     I represent to you that the
24 attachment has never been produced to me, that this

Page 77

1  is all I have, all right. We'll get to the bottom
2  of that at some point. And the reason I'm making
3  that representation is to give the Kroger attorneys
4  every opportunity to show that I'm wrong and that I
5  got it.
6      Now, so here we have Price, do you
7  know when this document, this KSUPP 180, first
8  surfaced as part of the document production in this
9  lawsuit?
10 A. I don't.
11 Q. Okay. So here's Jim Price telling
12 you per our conversation attached is a suggested
13 letter that you and Ed can edit, right?
14     MR. PHILLIPS: Second time you've
15 read that.
16 Q. Right. Did you -- Forgive me, I want
17 to get the question clear so when the witness
18 answers it, we can see. It states per our
19 conversation attached is a suggested letter that
20 you and Ed can edit. During your conversation with
21 Jim Price, did you talk to him about collaborating
22 with Ed in the editing of a letter that you would
23 now send to Jim Price who in turn would send to
24 Kadish?

Page 82

1  representing Kroger in this case?
2        A.  I didn't know that.
3        Q.  Okay.  Did you instruct the lawyers
4  to withhold any of the Price & Marshall documents?
5        A.  Absolutely not.
6        Q.  Did you authorize these lawyers to
7  actually physically stamp and produce the Price &
8  Marshall documents?
9        A.  Did not.
10       Q.  Do you know that I served a subpoena
11 on Price & Marshall?
12       A.  Did not.
13       Q.  Now, subsequent to September 13th,
14 did you ever again participate in the drafting of
15 any letter concerning purchase of the Malease
16 interest, which contained any false or misleading
17 information in it?
18       A.  No.
19       Q.  You're sure?
20       A.  Yes.
21       Q.  Sir, isn't it a fact that on February
22 18th, 2002 you wrote another misleading letter to
23 Price?
24            MR. PHILLIPS:  Objection,

Page 83

1  argumentative.
2        A.  I don't write misleading letters.
3        Q.  You know the thing about I wanted to
4  advise you that on July 24, 2001 Kroger Co.
5  purchased, you know that's in your September 13th
6  letter; do you see that?
7        A.  I do.
8        Q.  You've repeated it in the later
9  letter, didn't you?
10       A.  I don't remember.
11       Q.  Why did you write it again?
12            MR. PHILLIPS:  Objection.  He just
13 testified he doesn't remember.  You have the
14 letter, why don't you show it to him.
15            MR. CINQUE:  I sure do.
16            MR. PHILLIPS:  Great.  Let's see
17 it.
18 BY MR. CINQUE:
19       Q.  You see at the bottom of that one it
20 says --
21            MR. PHILLIPS:  Which one?
22       Q.  I'm talking now about the September
23 13th letter.  It says that April 2003 is only 18
24 months away.  That seems about right, so you would

Page 84

1  agree with me in February of 2002, April of 2003
2  wouldn't be only 18 months away, right?
3        A.  That is correct.
4        Q.  Are you aware that Price & Marshall
5  and not Kroger and your lawyers produced a letter
6  dated February 18th, 2002 on Kroger letterhead?
7        A.  I am not.
8  (Deposition Exhibit W was marked for
9  identification.)
10 BY MR. CINQUE:
11       Q.  Let me show you this.  We've marked
12 that as W.  Please explain, if you can, the genesis
13 of Exhibit W.
14       A.  It's a repeat of the September 13th
15 letter.
16       Q.  What's the date of Exhibit W?
17       A.  February 18th, '02.
18       Q.  Did you cause that to be prepared on
19 February 18th, 2002?
20       A.  Don't recall.
21       Q.  Look at the fax heading up at the
22 top?
23       A.  Doesn't show on this one.
24       Q.  Sorry.  I apologize, it's cut off.

Page 85

1  Take a look at my copy I'll give you.  I think the
2  Xerox cut it off.  I'll tell you what it says for
3  the record.  The fax header, which my photocopy is
4  cut off somewhat, is March 20th, 2002, 10:52 a.m.
5  FR Kroger to (919) 788-7093, and this shows that
6  it's page 4 in the right-hand corner.
7            And it bears PM, which is Price &
8  Marshall bates stamp number 01538.  And the way I
9  obtained this is it was produced to me by the
10 Frost, Brown firm, even though I subpoenaed it from
11 Price & Marshall.  Do you recognize the fax header?
12       A.  It looks like it came from Kroger on
13 March the 20th of '02.
14       Q.  Can you enlighten me in any way as to
15 where the remaining pages of this fax transmission
16 might be?
17       A.  I cannot.
18       Q.  Did you authorize anyone to send this
19 to Price on March 20th, 2002?
20            MR. PHILLIPS:  Objection.
21       A.  I don't remember.
22       Q.  Can you tell me anything more about
23 this letter, sir, than you already have?
24       A.  Only speculate.

22 (Pages 82 to 85)

Page 86

1  Q. Please speculate?
2      MR. PHILLIPS: I'll object.
3      MR. CINQUE: Your objection is
4  noted.
5  BY MR. CINQUE:
6      A. Someone asked us for another copy of
7  the letter.
8      Q. So you went and changed the date?
9      A. No. The system automatically updates
10 the date. Have you ever used software where you
11 plug in a date and it automatically puts the
12 current date on when you make another copy?
13     Q. Great. Then it should have been
14 March 20th, should it, the date that you sent it?
15 February 18th, does that date stick out in your
16 mind at all?
17     A. Four days after Valentine's Day.
18     Q. Isn't it also the date that Kroger
19 sent a certified letter to Malease Bulkhouse ML
20 Properties? Let's look at it.
21 (Deposition Exhibit X was marked for
22 identification.)
23 BY MR. CINQUE:
24     Q. You recognize the February 18th, 2002

Page 87

1  letter, Exhibit X, correct?
2      A. Yes.
3      Q. That's the old letter where you're
4  notifying Malease and others with the reference to
5  Article 35, right?
6      A. Yes.
7      Q. This is where Kroger is saying in
8  substance pursuant to Article 35 of each of the
9  occupancy leases dated April 1st, 1983 and certain
10 provisions of the two-party agreements, right,
11 Kroger exercises its purchase option, right?
12     A. Correct.
13     Q. Is there any relationship of any kind
14 that you wish to share with us about Exhibit W, the
15 February 18th, 2002 letter to Jim Price and Exhibit
16 X, the February 18th, 2002 option exercise?
17     A. No.
18     Q. No connection whatsoever?
19     A. I cannot recall any connection.
20     MR. PHILLIPS: Bob, do you mind if I
21 see the fax?
22     MR. CINQUE: You can take it and
23 copy it. You'll see it cut off. I'll give you
24 that. My machine does that from time to time.

Page 88

1      MR. PHILLIPS: Thank you. Off the
2  record.
3         (Brief recess.)
4      MR. CINQUE: I'm genuinely finished
5  with Mr. Hodge.
6      THE WITNESS: Very good.
7      MR. PHILLIPS: I want to give you
8  another opportunity to ask questions to Ed about
9  document production. I think in the midst of all
10 that --
11     MR. CINQUE: After you woodsheded
12 him, as we say.
13     MR. PHILLIPS: No. Have we
14 discussed anything about this?
15     MR. WALDVOGEL: (Nodding head.)
16     MR. CINQUE: He doesn't look like
17 it. You want to have him say something?
18     MR. PHILLIPS: You can ask him
19 anything you want to.
20     MR. CINQUE: I don't really have any
21 questions.
22     MR. PHILLIPS: Okay, good. We'll
23 reserve on him, too.
24

Page 89

JAMES E. HODGE
- - -
DEPOSITION CONCLUDED AT 1:25 P.M.
- - -

23 (Pages 86 to 89)