Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4                       -  -  -
 5   THE KROGER CO.,              :
 6              PLAINTIFF,:
 7   -VS-                         : CASE NO.:  C-1-02-439
 8   MALEASE FOODS CORP.,         :
 9              DEFENDANT.:
10                       -  -  -
```

           Deposition of JONATHAN D. LIBBERT, CPA,
CFE, a witness herein, taken by the defendant as
upon cross-examination pursuant to the Federal
Rules of Civil Procedure, and pursuant to agreement
and stipulations hereinafter set forth at the
offices of Frost, Brown & Todd, LLC, 2200 PNC
Center, 201 East Fifth Street, Cincinnati, Ohio at
1:48 p.m. on Wednesday, March 3, 2004, before
Britney L. Fisher, a notary public within and for
the State of Kentucky.
                       -  -  -

Page 6

1  back document, and that there were other items that
2  were furnished to me.
3         (Mr. Phillips left the room.)
4     Q. Okay. Now, you state here on the
5  second page or the page with your opinions if the
6  lease for the San Marcos property had been renewed
7  under normal business conditions, basically the
8  rent would have been substantially higher, et
9  cetera. Do you see that?
10    A. Yes.
11    Q. Did you review the lease?
12    A. I believe I did.
13    Q. You believe you did or did you?
14    A. Well, there's a complete copy of my
15 file that's here, we can look at the file.
16    Q. I want to know what you remember?
17    A. I believe that I did.
18    Q. Okay. And what did you determine
19 when you reviewed the lease with respect to this
20 finding?
21    A. There was what I call the original
22 sublease under the renewal for that sublease, that
23 the monthly rent was a little bit over $8,200 per
24 month.

Page 7

1     Q. Okay. And, therefore, what did you
2  conclude?
3     A. That beginning April 1st of 2003
4  there was an additional agreement between Kroger
5  and the H.E. Butt Company that provided for the
6  payment of $48,125 per month.
7     Q. Okay. So that's almost a reduction
8  of 50 percent, correct?
9     A. It's probably about 40 percent.
10    Q. Okay.
11    A. I think it's closer to 50, but my
12 arithmetic may be wrong.
13    Q. And what was the reason for that
14 reduced rent?
15    A. It was my understanding that this was
16 in recognition of, I'll call it, the deal to sell
17 the property not being able to be closed.
18    Q. What's the basis of your
19 understanding.
20    A. The basis was conversations with
21 people from Kroger.
22         (Mr. Phillips entered the room.)
23    Q. Which people?
24    A. Primarily Ed Waldvogel.

Page 8

1     Q. What did he tell you?
2     A. He told me that was the reason why
3  they reduced the rent.
4     Q. What did he say?
5     A. I think I just answered that.
6     Q. You can answer it again. I don't
7  know that I heard your answer entirely, but go
8  ahead.
9     A. He said that's the reason the rent
10 was reduced, because as it states right here on the
11 document failure -- decrease in rent due to failure
12 to close.
13    Q. So you're basing your opinion on
14 information that Waldvogel gave you; is that
15 correct?
16    A. Well, I did review the documents
17 myself as well.
18    Q. Okay. And did your review of the
19 documents furnish you with any information that you
20 used in your conclusion?
21    A. Well, it was a result of all of the
22 work that I've done, both the conversation and the
23 review of the documents.
24    Q. Okay. Is there anything in the

Page 9

1  document that led you to believe that the reason
2  the rent was reduced was dependency of the
3  transaction?
4     A. I would have to go back and look at
5  the document.
6     Q. Go ahead.
7         THE WITNESS: Do we have it here?
8         MR. PHILLIPS: Yeah.
9         THE WITNESS: Are these the
10 documents from my file?
11        MR. DENNIS: I think so.
12        THE WITNESS: I don't see the
13 document I'm looking for here.
14        (Mr. Phillips left the room.)
15 BY MR. CINQUE:
16    Q. What document are you looking for?
17    A. I'm looking for the document that was
18 the agreement effective April 1st, 2003.
19    Q. Is that something that you looked at
20 to form the basis for your conclusion about the
21 reduction in rent?
22    A. That was one of the documents that I
23 looked at, yes.
24    Q. You don't have it here?

Page 10

1   A.  I don't see it here.
2   Q.  Okay. The annual threshold rate that
3   you reflect on your report, did you put those
4   quotations around threshold?
5   A.  Yes.
6   Q.  Why did you do that?
7   A.  That's the terminology that Mr.
8   Waldvogel used.
9   Q.  What does it mean?
10  A.  Well, it can mean a couple of
11  different things.
12  Q.  What did it mean to you in your
13  report?
14  A.  The rate that was used here was an
15  attempt to kind of hit the middle ground between
16  what Kroger would use when they invested the money
17  to build new properties, and the rates that they
18  were paying on current debt.
19  Q.  Twelve percent, is that what you're
20  saying?
21  A.  That's the number that's on this
22  piece of paper.
23  Q.  I'm trying to understand. Explain
24  the relationship between the so-called threshold

Page 11

1   rate and any calculations to which it applies?
2   A.  Well, once again, the 12 percent is
3   sort of the middle ground between what Kroger
4   normally would achieve in investing new money,
5   which I believe is around 18 percent.
6   Q.  So you're basing your conclusion on
7   the fact that invariably when Kroger has money to
8   invest, it earns a yield of what?
9   A.  Well, they have told me it was 18
10  percent.
11  Q.  Did you do anything to independently
12  verify that?
13  A.  Not at this time.
14  Q.  Okay. Now, you use the figure $11
15  million, do you see that?
16  A.  Yes.
17  Q.  Where did you get that figure?
18  A.  I believe that was from a document
19  for the sale of that property. I believe there
20  were three different properties in the sale
21  agreement, and each price was spelled out
22  separately.
23  Q.  Did somebody give you that number or
24  did you find it somewhere?

Page 12

1   A.  I think both. I think somebody gave
2   it to me and it was in the documents.
3   Q.  And who's that someone, Waldvogel?
4   A.  Yes.
5   Q.  Now, the $11 million figure, what
6   does that represent?
7   A.  I was told that was the selling price
8   of the warehouse in San Marcos, Texas.
9   Q.  Did you factor in any income tax
10  consequences in any of these calculations?
11  A.  No.
12  Q.  So the way you did this is you
13  assumed that, if it sold for $11 million, Kroger
14  would have the $11 million available for
15  investment; is that correct?
16  A.  Yes.
17  Q.  Why didn't you consider income tax
18  consequences?
19  A.  I didn't think it was appropriate.
20  Q.  And what made you not think it was
21  appropriate?
22  A.  If Kroger had been able to sell this
23  warehouse when they thought they were going to,
24  they would have had the $11 million in cash. And

Page 13

1   they would have been able to invest that money or
2   to pay off the existing debt.
3   Q.  And when was this money to be
4   available to Kroger as you've just described it?
5   A.  I believe it would have been some
6   time around April 1st of 2003.
7   Q.  And we're sitting here in the
8   beginning of March of 2004, are there any income
9   tax consequences involved in the receipt of that
10  $11 million, as you sit here today?
11  A.  I'm not a tax expert, but I'm sure
12  there would be.
13  Q.  Okay. You didn't factor in anything
14  for income tax one way or the other, correct?
15  A.  That's correct.
16  Q.  In your experience has Kroger ever
17  lost any money on any investment its ever made?
18  A.  I've never had any previous dealings
19  with Kroger.
20  Q.  So what is your assumption then that
21  Kroger would have earned how much on $11 million,
22  is it 12 percent?
23  A.  Yes, it is.
24  Q.  Okay. And that's based simply upon

4 (Pages 10 to 13)

Page 14

1  the discussion you had with Waldvogel, correct?
2       A.  Primarily, yes.
3           MR. CINQUE:  All right.  That's all
4  I have for the witness.
5           MR. DENNIS:  Okay.
6           MR. CINQUE:  Thank you.
7
8
9
10
11          JONATHAN D. LIBBERT, CPA, CFE
12                       - - -
13         DEPOSITION CONCLUDED AT 2:03 P.M.
14                       - - -

Page 15

1                  C E R T I F I C A T E
2  STATE  OF  KENTUCKY:
3                :  SS
4  STATE AT LARGE    :
5       I, BRITNEY L. FISHER, the undersigned, a duly
6  qualified and commissioned notary public within and
7  for the State of Kentucky, do hereby certify that
8  before the giving of his aforesaid deposition, the
9  said JONATHAN D. LIBBERT, CPA, CFE was by me first
10 duly sworn to tell the truth, the whole truth and
11 nothing but the truth; that the foregoing is the
12 deposition given at said time and place by the said
13 JONATHAN D. LIBBERT, CPA, CFE; that said deposition
14 was taken in all respects pursuant to agreement;
15 that said deposition was taken by me in stenotypy
16 and transcribed by computer-aided transcription
17 under my supervision; that the transcribed
18 deposition is to be submitted to the witness for
19 his examination and signature; that I am neither a
20 relative of nor attorney for any of the parties to
21 this cause, nor relative of nor employee for any of
22 their counsel, and have no interest whatever in the
23 result of the action.
24

Page 16

1       IN WITNESS WHEREOF, I hereunto set my hand
2  and official seal of office at Cincinnati, Ohio,
3  this         day of           , 2004.
4
5
6
7  MY COMMISSION EXPIRES:  BRITNEY L. FISHER
8  JULY 3, 2005.           NOTARY PUBLIC-STATE OF
9                          KENTUCKY

Page 17

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION
                        - - -
3  THE KROGER CO.,      :
        PLAINTIFF,:
4   -VS-              : CASE NO. C-1-02-439
   MALEASE FOODS CORP., :
5       DEFENDANT.:
                        - - -
6
     Britney L. Fisher, a court reporter, first
7  duly cautioned and sworn, testifies and affirms
   that JONATHAN D. LIBBERT, CPA, CFE, a witness
8  herein, was notified that the transcript was ready
   for review and signature on Wednesday, March 17,
9  2004 2004, by forwarding a copy of the transcript
   to Mr. Scott Phillips, Esq.
10
       Within thirty-one days (pursuant to Rule
11 (30)E of the Federal Rules of Civil Procedure),
   JONATHAN D. LIBBERT, CPA, CFE, a witness herein,
12 did not present signature of said deposition.
13     The original transcript is now being
   tendered into the hands of Mr. Robert W. Cinque,
14 Esq.
15     Further affiant sayeth naught.
16
17     Britney L. Fisher
18 Sworn to me and subscribed in my presence this
      day of         , 2004.
19
20
   Pamela Sue Spangler
21 Notary Public: State of Ohio
   My commission expires:
22 April 29, 2007
23
24

5 (Pages 14 to 17)

Page 1

1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                   - - -

5   THE KROGER CO.,              :

6           PLAINTIFF,:

7   -VS-                 : CASE NO.:  C-1-02-439

8   MALEASE FOODS CORP.,     :

9           DEFENDANT.:

10                  - - -

11       Deposition of JONATHAN D. LIBBERT, CPA,

12  CFE, a witness herein, taken by the defendant as

13  upon cross-examination pursuant to the Federal

14  Rules of Civil Procedure, and pursuant to agreement

15  and stipulations hereinafter set forth at the

16  offices of Frost, Brown & Todd, LLC, 2200 PNC

17  Center, 201 East Fifth Street, Cincinnati, Ohio at

18  1:48 p.m. on Wednesday, March 3, 2004, before

19  Britney L. Fisher, a notary public within and for

20  the State of Kentucky.

21                  - - -

22

23

24

Page 6

1  back document, and that there were other items that
2  were furnished to me.
3      (Mr. Phillips left the room.)
4      Q. Okay. Now, you state here on the
5  second page or the page with your opinions if the
6  lease for the San Marcos property had been renewed
7  under normal business conditions, basically the
8  rent would have been substantially higher, et
9  cetera. Do you see that?
10     A. Yes.
11     Q. Did you review the lease?
12     A. I believe I did.
13     Q. You believe you did or did you?
14     A. Well, there's a complete copy of my
15 file that's here, we can look at the file.
16     Q. I want to know what you remember?
17     A. I believe that I did.
18     Q. Okay. And what did you determine
19 when you reviewed the lease with respect to this
20 finding?
21     A. There was what I call the original
22 sublease under the renewal for that sublease, that
23 the monthly rent was a little bit over $8,200 per
24 month.

Page 7

1      Q. Okay. And, therefore, what did you
2  conclude?
3      A. That beginning April 1st of 2003
4  there was an additional agreement between Kroger
5  and the H.E. Butt Company that provided for the
6  payment of $48,125 per month.
7      Q. Okay. So that's almost a reduction
8  of 50 percent, correct?
9      A. It's probably about 40 percent.
10     Q. Okay.
11     A. I think it's closer to 50, but my
12 arithmetic may be wrong.
13     Q. And what was the reason for that
14 reduced rent?
15     A. It was my understanding that this was
16 in recognition of, I'll call it, the deal to sell
17 the property not being able to be closed.
18     Q. What's the basis of your
19 understanding.
20     A. The basis was conversations with
21 people from Kroger.
22     (Mr. Phillips entered the room.)
23     Q. Which people?
24     A. Primarily Ed Waldvogel.

Page 8

1      Q. What did he tell you?
2      A. He told me that was the reason why
3  they reduced the rent.
4      Q. What did he say?
5      A. I think I just answered that.
6      Q. You can answer it again. I don't
7  know that I heard your answer entirely, but go
8  ahead.
9      A. He said that's the reason the rent
10 was reduced, because as it states right here on the
11 document failure -- decrease in rent due to failure
12 to close.
13     Q. So you're basing your opinion on
14 information that Waldvogel gave you; is that
15 correct?
16     A. Well, I did review the documents
17 myself as well.
18     Q. Okay. And did your review of the
19 documents furnish you with any information that you
20 used in your conclusion?
21     A. Well, it was a result of all of the
22 work that I've done, both the conversation and the
23 review of the documents.
24     Q. Okay. Is there anything in the

Page 9

1  document that led you to believe that the reason
2  the rent was reduced was dependency of the
3  transaction?
4      A. I would have to go back and look at
5  the document.
6      Q. Go ahead.
7      THE WITNESS: Do we have it here?
8      MR. PHILLIPS: Yeah.
9      THE WITNESS: Are these the
10 documents from my file?
11     MR. DENNIS: I think so.
12     THE WITNESS: I don't see the
13 document I'm looking for here.
14     (Mr. Phillips left the room.)
15 BY MR. CINQUE:
16     Q. What document are you looking for?
17     A. I'm looking for the document that was
18 the agreement effective April 1st, 2003.
19     Q. Is that something that you looked at
20 to form the basis for your conclusion about the
21 reduction in rent?
22     A. That was one of the documents that I
23 looked at, yes.
24     Q. You don't have it here?

3 (Pages 6 to 9)

## Page 10

1  A. I don't see it here.
2  Q. Okay. The annual threshold rate that
3  you reflect on your report, did you put those
4  quotations around threshold?
5  A. Yes.
6  Q. Why did you do that?
7  A. That's the terminology that Mr.
8  Waldvogel used.
9  Q. What does it mean?
10 A. Well, it can mean a couple of
11 different things.
12 Q. What did it mean to you in your
13 report?
14 A. The rate that was used here was an
15 attempt to kind of hit the middle ground between
16 what Kroger would use when they invested the money
17 to build new properties, and the rates that they
18 were paying on current debt.
19 Q. Twelve percent, is that what you're
20 saying?
21 A. That's the number that's on this
22 piece of paper.
23 Q. I'm trying to understand. Explain
24 the relationship between the so-called threshold

## Page 11

1  rate and any calculations to which it applies?
2  A. Well, once again, the 12 percent is
3  sort of the middle ground between what Kroger
4  normally would achieve in investing new money,
5  which I believe is around 18 percent.
6  Q. So you're basing your conclusion on
7  the fact that invariably when Kroger has money to
8  invest, it earns a yield of what?
9  A. Well, they have told me it was 18
10 percent.
11 Q. Did you do anything to independently
12 verify that?
13 A. Not at this time.
14 Q. Okay. Now, you use the figure $11
15 million, do you see that?
16 A. Yes.
17 Q. Where did you get that figure?
18 A. I believe that was from a document
19 for the sale of that property. I believe there
20 were three different properties in the sale
21 agreement, and each price was spelled out
22 separately.
23 Q. Did somebody give you that number or
24 did you find it somewhere?

## Page 12

1  A. I think both. I think somebody gave
2  it to me and it was in the documents.
3  Q. And who's that someone, Waldvogel?
4  A. Yes.
5  Q. Now, the $11 million figure, what
6  does that represent?
7  A. I was told that was the selling price
8  of the warehouse in San Marcos, Texas.
9  Q. Did you factor in any income tax
10 consequences in any of these calculations?
11 A. No.
12 Q. So the way you did this is you
13 assumed that, if it sold for $11 million, Kroger
14 would have the $11 million available for
15 investment; is that correct?
16 A. Yes.
17 Q. Why didn't you consider income tax
18 consequences?
19 A. I didn't think it was appropriate.
20 Q. And what made you not think it was
21 appropriate?
22 A. If Kroger had been able to sell this
23 warehouse when they thought they were going to,
24 they would have had the $11 million in cash. And

## Page 13

1  they would have been able to invest that money or
2  to pay off the existing debt.
3  Q. And when was this money to be
4  available to Kroger as you've just described it?
5  A. I believe it would have been some
6  time around April 1st of 2003.
7  Q. And we're sitting here in the
8  beginning of March of 2004, are there any income
9  tax consequences involved in the receipt of that
10 $11 million, as you sit here today?
11 A. I'm not a tax expert, but I'm sure
12 there would be.
13 Q. Okay. You didn't factor in anything
14 for income tax one way or the other, correct?
15 A. That's correct.
16 Q. In your experience has Kroger ever
17 lost any money on any investment its ever made?
18 A. I've never had any previous dealings
19 with Kroger.
20 Q. So what is your assumption then that
21 Kroger would have earned how much on $11 million,
22 is it 12 percent?
23 A. Yes, it is.
24 Q. Okay. And that's based simply upon

Page 14

1  the discussion you had with Waldvogel, correct?
2      A.  Primarily, yes.
3          MR. CINQUE:  All right.  That's all
4  I have for the witness.
5          MR. DENNIS:  Okay.
6          MR. CINQUE:  Thank you.
7
8
9
10
11         JONATHAN D. LIBBERT, CPA, CFE
12                     - - -
13         DEPOSITION CONCLUDED AT 2:03 P.M.
14                     - - -

Page 15

1          C E R T I F I C A T E
2  STATE OF KENTUCKY:
3              : SS
4  STATE AT LARGE    :
5      I, BRITNEY L. FISHER, the undersigned, a duly
6  qualified and commissioned notary public within and
7  for the State of Kentucky, do hereby certify that
8  before the giving of his aforesaid deposition, the
9  said JONATHAN D. LIBBERT, CPA, CFE was by me first
10 duly sworn to tell the truth, the whole truth and
11 nothing but the truth; that the foregoing is the
12 deposition given at said time and place by the said
13 JONATHAN D. LIBBERT, CPA, CFE; that said deposition
14 was taken in all respects pursuant to agreement;
15 that said deposition was taken by me in stenotypy
16 and transcribed by computer-aided transcription
17 under my supervision; that the transcribed
18 deposition is to be submitted to the witness for
19 his examination and signature; that I am neither a
20 relative of nor attorney for any of the parties to
21 this cause, nor relative of nor employee for any of
22 their counsel, and have no interest whatever in the
23 result of the action.
24

Page 16

1          IN WITNESS WHEREOF, I hereunto set my hand
2  and official seal of office at Cincinnati, Ohio,
3  this        day of            , 2004.
4
5
6
7  MY COMMISSION EXPIRES:   BRITNEY L. FISHER
8  JULY 3, 2005.      NOTARY PUBLIC-STATE OF
9                              KENTUCKY

Page 17

1       UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF OHIO
2            WESTERN DIVISION
                   - - -
3  THE KROGER CO.,      :
              PLAINTIFF,:
4    -VS-               : CASE NO. C-1-02-439
   MALEASE FOODS CORP., :
5            DEFENDANT.:
                   - - -
6
       Britney L. Fisher, a court reporter, first
7  duly cautioned and sworn, testifies and affirms
   that JONATHAN D. LIBBERT, CPA, CFE, a witness
8  herein, was notified that the transcript was ready
   for review and signature on Wednesday, March 17,
9  2004 2004, by forwarding a copy of the transcript
   to Mr. Scott Phillips, Esq
10
       Within thirty-one days (pursuant to Rule
11 (30)E of the Federal Rules of Civil Procedure),
   JONATHAN D. LIBBERT, CPA, CFE, a witness herein,
12 did not present signature of said deposition.
13     The original transcript is now being
   tendered into the hands of Mr. Robert W. Cinque,
14 Esq.
15     Further affiant sayeth naught.
16
17     Britney L Fisher
18 Sworn to me and subscribed in my presence this
      day of         , 2004.
19
20
   Pamela Sue Spangler
21 Notary Public: State of Ohio
   My commission expires:
22 April 29, 2007
23
24

5 (Pages 14 to 17)

Page 1

1                UNITED STATES DISTRICT COURT
2                 SOUTHERN DISTRICT OF OHIO
3                      WESTERN DIVISION
4                          - - -
5   THE KROGER CO.,              :
6              PLAINTIFF,:
7        -VS-                    : CASE NO.:  C-1-02-439
8   MALEASE FOODS CORP.,         :
9              DEFENDANT.:
10                         - - -
11         Deposition of JONATHAN D. LIBBERT, CPA,
12  CFE, a witness herein, taken by the defendant as
13  upon cross-examination pursuant to the Federal
14  Rules of Civil Procedure, and pursuant to agreement
15  and stipulations hereinafter set forth at the
16  offices of Frost, Brown & Todd, LLC, 2200 PNC
17  Center, 201 East Fifth Street, Cincinnati, Ohio at
18  1:48 p.m. on Wednesday, March 3, 2004, before
19  Britney L. Fisher, a notary public within and for
20  the State of Kentucky.
21                         - - -
22
23
24

Page 6

1  back document, and that there were other items that
2  were furnished to me.
3      (Mr. Phillips left the room.)
4      Q. Okay. Now, you state here on the
5  second page or the page with your opinions if the
6  lease for the San Marcos property had been renewed
7  under normal business conditions, basically the
8  rent would have been substantially higher, et
9  cetera. Do you see that?
10     A. Yes.
11     Q. Did you review the lease?
12     A. I believe I did.
13     Q. You believe you did or did you?
14     A. Well, there's a complete copy of my
15 file that's here, we can look at the file.
16     Q. I want to know what you remember?
17     A. I believe that I did.
18     Q. Okay. And what did you determine
19 when you reviewed the lease with respect to this
20 finding?
21     A. There was what I call the original
22 sublease under the renewal for that sublease, that
23 the monthly rent was a little bit over $8,200 per
24 month.

Page 7

1      Q. Okay. And, therefore, what did you
2  conclude?
3      A. That beginning April 1st of 2003
4  there was an additional agreement between Kroger
5  and the H.E. Butt Company that provided for the
6  payment of $48,125 per month.
7      Q. Okay. So that's almost a reduction
8  of 50 percent, correct?
9      A. It's probably about 40 percent.
10     Q. Okay.
11     A. I think it's closer to 50, but my
12 arithmetic may be wrong.
13     Q. And what was the reason for that
14 reduced rent?
15     A. It was my understanding that this was
16 in recognition of, I'll call it, the deal to sell
17 the property not being able to be closed.
18     Q. What's the basis of your
19 understanding.
20     A. The basis was conversations with
21 people from Kroger.
22         (Mr. Phillips entered the room.)
23     Q. Which people?
24     A. Primarily Ed Waldvogel.

Page 8

1      Q. What did he tell you?
2      A. He told me that was the reason why
3  they reduced the rent.
4      Q. What did he say?
5      A. I think I just answered that.
6      Q. You can answer it again. I don't
7  know that I heard your answer entirely, but go
8  ahead.
9      A. He said that's the reason the rent
10 was reduced, because as it states right here on the
11 document failure -- decrease in rent due to failure
12 to close.
13     Q. So you're basing your opinion on
14 information that Waldvogel gave you; is that
15 correct?
16     A. Well, I did review the documents
17 myself as well.
18     Q. Okay. And did your review of the
19 documents furnish you with any information that you
20 used in your conclusion?
21     A. Well, it was a result of all of the
22 work that I've done, both the conversation and the
23 review of the documents.
24     Q. Okay. Is there anything in the

Page 9

1  document that led you to believe that the reason
2  the rent was reduced was dependency of the
3  transaction?
4      A. I would have to go back and look at
5  the document.
6      Q. Go ahead.
7         THE WITNESS: Do we have it here?
8         MR. PHILLIPS: Yeah.
9         THE WITNESS: Are these the
10 documents from my file?
11        MR. DENNIS: I think so.
12        THE WITNESS: I don't see the
13 document I'm looking for here.
14        (Mr. Phillips left the room.)
15 BY MR. CINQUE:
16     Q. What document are you looking for?
17     A. I'm looking for the document that was
18 the agreement effective April 1st, 2003.
19     Q. Is that something that you looked at
20 to form the basis for your conclusion about the
21 reduction in rent?
22     A. That was one of the documents that I
23 looked at, yes.
24     Q. You don't have it here?

3 (Pages 6 to 9)

Page 10

1  A. I don't see it here.
2  Q. Okay. The annual threshold rate that
3  you reflect on your report, did you put those
4  quotations around threshold?
5  A. Yes.
6  Q. Why did you do that?
7  A. That's the terminology that Mr.
8  Waldvogel used.
9  Q. What does it mean?
10  A. Well, it can mean a couple of
11  different things.
12  Q. What did it mean to you in your
13  report?
14  A. The rate that was used here was an
15  attempt to kind of hit the middle ground between
16  what Kroger would use when they invested the money
17  to build new properties, and the rates that they
18  were paying on current debt.
19  Q. Twelve percent, is that what you're
20  saying?
21  A. That's the number that's on this
22  piece of paper.
23  Q. I'm trying to understand. Explain
24  the relationship between the so-called threshold

Page 11

1  rate and any calculations to which it applies?
2  A. Well, once again, the 12 percent is
3  sort of the middle ground between what Kroger
4  normally would achieve in investing new money,
5  which I believe is around 18 percent.
6  Q. So you're basing your conclusion on
7  the fact that invariably when Kroger has money to
8  invest, it earns a yield of what?
9  A. Well, they have told me it was 18
10  percent.
11  Q. Did you do anything to independently
12  verify that?
13  A. Not at this time.
14  Q. Okay. Now, you use the figure $11
15  million, do you see that?
16  A. Yes.
17  Q. Where did you get that figure?
18  A. I believe that was from a document
19  for the sale of that property. I believe there
20  were three different properties in the sale
21  agreement, and each price was spelled out
22  separately.
23  Q. Did somebody give you that number or
24  did you find it somewhere?

Page 12

1  A. I think both. I think somebody gave
2  it to me and it was in the documents.
3  Q. And who's that someone, Waldvogel?
4  A. Yes.
5  Q. Now, the $11 million figure, what
6  does that represent?
7  A. I was told that was the selling price
8  of the warehouse in San Marcos, Texas.
9  Q. Did you factor in any income tax
10  consequences in any of these calculations?
11  A. No.
12  Q. So the way you did this is you
13  assumed that, if it sold for $11 million, Kroger
14  would have the $11 million available for
15  investment; is that correct?
16  A. Yes.
17  Q. Why didn't you consider income tax
18  consequences?
19  A. I didn't think it was appropriate.
20  Q. And what made you not think it was
21  appropriate?
22  A. If Kroger had been able to sell this
23  warehouse when they thought they were going to,
24  they would have had the $11 million in cash. And

Page 13

1  they would have been able to invest that money or
2  to pay off the existing debt.
3  Q. And when was this money to be
4  available to Kroger as you've just described it?
5  A. I believe it would have been some
6  time around April 1st of 2003.
7  Q. And we're sitting here in the
8  beginning of March of 2004, are there any income
9  tax consequences involved in the receipt of that
10  $11 million, as you sit here today?
11  A. I'm not a tax expert, but I'm sure
12  there would be.
13  Q. Okay. You didn't factor in anything
14  for income tax one way or the other, correct?
15  A. That's correct.
16  Q. In your experience has Kroger ever
17  lost any money on any investment its ever made?
18  A. I've never had any previous dealings
19  with Kroger.
20  Q. So what is your assumption then that
21  Kroger would have earned how much on $11 million,
22  is it 12 percent?
23  A. Yes, it is.
24  Q. Okay. And that's based simply upon

4 (Pages 10 to 13)

Page 14

```
1   the discussion you had with Waldvogel, correct?
2       A.  Primarily, yes.
3           MR. CINQUE:  All right.  That's all
4   I have for the witness.
5           MR. DENNIS:  Okay.
6           MR. CINQUE:  Thank you.
7
8                        .
9
10
11          JONATHAN D. LIBBERT, CPA, CFE
12                      - - -
13          DEPOSITION CONCLUDED AT 2:03 P.M.
14                      - - -
```

Page 15

```
                CERTIFICATE
STATE OF KENTUCKY:
                : SS
STATE AT LARGE  :
    I, BRITNEY L. FISHER, the undersigned, a duly
qualified and commissioned notary public within and
for the State of Kentucky, do hereby certify that
before the giving of his aforesaid deposition, the
said JONATHAN D. LIBBERT, CPA, CFE was by me first
duly sworn to tell the truth, the whole truth and
nothing but the truth; that the foregoing is the
deposition given at said time and place by the said
JONATHAN D. LIBBERT, CPA, CFE; that said deposition
was taken in all respects pursuant to agreement;
that said deposition was taken by me in stenotypy
and transcribed by computer-aided transcription
under my supervision; that the transcribed
deposition is to be submitted to the witness for
his examination and signature; that I am neither a
relative of nor attorney for any of the parties to
this cause, nor relative of nor employee for any of
their counsel, and have no interest whatever in the
result of the action.
```

Page 16

```
    IN WITNESS WHEREOF, I hereunto set my hand
and official seal of office at Cincinnati, Ohio,
this        day of          , 2004.



MY COMMISSION EXPIRES:  BRITNEY L. FISHER
JULY 3, 2005.       NOTARY PUBLIC-STATE OF
                         KENTUCKY
```

Page 17

```
            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
                  WESTERN DIVISION
                      - - -
THE KROGER CO.,    :
          PLAINTIFF,:
    -VS-           : CASE NO. C-1-02-439
MALEASE FOODS CORP., :
          DEFENDANT.:
                      - - -

    Britney L. Fisher, a court reporter, first
duly cautioned and sworn, testifies and affirms
that JONATHAN D. LIBBERT, CPA, CFE, a witness
herein, was notified that the transcript was ready
for review and signature on Wednesday, March 17,
2004 2004, by forwarding a copy of the transcript
to Mr. Scott Phillips, Esq.
    Within thirty-one days (pursuant to Rule
(30)E of the Federal Rules of Civil Procedure),
JONATHAN D. LIBBERT, CPA, CFE, a witness herein,
did not present signature of said deposition.
    The original transcript is now being
tendered into the hands of Mr. Robert W. Cinque,
Esq.
    Further affiant sayeth naught.

    _____
    Britney L. Fisher
Sworn to me and subscribed in my presence this
    day of          , 2004.

    _____
    Pamela Sue Spangler
    Notary Public: State of Ohio
    My commission expires:
    April 29, 2007
```