UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Kroger Co., | : | Case No.: 0-1-02 439 |
| Plaintiff, | : | Beckwith, J. |
| | : | Sherman, M.J. |
| v. | : | |
| | : | DECLARATION OF |
| Malease Foods Corp., formerly | : | LAWRENCE KADISH |
| known as Malese Foods Corp., | : | IN OPPOSITION TO KROGER |
| Defendant. | : | MOTION AND IN SUPPORT OF |
| | : | MALEASE'S MOTION FOR |
| | | **SUMMARY JUDGMENT** |

LAWRENCE KADISH declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the President, sole director and sole shareholder of Malease Foods Corp. ("Malease"). I was directly involved in the 1983 transactions between Malease, Merrill Lynch and the Balkhouse entities. I have personal knowledge of the facts herein set forth and submit this declaration in opposition to the Kroger motion and in support of Malease's motion for summary judgment.

2. I have been an owner and developer of real estate for more than 40 years. Most of the properties I own are single tenant net lease properties leased to large retail tenants such as K-mart, Winn Dixie, Safeway, Home Depot, Target, Federated Department Stores, Con Agra and Shoney's. I own such properties today in not less than 30 states in the United States.

3. I have conducted substantial business transactions with Merrill Lynch & Co., Inc. and its predecessor Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill Lynch") together with entities controlled by me I have purchased over 100 properties from Merrill Lynch for aggregate purchase prices in excess of $100,000,000.00.

4. I was approached by Merrill Lynch in early 1983 to invest in the sale-lease back transactions involving the Kroger facilities. Merrill Lynch proposed that entities owned by me acquire by assignment all rights of Balkhouse Properties as Master Lessee of the three facilities in which Kroger was then the tenant.

5. On June 1, 1983, Balkhouse Properties assigned all of its rights as Master Lessee under the Kroger leases to Malease, the entity which I owned. Immediately thereafter, Malease and Balkhouse Associates entered into three separate agreements, each captioned "Two-Party Agreement," one for each of the Sites. The Two-Party Agreements closely followed and implemented the basic terms of the April 1983 leases. A true copy of one of the Two-Party Agreements is annexed as Exhibit H to the Kroger motion.

6. Under the terms of the Two-Party Agreements Malease and Balkhouse Associates each acknowledge that their interests in the three properties remain subject to the rights of the parties under the April 1983 Leases. As Master Lessee, Malease remained the landlord under the terms of the April 1983 Leases and was entitled to receive all rents due from Kroger under these Leases (Kroger Ex. H, pp. 1-2, 12-14).

7. Each of the Two-Party Agreements affords the tenant the limited right upon certain terms and conditions to acquire the Balkhouse interest in accordance with Article XXXV of the Occupancy Lease (Kroger, Ex. A, p. 50) simultaneously with the sale of the interest of the Master Lessee. Specifically, in relevant part, paragraph 3 of the Two-Party Agreement (Kroger, Ex. H, pp. 9-10) provides:

> 3. If Purchase Option Exercised. If a Purchase Option is exercised pursuant to Article XXXV of the Occupancy Lease, Partnership [Balkhouse Associates] shall be obligated to sell and convey Partnership's interest in the Premises to Occupancy Tenant [Kroger] **simultaneously with the sale of the Master Lessee's [Malease's] Interest in the Premises to Occupancy Tenant by the Master Lessee.** Partnership and Master Lessee shall execute and deliver a partial surrender of lease to release the Premises from the Master Lease. Partnership's Interest and Master Lessee's Interest in the Premises shall be sold and conveyed in accordance with Article XIX of the Occupancy Lease,.... (emphasis added).

8. On July 24, 2001, Kroger exercised its option to acquire the Balkhouse Interests as Fee Owner as well as an assignment of the rights of Balkhouse Associates under the Two-Party Agreements. Kroger did not seek a simultaneous conveyance of the interests of Malease as Master Lessee in accordance with paragraph 3 of the Two-Party Agreement and Article XXXV of the Occupancy Lease.

A. **My Relationship of Trust and Confidence With Jim Price**

9. Although I did not know it at the time, the architect of these transactions and Kroger's chief advisor was James D. Price who has submitted an extensive "expert"

3

report in this proceeding (Kroger Ex. D). As explained in this declaration, the report of Malease's expert Robert D. Howard, Esq. and in the memorandum of law submitted herewith, Malease takes strong issue with a number of the factual statements and legal conclusions of Mr. Price whom as I now know received a $100,000.00 fee from Kroger, who I now realize has secretly authored correspondence intended to trick me, who has been less than candid in his deposition and who has a very strong motive to shade the facts so as to suit Kroger's purposes.

10. Approximately 10 years ago, after Jim left the Wall Street brokerage business, he formed the firm of Price & Marshall. I continued to work with him and as time went on he became a trusted business adviser and confidant. Some evidence of the depth of Jim's and my relationship is reflected in the fact that on October 23, 2003, I made a contribution of $25,000.00 to a charity sponsored by Jim's wife Warrie. Sadly, I now know that at the very same time I was doing this, Jim was putting the finishing touches on his "expert" report dated October 30, 2003 in which, acting on behalf of Kroger, he called into issue virtually ever significant fact and interpretation at the heart of this dispute.

11. Until long after this lawsuit began, I never knew that Jim was the architect of the Kroger/Balkhouse transactions which closed on July 24, 2001, and as I later explain I was entirely duped by Jim's September 17, 2001 letter and the accompanying September 13, 2001 letter from James Hodge of Kroger which Jim secretly authored.

12. At my deposition on January 21, 2004, I testified extensively about the relationship of confidence and trust that I had enjoyed for many years with Jim and

explained how Kroger and he abused that trust (Tr. 29:14-37:12, Kroger Ex. G). One of the topics I covered was my proposed transaction with H.E. Butt Grocery, a subtenant at the Kroger facility in San Marcos..

13. Annexed hereto as Exhibit "A" is a copy of the Agreement Related to Sublease dated November 15, 1999 between Malease and Butt, the tenant in the San Marcos property. In relevant part, this agreement provides in paragraph 4 that in the event Malease acquires ownership of the Balkhouse limited partnership position in the San Marcos facility at any time prior to November 1, 2001, then Malease may require Butt to purchase that Site for the sum of $11,200,000.00. A successful conclusion of this transaction would have resulted in a very significant profit to Malease and me. I disclosed all of the main deal points to Jim Price in confidence and asked him to assist me in the purchase of this property from Balkhouse.

14. In conjunction with the foregoing, Balkhouse Associates, Malease, Kroger and Butt entered into an Agreement regarding Additional Facility dated as of November 1, 1999 (Exhibit "B") hereto whereby the parties (other than Butt): (i) consented to Butt's construction of an additional 268,000 square foot warehouse facility, subject to Butt's duty to comply with the provision of Article 16 of the Sublease to Butt governing construction of additions and alterations; (ii) confirmed to Butt that the Occupancy Lease was in effect and there were no existing defaults by Lessee under the Occupancy Lease, and (iii) agreed to modify the Lease as follows:

5. **MODIFICATION OF OCCUPANCY LEASE**

The Occupancy Lease is hereby modified and supplemented, effective as of the date hereof, by adding the following at the end of Article XXXV:

Notwithstanding anything to the contrary contained herein, and solely for purposes of this Article XXXV and Article XXXVI of this Lease if the Additional Warehouse Facility is constructed, the fair market value of the Leased Property shall be an amount equal to the greater of:

(i) the appraised value (as determined by Article XXXVI below) of the Leased Property, determined as if the Additional Warehouse Facility (as defined below) did not exist and had never been erected on the Land, and

(ii) the appraised value (as determined by Article XXXVI below) of the Leased Property, inclusive of the Additional Warehouse Facility (but excluding the value of any Lessee's Equipment, as defined in Section 6.2 of this Lease), minus the Costs of Construction (as hereinafter defined) incurred by or on behalf of H.E. Butt Grocery Company in connection with constructing the Additional Warehouse Facility.

15. This meant that Article XXXV of the Occupancy Lease, which contained the Kroger Purchase Option was modified by changing the manner in which the purchase price payable upon the exercise of the Option was computed in such that the price could not be reduced, but might well be increased, as a result of the construction of the addition. By purchasing the Leased Properties outside the option Kroger wrongfully attempted to avoid the effect of the Agreement Regarding Additional Facility upon the purchase price calculation under Article XXXV of the Operating Lease.

16. Discovery in this action has since revealed that in violation of our relationship

of trust and confidence, Jim Price disclosed all of the significant deal points of Malease's agreement with Butt to Kroger and then in combination with Kroger procured an agreement from Kroger on April 12, 2002 to sell that very same San Marcos property to Butt for $11 million (Kroger Ex. M, Tab 2, LIB000031-39).

17. Ironically, having taken advantage of this breach of trust by Price, Kroger now makes a claim that it is entitled to damages from Malease. This ridiculous contention is grounded upon the notion that Kroger was not responsible for any income tax payment on the proceeds received from its sale to Butt. Fresh evidence of Kroger's cavalier attitude toward its lawful obligations is provided by the contention in the Libbert report that the provisions of the Internal Revenue Code notwithstanding, Kroger could have sold the San Marcos facility for $11 million to Butt, paid no tax on any of the proceeds and therefore it is entitled to interest on this sum at the rate of 12% per annum (Kroger Ex. M, Tab 1).[1]

18. Separate and apart from my sale of the San Marcos facility to Butt, I also confided in Jim Price with respect to my business plan to buy the Merrill Lynch/Balkhouse position in its entirety. As explained at my deposition (Kroger Ex. G,

---

[1] I have read pages 10-13 of the Libbert deposition (Cinque Dec. Ex. A) where Mr. Libbert admits that although he is sure there would have been tax consequences involved with respect to Kroger's receipt of the $11 million, he did not in any way take that into account in his expert calculations. Based upon my years of experience as an investor in real estate, I can say that the Kroger contention that it can sell a property for $11 million, pay no tax and then achieve a guaranteed return on its investment of 12% is downright ludicrous.

Tr. 49), I told Price that I was prepared to offer $15 million for Merrill Lynch's position and perhaps go to $17 million or so if Kroger entered the bidding. This was in the mid to latter part of 2000. Never would I have disclosed this sensitive information to Price if I knew that he had already been engaged as Kroger's exclusive agent.

**B.     The Significance and Effect of the Purchase Option**

19. I was personally involved in the negotiation of the Two-Party Agreements (Kroger Ex. H) and particularly the Purchase Option in paragraph 3 at page 9 which requires a simultaneous conveyance. It is important to note that each of the Two-Party Agreements was made between Balkhouse Associates and Malease. No one at Kroger was involved in the negotiation or drafting of the option provision, and that includes Jim Price.

20. To a large extent, the requirement of a simultaneous transfer found in the Option was a direct product of certain unique aspects of this tax driven sale-lease back transaction. During the life of such a deal, there comes a point where the partnership's income and rental stream which had previously been off-set for tax purposes by depreciation and interest payments on the mortgage would begin to run out with the result that the interest component of the mortgage payment diminishes while there is a corresponding increase in the amount attributable to amortization.

21. For tax purposes, amortization payments are not deductible and thus during the years immediately preceding 2001, the limited partnerships were about to receive

8

what is known in the industry as "phantom income." This is also commonly referred to as the point "when the lines cross," i.e., when the transaction no longer works tax-wise. For example, during these later years, a limited partner would receive say a distribution of $5,000.00 and have to pay $7,000.00 in income tax. So the limited partners would want to unwind the transaction and sell.

22. Thus, in 1997 I received a call from Michael Giobbi, the Merrill Lynch representative handling these limited partnerships. Since the deferred rent in these transactions is typically paid in the last five years or so of the lease term, and that money is in turn used to pay down the mortgage, the transaction for the partnership on a tax level could soon become a disaster. Although by the terms of the various documents, Balkhouse and Kroger could wait until April 1, 2003 to purchase (assuming of course they gave notice and otherwise complied strictly with the terms of the various option provisions), there was a significant incentive for Merrill Lynch and Kroger if the right terms could be arranged to pay a premium, secure the consent of the Master Lessee and unwind the transaction. My statement has been confirmed by a number of documents produced by Kroger and Price during the course of this transaction. For example, annexed hereto as Exhibit "C" is the February 15, 2001 letter from Jim Price to Merrill Lynch explaining that the economics of Kroger's offer has a window of 120 days and needs to close on or before July 1, 2001.

23. As a matter of very real practical business reality, with a complicated series of sale lease-back transactions of this type, Merrill Lynch could not easily go out into the

9

market place and find buyers ready to familiarize themselves with all the nuances and economics necessary to the making of a sound business decision as to whether to purchase. Realistically, at any point in time there would only be two logical buyers for these property interests, Kroger and Malease. Realizing this, at the time I did the transaction back in 1983, I made sure that it was structured in such a way so as to prevent to the greatest extent possible Kroger from interfering or gaining an unfair advantage over the right and ability of Malease to purchase the interests from Merrill Lynch.

24. It was for this reason that the requirement of a simultaneous exercise and conveyance of both the Balkhouse and Malease positions was inserted in the documents so as to protect the interests of both sides of the transaction. At the time the 1983 transactions were negotiated and closed, it was reasonably anticipated by the parties that Kroger might wish to acquire both the fee and the lease position at the same time. While Kroger had the unquestionable right to do this simultaneously as of April 1, 2003, if it wished to modify the rights of the parties (as it did in the case of Balkhouse), then it could negotiate the right to achieve an early option exercise provided it complied with the obligation of a simultaneous conveyance or otherwise negotiated a modification of the option provisions with Balkhouse and Malease.

25. Following my conversation with Giobbi, I called Jim Price and told him what had occurred. I asked Jim to work with me on the transaction, and he agreed. I explained that Giobbi had given me a ball park price for the Merrill Lynch position of between $14 and $16 million. I discussed this with Price as well as the effect of my agreement to sell

10

the San Marcos property to Butt for $11.2 million. Assuming a $15 million price for the Merrill Lynch interest, since Butt had already agreed to pay me $11.2 million for one of the three properties, the sale of the remaining two presented Malease with a significant business opportunity.

26. Looking back on it, I remember that at the time Price did not seem all that enthusiastic, and of course now I know why. He had secretly made a deal to act as Kroger's agent.

27. I was not successful in buying the Merrill Lynch position, and as we know on July 24, 2001, Kroger purchased the Balkhouse interests. Kroger did not seek to obtain a simultaneous conveyance of the Malease interest in accordance with Article XXXV of the relevant provisions of the Two-Party Agreements. Submitted herewith is Malease's memorandum in which it explains in greater detail both the facts and the last as they relate to this particular transaction. In substance, Malease shows the requirement that in order to be effective, an option exercise must be accomplished strictly in accordance with its terms and a deviation such as that which occurred here will render the option a nullity.

28. Subsequent events have demonstrated that Kroger and Price were aware of this and knew that since they had not simultaneously purchased Malease's position along with the Balkhouse interest, Kroger no longer had the right to exercise a contractual purchase option a second time.

29. As I have now learned, in order to get around this problem, Kroger and Price manufactured the Hodge letter of September 13, 2001 which Price surreptitiously

11

authored.

30. At the time I received Jim Price's September 17, 2001 letter and attached Hodge letter dated September 13, 2001 (Exhibit B to Malease's memorandum), I had no idea that Price had been the architect of the transaction, that he was Kroger's exclusive representative in dealing with Merrill Lynch or that he had been paid a $100,000.00 fee from Kroger for his services. When I received this correspondence, I simply concluded that Kroger knew about the close relationship between Price and me and was asking for a favor. The reason I say this is that Kroger had previously sent Malease a notice advising of its acquisition of the Balkhouse interests, and by the time September came around I was fully aware that Kroger had failed to acquire the Malease interest simultaneously with the rights of Balkhouse as required under the operative documents, and therefore Kroger was in no position to make a "non-rejectable offer."

31. Jim Price and I were unable to come to terms in September, and a few months later he again approached me with a request that I agree to a modification of the Lease and Two-Party Agreements so as to permit Kroger to acquire the Malease interest outside of the Option. We could not agree, and ultimately this lawsuit ensued.

## CONCLUSION

30. As stated at the outset and further explained in this declaration, I was personally involved in the negotiation of the relevant provisions of the documents requiring a simultaneous transaction. From this experience I unequivocally state that the intention of the parties as manifested by the clear language was that in order to be

effective, the Kroger Option to purchase the Balkhouse and Malease positions was to be exercised simultaneously. The report of Malease's expert Robert D. Howard, Esq. submitted herewith carefully analyzes all relevant documents and confirms my conclusion. The manifestly improper conduct and connivance of Kroger and Price in concealing his true role while he attempted to persuade me to accept another Kroger option exercise underscores the guilty knowledge of Kroger and the validity and accuracy of the statements I have made.

31. I respectfully state that the position of Malease is crystal clear to the point that it is entitled to summary judgment as sought on this cross-motion.

I hereby declare the truth of the foregoing statements under penalty of perjury pursuant to 28 U.S.C. §1746.

Executed this 7 day of April, 2004.

_____
LAWRENCE KADISH

## CERTIFICATE OF SERVICE

     I hereby certify that on the _____ day of April, 2004 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ R. Gary Winters
R. Gary Winters   0018680
Attorney for Defendant
Suite 900 Provident Building
632 Vine Street
Cincinnati, OH 45202-2442
(513) 421-4646 Telephone
(513) 421-7929 Facsimile
rgarywinters@zoomtown.com
