## AGREEMENT RELATED TO SUBLEASE

THIS AGREEMENT RELATED TO SUBLEASE (this "Agreement"), dated to be effective as of the 15th day of November, 1999, is entered into by and between MALESE FOODS CORP. ("Malese"), a Delaware corporation, having an address c/o Kadish Real Estate, 135 Jericho Turnpike, Old Westbury, New York 11568, and H. E. BUTT GROCERY COMPANY ("HEB"), a Texas corporation, having an address at P.O. Box 839955, San Antonio, Texas 78238-3955 (collectively, the "Parties").

### W I T N E S S E T H:

WHEREAS, Balkhouse Associates, a Tennessee limited partnership ("Balkhouse") is the owner of a certain parcel of land located in the City of San Marcos, County of Hays, State of Texas, and more particularly described in Exhibit A attached hereto and made a part hereof (the "Premises").

WHEREAS, Balkhouse Properties Corp. ("BPC"), as lessor, entered into a certain Lease with The Kroger Company ("Kroger"), an Ohio corporation ("Kroger"), as lessee, dated as of April 1, 1983, with respect to the Premises (the "Operating Lease");

WHEREAS, as of June 1, 1983, (i) BPC transferred all its right, title and interest in the Premises to Balkhouse, (ii) Balkhouse leased the Premises back to BPC (the "Master Lease"), subject to the Operating Lease, (iii) BPC assigned its interest as lessee under the Master Lease to Malese, and (iv) BPC assigned its interest as lessor under the Operating Lease to Malese;

WHEREAS, Kroger, as Sublessor, entered into a sublease of the Premises with HEB, as Sublessee, dated December 4, 1990 (the "Sublease"); and

WHEREAS, HEB presently intends to construct an additional building and/or other improvements on the Premises ("Additional Facilities") consistent with Article X of the Operating Lease, and in connection therewith desires to receive certain agreements and/or assurances from Malese as hereinafter provided.

NOW, THEREFORE, in consideration of the sum of Five Hundred Thousand Dollars ($500,000) payable as provided in paragraph 3 below, and of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1. _Cost of Additional Facilities_. Notwithstanding anything to the contrary contained in Articles XXXV or XXXVI of the Operating Lease, Article XL of the Master Lease, or paragraph 3 of the Two Party Agreement between Balkhouse and Malese dated as of June 1, 1983, the cost or value of the Additional Facilities constructed by HEB on the

1

Premises shall be excluded from the calculation of Fair Market Value for purposes of calculating the purchase price to be paid in connection with the exercise of the Lessee's purchase option pursuant to Articles XXXV and XXXVI of the Operating Lease.

2.    <u>Notice of Lessee Default</u>.    Upon the occurrence of a default by the Lessee under the Operating Lease and the giving of notice of such default to the Lessee under the Operating Lease, Malese agrees to provide written notice to HEB simultaneously with or promptly following the giving of notice of such default to the Lessee under the Operating Lease and HEB shall have the same opportunity to cure such default as is afforded to the Lessee under the Operating Lease.

Malese agrees to accept performance by HEB as performance by the Lessee under the Operating Lease.

3.    <u>Consideration</u>.    In consideration for Malese's entry into this Agreement, HEB shall, upon execution of this Agreement, pay to Malese the sum of $500,000 by certified or official bank check.

4.    <u>Malese's Rights Upon Acquisition of Title or Entry Into a Contract to Purchase the Premises</u>.    For the purposes of this first paragraph of this Paragraph 4, "Malese" shall mean and include any of the following persons or entities: (i) Malese Foods Corp., (ii) Lawrence Kadish, his legal representatives, successors and assigns, or (iii) any entity controlled by Malese Foods Corp. or by Lawrence Kadish, or his legal representatives, successors or assigns.    For purposes of this Paragraph 4, "control" shall mean the ownership, directly or indirectly, of more than fifty (50%) percent of the voting stock of any corporation or of the beneficial interest in any other business entity.    In the event Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001 (it being expressly agreed that Malese has no obligation to do so) Malese shall provide written notice to HEB of such fact promptly upon the occurrence thereof, and then the following shall apply:

(a)    For purposes of the balance of this Paragraph 4, "Malese" shall mean that person or entity constituting Malese for purposes of such first paragraph as shall have acquired or contracted to acquire the fee title to the Premises, and the legal representatives, successors and assigns of such person or entity and the heirs of such person.    Malese, in its sole discretion, may require HEB to purchase from Malese fee title to the Premises, free of the Master Lease, which shall be released, surrendered or extinguished by merger prior to or contemporaneously with the conveyance of the Premises by Malese to HEB, on April 1, 2003, for a purchase price of $11,200,000 ("Purchase Price").    At the time of such conveyance Malese shall own no other interest or estate in the Premises.    Likewise, HEB may require Malese to convey to HEB fee title to the Premises, free of the Master Lease and free of any other interest of Malese in and to the Premises, on April 1, 2003, for the Purchase Price.    At the

2

closing of such purchase by HEB, the $500,000 paid by HEB as consideration for Malese's entry into this Agreement shall be credited against the Purchase Price. The Premises shall be conveyed by Malese to HEB by Special Warranty Deed free and clear of the Master Lease and any and all liens, including but not limited to the liens in favor of SunTrust Bank, Nashville, N.A., Trustee, and subject only to such conditions, restrictions and easements as affect the Premises as of the date hereof or as may hereafter be approved in writing by HEB and/or Kroger (to the extent permitted by the Operating Lease and/or the Sublease and provided further that Malese will not consent to a modification or amendment of the Operating Lease without the prior written consent of HEB; provided, however, that nothing herein contained shall make Malese liable, responsible or accountable for the conduct of Kroger in violation of either the Operating Lease and/or the Sublease from Kroger to HEB) ("Permitted Exceptions"). As a condition to closing its purchase of the Property, Lawyers Title Insurance Company (the "Title Company") shall provide to HEB its commitment to issue an Owner Policy of Title Insurance in the form promulgated by the Texas Insurance Commission insuring good and indefeasible fee simple title in and to the Premises in HEB as of the closing date subject only to the Permitted Exceptions; provided that HEB shall pay the premium associated with such title policy; and

(b)    At any time following the date that Malese has acquired fee title to the Premises or has contracted to acquire such fee title Malese, in its sole discretion, may require HEB to secure its obligation to purchase the Premises pursuant to subparagraph 4(a) by depositing with Malese, within ten (10) days following HEB's receipt of a written request from Malese, a letter of credit ("Letter of Credit") satisfying the requirements of this subparagraph 4(b) and to be substantially in the form of Exhibit C annexed hereto and made a part hereof. The Letter of Credit shall be in the amount of $10,200,000, shall be issued in favor of Malese, as beneficiary, shall be unconditional and irrevocable and shall be for a term expiring July 1, 2003, but shall be payable to only Lawyers Title Insurance Corporation of New York, 655 Third Avenue, New York, New York 10017, or its successor through merger, acquisition or operation of law (the "Escrow Agent"), who shall receive, accept, hold and dispose of the proceeds of the Letter of Credit as provided in the escrow agreement (the "Escrow Agreement") to be executed contemporaneously with the execution of this Agreement, in the form of Exhibit B annexed hereto and made a part hereof. Payment by the issuer of the Letter of Credit to the Escrow Agent upon any drawing under the letter of credit, shall be and be deemed to be made for the account of the beneficiary of the Letter of Credit, but shall, once so made, be accepted, held and disposed of by the Escrow Agent only as provided in the Escrow Agreement. The Letter of Credit shall provide that it may be drawn on at anytime following April 1, 2003, upon presentation of the original Letter of Credit together with a sight draft drawn on the issuer. Any drawing on the Letter of Credit shall constitute the representation by Malese that the conditions for drawing on the Letter of Credit under this Agreement have been satisfied. Contemporaneously with the

3

execution and delivery of this Agreement, Malese, HEB and the Escrow Agent have entered into an Escrow Agreement in the form attached hereto as <u>Exhibit B</u>.

The Letter of Credit shall be issued by Chase Manhattan Bank, N.A., Citibank, N.A., or by any other bank approved by Malese and shall indicate an address in New York City where such Letter of Credit may be drawn and the hours of operation of that location. The letter of credit shall be payable "on sight" by means of a sight draft and shall not contain any condition to draw upon the Letter of Credit, except as expressly provided in this Agreement. Malese will not be responsible for bank error. In the event Malese requires that HEB provide a Letter of Credit pursuant to this subparagraph (b) and HEB timely delivers and maintains such Letter of Credit in force and effect throughout the term of this Agreement (i.e., until the earlier to occur of the Closing [with the sale being consummated] or July 1, 2003 [or any later date specified by agreement of the parties as the stated expiry of the Letter of Credit]), the Purchase Price of the Premises pursuant to subparagraph (a) of this Paragraph 4 shall be reduced to $10,700,000.

(c) HEB shall be required to give notice to Malese of HEB's election to acquire from Malese fee title to the Premises no later than January 4, 2002, or thirty (30) days following HEB's receipt of notice from Malese that it has acquired fee title to the Premises, whichever is later. Within twenty (20) days after acquiring fee title to the Premises, Malese shall notify HEB that Malese has acquired such fee title. Malese may notify HEB prior to acquiring fee title to the Premises, that Malese has contracted to acquire fee to the Premises, if Malese has contracted to so acquire such fee title; provided, however, Malese shall again notify HEB when it acquires fee title to the Premises if it has given notice prior to acquiring title. Any notice that either Malese has contracted to acquire fee title to the Premises, or has acquired such fee title, may be accompanied by a request or demand that HEB deliver the unconditional Letter of Credit provided for in subparagraph (b) of this Paragraph 4.

(d) HEB shall not at any time prior to April 1, 2003 exercise any right or direct the exercise by Kroger or any other person or entity of any right that would interfere with or prevent the purchase of the Premises by Malese and the exercise or performance by Malese of its rights or obligations under this Agreement; provided, however, nothing in this sentence contained shall limit the right of HEB to acquire the Premises from Malese pursuant to the terms of this Agreement. In the event either (A) Malese acquires the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001, but (i) Malese does not require HEB to purchase the Premises from Malese, and (ii) HEB does not require Malese to sell the Premises to HEB, in either instance, pursuant to this Agreement, or (B) Malese fails to acquire fee title to the Premises or fails to enter into a contract of sale to acquire fee title to the Premises, in either case prior to November 1, 2001,

4

then and in either such event, nothing contained herein shall impair the rights of HEB to exercise the Purchase Option (as hereinafter defined) or to enter into negotiations and to acquire the Premises at any time on or after November 1, 2001.

5. **Restrictions on HEB's Contact with Present Fee Owner of the Premises.** HEB hereby agrees not to make any requests or demands on or enter into any agreement with Balkhouse Associates, the present fee owner of the Premises, its successors or assigns, prior to November 1, 2001, which would be inconsistent with or an impediment to Malese acquiring fee title to the Premises, without the prior written consent of Malese which may be withheld in Malese's sole discretion. Furthermore, HEB agrees not to exercise the option to purchase the Premises pursuant to Section 8 of the Sublease and in accordance with the provisions of Article XXXV and Article XXXVI of the Operating Lease ("Purchase Option") prior to November 1, 2001 without the prior written consent of Malese which may be withheld in Malese's sole discretion. If Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises prior to November 1, 2001 and either (i) Malese requires HEB to purchase the Premises from Malese, or (ii) HEB requires Malese to sell the Premises to HEB as provided in paragraph 4(a) above, then HEB shall exercise the Purchase Option on or prior to January 4, 2002.   Upon HEB's exercise of the Purchase Option, the purchase price payable to Malese for the Premises shall be the Purchase Price as defined in Paragraph 4 above, and no appraisal of the fair market value of the Premises shall be performed, notwithstanding anything contained in the Operating Lease or the Master Lease to the contrary. If, notwithstanding this provision, an appraisal of the fair market value of the Premises is required to be performed, Malese will cooperate with HEB and cause any and all sums payable by HEB pursuant to the Purchase Option which are in excess of the Purchase Price payable by HEB to Malese pursuant hereto to be payable to or retained by HEB or credited against the Purchase Price, such that the amount payable by HEB to Malese shall equal and not exceed the Purchase Price payable pursuant to this Agreement. Nothing contained in either Paragraph 4 or this Paragraph 5 shall limit the right of HEB to obtain from Balkhouse Associates and/or Kroger the covenants and agreements as are contained in Paragraphs 1 and 2 hereof, to obtain such consents or approvals as may be required by governmental authorities to construct the Additional Facilities, or to exercise its Purchase Option within the period which is within sixty (60) days prior to the last day upon which the Purchase Option may be exercised by HEB pursuant to the Sublease.

6. **No Modification of Rights and Obligations.**   The Parties agree that except as expressly set forth herein, nothing contained in this Agreement shall serve to modify, impair, or otherwise affect any of the covenants, terms or conditions of the Parties' respective interests under the Operating Lease, the Master Lease and/or the Sublease.

7.    <u>Provisions Binding; Due Authorization</u>.    Each Party hereby represents to the other Party that (i) it has full power and authority to enter into and perform this Agreement, (ii) the individuals and entities executing this Agreement on its behalf have full power and authority to do so, and (iii) this Agreement constitutes the legal, valid and binding obligation of such Party, enforceable against it in accordance with the terms hereof.    The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each of the parties.

8.    <u>Notices</u>.

(a)    All notices, demands and other communications to be given hereunder ("Notices") shall be in writing and shall be given by (i) delivery by overnight courier service to the address for Notices; and (ii) sending the same by United States mail, postage prepaid, certified mail, return receipt requested, to the address for Notices.

(b)    All Notices shall be deemed given and effective upon the earlier to occur of (i) one (1) business day after the deposit of such notice with an overnight courier service by the time deadline for next day delivery, addressed to the address for Notices; or (ii) three (3) business days after depositing the Notice in the United States mail as set forth in (a)(ii) above.

All Notices shall be addressed to the following addresses:

| | |
|---|---|
| <u>If to Malese</u>: | c/o Kadish Real Estate<br>135 Jericho Turnpike<br>Old Westbury, New York 11568 |
| <u>With copy to</u>: | Stephen A. Helman, Esq.<br>Gordon Altman Butowsky Weitzen Shalov<br>& Wein<br>114 West 47th Street, 20th Floor<br>New York, New York 10036-1510 |
| <u>If to HEB</u>: | 646 South Main Avenue<br>San Antonio, Texas 78204<br>Attn:  Todd A. Piland |
| <u>With copy to</u>: | Stephen L. Golden, Esq.<br>Akin, Gump, Strauss, Hauer & Feld, LLP<br>300 Convent, Suite 1500<br>San Antonio, Texas 78205 |

or to such other persons or at such other place as any party hereto may by notice designate as a place for service of such notice.

9.    <u>Entire Agreement</u>.    This Agreement sets forth the entire agreement among the Parties with respect to the matters contemplated hereby, and all other prior agreements, understandings or statements,

oral or written, with respect to such matters, are hereby superseded. Except as expressly otherwise provided in Paragraph 4 hereof, this Agreement shall be for the benefit of the parties hereto only, and their respective legal representatives, successors and assigns, and shall not inure to the benefit of any independent third parties, including, without limitation, The Kroger Company.

      10.  <u>No Oral Modifications</u>.  This Agreement may not be modified or amended except by an instrument in writing signed by the Party(s) against whom enforcement of this Agreement, as amended, may be sought.

      11.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which together shall constitute one and same original, and the execution of separate counterparts by the Parties shall bind the Parties as if they had each executed the same counterpart.

      IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

                          MALESE FOODS CORP.

                          By:_____

                          Name: _Lawrence Kadish_

                          Title: _Vice Pres._

                          H. E. BUTT GROCERY COMPANY

                          By:_____

                            Todd A. Piland

                            Senior Vice President

7

## AGREEMENT RELATED TO SUBLEASE

THIS AGREEMENT RELATED TO SUBLEASE (this "Agreement"), dated to be effective as of the 15th day of November, 1999, is entered into by and between MALESE FOODS CORP. ("Malese"), a Delaware corporation; having an address c/o Kadish Real Estate, 135 Jericho Turnpike, Old Westbury, New York 11568, and H. E. BUTT GROCERY COMPANY ("HEB"), a Texas corporation, having an address at P.O. Box 839955, San Antonio, Texas 78238-3955 (collectively, the "Parties").

### W I T N E S S E T H:

WHEREAS, Balkhouse Associates, a Tennessee limited partnership ("Balkhouse") is the owner of a certain parcel of land located in the City of San Marcos, County of Hays, State of Texas, and more particularly described in Exhibit A attached hereto and made a part hereof (the "Premises").

WHEREAS, Balkhouse Properties Corp. ("BPC"), as lessor, entered into a certain Lease with The Kroger Company, an Ohio corporation ("Kroger"), as lessee, dated as of April 1, 1983, with respect to the Premises (the "Operating Lease");

WHEREAS, as of June 1, 1983, (i) BPC transferred all its right, title and interest in the Premises to Balkhouse, (ii) Balkhouse leased the Premises back to BPC (the "Master Lease"), subject to the Operating Lease, (iii) BPC assigned its interest as lessee under the Master Lease to Malese, and (iv) BPC assigned its interest as lessor under the Operating Lease to Malese;

WHEREAS, Kroger, as Sublessor, entered into a sublease of the Premises with HEB, as Sublessee, dated December 4, 1990 (the "Sublease"); and

WHEREAS, HEB presently intends to construct an additional building and/or other improvements on the Premises ("Additional Facilities") consistent with Article X of the Operating Lease, and in connection therewith desires to receive certain agreements and/or assurances from Malese as hereinafter provided.

NOW, THEREFORE, in consideration of the sum of Five Hundred Thousand Dollars ($500,000) payable as provided in paragraph 3 below, and of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.    Cost of Additional Facilities. Notwithstanding anything to the contrary contained in Articles XXXV or XXXVI of the Operating Lease, Article XL of the Master Lease, or paragraph 3 of the Two Party Agreement between Balkhouse and Malese dated as of June 1, 1983, the cost or value of the Additional Facilities constructed by HEB on the

1

Premises shall be excluded from the calculation of Fair Market Value for purposes of calculating the purchase price to be paid in connection with the exercise of the Lessee's purchase option pursuant to Articles XXXV and XXXVI of the Operating Lease.

2.   Notice of Lessee Default.  Upon the occurrence of a default by the Lessee under the Operating Lease and the giving of notice of such default to the Lessee under the Operating Lease, Malese agrees to provide written notice to HEB simultaneously with or promptly following the giving of notice of such default to the Lessee under the Operating Lease and HEB shall have the same opportunity to cure such default as is afforded to the Lessee under the Operating Lease.

Malese agrees to accept performance by HEB as performance by the Lessee under the Operating Lease.

3.   Consideration.  In consideration for Malese's entry into this Agreement, HEB shall, upon execution of this Agreement, pay to Malese the sum of $500,000 by certified or official bank check.

4.   Malese's Rights Upon Acquisition of Title or Entry Into a Contract to Purchase the Premises.  For the purposes of this first paragraph of this Paragraph 4, "Malese" shall mean and include any of the following persons or entities: (i) Malese Foods Corp., (ii) Lawrence Kadish, his legal representatives, successors and assigns, or (iii) any entity controlled by Malese Foods Corp. or by Lawrence Kadish, or his legal representatives, successors or assigns.  For purposes of this Paragraph 4, "control" shall mean the ownership, directly or indirectly, of more than fifty (50%) percent of the voting stock of any corporation or of the beneficial interest in any other business entity.  In the event Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001 (it being expressly agreed that Malese has no obligation to do so) Malese shall provide written notice to HEB of such fact promptly upon the occurrence thereof, and then the following shall apply:

(a)   For purposes of the balance of this Paragraph 4, "Malese" shall mean that person or entity constituting Malese for purposes of such first paragraph as shall have acquired or contracted to acquire the fee title to the Premises, and the legal representatives, successors and assigns of such person or entity and the heirs of such person.  Malese, in its sole discretion, may require HEB to purchase from Malese fee title to the Premises, free of the Master Lease, which shall be released, surrendered or extinguished by merger prior to or contemporaneously with the conveyance of the Premises by Malese to HEB, on April 1, 2003, for a purchase price of $11,200,000 ("Purchase Price").  At the time of such conveyance Malese shall own no other interest or estate in the Premises.  Likewise, HEB may require Malese to convey to HEB fee title to the Premises, free of the Master Lease and free of any other interest of Malese in and to the Premises, on April 1, 2003, for the Purchase Price.  At the

062007.0186 SAN ANTONIO 113454 v13

2

closing of such purchase by HEB, the $500,000 paid by HEB as consideration for Malese's entry into this Agreement shall be credited against the Purchase Price. The Premises shall be conveyed by Malese to HEB by Special Warranty Deed free and clear of the Master Lease and any and all liens, including but not limited to the liens in favor of SunTrust Bank, Nashville, N.A., Trustee, and subject only to such conditions, restrictions and easements as affect the Premises as of the date hereof or as may hereafter be approved in writing by HEB and/or Kroger (to the extent permitted by the Operating Lease and/or the Sublease and provided further that Malese will not consent to a modification or amendment of the Operating Lease without the prior written consent of HEB; provided, however, that nothing herein contained shall make Malese liable, responsible or accountable for the conduct of Kroger in violation of either the Operating Lease and/or the Sublease from Kroger to HEB) ("Permitted Exceptions"). As a condition to closing its purchase of the Property, Lawyers Title Insurance Company (the "Title Company") shall provide to HEB its commitment to issue an Owner Policy of Title Insurance in the form promulgated by the Texas Insurance Commission insuring good and indefeasible fee simple title in and to the Premises in HEB as of the closing date subject only to the Permitted Exceptions; provided that HEB shall pay the premium associated with such title policy; and

(b) At any time following the date that Malese has acquired fee title to the Premises or has contracted to acquire such fee title Malese, in its sole discretion, may require HEB to secure its obligation to purchase the Premises pursuant to subparagraph 4(a) by depositing with Malese, within ten (10) days following HEB's receipt of a written request from Malese, a letter of credit ("Letter of Credit") satisfying the requirements of this subparagraph 4(b) and to be substantially in the form of Exhibit C annexed hereto and made a part hereof. The Letter of Credit shall be in the amount of $10,200,000, shall be issued in favor of Malese, as beneficiary, shall be unconditional and irrevocable and shall be for a term expiring July 1, 2003, but shall be payable to only Lawyers Title Insurance Corporation of New York, 655 Third Avenue, New York, New York 10017, or its successor through merger, acquisition or operation of law (the "Escrow Agent"), who shall receive, accept, hold and dispose of the proceeds of the Letter of Credit as provided in the escrow agreement (the "Escrow Agreement") to be executed contemporaneously with the execution of this Agreement, in the form of Exhibit B annexed hereto and made a part hereof. Payment by the issuer of the Letter of Credit to the Escrow Agent upon any drawing under the letter of credit, shall be and be deemed to be made for the account of the beneficiary of the Letter of Credit, but shall, once so made, be accepted, held and disposed of by the Escrow Agent only as provided in the Escrow Agreement. The Letter of Credit shall provide that it may be drawn on at anytime following April 1, 2003, upon presentation of the original Letter of Credit together with a sight draft drawn on the issuer. Any drawing on the Letter of Credit shall constitute the representation by Malese that the conditions for drawing on the Letter of Credit under this Agreement have been satisfied. Contemporaneously with the

3

execution and delivery of this Agreement, Malese, HEB and the Escrow Agent have entered into an Escrow Agreement in the form attached hereto as <u>Exhibit B</u>.

The Letter of Credit shall be issued by Chase Manhattan Bank, N.A., Citibank, N.A., or by any other bank approved by Malese and shall indicate an address in New York City where such Letter of Credit may be drawn and the hours of operation of that location.  The letter of credit shall be payable "on sight" by means of a sight draft and shall not contain any condition to draw upon the Letter of Credit, except as expressly provided in this Agreement. Malese will not be responsible for bank error.  In the event Malese requires that HEB provide a Letter of Credit pursuant to this subparagraph (b) and HEB timely delivers and maintains such Letter of Credit in force and effect throughout the term of this Agreement (i.e., until the earlier to occur of the Closing [with the sale being consummated] or July 1, 2003 [or any later date specified by agreement of the parties as the stated expiry of the Letter of Credit]), the Purchase Price of the Premises pursuant to subparagraph (a) of this Paragraph 4 shall be reduced to $10,700,000.

(c)  HEB shall be required to give notice to Malese of HEB's election to acquire from Malese fee title to the Premises no later than January 4, 2002, or thirty (30) days following HEB's receipt of notice from Malese that it has acquired fee title to the Premises, whichever is later.  Within twenty (20) days after acquiring fee title to the Premises, Malese shall notify HEB that Malese has acquired such fee title. Malese may notify HEB prior to acquiring fee title to the Premises, that Malese has contracted to acquire fee to the Premises, if Malese has contracted to so acquire such fee title; provided, however, Malese shall again notify HEB when it acquires fee title to the Premises if it has given notice prior to acquiring title. Any notice that either Malese has contracted to acquire fee title to the Premises, or has acquired such fee title, may be accompanied by a request or demand that HEB deliver the unconditional Letter of Credit provided for in subparagraph (b) of this Paragraph 4.

(d)  HEB shall not at any time prior to April 1, 2003 exercise any right or direct the exercise by Kroger or any other person or entity of any right that would interfere with or prevent the purchase of the Premises by Malese and the exercise or performance by Malese of its rights or obligations under this Agreement; provided, however, nothing in this sentence contained shall limit the right of HEB to acquire the Premises from Malese pursuant to the terms of this Agreement.  In the event either (A) Malese acquires the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001, but (i) Malese does not require HEB to purchase the Premises from Malese, and (ii) HEB does not require Malese to sell the Premises to HEB, in either instance, pursuant to this Agreement, or (B) Malese fails to acquire fee title to the Premises or fails to enter into a contract of sale to acquire fee title to the Premises, in either case prior to November 1, 2001,

4

then and in either such event, nothing contained herein shall impair the rights of HEB to exercise the Purchase Option (as hereinafter defined) or to enter into negotiations and to acquire the Premises at any time on or after November 1, 2001.

5. <u>Restrictions on HEB's Contact with Present Fee Owner of the Premises</u>. HEB hereby agrees not to make any requests or demands on or enter into any agreement with Balkhouse Associates, the present fee owner of the Premises, its successors or assigns, prior to November 1, 2001, which would be inconsistent with or an impediment to Malese acquiring fee title to the Premises, without the prior written consent of Malese which may be withheld in Malese's sole discretion. Furthermore, HEB agrees not to exercise the option to purchase the Premises pursuant to Section 8 of the Sublease and in accordance with the provisions of Article XXXV and Article XXXVI of the Operating Lease ("Purchase Option") prior to November 1, 2001 without the prior written consent of Malese which may be withheld in Malese's sole discretion. If Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises prior to November 1, 2001 and either (i) Malese requires HEB to purchase the Premises from Malese, or (ii) HEB requires Malese to sell the Premises to HEB as provided in paragraph 4(a) above, then HEB shall exercise the Purchase Option on or prior to January 4, 2002. Upon HEB's exercise of the Purchase Option, the purchase price payable to Malese for the Premises shall be the Purchase Price as defined in Paragraph 4 above, and no appraisal of the fair market value of the Premises shall be performed, notwithstanding anything contained in the Operating Lease or the Master Lease to the contrary. If, notwithstanding this provision, an appraisal of the fair market value of the Premises is required to be performed, Malese will cooperate with HEB and cause any and all sums payable by HEB pursuant to the Purchase Option which are in excess of the Purchase Price payable by HEB to Malese pursuant hereto to be payable to or retained by HEB or credited against the Purchase Price, such that the amount payable by HEB to Malese shall equal and not exceed the Purchase Price payable pursuant to this Agreement. Nothing contained in either Paragraph 4 or this Paragraph 5 shall limit the right of HEB to obtain from Balkhouse Associates and/or Kroger the covenants and agreements as are contained in Paragraphs 1 and 2 hereof, to obtain such consents or approvals as may be required by governmental authorities to construct the Additional Facilities, or to exercise its Purchase Option within the period which is within sixty (60) days prior to the last day upon which the Purchase Option may be exercised by HEB pursuant to the Sublease.

6. <u>No Modification of Rights and Obligations</u>. The Parties agree that except as expressly set forth herein, nothing contained in this Agreement shall serve to modify, impair, or otherwise affect any of the covenants, terms or conditions of the Parties' respective interests under the Operating Lease, the Master Lease and/or the Sublease.

5

7.    <u>Provisions Binding; Due Authorization</u>.    Each Party hereby represents to the other Party that (i) it has full power and authority to enter into and perform this Agreement, (ii) the individuals and entities executing this Agreement on its behalf have full power and authority to do so, and (iii) this Agreement constitutes the legal, valid and binding obligation of such Party, enforceable against it in accordance with the terms hereof.    The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each of the parties.

8.    <u>Notices</u>.

(a)    All notices, demands and other communications to be given hereunder ("Notices") shall be in writing and shall be given by (i) delivery by overnight courier service to the address for Notices; and (ii) sending the same by United States mail, postage prepaid, certified mail, return receipt requested, to the address for Notices.

(b)    All Notices shall be deemed given and effective upon the earlier to occur of (i) one (1) business day after the deposit of such notice with an overnight courier service by the time deadline for next day delivery, addressed to the address for Notices; or (ii) three (3) business days after depositing the Notice in the United States mail as set forth in (a)(ii) above.

All Notices shall be addressed to the following addresses:

<u>If to Malese</u>:    c/o Kadish Real Estate
135 Jericho Turnpike
Old Westbury, New York 11568

<u>With copy to</u>:    Stephen A. Helman, Esq.
Gordon Altman Butowsky Weitzen Shalov
    & Wein
114 West 47th Street, 20th Floor
New York, New York 10036-1510

<u>If to HEB</u>:    646 South Main Avenue
San Antonio, Texas 78204
Attn:  Todd A. Piland

<u>With copy to</u>:    Stephen L. Golden, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
300 Convent, Suite 1500
San Antonio, Texas 78205

or to such other persons or at such other place as any party hereto may by notice designate as a place for service of such notice.

9.    <u>Entire Agreement</u>.    This Agreement sets forth the entire agreement among the Parties with respect to the matters contemplated hereby, and all other prior agreements, understandings or statements,

6

oral or written, with respect to such matters, are hereby superseded. Except as expressly otherwise provided in Paragraph 4 hereof, this Agreement shall be for the benefit of the parties hereto only, and their respective legal representatives, successors and assigns, and shall not inure to the benefit of any independent third parties, including, without limitation, The Kroger Company.

10. <u>No Oral Modifications</u>. This Agreement may not be modified or amended except by an instrument in writing signed by the Party(s) against whom enforcement of this Agreement, as amended, may be sought.

11. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which together shall constitute one and same original, and the execution of separate counterparts by the Parties shall bind the Parties as if they had each executed the same counterpart.

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

MALESE FOODS CORP.

By:
Name: _Lawrence Kadish_
Title: _Vice Pres._

H. E. BUTT GROCERY COMPANY

By:
Todd A. Piland
Senior Vice President

7

## AGREEMENT RELATED TO SUBLEASE

THIS AGREEMENT RELATED TO SUBLEASE (this "Agreement"), dated to be effective as of the 15th day of November, 1999, is entered into by and between MALESE FOODS CORP. ("Malese"), a Delaware corporation, having an address c/o Kadish Real Estate, 135 Jericho Turnpike, Old Westbury, New York 11568, and H. E. BUTT GROCERY COMPANY ("HEB"), a Texas corporation, having an address at P.O. Box 839955, San Antonio, Texas 78238-3955 (collectively, the "Parties").

### W I T N E S S E T H:

WHEREAS, Balkhouse Associates, a Tennessee limited partnership ("Balkhouse") is the owner of a certain parcel of land located in the City of San Marcos, County of Hays, State of Texas, and more particularly described in Exhibit A attached hereto and made a part hereof (the "Premises").

WHEREAS, Balkhouse Properties Corp. ("BPC"), as lessor, entered into a certain Lease with The Kroger Company, an Ohio corporation ("Kroger"), as lessee, dated as of April 1, 1983, with respect to the Premises (the "Operating Lease");

WHEREAS, as of June 1, 1983, (i) BPC transferred all its right, title and interest in the Premises to Balkhouse, (ii) Balkhouse leased the Premises back to BPC (the "Master Lease"), subject to the Operating Lease, (iii) BPC assigned its interest as lessee under the Master Lease to Malese, and (iv) BPC assigned its interest as lessor under the Operating Lease to Malese;

WHEREAS, Kroger, as Sublessor, entered into a sublease of the Premises with HEB, as Sublessee, dated December 4, 1990 (the "Sublease"); and

WHEREAS, HEB presently intends to construct an additional building and/or other improvements on the Premises ("Additional Facilities") consistent with Article X of the Operating Lease, and in connection therewith desires to receive certain agreements and/or assurances from Malese as hereinafter provided.

NOW, THEREFORE, in consideration of the sum of Five Hundred Thousand Dollars ($500,000) payable as provided in paragraph 3 below, and of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.  <u>Cost of Additional Facilities</u>. Notwithstanding anything to the contrary contained in Articles XXXV or XXXVI of the Operating Lease, Article XL of the Master Lease, or paragraph 3 of the Two Party Agreement between Balkhouse and Malese dated as of June 1, 1983, the cost or value of the Additional Facilities constructed by HEB on the

1

Premises shall be excluded from the calculation of Fair Market Value for purposes of calculating the purchase price to be paid in connection with the exercise of the Lessee's purchase option pursuant to Articles XXXV and XXXVI of the Operating Lease.

2. <u>Notice of Lessee Default</u>. Upon the occurrence of a default by the Lessee under the Operating Lease and the giving of notice of such default to the Lessee under the Operating Lease, Malese agrees to provide written notice to HEB simultaneously with or promptly following the giving of notice of such default to the Lessee under the Operating Lease and HEB shall have the same opportunity to cure such default as is afforded to the Lessee under the Operating Lease.

Malese agrees to accept performance by HEB as performance by the Lessee under the Operating Lease.

3. <u>Consideration</u>. In consideration for Malese's entry into this Agreement, HEB shall, upon execution of this Agreement, pay to Malese the sum of $500,000 by certified or official bank check.

4. <u>Malese's Rights Upon Acquisition of Title or Entry Into a Contract to Purchase the Premises</u>. For the purposes of this first paragraph of this Paragraph 4, "Malese" shall mean and include any of the following persons or entities: (i) Malese Foods Corp., (ii) Lawrence Kadish, his legal representatives, successors and assigns, or (iii) any entity controlled by Malese Foods Corp. or by Lawrence Kadish, or his legal representatives, successors or assigns. For purposes of this Paragraph 4, "control" shall mean the ownership, directly or indirectly, of more than fifty (50%) percent of the voting stock of any corporation or of the beneficial interest in any other business entity. In the event Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001 (it being expressly agreed that Malese has no obligation to do so) Malese shall provide written notice to HEB of such fact promptly upon the occurrence thereof, and then the following shall apply:

(a) For purposes of the balance of this Paragraph 4, "Malese" shall mean that person or entity constituting Malese for purposes of such first paragraph as shall have acquired or contracted to acquire the fee title to the Premises, and the legal representatives, successors and assigns of such person or entity and the heirs of such person. Malese, in its sole discretion, may require HEB to purchase from Malese fee title to the Premises, free of the Master Lease, which shall be released, surrendered or extinguished by merger prior to or contemporaneously with the conveyance of the Premises by Malese to HEB, on April 1, 2003, for a purchase price of $11,200,000 ("Purchase Price"). At the time of such conveyance Malese shall own no other interest or estate in the Premises. Likewise, HEB may require Malese to convey to HEB fee title to the Premises, free of the Master Lease and free of any other interest of Malese in and to the Premises, on April 1, 2003, for the Purchase Price. At the

2

closing of such purchase by HEB, the $500,000 paid by HEB as consideration for Malese's entry into this Agreement shall be credited against the Purchase Price. The Premises shall be conveyed by Malese to HEB by Special Warranty Deed free and clear of the Master Lease and any and all liens, including but not limited to the liens in favor of SunTrust Bank, Nashville, N.A., Trustee, and subject only to such conditions, restrictions and easements as affect the Premises as of the date hereof or as may hereafter be approved in writing by HEB and/or Kroger (to the extent permitted by the Operating Lease and/or the Sublease and provided further that Malese will not consent to a modification or amendment of the Operating Lease without the prior written consent of HEB; provided, however, that nothing herein contained shall make Malese liable, responsible or accountable for the conduct of·Kroger in violation of either the Operating Lease and/or the Sublease from Kroger to HEB) ("Permitted Exceptions"). ·As a condition to closing its purchase of the Property, Lawyers Title Insurance Company (the "Title Company") shall provide to HEB its commitment to issue an Owner Policy of Title Insurance in the form promulgated by the Texas Insurance Commission insuring good and indefeasible fee simple title in and to the Premises in HEB as of the closing date subject only to the Permitted Exceptions; provided that HEB shall pay the premium associated with such title policy; and

(b) At any time following the date that Malese has acquired fee title to the Premises or has contracted to acquire such fee title Malese, in its sole discretion, may require HEB to secure its obligation to purchase the Premises pursuant to subparagraph 4(a) by depositing with Malese, within ten (10) days following HEB's receipt of a written request from Malese, a letter of credit ("Letter of Credit") satisfying the requirements of this subparagraph 4(b) and to be substantially in the form of Exhibit C annexed hereto and made a part hereof.  The Letter of Credit shall be in the amount of $10,200,000, shall be·issued in favor of Malese, as beneficiary, shall be unconditional and irrevocable and shall be for a term expiring July 1, 2003, but shall be payable to only Lawyers Title Insurance Corporation of New York, 655 Third Avenue, New York, New York 10017, or its successor through merger, acquisition or operation of law (the "Escrow Agent"), who shall receive, accept, hold and dispóse of··the proceeds of the Letter of Credit as provided in the escrow agreement (the "Escrow Agreement") to be executed contemporaneously with the execution of this Agreement, in the form of Exhibit B annexed hereto and made a part hereof.  Payment by the issuer of the Letter of Credit to the Escrow Agent upon any drawing under the letter of credit, shall be and be deemed to be made for the account of the beneficiary of the Letter of Credit, but shall, once so made, be accepted, held and disposed of by the Escrow Agent only as provided in the Escrow Agreement.  The Letter of Credit shall provide that it may be drawn on at anytime following April 1, 2003, upon presentation of the original Letter of Credit together with a sight draft drawn on the issuer.  Any drawing on the Letter of Credit shall constitute the representation by Malese that the conditions for drawing on the Letter of Credit under this Agreement have been satisfied.  Contemporaneously with the

execution and delivery of this Agreement, Malese, HEB and the Escrow Agent have entered into an Escrow Agreement in the form attached hereto as <u>Exhibit B</u>.

The Letter of Credit shall be issued by Chase Manhattan Bank, N.A., Citibank, N.A., or by any other bank approved by Malese and shall indicate an address in New York City where such Letter of Credit may be drawn and the hours of operation of that location. The letter of credit shall be payable "on sight" by means of a sight draft and shall not contain any condition to draw upon the Letter of Credit, except as expressly provided in this Agreement. Malese will not be responsible for bank error. In the event Malese requires that HEB provide a Letter of Credit pursuant to this subparagraph (b) and HEB timely delivers and maintains such Letter of Credit in force and effect throughout the term of this Agreement (i.e., until the earlier to occur of the Closing [with the sale being consummated] or July 1, 2003 [or any later date specified by agreement of the parties as the stated expiry of the Letter of Credit]), the Purchase Price of the Premises pursuant to subparagraph (a) of this Paragraph 4 shall be reduced to $10,700,000.

(c) HEB shall be required to give notice to Malese of HEB's election to acquire from Malese fee title to the Premises no later than January 4, 2002, or thirty (30) days following HEB's receipt of notice from Malese that it has acquired fee title to the Premises, whichever is later. Within twenty (20) days after acquiring fee title to the Premises, Malese shall notify HEB that Malese has acquired such fee title. Malese may notify HEB prior to acquiring fee title to the Premises, that Malese has contracted to acquire fee to the Premises, if Malese has contracted to so acquire such fee title; provided, however, Malese shall again notify HEB when it acquires fee title to the Premises if it has given notice prior to acquiring title. Any notice that either Malese has contracted to acquire fee title to the Premises, or has acquired such fee title, may be accompanied by a request or demand that HEB deliver the unconditional Letter of Credit provided for in subparagraph (b) of this Paragraph 4.

(d) HEB shall not at any time prior to April 1, 2003 exercise any right or direct the exercise by Kroger or any other person or entity of any right that would interfere with or prevent the purchase of the Premises by Malese and the exercise or performance by Malese of its rights or obligations under this Agreement; provided, however, nothing in this sentence contained shall limit the right of HEB to acquire the Premises from Malese pursuant to the terms of this Agreement. In the event either (A) Malese acquires the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001, but (i) Malese does not require HEB to purchase the Premises from Malese, and (ii) HEB does not require Malese to sell the Premises to HEB, in either instance, pursuant to this Agreement, or (B) Malese fails to acquire fee title to the Premises or fails to enter into a contract of sale to acquire fee title to the Premises, in either case prior to November 1, 2001,

4

then and in either such event, nothing contained herein shall impair the rights of HEB to exercise the Purchase Option (as hereinafter defined) or to enter into negotiations and to acquire the Premises at any time on or after November 1, 2001.

5.    <u>Restrictions on HEB's Contact with Present Fee Owner of the Premises</u>.  HEB hereby agrees not to make any requests or demands on or enter into any agreement with Balkhouse Associates, the present fee owner of the Premises, its successors or assigns, prior to November 1, 2001, which would be inconsistent with or an impediment to Malese acquiring fee title to the Premises, without the prior written consent of Malese which may be withheld in Malese's sole discretion. Furthermore, HEB agrees not to exercise the option to purchase the Premises pursuant to Section 8 of the Sublease and in accordance with the provisions of Article XXXV and Article XXXVI of the Operating Lease ("Purchase Option") prior to November 1, 2001 without the prior written consent of Malese which may be withheld in Malese's sole discretion.    If Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises prior to November 1, 2001 and either (i) Malese requires HEB to purchase the Premises from Malese, or (ii) HEB requires Malese to sell the Premises to HEB as provided in paragraph 4(a) above, then HEB shall exercise the Purchase Option on or prior to January 4, 2002.    Upon HEB's exercise of the Purchase Option, the purchase price payable to Malese for the Premises shall be the Purchase Price as defined in Paragraph 4 above, and no appraisal of the fair market value of the Premises shall be performed, notwithstanding anything contained in the Operating Lease or the Master Lease to the contrary.    If, notwithstanding this provision, an appraisal of the fair market value of the Premises is required to be performed, Malese will cooperate with HEB and cause any and all sums payable by HEB pursuant to the Purchase Option which are in excess of the Purchase Price payable by HEB to Malese pursuant hereto to be payable to or retained by HEB or credited against the Purchase Price, such that the amount payable by HEB to Malese shall equal and not exceed the Purchase Price payable pursuant to this Agreement.    Nothing contained in either Paragraph 4 or this Paragraph 5 shall limit the right of HEB to obtain from Balkhouse Associates and/or Kroger the covenants and agreements as are contained in Paragraphs 1 and 2 hereof, to obtain such consents or approvals as may be required by governmental authorities to construct the Additional Facilities, or to exercise its Purchase Option within the period which is within sixty (60) days prior to the last day upon which the Purchase Option may be exercised by HEB pursuant to the Sublease.

6.    <u>No Modification of Rights and Obligations</u>.    The Parties agree that except as expressly set forth herein, nothing contained in this Agreement shall serve to modify, impair, or otherwise affect any of the covenants, terms or conditions of the Parties' respective interests under the Operating Lease, the Master Lease and/or the Sublease.

5

7.   <u>Provisions Binding; Due Authorization</u>.   Each Party hereby represents to the other Party that (i) it has full power and authority to enter into and perform this Agreement, (ii) the individuals and entities executing this Agreement on its behalf have full power and authority to do so, and (iii) this Agreement constitutes the legal, valid and binding obligation of such Party, enforceable against it in accordance with the terms hereof.   The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each of the parties.

8.   <u>Notices</u>.

(a)   All notices, demands and other communications to be given hereunder ("Notices") shall be in writing and shall be given by (i) delivery by overnight courier service to the address for Notices; and (ii) sending the same by United States mail, postage prepaid, certified mail, return receipt requested, to the address for Notices.

(b)   All Notices shall be deemed given and effective upon the earlier to occur of (i) one (1) business day after the deposit of such notice with an overnight courier service by the time deadline for next day delivery, addressed to the address for Notices; or (ii) three (3) business days after depositing the Notice in the United States mail as set forth in (a)(ii) above.

All Notices shall be addressed to the following addresses:

| If to Malese: | c/o Kadish Real Estate<br>135 Jericho Turnpike<br>Old Westbury, New York 11568 |
|---|---|
| With copy to: | Stephen A. Helman, Esq.<br>Gordon Altman Butowsky Weitzen Shalov<br>    & Wein<br>114 West 47th Street, 20th Floor<br>New York, New York 10036-1510 |
| If to HEB: | 646 South Main Avenue<br>San Antonio, Texas 78204<br>Attn:  Todd A. Piland |
| With copy to: | Stephen L. Golden, Esq.<br>Akin, Gump, Strauss, Hauer & Feld, LLP<br>300 Convent, Suite 1500<br>San Antonio, Texas 78205 |

or to such other persons or at such other place as any party hereto may by notice designate as a place for service of such notice.

9.   <u>Entire Agreement</u>.   This Agreement sets forth the entire agreement among the Parties with respect to the matters contemplated hereby, and all other prior agreements, understandings or statements,

oral or written, with respect to such matters, are hereby superseded. Except as expressly otherwise provided in Paragraph 4 hereof, this Agreement shall be for the benefit of the parties hereto only, and their respective legal representatives, successors and assigns, and shall not inure to the benefit of any independent third parties, including, without limitation, The Kroger Company.

10. <u>No Oral Modifications</u>. This Agreement may not be modified or amended except by an instrument in writing signed by the Party(s) against whom enforcement of this Agreement, as amended, may be sought.

11. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which together shall constitute one and same original, and the execution of separate counterparts by the Parties shall bind the Parties as if they had each executed the same counterpart.

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

MALESE FOODS CORP.

By: _____
Name: _Lawrence Kadish_____
Title: _Vice Pres._____

H. E. BUTT GROCERY COMPANY

By: _____
Todd A. Piland
Senior Vice President

## AGREEMENT RELATED TO SUBLEASE

THIS AGREEMENT RELATED TO SUBLEASE (this "Agreement"), dated to be effective as of the 15th day of November, 1999, is entered into by and between MALESE FOODS CORP. ("Malese"), a Delaware corporation, having an address c/o Kadish Real Estate, 135 Jericho Turnpike, Old Westbury, New York 11568, and H. E. BUTT GROCERY COMPANY ("HEB"), a Texas corporation, having an address at P.O. Box 839955, San Antonio, Texas 78238-3955 (collectively, the "Parties").

## W I T N E S S E T H:

WHEREAS, Balkhouse Associates, a Tennessee limited partnership ("Balkhouse") is the owner of a certain parcel of land located in the City of San Marcos, County of Hays, State of Texas, and more particularly described in Exhibit A attached hereto and made a part hereof (the "Premises").

WHEREAS, Balkhouse Properties Corp. ("BPC"), as lessor, entered into a certain Lease with The Kroger Company, an Ohio corporation ("Kroger"), as lessee, dated as of April 1, 1983, with respect to the Premises (the "Operating Lease");

WHEREAS, as of June 1, 1983, (i) BPC transferred all its right, title and interest in the Premises to Balkhouse, (ii) Balkhouse leased the Premises back to BPC (the "Master Lease"), subject to the Operating Lease, (iii) BPC assigned its interest as lessee under the Master Lease to Malese, and (iv) BPC assigned its interest as lessor under the Operating Lease to Malese;

WHEREAS, Kroger, as Sublessor, entered into a sublease of the Premises with HEB, as Sublessee, dated December 4, 1990 (the "Sublease"); and

WHEREAS, HEB presently intends to construct an additional building and/or other improvements on the Premises ("Additional Facilities") consistent with Article X of the Operating Lease, and in connection therewith desires to receive certain agreements and/or assurances from Malese as hereinafter provided.

NOW, THEREFORE, in consideration of the sum of Five Hundred Thousand Dollars ($500,000) payable as provided in paragraph 3 below, and of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.    Cost of Additional Facilities. Notwithstanding anything to the contrary contained in Articles XXXV or XXXVI of the Operating Lease, Article XL of the Master Lease, or paragraph 3 of the Two Party Agreement between Balkhouse and Malese dated as of June 1, 1983, the cost or value of the Additional Facilities constructed by HEB on the

1

Premises shall be excluded from the calculation of Fair Market Value for purposes of calculating the purchase price to be paid in connection with the exercise of the Lessee's purchase option pursuant to Articles XXXV and XXXVI of the Operating Lease.

2.    Notice of Lessee Default.    Upon the occurrence of a default by the Lessee under the Operating Lease and the giving of notice of such default to the Lessee under the Operating Lease, Malese agrees to provide written notice to HEB simultaneously with or promptly following the giving of notice of such default to the Lessee under the Operating Lease and HEB shall have the same opportunity to cure such default as is afforded to the Lessee under the Operating Lease.

Malese agrees to accept performance by HEB as performance by the Lessee under the Operating Lease.

3.    Consideration.    In consideration for Malese's entry into this Agreement, HEB shall, upon execution of this Agreement, pay to Malese the sum of $500,000 by certified or official bank check.

4.    Malese's Rights Upon Acquisition of Title or Entry Into a Contract to Purchase the Premises.    For the purposes of this first paragraph of this Paragraph 4, "Malese" shall mean and include any of the following persons or entities: (i) Malese Foods Corp., (ii) Lawrence Kadish, his legal representatives, successors and assigns, or (iii) any entity controlled by Malese Foods Corp. or by Lawrence Kadish, or his legal representatives, successors or assigns.    For purposes of this Paragraph 4, "control" shall mean the ownership, directly or indirectly, of more than fifty (50%) percent of the voting stock of any corporation or of the beneficial interest in any other business entity.    In the event Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001 (it being expressly agreed that Malese has no obligation to do so) Malese shall provide written notice to HEB of such fact promptly upon the occurrence thereof, and then the following shall apply:

(a)    For purposes of the balance of this Paragraph 4, "Malese" shall mean that person or entity constituting Malese for purposes of such first paragraph as shall have acquired or contracted to acquire the fee title to the Premises, and the legal representatives, successors and assigns of such person or entity and the heirs of such person.    Malese, in its sole discretion, may require HEB to purchase from Malese fee title to the Premises, free of the Master Lease, which shall be released, surrendered or extinguished by merger prior to or contemporaneously with the conveyance of the Premises by Malese to HEB, on April 1, 2003, for a purchase price of $11,200,000 ("Purchase Price").    At the time of such conveyance Malese shall own no other interest or estate in the Premises.    Likewise, HEB may require Malese to convey to HEB fee title to the Premises, free of the Master Lease and free of any other interest of Malese in and to the Premises, on April 1, 2003, for the Purchase Price.    At the

closing of such purchase by HEB, the $500,000 paid by HEB as consideration for Malese's entry into this Agreement shall be credited against the Purchase Price. The Premises shall be conveyed by Malese to HEB by Special Warranty Deed free and clear of the Master Lease and any and all liens, including but not limited to the liens in favor of SunTrust Bank, Nashville, N.A., Trustee, and subject only to such conditions, restrictions and easements as affect the Premises as of the date hereof or as may hereafter be approved in writing by HEB and/or Kroger (to the extent permitted by the Operating Lease and/or the Sublease and provided further that Malese will not consent to a modification or amendment of the Operating Lease without the prior written consent of HEB; provided, however, that nothing herein contained shall make Malese liable, responsible or accountable for the conduct of Kroger in violation of either the Operating Lease and/or the Sublease from Kroger to HEB) ("Permitted Exceptions"). As a condition to closing its purchase of the Property, Lawyers Title Insurance Company (the "Title Company") shall provide to HEB its commitment to issue an Owner Policy of Title Insurance in the form promulgated by the Texas Insurance Commission insuring good and indefeasible fee simple title in and to the Premises in HEB as of the closing date subject only to the Permitted Exceptions; provided that HEB shall pay the premium associated with such title policy; and

(b) At any time following the date that Malese has acquired fee title to the Premises or has contracted to acquire such fee title Malese, in its sole discretion, may require HEB to secure its obligation to purchase the Premises pursuant to subparagraph 4(a) by depositing with Malese, within ten (10) days following HEB's receipt of a written request from Malese, a letter of credit ("Letter of Credit") satisfying the requirements of this subparagraph 4(b) and to be substantially in the form of Exhibit C annexed hereto and made a part hereof.  The Letter of Credit shall be in the amount of $10,200,000, shall be issued in favor of Malese, as beneficiary, shall be unconditional and irrevocable and shall be for a term expiring July 1, 2003, but shall be payable to only Lawyers Title Insurance Corporation of New York, 655 Third Avenue, New York, New York 10017, or its successor through merger, acquisition or operation of law (the "Escrow Agent"), who shall receive, accept, hold and dispose of the proceeds of the Letter of Credit as provided in the escrow agreement (the "Escrow Agreement") to be executed contemporaneously with the execution of this Agreement, in the form of Exhibit B annexed hereto and made a part hereof.  Payment by the issuer of the Letter of Credit to the Escrow Agent upon any drawing under the letter of credit, shall be and be deemed to be made for the account of the beneficiary of the Letter of Credit, but shall, once so made, be accepted, held and disposed of by the Escrow Agent only as provided in the Escrow Agreement.  The Letter of Credit shall provide that it may be drawn on at anytime following April 1, 2003, upon presentation of the original Letter of Credit together with a sight draft drawn on the issuer.  Any drawing on the Letter of Credit shall constitute the representation by Malese that the conditions for drawing on the Letter of Credit under this Agreement have been satisfied.  Contemporaneously with the

3

execution and delivery of this Agreement, Malese, HEB and the Escrow Agent have entered into an Escrow Agreement in the form attached hereto as <u>Exhibit B</u>.

The Letter of Credit shall be issued by Chase Manhattan Bank, N.A., Citibank, N.A., or by any other bank approved by Malese and shall indicate an address in New York City where such Letter of Credit may be drawn and the hours of operation of that location. The letter of credit shall be payable "on sight" by means of a sight draft and shall not contain any condition to draw upon the Letter of Credit, except as expressly provided in this Agreement. Malese will not be responsible for bank error. In the event Malese requires that HEB provide a Letter of Credit pursuant to this subparagraph (b) and HEB timely delivers and maintains such Letter of Credit in force and effect throughout the term of this Agreement (i.e., until the earlier to occur of the Closing [with the sale being consummated] or July 1, 2003 [or any later date specified by agreement of the parties as the stated expiry of the Letter of Credit]), the Purchase Price of the Premises pursuant to subparagraph (a) of this Paragraph 4 shall be reduced to $10,700,000.

(c) HEB shall be required to give notice to Malese of HEB's election to acquire from Malese fee title to the Premises no later than January 4, 2002, or thirty (30) days following HEB's receipt of notice from Malese that it has acquired fee title to the Premises, whichever is later. Within twenty (20) days after acquiring fee title to the Premises, Malese shall notify HEB that Malese has acquired such fee title. Malese may notify HEB prior to acquiring fee title to the Premises, that Malese has contracted to acquire fee to the Premises, if Malese has contracted to so acquire such fee title; provided, however, Malese shall again notify HEB when it acquires fee title to the Premises if it has given notice prior to acquiring title. Any notice that either Malese has contracted to acquire fee title to the Premises, or has acquired such fee title, may be accompanied by a request or demand that HEB deliver the unconditional Letter of Credit provided for in subparagraph (b) of this Paragraph 4.

(d) HEB shall not at any time prior to April 1, 2003 exercise any right or direct the exercise by Kroger or any other person or entity of any right that would interfere with or prevent the purchase of the Premises by Malese and the exercise or performance by Malese of its rights or obligations under this Agreement; provided, however, nothing in this sentence contained shall limit the right of HEB to acquire the Premises from Malese pursuant to the terms of this Agreement. In the event either (A) Malese acquires the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001, but (i) Malese does not require HEB to purchase the Premises from Malese, and (ii) HEB does not require Malese to sell the Premises to HEB, in either instance, pursuant to this Agreement, or (B) Malese fails to acquire fee title to the Premises or fails to enter into a contract of sale to acquire fee title to the Premises, in either case prior to November 1, 2001,

4

then and in either such event, nothing contained herein shall impair the rights of HEB to exercise the Purchase Option (as hereinafter defined) or to enter into negotiations and to acquire the Premises at any time on or after November 1, 2001.

5.    <u>Restrictions on HEB's Contact with Present Fee Owner of the Premises</u>.  HEB hereby agrees not to make any requests or demands on or enter into any agreement with Balkhouse Associates, the present fee owner of the Premises, its successors or assigns, prior to November 1, 2001, which would be inconsistent with or an impediment to Malese acquiring fee title to the Premises, without the prior written consent of Malese which may be withheld in Malese's sole discretion. Furthermore, HEB agrees not to exercise the option to purchase the Premises pursuant to Section 8 of the Sublease and in accordance with the provisions of Article XXXV and Article XXXVI of the Operating Lease ("Purchase Option") prior to November 1, 2001 without the prior written consent of Malese which may be withheld in Malese's sole discretion.    If Malese acquires fee title to the Premises or enters into a contract of sale to acquire fee title to the Premises prior to November 1, 2001 and either (i) Malese requires HEB to purchase the Premises from Malese, or (ii) HEB requires Malese to sell the Premises to HEB as provided in paragraph 4(a) above, then HEB shall exercise the Purchase Option on or prior to January 4, 2002.    Upon HEB's exercise of the Purchase Option, the purchase price payable to Malese for the Premises shall be the Purchase Price as defined in Paragraph 4 above, and no appraisal of the fair market value of the Premises shall be performed, notwithstanding anything contained in the Operating Lease or the Master Lease to the contrary.    If, notwithstanding this provision, an appraisal of the fair market value of the Premises is required to be performed, Malese will cooperate with HEB and cause any and all sums payable by HEB pursuant to the Purchase Option which are in excess of the Purchase Price payable by HEB to Malese pursuant hereto to be payable to or retained by HEB or credited against the Purchase Price, such that the amount payable by HEB to Malese shall equal and not exceed the Purchase Price payable pursuant to this Agreement.    Nothing contained in either Paragraph 4 or this Paragraph 5 shall limit the right of HEB to obtain from Balkhouse Associates and/or Kroger the covenants and agreements as are contained in Paragraphs 1 and 2 hereof, to obtain such consents or approvals as may be required by governmental authorities to construct the Additional Facilities, or to exercise its Purchase Option within the period which is within sixty (60) days prior to the last day upon which the Purchase Option may be exercised by HEB pursuant to the Sublease.

6.    <u>No Modification of Rights and Obligations</u>.    The Parties agree that except as expressly set forth herein, nothing contained in this Agreement shall serve to modify, impair, or otherwise affect any of the covenants, terms or conditions of the Parties' respective interests under the Operating Lease, the Master Lease and/or the Sublease.

7. <u>Provisions Binding; Due Authorization</u>. Each Party hereby represents to the other Party that (i) it has full power and authority to enter into and perform this Agreement, (ii) the individuals and entities executing this Agreement on its behalf have full power and authority to do so, and (iii) this Agreement constitutes the legal, valid and binding obligation of such Party, enforceable against it in accordance with the terms hereof. The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each of the parties.

8. <u>Notices</u>.

(a) All notices, demands and other communications to be given hereunder ("Notices") shall be in writing and shall be given by (i) delivery by overnight courier service to the address for Notices; and (ii) sending the same by United States mail, postage prepaid, certified mail, return receipt requested, to the address for Notices.

(b) All Notices shall be deemed given and effective upon the earlier to occur of (i) one (1) business day after the deposit of such notice with an overnight courier service by the time deadline for next day delivery, addressed to the address for Notices; or (ii) three (3) business days after depositing the Notice in the United States mail as set forth in (a)(ii) above.

All Notices shall be addressed to the following addresses:

<u>If to Malese</u>:          c/o Kadish Real Estate
                     135 Jericho Turnpike
                     Old Westbury, New York 11568

<u>With copy to</u>:        Stephen A. Helman, Esq.
                     Gordon Altman Butowsky Weitzen Shalov
                          & Wein
                     114 West 47th Street, 20th Floor
                     New York, New York 10036-1510

<u>If to HEB</u>:            646 South Main Avenue
                     San Antonio, Texas 78204
                     Attn: Todd A. Piland

<u>With copy to</u>:        Stephen L. Golden, Esq.
                     Akin, Gump, Strauss, Hauer & Feld, LLP
                     300 Convent, Suite 1500
                     San Antonio, Texas 78205

or to such other persons or at such other place as any party hereto may by notice designate as a place for service of such notice.

9. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement among the Parties with respect to the matters contemplated hereby, and all other prior agreements, understandings or statements,

oral or written, with respect to such matters, are hereby superseded. Except as expressly otherwise provided in Paragraph 4 hereof, this Agreement shall be for the benefit of the parties hereto only, and their respective legal representatives, successors and assigns, and shall not inure to the benefit of any independent third parties, including, without limitation, The Kroger Company.

10. <u>No Oral Modifications</u>. This Agreement may not be modified or amended except by an instrument in writing signed by the Party(s) against whom enforcement of this Agreement, as amended, may be sought.

11. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same original, and the execution of separate counterparts by the Parties shall bind the Parties as if they had each executed the same counterpart.

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

MALESE FOODS CORP.

By: _____
Name: _Lawrence Kadish_
Title: _Vice Pres._

H. E. BUTT GROCERY COMPANY

By: _____
Todd A. Piland
Senior Vice President