# EXHIBIT A

Page 1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                    WESTERN DIVISION

4                       —  —  —

5     THE KROGER CO.,              :

6                     PLAINTIFF,:

7        -VS-                 : CASE NO.:  C-1-02-439

8     MALEASE FOODS CORP.,       :

9                     DEFENDANT.:

10                       -  -  -

11            Deposition of EDWARD N. WALDVOGEL, a

12    witness herein, taken by the defendant as upon

13    cross-examination pursuant to the Federal Rules of

14    Civil Procedure, and pursuant to agreement and

15    stipulations hereinafter set forth at the offices

16    of Frost, Brown & Todd, LLC, 2200 PNC Center, 201

17    East Fifth Street, Cincinnati, Ohio at 9:10 a.m. on

18    Wednesday, March 3, 2004, before Britney L. Fisher,

19    a notary public within and for the State; of

20    Kentucky.

21                       -  -  -

22

23

24

Page 2

APPEARANCES:

On behalf of the Plaintiff:

    Scott D. Phillips, Esq.

      of

    Frost, Brown & Todd, LLC

    2200 PNC Center

    201 East Fifth Street

    Cincinnati, Ohio 45202

On behalf of the Defendant:

    Robert W. Cinque, Esq.

      of

    Cinque & Cinque, P.C.

    845 Third Avenue

    New York, New York 10022

Also present:

    Mr. James E. Hodge

    S T I P U L A T I O N S  It is stipulated by and between

counsel for the respective parties that the deposition of

EDWARD N. WALDVOGEL, a witness herein, may be taken

22  as upon cross-examination pursuant to the Federal

23  Rules of Civil Procedure, and pursuant to

24  agreement; that the deposition may be taken in

---

Page 3

1  stenotypy by the notary public-court reporter and

2  transcribed by her out of the presence of the witness;

3  that the jurisdiction of the notary public-court reporter

4  is waived; and that the transcribed deposition is to be

5  submitted to the witness for his examination and

6  signature, and that signature may be affixed out of the

7  presence of the notary public-court reporter.

8

9       I N D E X

10 WITNESS           CROSS-EXAMINATION

11 Edward N. Waldvogel        4

12

13       E X H I B I T S

14 DEPOSITION EXHIBITS       MARKED

15 T, a document containing e-mails.    81

16 U, a July 30th, 2001 letter.     84

17

18

19

20

21

22

23

24

---

Page 4

1       (Witness sworn.) EDWARD N.

2 WALDVOGEL of lawful age, a witness herein,

3 being first duly sworn as hereinafter certified,

4 was examined and deposed as follows:

5       CROSS-EXAMINATION

6 BY MR. CINQUE:

7 **Q.  Good morning, Mr. Waldvogel.** A.  Good

8 morning. **Q.  WhoisXavier?** A.  Just a

9 college I went to. My daughters go there. It's in

10 town. **Q.  Is that a Jesuit school?** Yeah. **I went**

11 **to Florida, which was a Jesuit**

12

13     A. We're in the same league together.

14     Q. **Good training, right?**

15 **school?** Right.

16     A. **Okay. By whom are you employed?**

17     Q. The Kroger Company.

18     A. **Okay. And in what capacity?**

19     Q. I'm Vice President of Capital

20     A. Management.

21     Q.

22     A.

23     ^

24

---

Page 5

1     **Q.  And how long have you had that**

2 **position?**

3     A.  I've been Vice President of Capital

4 Management since about two years, about two years.

5 Before that I was Director of Capital Management.

6     **Q.  And how long have you been with**

7 **Kroger?**

8     A.  Since 1977, about 27 years.

9     **Q.  Okay. Were you involved in the**

10 **initial transaction, the initial Kroger sale and**

11 **lease back?**

12     A.  Not the actual closing, no.

13     **Q.  And during the year 2001 were you**

14 **also Vice President of Capital Management or did**

15 **you have a different role?**

16     A.  I had the same role. I got promoted

17 right around then. I was Director of Capital

18 Management. What was the actual date, Summer of

19 2001 I think, so right around then.

20     **Q.  And what were your duties at Kroger?**

21 **Just describe generally in 2001, and if they have**

22 **changed today, you can tell me.**

23     A.  They haven't changed.

24     **Q.  Okay.**

1     A.   Gee, Capital Management we manage all
2 of the capital investments of the corporation, the
3 capital budgets of each division. We review their
4 intentions on their procurement of assets and what
5 the financial impact is of those assets, and their
6 return on investment and their expectations. And
7 we document and we act as consultants and bankers
8 to all of our operating divisions to assure that
9 they're making decisions that add value to the
10 shareholders.
11     **Q.  You mentioned "return on investment,'**
12 **what does that mean?**
13     A.   Return on investment?
14     **Q.  I thought that's what you said,**
15 **correct me if I'm wrong.**
16     A.   That means when you make an
17 investment, that you're going to get an adequate
18 return in the form of higher sales, higher margins,
19 lower expenses, whatever. But when you make a
20 capital investment, you've got to get some
21 additional income for the corporation in return.
22     **Q.  Does Kroger, as a matter of general**
23 **policy, monitor its return on capital investment?**
24     A.   Absolutely.

1     **Q.  And does it break it out in**
2 **percentage terms?**
3     A.   Uh-huh.
4     **Q.  And how often does it do that?**
5     A.   Well, we have what we call a hurdle
6 rate.
7     **Q.  What's that?**
8     A.   A hurdle rate is what we use as a
9 benchmark expectation for each investment that we
10 make. Our hurdle rate is 11.3 percent after tax, and
11 that's been the same, gosh, probably for at least 10
12 or 15 years.
13     **Q.  So am I correct then that for the past**
14 **10 or 15 years typically Kroger enjoys a return**
15 **on its capital of 11 percent or thereabouts after**
16 **tax?**
17     A.   No. That's our hurdle rate. We don't
18 always hit our numbers. We try and that hurdle
19 rate by intention has some room for failure. What
20 we're really trying to accomplish is our cost of
21 capital. If our cost of capital is below the hurdle
22 rate, that margin in there is room for error and for
23 nonreturn assets that we make investment in
24 sometimes like office buildings, et

1 cetera.
2     **Q.  When for the last time did Kroger**
3 **compute its actual return on capital investment,**
4 **for example, did it do it in a particular fiscal**
5 **year or calendar year most recently?**
6     A.   We don't do that as a regular
7 exercise. From time to time we talk about it when
8 issues are coming up, but we don't formally publish
9 anything that would show that particular number.
10 It changes every day depending on debt markets.
11     **Q.  Let me ask you this for example:**
12 **Let's say - Withdrawn.**
13     **Do you direct investments at Kroger?**
14     A.   No. I review them.
15     **Q.  Okay. Let's say, for example, Kroger**
16 **has excess cash of $10 million, who would make the**
17 **decision as to how that excess cash is invested; is**
18 **that something you wo uld do?**
19     A.   That would be a combination of my
20 boss and the capital committee upon which I'm a
21 member.
22     **Q.  Okay. Do those instances ever arise**
23 **at Kroger?**
24     **A.  Yes.**

1     **Q.  Typically where is that money**
2 **invested, would it depend on — Withdrawn. Let me**
3 **ask you that.**
4     A.   We have a policy of our free cash
5 flow to be used to do one of three things, and we
6 split it up buy stock, make additional capital
7 investments or pay down debt. We usually split it
8 up into those three pieces whenever it becomes
9 available.
10     **Q.  When it comes to buying stock, does**
11 **Kroger monitor the return on its investments?**
12     A.   I wouldn't use the term "monitor."
13 We believe that the return on Kroger stock is
14 probably somewhere in the range of 10 to 14 percent
15 after tax as an expectation on an ongoing basis.
16     **Q.  As an expectation, and does reality**
17 **bear that out?**
18     A.   If you look at it over the past 10,
19 15 years since 1988, I think it would, yes.
20     **Q.  Okay. And that 10 to 15 percent**
21 **you're talking about the growth in the value of**
22 **Kroger stock?**
23     A.   Uh-huh.
24     **Q.  Okay. And what about investments,**

3 (Pages 6 to 9)

Page 10

1 does Kroger typical - you mentioned the hurdle
2 rate, does Kroger typically earn, let's say, double
3 figures over time on its investment of capital?
4     A.   We believe its cost of capital, in
5 excess of its cost of capital, which is why the
6 stock would go up because cost of capital carries
7 the value of the stock inherent in it, so I would
8 say yes.
9     Q.   Now, does Kroger regularly pay all
10 income taxes due to the federal, state and
11 municipal authorities?
12     A.   Yes, sir.
13     Q.   And are you aware, by the way, that
14 in this case there's a claim on the part of Kroger
15 relating to the Butt transaction, H.E. Butt, BUI
16 T?
17     A.   I'm not sure what you mean by
18 "claim." I know Butt is involved in the San
19 Marcos warehouse.
20     Q.   Do you know who Jonathan Libbert is?
21 LIBBERT.
22     A.   The name is vaguely familiar. No, I
23 don't know. I'm not sure who that is.
24     Q.   So did you - I think I know the

Page 11

1 answer, but did you ever see a report that Mr.
2 Libbert submitted in connection with this
3 proceeding?
4     A.   I know who John Libbert is. That's
5 the guy that you hired.
6     Q.   He's someone who's an expert?
7     A.   Yes. I know who he is. I didn't see
8 his report.
9     Q.   Did anyone tell you what the report
10 contained?
11     A.   I think my attorney might have told
12 me that he needed to put together some kind of a
13 report that would document potential damages to the
14 company.
15     Q.   But you didn't review that report,
16 correct?
17     A.   I did not review that report.
18     Q.   Do you know who did, if anyone, at
19 Kroger?
20     A.   I do not know if anyone did at
21 Kroger.
22     Q.   Who would have been the person
23 responsible for reviewing such a report at Kroger?
24         MR. PHILLIPS: If you know.

Page 12

1     Q.   If you don't know, don't tell me what
2 you don't know.
3     A.   No one that I know of.
4     Q.   Do you know anything about the Butt
5 transaction?
6     A.   Yes.
7     Q.   Okay. What do you know?
8         MR. PHILLIPS: Objection, vague. Go
9 ahead.
10         MR. CINQUE: His answer or my
11 question?
12         MR. PHILLIPS: The question.
13         MR. CINQUE: What's vague about my
14 question? I'm asking him what he knows about Butt,
15 he might as well tell me.
16         MR. PHILLIPS: It's vague. Specify
17 which transaction, what aspect of the transaction,
18 what time period of the transaction.
19 BY MR. CINQUE:
20     Q.   Answer all of those questions now
21 that he's broken it down for you.
22     A.   H.E. Butt is operating the San Marcos
23 warehouse. They subleased it from us back in the
24 early '90s after we evacuated it. They're a

Page 13

1 grocery retailer that's domiciled I believe in
2 Texas, and they had a need for a facility. And
3 when we decided we didn't need San Marcos anymore,
4 we subleased it to them.
5     Q.   Are you aware of whether any contract
6 of sale presently exists between Kroger and Butt
7 with respect to the San Marcos property?
8     A.   Sure.
9     Q.   What do you know about that contract;
10 do you know the price?
11     A.   Yes.
12     Q.   What's the price?
13     A.   Well, I know about. I think it's
14 about $11 million.
15     Q.   Now, let's assume for the moment that
16 Kroger — Withdrawn.
17         But for this lawsuit would Kroger
18 have already consummated that transaction with
19 Butt?
20     A.   Yes. We were supposed to consummate
21 it in April of 2003.
22     Q.   Okay. And let's just use the number
23 $11 million, we'll round it off, how much would
24 Kroger have received as a result of the Butt

4(Pages 10 to 13)

Page 14

1  transaction; in other words —
2      A.  About $11 million.
3      Q.  There were no encumbrances that had
4  to be satisfied; is that correct?
5      A.  Not after April 1st, no. All
6  encumbrances would have been paid off.
7      Q.  So there were no mortgages, correct?
8      A.  Not as of that date.
9      Q.  Okay. When was the mort — Was there
10  a mortgage on the San Marcos facility?
11     A.  Yes.
12     Q.  And when was it satisfied?
13     A.  April 1st.
14     Q.  April 1st. What was the amount of
15  the mortgage in 2003?
16     A.  Gosh.
17     Q.  Approximately?
18     A.  At that time of the last payment it
19  was about $ 10 million.
20     Q.  So that sum was paid on or about —
21     A.  I'm sorry, $10 million was the amount
22  of the mortgage on all three properties. There's
23  three properties involved in the transaction, and
24  that would have been split among the three.

Page 15

1      Q.  So am I correct then that as of
2  April, on or about April 1st, the San Marcos
3  mortgage was satisfied?
4      A.  Correct.
5      Q.  And that mortgage, you don't know the
6  amount of that particular mortgage?
7      A.  The amount of that particular
8  mortgage, the last payment, the amount prior to the
9  last payment was about $10 million. The last
10  payment was made April 1st.
11     Q.  On San Marcos?
12     A.  On all three.
13     Q.  All three. I'm trying to find out
14  what was referable to San Marcos?
15     A.  Somewhere in the documents there's a
16  percentage allocation. I don't know that number
17  exactly.
18     Q.  Would it be roughly one-third?
19     A.  Probably, but I'm not sure.
20     Q.  Okay. If the transaction had gone
21  through on April 1st, 2003, would any portion of
22  the $11 million have been used to pay down the
23  existing mortgage?
24     A.  No. It was already paid off by then.

Page 16

1      Q.  When was it paid off?
2      A.  April 1st. And the deal was set with
3  H.E. Butt was to sell it to them after it was paid
4  off.
5      Q.  What was the source of the funds to
6  pay off the mortgage?
7      A.  The source of the funds, it was a
8  regular payment that Kroger was obligated to make
9  as part of the mortgage transaction.
10     Q.  Okay. And was it in Kroger's —
11  Again, let's put aside this lawsuit. If this
12  lawsuit hadn't been in place, would Kroger have
13  simultaneously satisfied the mortgage at the same
14  time that it sold to Butt; is that how it would
15  have worked?
16     A.  Probably not. We would have made the
17  normal payment we had to make on April 1st. Then
18  we would have gone through some legal due diligence
19  documentation, title, all of that kind of stuff.
20  It probably would have been 30 to 60 days, I would
21  guess.
22     Q.  And would any portion of that
23  mortgage payment have been charged for accounting
24  purposes against the $11 million proceeds from

Page 17

1  Butt?
2          MR. PHILLIPS: Objection. You can
3  answer.
4          THE WITNESS: I can answer?
5          MR. PHILLIPS: Yes.
6  BY MR. CINQUE:
7      A.  I don't think so.
8      Q.  Okay. Why?
9      A.  Because we had to pay it anyway
10  regardless of whether we sold the facility.
11     Q.  Now, would Kroger, in the normal
12  cour  se if Kroger had received that $11 million,
13  would it    have paid any income tax on those
14  proc  eeds?
15     A.  I believe we actually had a tax basis
16  that was higher because of the accounting of the
17  structure. I'd have to check into that, I don't
18  know, but my immediate answer is I don't think so.
19  I think there might have actually been a refund.
20     Q.  And what makes you say that?
21     A.  Because we had bought the facility
22  two years prior for $30 million -- three facilities
23  two years prior for $30 million, and it was a
24  question of how we allocated that money plus the

5 (Pages 14 to 17)

Page 18

1  existing basis we already had.
2      **Q. Was that $30 million above the**
3  **mortgage?**
4      A.  That included the mortgage.
5      **Q. How much did you actually pay then?**
6      A.  I think we paid about 11 and assumed
7  a mortgage of about 20, 21, something like that.
8      **Q. So you paid 11 for three properties**
9  **and assumed a mortgage of 21?**
10     A.  Twenty to twenty-one.
11     **Q. Thereabouts?**
12     A.  Uh-huh.
13     **Q. And you had a contract to sell one of**
14 **the facilities for $11 million, correct?**
15     A.  I don't know if we had the contract
16 at that time or not.
17     **Q. Okay. But there did come a point**
18 **where you had a contract to sell one of the**
19 **facilities, i.e. San Marcos for $11 million?**
20     A.  Right.
21     **Q. Is that correct?**
22     A.  Right.
23     **Q. And that would have been pure profit?**
24     A.  No.

Page 19

1      MR. PHILLIPS: Objection.
2      **Q. Is that your testimony?**
3      A.  Pure profit?
4      **Q. Well, you said there was no income**
5  **tax referable to the transaction, there is no**
6  **encumbrance, so the $11 million?**
7      A.  I'm saying it was about equal to our
8  basis, which is why there would be no income tax
9  It would be about equal to a break even situation.
10     **Q. What would be the gain for Kroger, if**
11 **any, on that transaction that you've been**
12 **describing?**
13     A.  I'd have to check with the
14 accountant. I don't think it would be very large.
15     **Q. Why do you say that?**
16     A.  Again, because we paid about S30
17 million, $31 million. There were three properties
18 involved, so their bases would be about 10 to $ 11
19 million each. Over two years you don't take a lot
20 of depreciation on land and buildings. That's a
21 long depreciation schedule in land and buildings.
22     **Q. Now, in computing the bases of those**
23 **three buildings, did you take into account any**
24 **existing mortgages?**

Page 20

1      A.  Uh-huh.
2      **Q. You did.**
3          **Okay. And would you explain how you**
4  **applied the existing mortgage against the $30**
5  **million?**
6      A.  I'm sorry, the existing, we're
7  talking about the 20.
8      **Q. Twenty what?**
9      A.  The 20 to $21 million mortgage that
10 we assumed. That's the existing mortgage I was
11 referring to.
12     **Q. You had a basis, you said, of what;**
13 **what was your basis when you bought the three**
14 **properties?**
15     A.  After we bought it?
16     **Q. Yeah.**
17     A.  It would have been about 30 to S31
18 million.
19     **Q. Now, do the mortgages — were there**
20 **mortgages at the time?**
21     A.  The $21 million that we assumed is
22 the only mortgage.
23     **Q. Do you factor in — In any way do you**
24 **factor in that mortgage in computing the basis?**

Page 21

1      A.  Absolutely.
2      **Q. And how does it factor?**
3      A.  It's an assumption of debt as the
4  same as basis.
5      **Q. So what would your basis be in those**
6  **three properties taking into account the mortgages?**
7      A.  About 30 to $31 million for all three
8  of them.
9      **Q. Okay. So in terms of computing your**
10 **gain, if you were to sell all three properties the**
11 **next day, what would your gain be? Let's say you**
12 **sold it for $31 million.**
13     A.  If we sold it for $31 million, our
14 gain would be the $31 million minus our basis,
15 adjusted for any depreciation we took depending on
16 the time that passed between the day we bought it
17 and the day we sold it.
18     **Q. And your basis would be $30 million;**
19 **is that correct?**
20     A.  Adjusted for whatever depreciation
21 was taken between the time of our basis and the
22 sale, yes.
23     **Q. And the mortgage, the existing**
24 **mortgages would in no way be factored into a**

6 (Pages 18 to 21)

Page 22

1  computation of basis; is that right?
2      A.  I thought I said they would be part
3  of the basis.
4      Q.  All right. You paid 30 over and
5  above the mortgages, right, you had about 19?
6          MR. PHILLIPS: No. You're not
7  listening, Bob.
8      Q.  Go ahead. 30 above, you tell me.
9      A.  I paid 11,1 assumed 20, which adds
10 up to 30, 31. That's your basis.
11         MR. CINQUE: Okay. Now, do you
12 have — Off the record.
13             (Brief recess.)
14 BY MR. CINQUE:
15     Q.  Mr. Waldvogel, were you involved in
16 any aspect of the Balkhouse San Marcos termination
17 transaction or contemplated transaction which
18 occurred in 1995?
19         MR. PHILLIPS: I'll just object to
20 termination. I'm not sure what that's in reference
21 to. If you understand, you can answer.
22     A.  I don't know of any termination in
23 1995.
24     Q.  Okay. Let me show you, I'm handing

Page 23

1  you Exhibit E. It's headed Bulkhouse San Marcos
2  termination October 1995 from Scott Butler to Jim
3  Price.
4      A.  Oh, the economic abandonment. I
5  remember talking to Scott Butler from time to time
6  about how the economic abandonment worked in the
7  transaction. It was actually even prior 1995, but
8  sure.
9      Q.  Did you ever see this memo, Exhibit
10 E?
11     A.  It's not familiar. No, not to my
12 knowledge.
13     Q.  Okay. Other than what you read here,
14 do you have any independent memory of any aspect of
15 this Bulkhouse San Marcos termination or economic
16 abandonment?
17     A.  Yeah, yes. My recollection would be
18 that back in 1990 or '91 when Kroger stopped using
19 the San Marcos warehouse, I knew that Scott Butler
20 and Jim Price had done the original transaction.
21 And I talked to them from time to time and asked
22 them to explain to me what my options were, because
23 we had abandoned the warehouse, and it was sitting
24 empty prior to our sublease of it, and what were

Page 24

1  our options to get out of this mortgage, if any.
2          And we discussed it from time to time
3  about what that might be. Ever since we abandoned
4  the warehouse, we've been trying to figure out how
5  to unwind ourselves of this surplus asset.
6      Q.  Okay. And Exhibit E, toward the
7  bottom has a series of numbers. You see it says PM
8  610,000, Kadish 1,372,500 versus 350,000, and
9  Kroger $,117,500 or more. Do you recall discussing
10 those calculations with Butler or Price back in
11 October of 1995?
12     A.  No.
13     Q.  As you sit here today, do you know
14 what they mean or how they were derived?
15     A.  No. All I know is we had to make a
16 payment to exercise economic termination.
17     Q.  Okay. And that never occurred,
18 correct?
19     A.  Correct.
20     Q.  I'm going to show you what — By the
21 way, prior to coming here did you review any
22 documents in connection with your testimony?
23     A.  Not recently.
24     Q.  Okay. Did you ever review any

Page 25

1  documents in connection with your testimony?
2      A.  The meeting we had, I had a meeting
3  with my lawyer a week ago and we talked about some
4  documents that might be discussed.
5      Q-  I don't want to know what the two of
6  you discussed, I want to know did you review
7  documents at the time?
8      A.  One or two.
9      Q.  Okay.
10     A.  A few. It might have been more than
11 two, a few.
12     Q.  If you see as I'm handing you
13 exhibits, if it's anything you've ever seen before,
14 if you tell me that or from time to time I might
15 ask you. For example, is Exhibit F familiar to
16 you?
17     A.  No.
18     Q.  Now, Exhibit F is a memo to the file
19 from James Price dated October 25th, 1995, re: The
20 Kroger Co. and it begins Jim Hodge, Sandra Linn
21 and Ed Waldvogel called to follow up and discuss mj
22 letter of October 17th.
23         Do you recall now having looked at
24 Exhibit F and looked at Exhibit E this discussion

7 (Pages 22 to 25)

Page 26

1 that he's referring to? You can read it.
2     A . I  refer — I remember talking to Jim
3 about the economic abandonment back in a number of
4 times during the '90s. This may have been one of
5 them, sure.
6     Q.  Okay. There's a reference down here
7 to Jim Hodge, that's the gentleman seated here in
8 the room with us, right?
9     A.  Uh-huh.
10     Q.  Okay. Is he a Kroger employee?
11     A.  Correct.
12     Q.  Okay. What is Mr. Hodge's position
13 at Kroger?
14     A.  He's Vice President of Real Estate.
15     Q.  Is he senior or subordinate to you or
16 equivalent?
17     A.  He's senior to me.
18     Q.  Do you report to him at all?
19     A.  I do not.
20     Q.  But from time to time you work with
21 him on various transactions?
22     A.  I work with him all of the time.
23     Q.  And just describe the role that you
24 play and the role that he plays, let's say, in the

Page 27

1 connection with these various Bulkhouse
2 transactions?
3     A.  I mean, in a nutshell Jim is a real
4 estate expert and I'm the financial expert, so he
5 does the real estate work and I do the financial
6 work.
7     Q.  Okay. Now, at the bottom of this
8 memo the last bullet point is get Kadish to agree
9 on fixed price; do you know what that refers to?
10     A.  This is from 1995? No, I don't.
11     Q.  Okay. Who is Sandra Linn, L I N N,
12 or who was she in 1995?
13     A.  Sandra Linn worked in Capital
14 Management as well. She had my job previous to me,
15 and she worked for me previous to that.
16     Q.  So in 1995 did she report to you?
17     A.  No.  1995 I was in logistics then in
18 1995, and Sandra Linn had my position and reported
19 to someone else. I'm not sure, Rodney McMullen or
20 someone else.
21     Q.  Now, to your knowledge, as of October
22 of 1995 was the firm of Price & Marshall performing
23 any services for Kroger?
24     A.  I'm not sure what you mean by

Page 28

1 "services." We did not have them engaged to do
2 any official work for us. They were — From time
3 to time we discussed doing transactions. We've
4 done a number of transactions with them throughout
5 the 20 years we've known them.
6         MR. PHILLIPS: Off the record.
7             (Off the record.)
8 BY MR. CINQUE:
9     Q.  I'm handing you Exhibit G. Did you
10 ever see Exhibit G? And take a look at what it is,
11 did you see that before today?
12     A.  I may have.
13     Q.  It's not something that you reviewed
14 in connection with your testimony today, correct?
15     A.  Recently, no.
16     Q.  Okay. For the record Exhibit G is a
17 letter dated January 12th, 1996 from Price &
18 Marshall to James Hodge. And it has attached to ii
19 three pages, which have previously been described.
20     A.  Should I look at all three?
21     Q.  Sure. I'm going to ask you
22 questions, look at anything you want if it will
23 help you answe r the question.
24         Do you know what the relationship of

Page 29

1 Price & Marshall was with respect to Kroger as of
2 January 12th, '96?
3         That's probably a bad question. You
4 see he's sending Hodge an engagement letter, which
5 is attached, were you ever consulted about that
6 engagement letter?
7     A.  I may have been. It was Sandra Linn
8 was working as in charge of Capital Management, but
9 I was the one who was most familiar with all of the
10 old real estate transactions from the'80s. Sol
11 probably talked to Jim about this from time to
12 time, Jim Hodge.
13     Q.  Okay. And do you remember the
14 proposal that is attached as the second page?
15     A.  It's the second page?
16     Q.  Yeah. On the first page the author,
17 which I believe to be Price since we have JDP at
18 the lower left-hand side, states I've also included
19 a summary of two proposals from Malease Foods Corp.
20 to purchase their master lease on all three
21 properties.
22         Do you recognize this proposal?
23     A.  This one here?
24     Q.  Yes. If you're looking at bates

8 (Pages 26 to 29)

1  PM01175.
2      A.  I can't say that I remember that one,
3  no.
4      Q.  Do you remember being involved in
5  this transaction or proposed transaction at the
6  time?
7      A.  I can't say that I remember exactly
8  this one. Like I said, we've talked to Price &
9  Marshall, many, many times since 1991 about
10  unwinding this. This is one of many. They weren't
11  all put in writing, sometimes they were just phone
12  calls.
13      Q.  Okay. You see he states I include a
14  summary of two proposals from Malease Foods Corp.
15  do you know, as you sit here today, whether these
16  proposals came from Malease Foods?
17      A.  I do not.
18      Q.  All right. Do you know whether this
19  engagement letter was ever signed?
20      A.  I doubt that it was, because we
21  didn't--1 don't know for sure.
22      Q.  Okay. Now, Exhibit H is a memo dated
23  January 30th, 1996 from JDP, which I believe is
24  James D. Price of Price & Marshall to the file.

1      A.  You want me to read this?
2      Q.  Have you seen that before today?
3      A.  No.
4      Q.  Okay. Why don't you just read it.
5      A.  Okay.
6      Q.  Okay. At the bottom of this memo the
7  author is saying, he says here Sandra and Jim wan
8  to go over agenda Friday. Before I get to that, do
9  you recall being consulted about any aspect of the
10  dealings that are reflected in this memo; were you
11  involved or did you discuss it with Jim Hodge or
12  Sandra Linn?
13      A.  I can't say that I was involved in
14  every discussion that occurred. Like I said, I was
15  involved in this transaction early on. I knew
16  about it as well as anyone. At the time I was
17  working in another function, logistics, and
18  whenever they had questions about history and
19  comparing economics of the transaction, they would
20  ask me about them at that time. If they didn't
21  have any questions, they didn't ask.
22      Q.  At the conclusion of this memo the
23  author states Sandra and Jim wanted to go over
24  agenda Friday, said okay. Got the feeling no one

1  at Kroger understands the financing and they are
2  proceeding but walking on eggs.
3          From your vantage point was that a
4  fair appraisal of the knowledge of Kroger at the
5  time?
6      A.  Not of Kroger. I think it was of
7  Sandra. I think Sandra was struggling with the
8  structure of the transaction.
9      Q.  And what makes you say that?
10      A.  Because every time it got complicated
11  and they asked questions they would call me and ask
12  me about it.
13      Q.  Do you remember having said that? Do
14  you remember Sandra or Jim Hodge calling you and
15  asking you anything about the transaction described
16  in this memo?
17      A.  I can't speak to this particular
18  memo. Like I said, from time to time throughout
19  1993, 1995, 1997 we talked about it many times.
20      Q.  Okay. In the memo Price talks about
21  coming out to Cincinnati. He says asked us to come
22  out to Cincinnati and go over the steps, et
23  cetera. Do you recall did Price and/or Butler come
24  to Cincinnati in '96 in January of 1996, or

1  thereabouts?
2      A.  I don't recall.
3      Q.  Okay. Exhibit J, have you seen
4  Exhibit J before?
5      A.  I'm sure I have.
6      Q.  When?
7      A.  Since it was addressed to me, I
8  imagine I read it right after it came in to my
9  office some time in June of 2000.
10      Q.  And since then you've never read it
11  again; is that right?
12      A.  I can't say I haven't read it since
13  then. I haven't read it in the last month or few
14  months.
15      Q.  Okay. Can you tell me the discussion
16  that is referenced in the first line of this
17  letter? By that I mean, did you contact Price, die
18  he contact you; how did this come about that he
19  wrote you a letter?
20      A.  We talked on the phone and I told him
21  that as I told him since 1991, we would like to get
22  out of this transaction in any way we can. I think
23  at that time he might have told me that Merrill
24  Lynch was interested in selling their position.

9 (Pages 30 to 33)

Page 34

1  And I said if that's the case, we'd be a buyer.
2      Q.  And when you say "get out of this
3  transaction," what do you mean?
4      A.  Unwind the structure so that we
5  could — San Marcos was a surplus asset and we
6  wanted to dispose of it, and we wanted to own our
7  other two assets that were in this transaction at
8  the end of the day.
9      Q.  And this was something that was in
10  the contemplation of Kroger since at least 1996 and
11  prior; is that right?
12      A.  'Ninety-one, sure.
13      Q.  And what was the reason for that;
14  what motivated you folks?
15      A.  It was a surplus asset.
16      Q.  San Marcos was?
17      A.  Right.
18      Q.  And the other two you wanted to own?
19      A.  Right.  And the financing
20  transaction, which might have been attractive when
21  it was originally done was expensive at that time,
22  and we're constantly looking for ways to reduce our
23  cost by repaying expensive mortgages.
24      Q.  Do you mean the interest rate, is

Page 35

1  that what you're talking about?
2      A.  Uh-huh, right.
3      Q.  Were there any tax considerations,
4  let's say, since starting in 1991?
5      A.  Absolutely.
6      Q.  What were the **tax** considerations.
7      A.  This was a sale lease back, and it
8  was a very complicated transaction that had
9  high/low payments, and because of that the
10  accounting entries and tax entries were different
11  for our books.  And because of that we had a basis
12  that caused our tax situation to be — I'm trying
13  to remember the way the numbers worked, it's a long
14  time ago when we looked at that.
15          My recollection was book rent and tax
16  rent were different, and because of that unwinding
17  this transaction at certain points in time would
18  cause us to have a tax liability.  And that changed
19  over time because of the amortization of some of
20  the original costs of this transaction.
21      Q.  As far as you were concerned was it
22  more beneficial to Kroger to unwind these
23  transactions, say, in 1991 as opposed to 2001; in
24  other words, as each year went by did it become

Page 36

1  less beneficial to Kroger or more beneficial?
2      A.  Because of the tax situation it
3  became more beneficial as time passed.
4      Q.  So it actually benefited you to wait?
5      A.  Right.
6      Q.  So if you were able to accomplish
7  what you were talking about by unwinding the
8  transactions in '91, it would not have been as
9  beneficial as what actually happened when you did
10  it in 2001; is that right?
11      A.  Based on the options at that time,
12  correct, yes, um-hmm.
13      Q.  Okay.  Now, were any efforts being
14  made to — other than the San Marcos that we've
15  addressed and the economic abandonment, were there
16  any efforts made prior to 2000 for Kroger to
17  purchase the other two facilities?
18      A.  No efforts that 1 can document.  We
19  also had an interest in buying them.  We thought we
20  had to wait until the end of the lease, because
21  that's when we had a fair market value purchase
22  option, which is what we have in all of our
23  transactions, most of our transactions.
24      Q.  Did you believe that you could go to

Page 37

1  Bulkhouse before the termination of the lease and
2  offer to buy?
3      A.  I believe you can go to anybody and
4  offer to buy, sure.
5      Q.  So there was nothing stopping you
6  from doing that, correct?
7      A.  No, hmm-um.
8      Q.  You could have gone to Malease, the
9  holder of the master lease as well, correct, or was
10  there some prohibition against you doing that?
11      A.  None to my knowledge.  We weren't--
12  It was a complicated transaction.  We weren't sure
13  until you read the documents who you had to deal
14  with.
15      Q.  Did you ever figure out who you had
16  to deal with?
17      A.  Sure.
18      Q.  What did you learn?
19      A.  Merrill Lynch was the person we dealt
20  with on an ongoing basis from 1983 through 2000 and
21  whenever 1, when we finally bought it, and
22  ultimately it was a question of buying out their
23  position.  And they convinced us that we could do
24  that and still end up owning the properties.

10 (Pages 34 to 37)

Page 38

1    Q. And who convinced you? You said
2  "they convinced us," who was that?
3        A. Merrill Lynch.
4    Q. Who, do you know?
5        A. Gosh, there was a bunch of guys we
6  talked to over time. Al DeFurioni. No, I'm
7  forgetting the names.
8    Q. Giobbi?
9        A. Mike Giobbi was one. Offendorpher
10  was one. DeFurioni, Al DeFurioni was one. There
11  were four or five guys we talked to over the years
12  at Merrill Lynch.
13    Q. So I'm clear then, are you telling me
14th  at it was the people at Merrill Lynch who
15co  nvinced you that the transaction could be done
16is  that   what you said?
17        A. Well, it was a combination of talking
18  to folks at Merrill Lynch, reading the documents
19  and discussions with Scott Butler over the ten
20  years that convinced us that we could do what we
21  wanted to do without risk.
22    Q. When you say "risk," what do you
23mea  n, tax issues or what kind of risk?
24        A. The risk that there was a party out

Page 39

1  there that would interfere with our ability to buy
2  these properties.
3    Q. You thought somebody might try and
4  compete with you, is that it, for the purchase?
5        MR. PHILLIPS: Objection. You can
6  answer.
7        A. No. It wasn't the question of
8  competing in the purchase. It was a question of
9  some of these deals had encumbrances because of tax
10  considerations that you didn't even know about,
11  that you had to make sure that there wasn't some
12  contract buried in the documents that allowed them
13  to do things that could cause you problems.
14    Q. Okay. And did you discuss that with
15  Merrill Lynch, that there might be this type of
16  problem or issue?
17        A. Merrill Lynch and Scott Butler, yes.
18    Q. And that was over a period of years
19  you had those discussions?
20        A. About the entire transaction was over
21  a period of years.
22    Q. But I'm talking about this
23  possibility that there was something out there that
24  you've just described, was that a subject that was

Page 40

1  discussed over a period of years?
2        A. I think that was the subject that was
3  discussed in 2001, 2000, 2001 mainly.
4    Q. What was the essence or gist of those
5  discussions?
6        A. Was there a clear end gain to get
7  clear title to the assets if we bought out their
8  position.
9    Q. When you say "their position," you're
10  talking about Bulkhouse?
11        A. Uh-huh.
12    Q. And did you ever reach a conclusion
13  on that?
14        A. Yes.
15    Q. And what was the conclusion?
16        A. Well, the conclusion was we had a
17  fair market value purchase option; and, therefore,
18  the documents had to have a path of settling all
19  encumbrances so they could give us clear title to
20  the property when we exercised that option.
21    Q. Did the rights of Malease ever come
22  up at any of those discussions that you've just
23  described?
24        A. Malease was one of the encumbrances

Page 41

1  that we were concerned about, yes.
2    Q. And what was the Malease encumbrance
3  as you understood it?
4        A. All we knew is it was a master lease
5  that had a shirttail that was put in for tax
6  purposes solely.
7    Q. Okay. And how was that an
8  encumbrance to your transaction with Bulkhouse?
9        A. Because it's a master lease that had
10  to be eliminated to own the property free and
11  clear.
12    Q. When you say "eliminated," you mean
13  bought out?
14        A. Relieved. No, relieved from title.
15    Q. Okay. What does that mean?
16        A. So that we have a free and clear
17  title to sell an asset.
18    Q. And did you people discuss how you
19  might relieve Malease from title?
20        A. "You people?"
21    Q. In your discussions with Merrill
22  Lynch you're talking about this encumbrance,
23  Malease, right, you said it had to be I think your
24  words were "relieved from title"?

11 (Pages 38 to 41)

Page 42

1 A. Right.
2 Q. Okay. And what I want to know is:
3 Were there any discussions about how that might
4 occur with Merrill Lynch?
5 A. Probably. I can't remember a
6 specific discussion between Merrill Lynch and Scott
7 Butler. And reading the documents we tried to
8 determine that the documents had a clear path to
9 relieve all encumbrances, and we concluded that
10 they did.
11 Q. Okay. And how did you conclude that
12 with respect to Malease, or what did you conclude
13 with respect to the rights of Malease?
14 A. That there was a document in the
15 binders that clearly said exercising certain
16 notices and making certain payments took them out
17 of the transaction.
18 Q. Did you ever have any discussion as
19 to when Kroger might be in a position to deal with
20 Malease?
21 A. Yes.
22 Q. Okay. Did you - What was the
23 discussion that you had?
24 A. That there was a — there was a two

Page 43

1 party — I forget the name of the document, Bob.
2 Q. Whatever you remember?
3 A. There was a document included in the
4 binder that called for the 360-day notice to
5 exercise a buyout of the master lease by paying the
6 shirttail rent, two years of rent, present value at
7 the discount rate of the document plus 100 basis
8 points.
9 Q. Are you aware, by the way, of
10 Malease's claim in this lawsuit?
11 A. No. I don't know what he's claiming,
12 I really don't.
13 Q. Did you ever ask anybody?
14 A. Yes. I've asked my lawyers and I've
15 asked our lawyers. They don't understand his
16 position.
17 Q. So they just said we don't understand
18 what Malease is claiming; is that right?
19 MR. PHILLIPS: Answer that but no
20 specifics.
21 A. Correct.
22 Q. Are you aware that within the past
23 few days your lawyers have submitted a set of
24 papers to The Court telling The Court in substance

Page 44

1 that not only do they full understand the claim of
2 Malease, but, in fact, it is entirely without
3 merit; and therefore, it should be summarily
4 dismissed; do you know any of that?
5 A. I'm sure they have. When I say we
6 don't understand it, what I meant was we don't
7 understand the basis for it.
8 Q. My question to you is: Did you ever
9 read the summary judgement motion that your lawyers
10 served us with the past few day?
11 A. I did not, no.
12 Q. Did anybody ever tell you in
13 substance that Kroger is now taking the position
14 that the issue relating to Malease is crystal
15 clear, incandescent, to the point that it should be
16 summarily resolved in favor of Kroger? And when I
17 say "summarily resolved," what I mean is it doesn't
18 even require a deliberation by a jury.
19 A. Sure, yes.
20 Q. You're aware of that?
21 A. Yes.
22 Q. But yet you, as you sit here today,
23 you don't know what Malease's claim is; is that
24 right?

Page 45

1 MR. PHILLIPS: Objection,
2 argumentative. Go ahead.
3 A. I don't understand why he doesn't
4 accept the documents and the payment we tried to
5 tender him and follow ahead with the contract that
6 was agreed to in 1983.
7 Q. Do you know what Malease's contention
8 is or don't you?
9 A. No, I don't.
10 Q. Did you ever hear the word
11 simultaneously used in connection with any aspect
12 of Malease's claim?
13 A. Simultaneously?
14 Q. Right. That particular word. I'm
15 choosing that precise word, did it ever come up in
16 any discussions you had with anyone?
17 A. That word doesn't ring a bell as
18 being important.
19 Q. Do you regard this lawsuit as an
20 important part of Kroger's business life?
21 A. It's important to settle it.
22 Q. But not important enough for you to
23 actually acquaint yourself with Malease's position;
24 is that right?

12 (Pages 42 to 45)

1       MR. PHILLIPS: Objection,
2   argumentative again. Go ahead.
3       MR. CINQUE: You can answer.
4   BY MR. CINQUE:
5       A.  I don't understand what Malease's
6   position is.
7       **Q.  Have you ever read Malease's**
8   **counterclaim?**
9       A.  I don't think I have, no.
10      **Q.  The counterclaim, by the way, is the**
11  **recitation by Malease of what it says — not with**
12  **regard to whether it's right or wrong —**
13  **Withdrawn.**
14      **Are you aware that in this lawsuit**
15  **Malease has filed a 5- or 6-page counterclaim where**
16  **it outlines its position?**
17      A.  I assume he probably has.
18      **Q.  Okay.**
19      A.  We let the lawyers handle all of that
20  stuff. We think we did the right thing, and we let
21  the lawyers handle all of the argument back and
22  forth.
23      **Q.  I understand. And what's the basis**
24  **for your thinking you did the right thing?**

1       A.  We bought the Balkhouse position and
2   exercised the purchase option that was in the
3   documents, and should have completely unwound the
4   transaction. We made our final mortgage payments
5   on April 1st, 2003, and we hoped it would all be
6   done by then.
7       **Q.  What I'm trying to find out is: You**
8   **personally have not analyzed the merits or lack of**
9   **merit of Malease's position, correct?**
10      A.  Correct.
11      **Q.  Okay. You relied upon someone else**
12  **for that analysis, right?**
13      A.  For the analysis of Malease's
14  position?
15      **Q.  Right?**
16      **A.  Yes.**
17      **Q.  And upon whom did you rely, was it**
18  **Merrill Lynch?**
19      A.  No. My lawyers.
20      **Q.  Okay. These lawyers, you're talking**
21  **about the Frost, Brown firm?**
22      **A.  Yes.**
23      **Q.  So am I correct then that in addition**
24  **to talking to Merrill Lynch, you also spoke to your**

1       lawyers; is that right?
2           MR. PHILLIPS: Objection to the time
3   frame.
4       A.  I didn't say that.
5       **Q.  Okay. I know you were discussing**
6   **whether there was something out there, some**
7   **encumbrances, you described it previously?**
8       A.  Right.
9       **Q.  That was the subject of discussion**
10  **with Merrill Lynch, correct?**
11      A.  And Scott Butler, yes, um-hmm.
12      **Q.  Did you also discuss that with your**
13  **lawyers Frost, Brown or anyone?**
14      A.  I'm sure I told them that we looked for this
15  document and had it and thought it was clear enough
16  that we could proceed with our investment of $30
17  million without any risk of not having clear title.
18      **Q.  And what I'm trying to find is upon**
19  **whom did you rely to reach that conclusion; was it**
20  **Price, Butler, Merrill Lynch, your lawyers? I'm**
21  **trying to find out who you relied upon.**
22          MR. PHILLIPS: And we've been jumping
23  around between 2000 and current, I want to
24

1   clarify for the record whether or not you're asking
2   him back in 2000 when he was having these
3   discussions with Butler and Merrill Lynch or now
4   are you talking about with respect to the
5   counterclaim?
6           MR. CINQUE: Okay, fair.
7   BY MR. CINQUE:
8       **Q.  I'll do it this way: Did there come**
9   **a point in time where you satisfied yourself that**
10  **Malease was being — the Malease situation was not**
11  **an encumbrance?**
12      **A.  Yes.**
13      **Q.  When was that?**
14      A.  When I read what I think is called
15  the two-party agreement, that was a purchase option
16  to buy out the master lease.
17      **Q.  When you read the two-party**
18  **agreement, did you see the words simultaneously**
19  **anywhere in that document?**
20      A.  Not that I recall.
21      **Q.  Okay. So did you rely upon your own**
22  **reading of the two-party agreement to reach your**
23  **conclusion?**
24      A.  I'm sure I had my attorney look at it

13 (Pages 46 to 49)

1    as well.

2      Q.

3        Which attorney?

4      A. Tom O'Brien.

5      **Q. Is he at the Frost, Brown firm?**

6      A. No. He's with Kroger.

7      **Q. Okay. Did Mr. O'Brien give you any**

8 **kind of a written opinion as to the rights of**

9 **Malease?**

10      MR. PHILLIPS: You can answer that

11 yes or no.

12      A. I don't think so.

13      **Q. Now, are you aware that in this lawsuit**

14 **Messrs. Price and Butler have submitted a report**

15 **or statement of position?**

16      A. I heard they were deposed, so I

17 assume that was documented.

18      **Q. Aside from hearing that they were**

19 **deposed are you aware of any written statements of**

20 **any kind that Price or Butler have submitted in**

21 **connection with this proceeding?**

22      A. Other than their deposition?

23      **Q. Right.**

24      **A. No.**

     **Q. Did you read the transcript of any**

1 depositions?

2      A. No.

3      **Q. So when you say you "heard they were**

4 **deposed," what did you hear?**

5      MR. PHILLIPS: Objection. It came

6 from counsel.

7      MR. CINQUE: Pardon.

8      MR. PHILLIPS: It came from counsel.

9      MR. CINQUE. How do I know that?

10      MR. PHILLIPS: I know so why don't

11 you ask him the question where he heard it from and

12 we'll get to it.

13 BY MR. CINQUE:

14      **Q. Tell me where you heard it from.**

15      A. Counsel.

16      **Q. Okay. And what did counsel tell you?**

17      MR. PHILLIPS: Don't answer that.

18      MR. CINQUE: Why?

19      MR. PHILLIPS: It's privileged.

20      MR. CINQUE: Whether someone was

21 deposed or not?

22      MR. PHILLIPS: He already answered

23 that. I thought you were asking him the content of

24 the conversation with him about the deposition.

1 BY MR. CINQUE:

2      **Q. Are you saying that the sole source**

3 **of your knowledge that Price and/or Butler were**

4 **deposed comes from counsel?**

5      **A. Yes.**

6      **Q. Okay. Did you discuss with counsel**

7 **what Price or Butler said?**

8      MR. PHILLIPS: You can answer that

9 yes or no.

10      A. Yes.

11      **Q. Do you remember learning anything**

12 **about what Price or Butler said?**

13      MR. PHILLIPS: You can answer that

14 yes or no.

15      A. Yes.

16      **Q. Elid you ever read any written**

17 **statement emanating from Price or Butler?**

18      A. From the deposition, do you mean?

19      **Q. Any written statement of any kind,**

20 **whether it's a deposition.**

21      A. Is this a written statement?

22      **Q. That's a letter. I'll be more**

23 **specific.**

24      Do you know who, if anyone, has

1 submitted an expert report on behalf of Kroger in

2 this lawsuit?

3      A. Expert report?

4      **Q. Right.**

5      A. Is that the guy that -

6      **Q. I'm not talking about Libbert now?**

7      A. Libbert.

8      **Q. No. Aside from Libbert are you aware**

9 **of any other expert reports that have been**

10 **submitted on Kroger's behalf in this lawsuit?**

11      A. Other than their depositions, no.

12      **Q. So therefore, I think the answer is**

13 **self-evident, but you have never read nor have you**

14 **been told about any expert opinions or conclusions**

15 **that have been put forth on Kroger's behalf in this**

16 **lawsuit, correct?**

17      MR. PHILLIPS: Other than Libbert?

18      MR. CINQUE: Other than Libbert.

19 BY MR. CINQUE:

20      A. Correct.

21      **Q. So if I told you that Price &**

22 **Marshall submitted a report of some ten pages, give**

23 **or take, that would be news to you?**

24      A. Um-hmm.

Page 54

1    Q.    Yes?
2    A.    Yes.
3    Q.    You have to say yes.
4          Okay. Now, did you engage Price &
5    Marshall in or around June of 2000 to assist
6    Kroger?
7    A.    Yes.
8    Q.    Did you sign a written letter of
9    engagement.
10    A.    Probably.
11    Q.    I don't believe I've ever seen one,
12    but you think you did?
13    A.    It wouldn't surprise me, but I don't
14    recall.
15    Q.    Typically would Kroger proceed on a
16    handshake basis in a transaction like this with
17    Price & Marshall, or would it be corporate policy
18    to have a written engagement agreement?
19    A.    I believe we have a written
20    engagement.
21    Q.    He does say at the second page of
22    this letter that Price & Marshall would be paid a
23    flat fee of $100,000?
24    A.    Uh-huh.

Page 55

1    Q.    Was that your agreement at the time?
2    A.    Correct.
3    Q.    Okay. Now, he uses a figure in
4    paragraph 1 of $9 million in cash?
5    A.    Uh-huh.
6    Q.    Ultimately that number became what?
7    A.    Eleven.
8    Q.    Okay.
9    A.    I believe.
10    Q.    Now, paragraph 3 on the second page
11    starts Kroger would buy the three properties and
12    all permits, leases, contracts and other intangible
13    assets relating to the property or their use. Do
14    you understand what that means?
15    A.    I think I do.
16    Q.    Okay. What does it mean to you?
17    A.    I think we would have all of the
18    rights that Bulkhouse had in the transaction.
19    Q.    It doesn't say Bulkhouse there,
20    that's what I'm trying to get at. Does that
21    include any rights of Malease or was that your
22    understanding at the time when it says Kroger woulc
23    buy the three properties and all permits, leases,
24    contracts and other intangible assets relating to

Page 56

1    the properties or their use; was it your
2    understanding that that would include the rights o
3    Malease?
4    A.    No. It would include the right to
5    buy out Malease.
6    Q.    What do you mean by that?
7    A.    The two-party agreement or whatever
8    that thing was called.
9    Q.    The right?
10    A.    The option to prepay the master
11    lease.
12    Q.    So you're saying that paragraph 3
13    here that I've just read would include the right to
14    buy out Malease?
15    A.    It would include the ability to
16    exercise the purchase options that Bulkhouse had in
17    the documents.
18    Q.    Okay. Can I find that anywhere in
19    this letter, what you just said?
20    A.    I don't know. I don't think so, what
21    I just said.
22    Q.    What makes you say what you said
23    then? If I can't find it in the letter, how can I
24    tell that it would have included what you've just

Page 57

1    described? Would I have to look at something else?
2    A.    The documents themselves I guess.
3    Q.    You guess, you're not sure?
4    A.    That's what I intended it to mean.
5    Q.    Well, I didn't write this letter,
6    though?
7    A.    No. But whenever we talked to Jim
8    Price about what we wanted him to do, we wanted to
9    make sure that we had everything we needed to
10    end — at the end of the day we had free and clear
11    title to all of the properties.
12    Q.    Let me put it this way: Let's assume
13    for the moment that someone were to walk up to you
14    and say, Mr. Waldvogel, paragraph 3, does that
15    include the rights of Malease as far as you were
16    concerned, would you say, yes, I understand that to
17    include that or no?
18    MR. PHILLIPS: Objection.
19    A.    The rights of Malease?
20    Q.    Yeah. In other words, when it says
21    Kroger would buy all three properties and leases
22    contracts, did that include the master lease?
23    MR. PHILLIPS: Objection. Asked and
24    answer. Ed, you can answer it again.

15 (Pages 54 to 57)

Page 58

1    A.  I don't think so.

2    Q.  So Kroger was not buying all? There
3  was something as far as you're contemplation at the
4  time, right, Kroger was not going to buy all
5  rights, leases, et cetera, it was only going to buy
6  the Bulkhouse interest; is that right?

7    A.  Correct.

8    Q.  What about Malease, what was going to
9  happen with Malease?

10    A.  The Bulkhouse interest had the option
11  to take Malease out through the purchase option.

12    Q.  So in other words, you think that by
13  acquiring the Bulkhouse ~

14    A.  The contract.

15    Q.  — rights, you in turn would require
16  whatever rights Bulkhouse had vis-a-vis Malease; u
17  that what you're saying? I'm not trying to put
18  words in your mouth.

19    A.  Yes. We're buying the contract to
20  exercise the purchase option to take out the master
21  lease, yes.

22    Q.  And did you understand at the time
23  that the right that Bulkhouse had was to have a
24  simultaneous transaction?

Page 59

1    A.  I don't know what simultaneous
2  means. I just knew that we could take them out.

3    Q.  You don't know what simultaneous
4  means, I understand.

5        Okay. Paragraph 4 says a 2000 closing
6  would provide benefits to the partners by
7  simplifying their tax situation for 2001. What does
8  that mean, do you know?

9    A.  I think that meant that, if we acted
10  now, we could get a better purchase price from
11  Merrill Lynch.

12    Q.  Did he tell you why?

13    A.  Just that there were tax situations
14  that compelled them to sell now versus later.

15    Q.  Do you have any background in taxation;
16  have you studied any courses in taxation?

17    A.  Yeah, I'm a CPA.

18    Q.  You're a CPA, great. You
19        went to Xavier, right?

20    A.  Um-hmm.

21    Q.  And when did you graduate?

22    A. I graduated with my Master's degree
23 in 1975.

24    Q. Master's in which?

Page 60

1    A.  Business Administration.

2    Q.  Okay. And when did you become
3  certified?

4    A.  1976.

5    Q.  Do you have any — Did you have any
6  specialty following your certification or at the
7  time of your certification; was there a particular
8  area of accounting that you worked in?

9    A.  Not necessarily, no.

10    Q.  Okay. Are you familiar with the term
11  phantom income?

12    A.  Yes.

13    Q.  Okay. Do you have an understanding
14  of that term?

15    A.  Uh-huh.

16    Q.  What is your understanding?

17    A.  That means that you basically have
18  income that was caused by previous accelerated tax
19  deductions that now is payable, but you have no
20  cash inflow to support it.

21        (Mr. Hodge left the room.)

22    Q.  As of 2000, to your knowledge, were
23  the Bulkhouse partners receiving phantom income in
24  respect of these properties?

Page 61

1    A.  I didn't know when that would
2  happen. I knew it was going to happen.

3    Q.  Now, was there any particular tax
4  benefit that you were aware of or other benefit,
5  for that matter, to Kroger to close this
6  transaction in 2000?

7    A.  As far as we're concerned the sooner
8  the better. Like I said, I've been working it
9  since 1991.

10    Q.  Okay.

11        MR. PHILLIPS: Bob, can you let me
12  know when you get to a good point to take a break?

13        MR. CINQUE: Good point, sure.

14        (Brief recess.)

15        (Mr. Hodge entered the room.)

16  BY MR. CINQUE:

17    Q.  I've placed before you Exhibit K,
18  which is a June 26th, 2000 letter to Michael
19  Giobbi, GI O B B I, from Jim Price.

20    A.  Okay.

21    Q.  And it has attached to it a 3-page
22  document. Do you recall seeing this letter in or
23  about June of 2000 or the attachment?

24    A.  Probably, yeah.

16 (Pages 58 to 61)

Page 62

1  Q.  At Kroger who would be the one who
2  would review this before it would be sent out?
3       A.  Jirn or me, Jim Hodge or myself or
4  both.
5       Q.  Was Jim Hodge equally capable or
6  competent to review this? I don't know the man's
7  background, I've seen his name, but as far as you
8  were concerned did he have the same level? You
9  said he was in real estate, but we have the same
10 level or necessary level of expertise to review
11 this in its entirety or would it have to be a joint
12 collaboration?
13      A.  It's usually a joint collaboration,
14 because this is a complicated financial structure.
15      Q.  Okay. Now, referring your attention
16 to the first page of the summary, second page of
17 the document, reference is made in the first full
18 paragraph to it states many aspects of the
19 structure were designed to take advantage of
20 loopholes *in* the tax code as it existed in the
21 early 1980s.
22          As far as you were concerned was
23 Kroger taking advantage of loopholes in the tax
24 code in 1980 or was that Price's?

Page 63

1       A.  That was the investment banker's. We
2  simply said to them we want to finance these
3  properties, what is our rent rate, and by using
4  financial tax loopholes, I guess, if you want to
5  call them that, they were able to lower our total
6  cost of occupancy.
7       Q.  Were you involved in the original
8  transaction?
9       A.  I was not.
10      Q.  Okay. Did you know about it?
11      A.  I knew about it starting in 1986.
12      Q.  Okay. Now, when he makes reference
13 in this to loopholes, did you object to his use of
14 that term?
15      A.  I did not, no.
16      Q.  It was acceptable to Kroger or to you
17 as a representative of Kroger?
18      A.  Sure.
19      Q.  Okay. Now, it goes on under
20 structure, toward the end it states this complex
21 structure provided enormous tax advantages to
22 Kroger. You agree with that statement?
23      A.  What statement again?
24      Q.  Toward the end of the second

Page 64

1  paragraph three lines up.
2       A.  No, I don't agree with that.
3       Q.  Why?
4       A.  Because all we did is pay and deduct
5  rent.
6       Q.  At the time this was — Prior to it being
7  sent out, you believed you looked at it; is that
8  right?
9          MR. PHILLIPS: Objection. Go
10 ahead.
11      A.  I may have.
12      Q.  Well, do you recall asking Price to change
13 any part of his cover letter or this summary before it
14 was sent ou t?
15      A.  No. We had engaged him to negotiate a
16 price and that's — we let him do that.
17      Q.  He states in his letter of June 26th, 2000
18 Kroger has returned us to explore with Merrill
19 Lynch -
20         MR. PHILLIPS: Retained. You said
21 returned.
22         MR. CINQUE: Retained. I thought I
23 said retained. Off the record.
24              (Off the record.)

Page 65

1  BY MR. CINQUE:
2       Q.  Kroger has retained us, et cetera, so
3  as of June he was — Price & Marshall were Kroger's
4  agents, correct?
5       A.  Correct.
6       Q.  And they had the authority to speak
7  for Kroger?
8       A.  On this transaction to buy this
9  property, yes, uh-huh.
10      Q.  But yet he's saying here this complex
11 structure provided enormous tax advantages to
12 Kroger, and you don't agree with that statement,
13 correct?
14      A.  I don't know why he said that. I'm
15 not sure what those tax advantages were.
16      Q.  Okay. Did you ever ask him?
17      A.  No.
18      Q.  Did you care?
19      A.  At that time, no.
20      Q.  Why is that?
21      A.  I don't think that I read that
22 sentence, to be honest with you.
23      Q.  Do you typically allow people to send
24 things out on behalf of Kroger without reading

17 (Pages 62 to 65)

Page 66

1  them?
2      A.  Once we've engaged them we usually
3  let them do whatever they think.is necessary. We
4  expect them to operate in a professional manner.
5      Q.  Okay. At the top of the next page
6  under purchase option there someone punched holes
7  in this, but II think we can agree the word is
8  Kroger has the right to purchase, must be the word
9  the in there, it's blank but I think it would mean
10 Kroger has the right to purchase the properties for
11 the fair market value as unencumbered by the
12 leases, and there's a spot that probably means at
13 the expiration of the primary term and each renewal
14 term. Did you ever discuss that statement?
15     A.  That statement, no, but I was aware
16 of that concept.
17     Q.  Is that an accurate reflection of
18 Kroger's right?
19     A.  I believe it is, yes, um-hmm.
20     Q.  Now, did that include the master
21 lease as well as the occupancy lease?
22     A.  My understanding was we could buy the
23 properties and own them free and clear and all
24 leases would be removed.

Page 6"

1      Q.  Okay. And did that have to occur
2  simultaneously, both the master lease and the
3  Bulkhouse interest, or could they occur at
4  different times?
5          MR. PHILLIPS: Objection. Calls for
6  a legal conclusion. You can answer.
7      A.  I didn't know and I didn't care.
8      Q.  Do you care today?
9      A.  I don't think so.
10     Q.  Under termination prices can you read
11 that, please?
12     A.  Uh-huh.
13     Q.  What does that mean?
14     A.  That looks like that would you have
15 been the price to terminate the lease at that point
16 in time. I didn't think we had the option to do
17 it, though. I think I would say termination in the
18 event of some kind of a disaster with the
19 properties or something like that.
20     Q.  Some kind of what?
21     A.  Disaster with the properties or
22 something like that.
23     Q.  Do you know why he put that paragraph
24 into this document?

Page 68

1      A.  No, I don't.
2      Q.  Now, down below under debt face
3  principal $50,291,000, what does that mean?
4      A.  That was the original ~ No, not the
5  original, the accreted value of the mortgage debt
6  on the property.
7      Q.  You're spelling that how, A C C R E T
8  ED?
9      A.  Correct.
10     Q.  What do you mean by that?
11     A.  My understanding of this transaction
12 was that the original mortgage debt was ~ rather
13 than paying cash interest was accreting interest,
14 which was increasing the loan balance.
15     Q.  Now, on the next page, the financial
16 page, under proposed offer price can you look ai
17 terms?
18     A.  Okay.
19     Q.  What does that mean, that statement,
20 cash with the properties taken subject to the
21 existing debt that will be left in place?
22     A.  Um-hmm.
23     Q.  What does that mean?
24     A.  I thought we'd pay cash and when we

Page 69

1  assumed the mortgage, it was in place.
2      Q.  And then closing as soon as possible
3  on or after 10/12000 but before year end 2000, wa<
4  that something that you discussed with Price?
5      A.  Not specifically, no.
6      Q.  Was it important to Kroger to close
7  before year end 2000?
8      A.  Not really.
9      Q.  So as far as you were concerned this
10 would have been put in there for the benefit of the
11 Merrill Lynch entity?
12         MR. PHILLIPS: Objection.
13     A . I  don't know.
14     Q.  You don't know, okay.
15         You don't remember any discussion
16 with Price during the year 2000 as to whether
17 anyone would be advantaged by a closing in 2000?
18     A.  Well, once we decided to do it the
19 sooner the better.
20     Q.  Okay. Now, Exhibit L, I'll tell you
21 this is a portion of a document, it's not a
22 complete document. This was a rather lengthy
23 document and I extracted certain pages from it.
24 It's a Price & Marshall document, February 2001.

18 (Pages 66 to 69)

Page 70

1 Have you seen that before today within the past 30
2 days?
3     A. Not in the past 30 days.
4     Q. Okay. Do you remember seeing this
5 document?
6     A. Yeah.
7     Q. You're free to look at it.
8     A. Um-hmm.
9     Q. Now, did you discuss this with anyone
10 at Price & Marshall at the time you saw it?
11     A. I assume this is the one they gave
12 us. If this is the one they gave us, then, yes, I
13 would have. I can't tell that for sure, though. I
14 know they gave us something similar to this.
15     Q. Do you know where this document —
16 Take a look at the table of contents and maybe it
17 will help refresh your memory, do you know whether
18 this was prepared for the benefit of Kroger or was
19 it prepared as a selling tool for Merrill Lynch and
20 Bulkhouse?
21     A. I don't know. February 2001 we had
22 already decided to buy the property, so I'm not
23 sure. I don't recall what the purpose of it was.
24     Q. Well, when you said you decided to

Page 71

1 buy the property, obviously the price was a
2 consideration?
3     A. At the right price.
4     Q. At the right price, okay.
5         Now, under overview the second bullet
6 point states leave master lease and sandwich
7 position in place avoiding tax recapture of
8 deferred rent; do you know what that means?
9     A. Not exactly.
10     Q. Okay. Then let's look at advantages,
11 the next page. Are these advantages, do you know
12 whose advantages they were; in other words, were
13 they Kroger's or Bulkhouse's or both?
14     A. This looks like it's Merrill Lynch's
15 advantages, not mine.
16     Q. Okay. Now, under the third bullet
17 point on this page, advantages, it states master
18 lease stays in place, no outlay to acquire Malease
19 Foods; do you see that?
20     A. Um-hmm.
21     Q. Did you regard that as an advantage
22 in February of 2001, an advantage to Kroger?
23     A. To Kroger, no.
24     Q. Did you discuss this with Price or

Page 72

1 Butler at the time, this particular statement?
2     A. When you say a particular time, I
3 can't say. I know we talked about potentially
4 offering to buy the lease out prior to the
5 two-party agreement when that was effective, but
6 Kroger would do that, though.
7     Q. So what do you remember discussing?
8     A. Whether or not we could do that
9 earlier than later at some advantage price.
10     Q. So in other words when you say an
11 "advantage price," advantage to Malease?
12     A. Uh-huh.
13     Q. So Malease would receive a premium?
14     A. More than just what was in the
15 two-party agreement, because we're doing it sooner
16 and he would lose more rent and we'd compensate him
17 for that.
18     Q. And do you recall any discussion
19 about the feasibility of doing that as of February
20 2001?
21     A. Not really. We just talked around
22 it.
23     Q. Is it fair to say that from February
24 right through July when the actual closing took

Page 73

1 place — Withdrawn. I don't want to characterize
2 it.
3         Was Malease a consideration; was
4 Malease a significant consideration at any time
5 prior to the closing of this transaction?
6     A. Not really.
7     Q. As of February 2001 were you
8 satisfied that the Kroger side of things had fully
9 and adequately examined the legal status of
10 Malease?
11     A. I'm not sure what you mean by "legal
12 status of Malease." I think we had reviewed our
13 rights and obligations and were satisfied that we
14 could end up with clear title.
15     Q. Maybe that was a bad question. I
16 meant the position of Malease, whether it could be
17 dealt with prior to the closing or whether you had
18 to wait?
19     A. We assumed we had to wait but we
20 thought we might be able to negotiate something at
21 the right time.
22     Q. Was any effort made prior to July
23 24th, 2001 to negotiate with Malease -
24     A. No.

19 (Pages 70 to 73)

Page 74

1    Q.  — to purchase this interest?
2    A.  No.
3    Q.  Okay.  Why?
4    A.  Not that I recall.
5    Q.  Do you know why?
6    A.  I was getting on the cart before the
7    horse.
8    Q.  What do you mean by that?
9    A.  We wanted to get the Bulkhouse
10   position first.
11   Q.  And was there any discussion at any
12   time up to the time of the closing on July 24th,
13   2001 as to whether the position of Malease had to
14   be acquired at the same time as the accusation of
15   the Bulkhouse interest?
16   A.  No.
17   Q.  So that was never discussed one way
18   or another?
19   A.  (Nodding head.)
20   Q.  No?
21   A.  No.
22   Q.  You have to say it for the benefit of
23   our record.
24   A.  Sorry.

Page 75

1    Q.  Sure.
2    Okay.  Now on disadvantages, under
3    the disadvantages we have the first bullet point
4    master lease stays in place, and it talks about
5    Malease remaining a party to the transaction for
6    now. And it goes on to say but Kroger can buy out
7    Malease Foods in 2003 by exercising the Kroger
8    purchase option with itself?
9    A.  Um-hmm.
10   Q.  Do you recall any discussion about
11   that?
12   MR. PHILLIPS: That being this
13   statement?
14   MR. CINQUE: That statement I just
15   read.
16   BY MR. CINQUE:
17   A.  Discussion with who?
18   Q.  Anyone, anyone?
19   A.  Probably with ourselves with maybe
20   Jim or Tom O'Brien.
21   Q.  But that's sort of guessing. I'm
22   saying do you have any memory in 2001 of discussing
23   that concept or that thought?
24   A.  Yes.

Page 76

1    Q.  Okay. What do you remember
2    discussing and with whom?
3    A.  What I said before. We had concluded
4    from reviewing the documents and discussions we had
5    that Kroger had the right to buy the properties and
6    get free and clear title; therefore, the documents
7    had to have a path in place that unwound every
8    party of the transaction that took them out.
9    Q.  During any of those discussions
10   leading up to the — prior to the time of the
11   closing, do you recall anyone using the word
12   simultaneously or some substitute or some similar
13   word?
14   MR. PHILLIPS: That's got to be the
15   sixth time you've asked that question, Bob. So you
16   can answer it again.
17   MR. CINQUE:  I don't think it is.
18   If it is, I think it's important.
19   BY MR. CINQUE:
20   Q.  At any time up to the time of the
21   closing?
22   A.  No.
23   Q.  No recollection?
24   A.  No.

Page 77

1    Q.  Things have to be done at the same
2    time simultaneously, anything like that?
3    A.  No.
4    Q.  As it relates to Malease?
5    A.  (Nodding head.)
6    Q.  Okay.
7    MR. PHILLIPS: You have to say no
8    for the record.
9    A.  No.
10   Q.  Okay. Exhibit D is a letter dated
11   February 15th, 2001 to Michael Lurie, L U R I E.
12   Over in the left are the initials JDP, which is
13   Price. And specifically this letter makes an offer
14   of $8,700,000 cash plus an assumption of $18.3
15   million of debt; do you see that?
16   A.  Um-hmm.
17   Q.  You authorized that offer to be made?
18   A.  I certainly did.
19   Q.  Were you the person at Kroger who hac
20   the final say on authorizing that or did that
21   require Board approval?
22   A.  It didn't require Board approval. It
23   required I had to review it with my superiors,
24   Chief Financial Officer of the company.

20 (Pages 74 to 77)

1    Q.  Who is that?

2    A.  Was that Mike or Rodney then? It was
3  Mike Schlotman or Rodney McMullen, they changed.
4  Probably reviewed it with both of them, though.

5    Q.  Okay. Now, the statement is made in
6  the second paragraph, last sentence, the economics
7  of our offer has a window of 120 days and needs to
8  close on or before July 1st, 2001. Do you know
9  whose economics he's talking about?

10    A.  No.

11    Q.  As far as you knew back in February
12  of 2001, was July 1st a critical date from the
13  point of view of the economics of Kroger?

14    A.  Not terrible.

15    Q.  Did you ever ask Price what he meant
16  by that sentence?

17    A.  Can't say that I did, no.

18    Q.  Okay. It goes on to say the offer is
19  timely to us, because we're currently reviewing our
20  5-year capital expenditures, et cetera; do you see
21  that?

22    A.  Yes.

23    Q.  It goes on to say it's important in
24  our analysis to know whether we will be able to own

1  these properties by July 1st; do you agree with
2  that?

3    MR. PHILLIPS: Does he agree that's
4  what it says?

5    MR. CINQUE: Do you think that's the
6  question?

7    MR. PHILLIPS: I don't know what the
8  question is, Bob. That's why I asked.

9    MR. CINQUE: I bet he can answer it
10  better than that.

11  BY MR. CINQUE:

12    Q.  Go ahead. Do you agree with it?

13    A.  Do I agree with this, the last
14  sentence?

15    Q.  Yes. With your lawyer's
16  qualification believe it or not. He wants to know
17  first if you can read.

18    A.  Yeah.

19    Q.  I think we all agree you can read,
20  right?

21    A.  Yes.

22    Q.  Okay. Now, I'm going to ask you if
23  you agree with the statement as made?

24    A.  It had some importance, sure.

1    Q.  You just told me a minute ago that it
2  didn't really make that much difference as far as
3  this July 1st, 2001 date?

4    A.  It wasn't walk away critical, but,
5  like I said before, once you decide to buy
6  something the sooner the better.

7    Q.  Well, that's not what he says, is it,
8  though? He seems to be talking about reviewing our
9  5-year capital expenditures, et cetera, new
10  facilities?

11    MR. PHILLIPS: We'll stipulate what
12  the letter says.

13    Q.  So it was important then, the date of
14  July 1st was important from the point of view of
15  your economic analysis, correct?

16    MR. PHILLIPS: He just testified to
17  the opposite of that, Bob.

18    MR. CINQUE: You tell me. He said
19  both I think.

20    THE WITNESS: I said the sooner the
21  better.

22    MR. PHILLIPS: I think you said one
23  and he said the other. You're not listening to the
24  witness.

1    MR. CINQUE: I beg to differ. We'll
2  do it again.

3  BY MR. CINQUE:

4    Q.  You see the sentence the economics of
5  our offer has a window of 120 days, and we touched
6  on that earlier, right?

7    A.  And all of these negotiates time
8  kills deals. We usually try to set a window that
9  we're going to do it by so it doesn't drag out
10  forever. That's not unusual in any kind of
11  negotiation like this.

12    Q.  So are you telling me that in your
13  judgement this was a device to move the thing
14  along?

15    A.  Sure.

16    Q.  So it really didn't mean what he
17  said, it was just a method trying to stimulate the
18  other side?

19    A.  Right.

20    MR. CINQUE: Okay. Why don't we
21  mark as.

22  (Deposition Exhibit T was marked for
23  identification.)

24  BY MR. CINQUE:

21 (Pages 78 to 81)

1    Q.   Are you familiar with Exhibit T?
2    A.   It looks familiar.
3    Q.   Am I correct basically that this is
4  on the Bulkhouse transaction, it's Jim Hodge's
5  communication and he's asking Jen on July 25th
6  2001 to initiate a payment to Price & Marshall oi
7  $100,000 for its fee on the Bulkhouse deal, right?
8    A.   Well, I'm not sure which paragraph
9  you're talking about. It's actually my
10  communication on July 27th, the most recent one,
11  the one on the top.
12    Q.   Okay. I'm looking at the July 25th,
13  I took it in date order.
14    MR. PHILLIPS: There's three.
15    THE WITNESS: There's 23, 25 and 27.
16    MR. PHILLIPS: There's three
17  communications on the 25th.
18    MR. CINQUE: The one right in the
19  middle.
20    MR. PHILLIPS: The one at 9:33?
21    THE WITNESS: Author Jim Hodge?
22    MR. CINQUE: Sure, right.
23  BY MR. CINQUE:
24    A.   Okay.

1    Q.   You approved the $100,000 payment to
2  Price & Marshall, correct?
3    A.   Correct.
4    Q.   Okay. And had you approved the
5  payment before or after the closing?
6    A.   I would have thought we had done it
7  after closing.
8    Q.   Okay. In any event Price & Marshall
9  did receive $100,000, right?
10    A.   Correct.
11    Q.   And they received it in August; is
12  that right?
13    A.   It would have been after closing I
14  would think.
15    Q.   Just take a look at Exhibit N.
16    A.   August 22nd, I would have sent it the
17  day after I got that check, uh-huh.
18    Q.   Okay. I'll take that from you.
19    Okay. Now, the closing occurred on
20  July 24th, 2001, correct? I'll show you.
21    A.   If you say so. I'd have to look at
22  the records. That sounds familiar.
23    Q.   July 24th?
24    A.   Okay.

1    Q.   Just fixing a day. Now, if you'll
2  please take a look at this, it is going to be U.
3  (Deposition Exhibit U was marked for
4  identification.)
5  BY MR. CINQUE:
6    Q.   Okay. Exhibit U is a letter on
7  Kroger stationery?
8    MR. PHILLIPS: Do you want him to
9  look at the one that's been marked? He doesn't
10  have it.
11    MR. CINQUE: He can use that one.
12  BY MR. CINQUE:
13    Q.   July 30th, 2001 your letter for your
14  memo, right?
15    A.   Correct.
16    Q.   Do you recognize this?
17    A.   Uh-huh, yes.
18    Q.   You say in this second paragraph
19  while it looks like we are paying 30 mill today,
20  that is misleading, right, just continue to read
21  that please and I'll ask you some questions.
22    A.   Uh-huh.
23    Q.   Can you explain what you're saying
24  there in layperson's terms?

1    A.   Okay. We had rent obligations that
2  we had already been obligated to pay, and by buying
3  out the Bulkhouse position we're simply converting
4  our rent obligations to mortgage obligations.
5  That's what I'm trying to say.
6    Q.   Okay. And was that beneficial to
7  Kroger in some way?
8    A.   It wasn't so much beneficial as it
9  was neutral.
10    Q.   So then why comment upon it?
11    A.   Because the actual CA said $30
12  million, and I wanted to make them clear we weren't
13  writing a check for S30 million.
14    Q.   Okay. Now, Exhibit Q. Exhibit Q is
15  a letter on Kroger letterhead from you?
16    A.   Uh-huh.
17    Q.   To Jim Price dated August 27th, 2001?
18    A.   Right.
19    Q.   All right. And it begins, well,
20  after six years of trying we finally got it done.
21  We closed on the Bulkhouse interest in the three
22  properties on July 24th, 2001.
23    Okay. Now, what caused you to make
24  those statements on August 27th in that

Page 86

1

2 communication to Price?

3    A.  Which statements?

4    Q.  The statements I just read, the two

5 sentences I just read to you.

6    A.  Because I had been wanting to buy these

7 properties forever and we finally bought them. And

8 that's what I was complementing him on, he got it

9 done, helped us get it done by negotiating the price

10 with Merrill Lynch.

11    Q.  I see you say here we closed on the

12 Bulkhouse interest in three properties on July 24th,

13 2001, was that something that he did not know as of

14 August 27th?

15    A.  Right, correct.

16    Q.  But had he already been paid for his

17 services?

18    A.  No.

19    Q.  You're confused, all right?

20    A.  On July 24th had he already been

21 paid?

    Q.  Why don't I read the question back to

you.

22

23 back.

24

    MR. CINQUE: Read the question

Page 87

1 (The record was read back by the court reporter.)

2 BY MR. CINQUE:

3    Q.  You're telling Price on August — Was

4 this a legitimate letter?

5    A.  Yes.

6    Q.  This was not manufactured for any

7 purpose, right?

8    A.  This is a letter that I sent to him

9 with the check for $ 100,000.

10    Q.  Okay. Where is the reference to

11 the — Oh, you say included is our agreed fee?

12    A.  Right.

13    Q.  Okay. Now, are you telling me — did

14 he send an invoice prior to August 27th; do you

15 remember?

16    A.  I don't think so.

17    Q.  So as far as you were concerned you

18 were telling him something that he didn't know, you

19 sent him the check?

20    A.  Right.

21    Q.  And you were telling him it closed on

22 July 24th?                              •

23    A.  Right.

24    Q.  So isn't it the fact that he had

Page 88

1 already sent an invoice weeks before August 27th?

2    A.  I don't remember that. It's

3 possible, I don't remember that.

4    Q.  Sir, isn't it true that he knew on

5 July 24th that the closing had been concluded?

6    A.  He wasn't involved in it. I don't

7 think he did.

8    Q.  When do you think he first found out,

9 when you wrote him on August 27th ?

10    A.  I don't know.

11    Q.  Well, as far as you were concerned

12 when you wrote that letter, you didn't know whether

13 he knew that the transaction had concluded on

14 August ~ on July 24th?

15    A.  Right.

16    Q.  So you thought you were telling him

17 something he didn't know; is that right?

18    A . I  didn't know whether he knew or

19 not. Once he negotiated the price we took over

20 from there.

21    Q.  And you don't remember whether he

22 submitted an invoice?

23    A.  I don't think he did, but I could be

24 wrong.

Page 89

1    Q.  I'll show you one. Take a look at

2 Exhibit M. It's an invoice dated August 6th, 2001

3    A.  Okay.

4    Q.  To the Kroger Co., right, for

5 $100,000?

6    A.  Right.

7    Q.  Did you see that invoice on or about

8 August 6th?

9    A.  Probably, yes.

10    Q.  So you knew that Price was billing

11 you for his services as of August 6th or

12 thereabouts, correct?

13    A.  Okay, yes.

14    Q.  Right. And in order to be billing

15 you for his services there had to have been a

16 closing, right?

17    A.  Yes.

18    Q.  He wasn't entitled to the $100,000 if

19 the transaction fell through; is that correct?

20    A.  Right.

21    Q.  All right. But nonetheless three

22 weeks later you're writing him this August 26th

23 letter where you're telling him that the closing

24 occurred on July 24th, correct?

23 (Pages 86 to 89)

1    A.  Right.
2        Q.  And your testimony is that the reason
3    you wrote it this way is in your mind as of Augus
4    27th he didn't know that it had closed on July
5    24th, correct?
6        A.  No. All I'm saying — I was just —
7    it was a letter to enclose with the check of
8    payment. It wasn't to notify him. It was to give
9    him the money.
10       Q.  It wasn't to make it look like you
11   were first telling him about the closing on Augus
12   27th?
13       A.  No. It was to give him the check.
14       Q.  This letter was not intended to make
15   it appear that Price didn't know that the closing
16   had occurred on July 24th, 2001; is that correct?
17       A.  I was not trying to make that
18   appearance with this letter, absolutely not.
19       Q.  So even though he had already sent
20   you an invoice on August 6th, you still felt it
21   necessary to tell him, oh, by the way, the closing
22   occurred on July 24th, correct?
23       A.  That's the reason we're sending him
24   the money.

1        Q.  Let's go on. You say but Malease is
2    still out there?
3        A.  Um-hmm.
4            (Mr. Hodge left the room.)
5        Q.  I hope you are still planning to
6    finish this piece of the transaction by negotiating
7    a price to buy him out early.
8            Okay. You say "you are still
9    planning," what does that mean, that there had been
10   plans in the works?
11       A.  No. We had discussed buying Malease
12   out early instead of waiting until April 1st, 2003.
13       Q.  And as far as — So there was a plan
14   in place?
15       A.  No, there wasn't a plan in place.
16   There was — What I said was I would certainly be
17   willing to do that, if we can do it for the right
18   price, and he would probably be in a better
19   position of negotiating that than me.
20       Q.  Did you have any discussion with
21   Price as of August 27th as to the method to be
22   applied in dealing with Malease?
23       A.  No. I mean, other than I said —
24   what I told him was whatever you think works best.

1    If you want to buy it from them, then I'll buy it
2    from you or we can buy it direct or whatever
3    works. He knew Malease, I did not.
4        Q.  When you say he could buy it from
5    him, what do you mean, Price & Marshall would buy
6    the Malease interest?
7        A.  Right.
8        Q.  And where was Price & Marshall going
9    to get the money to buy the Malease interest, was
10   there ever any discussion about that?
11       A.  From me. Probably talked about it on
12   the phone.
13       Q.  From Kroger?
14       A.  Right.
15       Q.  Why is it that you were going to have
16   or you were considering having Price & Marshall bu
17   the Malease position with Kroger money?
18       A.  Because he knew the man and I didn't.
19       Q.  Was there any discussion as to
20   whether Price could simply go — The man being
21   Kadish, right?
22       A.  Yes.
23       Q.  You know him to be Kadish now?
24       A.  Yes.

1        Q.  Did you know it was Kadish then?
2        A.  Yes.
3        Q.  Okay. Was there any discussion about
4    Kroger going directly to Kadish and offering to buy
5    him his position?
6        A.  Might have been.
7        Q.  Was there any particular benefit,
8    economic benefit, to Kroger to having Price &
9    Marshall buy the Malease position as opposed to
10   Kroger buying it?
11       A.  Our experience has always been that
12   when Kroger buys these things, negotiates these
13   things directly, we pay more money. And if we can
14   use an agent to run interference for us, we end up
15   with a better price.
16       Q.  So when you say agent run it, "to run
17   interference," was it in your contemplation that
18   Price would not tell Kadish that he was merely an
19   agent acting for Kroger; was that the idea?
20       A.  My idea was whatever he thought was
21   the best method, because he knew the transaction
22   and the people and I didn't.
23           (Mr. Hodge entered the room.)
24       Q.  Was Price authorized to tell Kadish

24 (Pages 90 to 93)

1  that he was actually acting for Kroger?
2      A.  If we decided to proceed with this,
3  sure.
4      Q.  Then why did you need him at all? If
5  he was telling — If he was authorized to tell
6  Kadish that he was acting for Kroger, wouldn't
7  Kadish now know that it was Kroger that was buying?
8      A.  Yeah.
9      Q.  So isn't it the truth that what you
10  felt as you were attempting here was to conceal
11  from Kadish the true identify of the buyer?
12         MR. PHILLIPS: Objection.
13  Mischaracterizes his testimony. You can answer.
14      A.  I simply said we relied on Jim to
15  select the best method approach that he could do to
16  get us the best price, the lowest cost.
17      Q.  The "best method," let's assume for
18  the moment — did the best method in Kroger's
19  contemplation include deception?
20         MR. PHILLIPS: Objection,
21  argumentative. Go ahead.
22      A.  I don't know if deception is the
23  right term. We often have agents buy things for us
24  for our benefit as agents, because sellers often

1  think when Kroger is directly involved, we have big
2  pockets and the cost goes up.
3      Q.  So the idea was to conceal from
4  Kadish the identity of the true buyer; is that
5  right?
6      A.  No.
7      Q.  No. It was okay for Price to go and
8  tell him I'm acting for Kroger?
9      A.  If that was the best way to do the
10  transaction, he could have done it that way.
11      Q.  Did you think it was the best way to
12  do the transaction?
13      A.  I didn't know. I didn't know. I
14  don't know the person.
15      Q.  So you had no knowledge or feeling
16  one way or another whether you should simply let
17  Kadish know that Price is acting for Kroger, or
18  whether Price should let Kadish think he's acting
19  for himself; is that what you're saying?
20      A.  Right.
21      Q.  This letter was not - Withdrawn.
22         Now, at the time you wrote this
23  August 27, 2001 letter, did you have any knowledge
24  or information concerning the relationship,

1  business or personal, between Price and Kadish?
2      A.  Other than I knew that he knew him,
3  no.
4      Q.  Okay. So you had no knowledge one
5  way or the other as to whether Price had ever been
6  involved with these properties on behalf of Kadish?
7      A.  You mean other than at the original
8  transaction?
9      Q.  Right. Other than the 1983?
10      A.  Correct.
11      Q.  So Price never told you in words or
12  substance at any time prior to August 27th, 2001
13  that Kadish had actually engaged Price and his firm
14  to act for Kadish to buy these properties?
15      A.  No.
16      Q.  As of August 27th, 2001 did you know
17  whether Kadish had a deal with Butt with respect to
18  the San Marcos property?
19      A.  Kadish?
20      Q.  Kadish.
21      A.  No.
22      Q.  Do you know, as we sit here today,
23  whether Kadish ever had a deal to sell the San
24  Marcos property to Butt?

1      A.  No. The only thing I knew —
2      Q.  You can tell me the only thing you
3  knew, that's fine.
4      A.  What I thought he had agreed — the
5  agreement with Butt was with the Bulkhouse property
6  owner was that any expansion that they performed
7  would not be included in their fair market value
8  purchase option when that was exercised.
9      Q.  Did Price ever tell you one way or
10  another at any time whether Kadish had a deal to
11  sell San Marcos to Butt?
12      A.  No. I don't know how he could do
13  that, he didn't own it.
14      Q.  If he could acquire it, did that ever
15  come up?
16      A.  No.
17      Q.  So I know the answer to this, I want
18  to make sure: You never saw a contract between
19  Kadish or a Kadish controlled entity and Butt
20  relating to the sale of San Marcos?
21      A.  No.
22      Q.  For about $11 million?
23      A.  No. How could — I don't know how
24  they could have a contract.

25 (Pages 94 to 97)

1    MR. PHILLIPS: Wait for a question.
2    MR. CINQUE: They had it. I've
3 given it — I can tell you on the record I've given
4 it to your lawyers.
5    THE WITNESS: Okay.
6    MR. CINQUE: Probably some things
7 you don't know about this case. They have one.
8 Same price as you guys sold it for, but that's
9 another day.
10 BY MR. CINQUE:
11    **Q. Okay. Exhibit P, have you ever seen**
12 **Ex    hibit P before?**
13    **A.** Yes.
14    **Q. Okay. Exhibit P, by the way, is a**
15 **le    tter on the letterhead of Price & Marshall dated**
16 **Sept    ember 17th, 2001 from Price to Lawrence**
17 **Kadi    sh. It has an attached letter from Jim Hodg**
18 **IS dated S    eptember 13th, 2001.**
19    **Now, I asked you whether you saw P,**
20 **did yo    u also see the document attached to P, the**
21 **Hodg    e letter as well?**
22    A. I'm sorry, I saw the Hodge letter.
23 When I answered, I was referring to the Hodge
24 letter.

1    **Q. Okay.**
2    A. Did I see the Price & Marshall
3 letter, cover letter in front of it, probably.
4    **Q. Did you see it back in September of**
5 **2001?**
6    A. Probably.
7    **Q. When you say "probably," you're not**
8 **sure?**
9    A. I can't say for certain.
10    **Q. Okay.**
11    A. I knew this letter was going out. I can't
12 say that I saw the cover letter. I probably did, but
13 I'm not for sure.
14    **Q. So you knew the Hodge letter of**
15 **September 13th, 2000 was going out?**
16    A. Absolutely.
17    **Q. And what did you know? Tell me what**
18 **you knew.**
19    A. Again, we wanted Jim Price to contact
20 Malease, Mr. Kadish, and see if we could buy out
21 his position earlier, sooner.
22    **Q. Okay. You said you knew the letter was**
23 **going out, what does that mean; that means you saw**
24 **it before it was sent?**

1    A. Probably, yes.
2    **Q. Probably?**
3    A. Yeah, I think I did.
4    **Q. You think you did?**
5    A. I saw a draft. I don't know if I saw
6 the final or not.
7    **Q. Who drafted this letter, the**
8 **September 13th letter?**
9    A. Jim did, Jim Hodge.
10    **Q. Jim Hodge. How do you know that?**
11    A. He signed it.
12    **Q. Aside from seeing his signature on**
13 **there, how do you know he drafted it?**
14    A. Well, I'm sure we probably would have
15 asked Jim Price how he wants to structure this
16 transaction, how we should best get into a
17 negotiation with Malease to unwind this
18 transaction, and he probably asked Jim to write him
19 a letter.
20    **Q. You're saying a lot of probabilies in**
21 **there. Are you guessing because, you know, ever**
22 **your lawyer will tell you we don't want you to**
23 **guess. This is an important part of the case, and**
24 **I only want to know what you remember.**

1    **So if it's probably, you know,**
2 **qualify that, because it's not fair to you or**
3 **whatever. I'll ask another question.**
4    **Did you ever discuss this letter with**
5 **Jim Hodge before today?**
6    MR. PHILLIPS: Which letter?
7    MR. CINQUE: Yeah, either one.
8    MR. PHILLIPS: The September 13th?
9    MR. CINQUES: Exhibit P either page 1
10 or 2.
11 BY MR. CINQUE:
12    A. Yes.
13    **Q. When did you discuss it with him most**
14 **recently?**
15    A. Last week.
16    **Q. This morning? Last week, okay.**
17    A. I'm sorry, I did not discuss it with
18 Jim Hodge, I discussed it with my lawyer.
19    **Q. Okay. Aside from discussing it with**
20 **your lawyer, did you ever discuss it with Hodge?**
21    A. Probably back in September of 2001.
22    **Q. Are you aware that this lawyer —**
23 **this letter was the subject of extensive testimony**
24 **during the Price deposition?**

26 (Pages 98 to 101)

1    A.  This letter?
2    Q.  Um-hmm, yes.
3    A.  I was aware that it was part — part
4  of the deposition.
5    **Q.  But other than being aware that the**
6  **September 13th, 2001 Hodge letter was part of the**
7  **deposition, you can't enlighten us any further as**
8  **to what you knew?**
9    A.  I'm not sure what your question is.
10    **Q.  Did you ever go to Hodge and ask him,**
11  **Hodge, did you write this letter all by yourself;**
12  **did you ever ask him that question?**
13    A.  I can't say that I did, no.
14    **Q.  Did he ever tell you that he did**
15  **write it all by himself?**
16    A.  I doubt it.
17    **Q.  You doubt that he told you that?**
18    A.  No, I don't think so.
19    **Q.  Do you know whether this letter has**
20  **featured prominently in any aspect in this case?**
21    MR. PHILLIPS: Don't discuss
22  anything with the lawyers.
23    A.  Just the discussion I had with my
24  lawyer.

1    **Q.  You didn't have any native curiosity**
2  **once you talked to the lawyer to go to the horse's**
3  **mouth who's sitting right over here and ask him**
4  **about it; is that your testimony?**
5    A.  Last week?
6    **Q.  At any time before today did you ever**
7  **go to Hodge?**
8    A.  Other than back in September of 2001,
9  no.
10    **Q.  Were you curious as to who wrote it?**
11    A.  Not really.
12    **Q.  Would it come as a total shock to you**
13  **if I suggested to you that Jim Price wrote this**
14  **letter?**
15    **A.  No.**
16    **Q.  Was Price in the habit of writing**
17  **letters for Hodge to sign?**
18    A.  Again, I think what I told you before
19  was we asked Jim Price what is the best method to
20  approach Malease to take them out, and this was his
21  advice.
22    **Q.  Did you think that was perfectly**
23  **proper?**
24    A.  Sure.

1    Q.  Do you know whether Price wrote the
2  **letter?**
3    A.  I think I do, yes.
4    Q.    **Sure you do, you know, and**
5        **what do you know, tell us.**
6    A.  I know that my lawyer showed it to me
7  last week.
8    MR. PHILLIPS: Let's not talk about
9  anything that occurred between us. If that's the
10  only basis of your knowledge with respect to this
11  letter, then we'll claim privilege. Move on.
12    MR. CINQUE: You'll claim
13  conspiracy, that's what you'll claim.
14    MR. PHILLIPS: Bob.
15    MR. CINQUE: This is an outrage. I'm
16  going to bring this to the attention of Judge
17  Beckwith as soon as I can.
18    MR. PHILLIPS: Do what you need to,
19  Bob.
20    MR. CINQUE: And I'm going to say --
21    MR. PHILLIPS: Stop the speeches.
22  Just ask the next question. We're not going to
23  engage in this. Go ahead.
24    MR. CINQUE: I'm going to say on the

1  record right now because there are no secrets here,
2  sir, I represent to you that evidence that Price
3  had drafted this letter was furnished to me as part
4  of the discovery in this case only after I pressed
5  your lawyers for their failure to produce
6  documents.
7    MR. PHILLIPS: Stop.
8    MR. CINQUE: Do you have any -
9    MR. PHILLIPS: Stop. Ask the
10  questions, stop the speeches.
11    MR. CINQUE: I sure will.
12    MR. PHILLIPS: Ask the question.
13    MR. CINQUE: I sure will.
14  BY MR. CINQUE:
15    **Q.  Sir, are you aware that at the**
16  **deposition of Mr. Price on January 22nd, 2004 I**
17  **marked as Exhibits A, B and C a series of letters**
18  **between Mr. Phillips and myself referencing the**
19  **issue of document production by Kroger; do you know**
20  **that?**
21    MR. PHILLIPS: Don't answer. We're
22  not answering these questions. Go to a question
23  that pertains to this case. Not your speeches, not
24  your posturing trying to get some type of

27 (Pages 102 to 105)

Page 106

1  advantage. Ask a question that this witness would
2  have firsthand knowledge of.
3          MR. CINQUE: What I am going to do
4  is at the end of this deposition, I'm going to call
5  the Magistrate and see if we can get a ruling right
6  now while I'm here.
7  BY MR. CINQUE:
8      Q.  Did you participate in any way in
9  document production on the part of Kroger in this
10 case?
11     A.  What do you mean "document
12 production"?
13     Q.  Are you aware that Kroger was under
14 an obligation under the Federal Rules of Civil
15 Procedure to produce certain documents in
16 connection with this case?
17     A.  My lawyer asked me to--
18         MR. PHILLIPS: Stop. Don't testify
19 about any conversations that we had with lawyers.
20 If you can't answer that question based on your own
21 knowledge, then let me know that and we'll claim
22 privilege.
23         THE WITNESS: Okay. Ask the
24 question again then.

Page 107

1  BY MR. CINQUE:
2      Q.  Who was responsible at Kroger for
3  producing documents required in this litigation, dc
4  you know?
5      A.  I would think it was my lawyer, our
6  law department.
7      Q.  You think?
8      A.  That's what I would expect.
9      Q.  Who at Kroger has the ultimate
10 responsibility fo r the supervision of this
11 litigation?
12     A.  Ultimate responsibility?
13     Q.  Right.
14     A.  Our general counsel I would think.
15     Q.  Were you ever told that you were
16 required to produce documents in your file related
17 to the Bulkhouse transaction as part of this
18 litigation?
19     A.  What I remember is my lawyer asked me
20 to see my file.
21         MR. PHILLIPS: Stop. Don't
22 communicate any information related to a
23 conversation you had with counsel. If you can't
24 answer the question without referring to

Page 108

1  conversations with counsel, then let me know that
2  and I'll assume privilege.
3          MR. CINQUE: That's absolutely a
4  misstatement of the law of privilege. Privilege
5  goes to advice given by a lawyer. If you asked him
6  to search for documents, I'm entitled to know
7  that. We'll deal with the Magistrate on this, but
8  I'm giving you a chance now.
9          You know as a lawyer that parties
10 have discovery obligations. If the lawyer goes to
11 the client and asks the client to produce
12 documents, that is absolutely not privileged. Now
13 do you wish to reconsider your position or do we
14 let the Magistrate rule on it?
15         MR. PHILLIPS: Ask a question.
16 BY MR. CINQUE:
17     Q.  Okay. Sir, were you ever asked by
ISanyone   to produce any documents in your file
19re   lating to the Bulkhouse transaction that closed
20inJuly   of 2001?
21         MR. PHILLIPS: You can answer that
22 question yes or no.
23     A.  Yes.
24     Q.  Did you produce everything you had in

Page 109

1  your file relating to the Bulkhouse transaction?
2  "   A.  Yes.
3      Q.  Did you do it directly or did you
4  deputize someone to do it for you?
5      A.  I gave it to my attorney, my lawyer
6  in-house.
7      Q.  What did you give to your lawyer
8  in-house?
9      A.  A book and a file.
10     Q.  And what's that lawyer's name?
11     A.  PaulParmele.
12     Q.  Spell it, please.
13     A.  PaulParmele. I'm not sure. FARM
14 E L E, or something like that.
15     Q.  You don't know how to spell his name
16 and you entrusted him to produce the documents'
17         MR. PHILLIPS: Stop arguing with the
18 witness, Bob.
19         MR. CINQUE: Be quiet.
20         MR. PHILLIPS: Stop.
21         MR. CINQUE: Tone down.
22         MR. PHILLIPS: Stop. I'm not-
23         MR. CINQUE: We're dealing with an
24 obstruction of justice here.

28 (Pages 106 to 109)

1    MR. PHILLIPS: No, we're not, Bob.
2  We're dealing with you being completely ridiculous
3  and out of lime with not only the questions you're
4  asking, the tone and accusations. This is not an
5  argument to the Magistrate. This is not an
6  argument to the lawyer.
7    MR. CINQUE: Lower your voice.
8    MR. PHILLIPS: My voice is not
9  raised, Bob.
10    MR. CINQUE: You have raised your
11  voice.
12    MR. PHILLIPS: I disagree with you.
13    MR. CINQUE: Your tone is
14  reprehensible.
15    MR. PHILLIPS: The tone of my voice
16  is lower and much more respectful than yours has
17  been throughout the day.
18    MR. CINQUE: Hardly. We will deal
19  with the Magistrate on this.
20  BY MR. CINQUE:
21    **Q.  Sir, do you know, as you sit here**
22  **today, that Jim Price ghost wrote the letter that**
23  **Hodge sent dated September 13th, 2001, correct?**
24  **When I say "ghost wrote," wrote it for Hodge, you**

1  **know that, don't you, yes or no?**
2    **A.  Yes.**
3    **Q.  Sure you do. And you know the reason**
4  **that it was sent was to deceive Kadish, correct?**
5    MR. PHILLIPS: Objection.
6    A.  No.
7    **Q.  And you knew back in September of**
8  **2001 that Price had ghost written that letter,**
9  **correct?**
10    A.  Probably, yes. I can't say that I
11  remember it before, but when I was reminded of it
12  last week, yes.
13    **Q.  And who reminded you of it?**
14    A.  When I was reviewing some of the
15  documents that you showed him I think last week, my
16  lawyer showed it to me.
17    **Q.  And the reason, correct me if I'm**
18  **wrong, but the reason that you people chose to**
19  **proceed this way was you knew that you had a**
20  **problem legally with getting Malease to cooperate,**
21  **correct?**
22    MR. PHILLIPS: Objection. Go
23  ahead.
24    A.  No.

1    **Q.  You didn't think that you did?**
2    **A.  No.**
3    **Q.  And just so I'm clear, your testimony**
4  **is, and correct me if I'm wrong, that never once**
5  **prior to this moment did you discuss this**
6  **particular letter, the September 13th, 2001 letter**
7  **or the September 17th, 2001 letter, Exhibit P, with**
8  **Mr. Hodge?**
9    A.  Correct.
10    **Q.  Now, to your —**
11    MR. CINQUE: Let me take a minute and
12  collect my thoughts such as they are.
13      (Brief recess.)
14  BY MR. CINQUE:
15    **Q.  Sir, subsequent to August — I'm**
16  **sorry, September of 2001, did you have any**
17  **involvement in the dealings with Malease?**
18    A.  Involvement with the dealings?
19    **Q.  Right.**
20    A.  I don't recall if there were many,
21  but if there were any, I would have been involved.
22    **Q.  Do you have any recollection of any**
23  **transactions or dealings with Malease; in other**
24  **words, let's put it this way: Do you know whether**

1  Price sent the — I take it back, I'm sorry.
2    **Do you know whether Price, in fact,**
3  **sent Exhibit P, is it P, yeah, P, to Kadish?**
4    A.  I don't know for sure.
5    **Q.  Did anyone ever report back to you on**
6  **what transpired between Price and Kadish?**
7    A.  Basically Jim said he didn't want to
8  be bought out at any reasonable price at this point
9  in time, just assume let the thing expire.
10    **Q.  Were those Jim's words, Kadish didn't**
11  **want to be bought out at any reasonable price or**
12  **was any of that Price, I want to make sure I**
13  **understand?**
14    A.  He said nothing in the range of the
15  numbers that I had talked about.
16    **Q.  So in other words when you use the**
17  **word reasonable —**
18    A.  In my terms reasonable.
19    **Q.  — it's what you thought was**
20  **reasonable?**
21    A.  Correct.
22    **Q.  Okay. Do you remember what you**
23  **thought was reasonable?**
24    A.  I thought — what I thought was

29 (Pages 110 to 113)

1    reasonable was the present value of that rent
2    stream, that 2-year rent stream present value to
3    that point in time.
4        Q.    And did that - Did you contemplate
5    any premium of any kind in that calculation?
6        A.    The only premium would hav e been in
7    the form of what discount rate I used.
8        Q.    And what do you mean by that?
9        A.    Well, whenever you do a present value
10   calculation, you do a discount rate. And it could
11   be a very low rate, which raises the number or very
12   high rate, which lowers the number.
13       Q.    What discount rate did you have in
14mind?
15       A.    A fairly low rate.
16       Q.    Of, such as?
17       A.    Three or four percent.
18       Q.    As opposed to 7?
19       A.    The deal was 12 percent.
20       Q.    Twelve?
21       A.    Twelve plus.
22       Q.    For two years, talking about two
23yea   rs?
24       A.    Right.

1        Q.    Subsequent to September of 2001, did
2    you ever have any discussion with Mr. Hodge or
3    anyone — or Mr. Price or anyone at Kroger
4    concerning the legal position of Malease?
5        A.    Not really.
6        MR. CINQUE: Okay, all right.
7    That's all I have for the witness at this time
8    subject to obtaining certain rulings, which I
9    described previously.
10       MR. PHILLIPS: We'll reserve on
11   signature if it's order. Send it to me and I'll
12   get it to the witness to review.
13
14
15
16
17        EDWARD N. WALDVOGEL
18        ------
19   DEPOSITION CONCLUDED AT 11:35 A.M.
20        ------
21
22
23
24

1        CERTIFICATE
2    STATE  OF  KENTUCKY:
3        : SS
4    STATE AT LARGE    :
5        I, BRITNEY L. FISHER, the undersigned, a duly
6    qualified and commissioned notary public within and
7    for the State of 'Kentucky, do hereby certify that
8    before the giving of his aforesaid deposition, the
9    said EDWARD N. WALDVOGEL was by me first duly sworn
10   to tell the truth, the whole truth and nothing but
11   the truth; that the foregoing is the deposition
12   given at said time and place by the said EDWARD N.
13   W ALD VOGE L; that said deposition was taken in all
14   respects pursuant to agreement; that said
15   deposition was taken by me in stenotypy and
16   transcribed by computer-aided transcription under
17   my supervision; that the transcribed deposition is
18   to be submitted to the witness for his examination
19   and signature; that I am neither a relative of nor
20   attorney for any of the parties to this cause, nor
21   relative of nor employee for any of their counsel,
22   and have no interest whatever in the result of the
23   action.
24

1        IN WITNESS WHEREOF, I hereunto set my hand
2    and official seal of office at Cincinnati, Ohio,
3    this        day of          , 2004.
4
5
6
7    MY COMMISSION EXPIRES: BRITNEY L. FISHER
8    JULY 3, 2005.        NOTARY PUBLIC-STATE OF
9            KENTUCKY
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

118

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF OHIO
2              WESTERN DIVISION

3    THE KROGER CO,        :
                PLAINTIFF,:
4    -VS-              : CASE NO. C-1-02-439
     MALEASE FOODS CORP.,   :
5          DEFENDANT.:


         Britney L. Fisher, a court reporter, first
7    duly cautioned and sworn, testifies and affirms
     that EDWARD N. WALDVOGEL, a witness herein, was
8    notified that the transcript was ready for review
     and signature on Wednesday, March 17, 2004 2004, by
9    forwarding a copy of the transcript to Mr. Scott
     Phillips, Esq.
10
         Within thirty-one days (pursuant to Rule
11   (30)E of the Federal Rules of Civil Procedure),
     EDWARD N. WALDVOGEL, a witness herein, did not
12   present signature of s.aid deposition.
13   The original transcript is now being
     tendered into the hands of Mr. Robert W. Cinque,
     Esq.
         Further affiant saycth naught.


17 18              Britney L. Fisher
          Sworn to me and subscribed in my presence this
19 20          day of          , 2004.

21
              Pamela Sue Spangler Notary
22 23 24      Public: State of Ohio My
              commission expires: April 29,
              2007


31 (Page 118)

TSG REPORTING, INC.    212-702-9580

Paae 1

## A

abandoned 23:23
  24:3
abandonment 23:4,6
  23:16226:336:15
ability 39:1 56:15
able 36:6 63:5 73:20
  78:24
about 5:4,4,8 8:7 9:21
  9:24 12:4,13,14
  13:9,13,14 14:2,19
  14:20 15:2,9 18:6,7
  19:7,9,16,1820:7
  20:1721:722:5
  23:6 24:3 25:3 26:3
  29:5,11 30:931:9
  31:16,18,2032:12
  32:15,19,2033:18
  35:1 36:739:10,20
  39:2240:1041:1,22
  42:347:21 49:4
  51:2452:1253:6,14
  57:858:861:23
  63:10,11 72:3,19
  75:4,1078:980:8
  82:989:790:11
  92:10,11 93:397:22
  98:7 103:4 104:8
  106:19 113:15
  114:22
above 18:2 22:5,8:
absolutely 6:24 21:1
  35:590:1899:16
  108:3,12
accelerated 60:18
accept 45:4
acceptable 63:16
accomplish 7:20 36:6
account 19:23 21:6
accountant 19:14
accounting 16:23
  17:1635:1060:8
accreted 68:5
accreting 68:13
accurate 66:17
accusation 74:14
accusations 1 10:4
acquaint 45:23
acquire 71:18 97:14
acquired 74:14
acquiring 58:13
act 6:7 96: 14
acted 59:9
acting 93:19 94:1,6
  95:8,17,18
action 116:23
actual 5:12,18 8:3
  72:2485:11
actually 17:15,19 18:5
  23:736:4,945:23

82:994:1 96:13
add 6:9
addition 47:23
additional 6":21 9:6
addressed 33.7 36: 15
adds 22:9
adequate 6:17
adequately 73:9
adjusted 21: 15, 20
Administration 60: 1
advantage 62: 19,23
  71:21,2272:9,11,11
  106:1
advantaged 69: 1 7
advantages 63:21
  65:11,1571:10,11
  71:12,15,17
advice 103:21 108:5
affiant 11 8: 15
affirms 11 8:7
affixed 3:7
aforesaid 116:8
after 7:10,16 9:15
  12:24 14:5 16:3
  20:1533:869:3
  83:5,7,13,1785:20
  105:4
again 16:11 19:16
  33:1146:257:24
  63:2376:1681:2
  99:19 103:18
  106:24
against 16:24 20:4
  37:10
age 4:3
agenda 3 1:8,24
agent 93:14,16,19
agents 65:4 94:23,24
ago 25:3 35:14 80:1
agree 27:8 63:22 64:2
  65:1266:779:1,3
  79:12,13,19,23
agreed 45:6 87:11
  97:4
agreement 1:14 2:24
  49:15,18,2254:18
  55:1 56:772:5,15
  97:5 116:14
ahead 12:922:845:2
  45:546:264:10
  79:1294:21 104:23
  111:23
AI 38:6,10
allocated 17:24
allocation 15:16
allow 65:23
allowed 39: 12
along 81: 14
already 13:18 15:24
  18:1 51:2270:22

85:286:15,1988:1
  90:19
always 7: 18 93: 11
among 14:24
amortization 35:19
amount 14: 14,21 15:6
  15:7,8
analysis 47: 12, 13
  78:2480:15
analyzed 47:8
and/or 32:23 52:3
another 31:17 74:18
  95:1697:1098:9
  101:3
answer 11:1 12:10,20
  17:3,4,1822:21
  28:2339:643:19
  46:3 50:951:17
  52:8,1353:1257:24
  57:2467:676:16
  79:994:1397:17
  105:21 106:20
  107:24 108:21
answered 5 1:22 98:23
answering 105:22
anybody 37:3 43:13
  44:12
anymore 13:3
anyone 11:9,18,20
  31:1645:1648:13
  52:2469:1770:9
  75:18,1876:11
  108:18 113:5 115:3
  115:3
anything 8:9 12:4
  25:1328:2232:15
  52:11 77:2 102:22
  104:9
anyway 17:9
any where 49: 19
  56:18
appear 90:15
appearance 90:18
APPEARANCES 2:1
applied 20:4 9 1:22
appraisal 32:4
approach 94:15
  103:20
approval 77:21,22
approved 83:1,4
Approximately 14:17
April 13:21 14:5,13
  14:14 15:2,2,10,21
  16:2,1747:591:12
  118:22
area 60:8
arguing 109:17
argument 46:21
  110:5,6
argumentative 45:2

46:2 94:21
arise 8:22
around 5:17,19 48:24
  54:572:21
aside 16: 11 50:17
  53:8 100:12 101:19
asked 23:21 32:11,21
  43:14,1557:23
  76:1579:898:19
  100:15,18 103:19
  106:17 107:19
  108:5,17
asking 12: 14 32: 15
  49:1 51:2364:12
  82:5 110:4
asks 108: 11
aspect 12: 17 22: 16
  23:1431:945:11
  102:20
aspects 62:18
asset 24:5 34:5, 15
  41:17
assets 6:4,5 7:23 34:7
  40:755:13,24
assist 54:5
assume 13:15 46:17
  50:1657:1270:11
  94:17 108:2 113:9
assumed 18:6,920:10
  20:21 22:969:1
  73:19
assumption 21:3
  77:14
assure 6:8
attached 28: 18 29:5
  29:1461:21 98:17
  98:20
attachment 61:23
attempting 94: 10
attention 62:15
  104:16
attorney 11:11 49:24
  50:2 109:5 116:20
attractive 34:20
August 83:1 1,16
  85:17,2486:13 87:3
  87:1488:1,9,14
  89:2,8,11,2290:3
  90:11,2091:21
  95:2396:12,16
  112:15
author 29:16 31:7,23
  82:21
authorities 10:1 1
authority 65:6
authorized 77:17
  93:24 94:5
authorizing 77:20
available 9:9
Avenue 2:13

avoiding 71:7
aware 10:13 13:543:9
  43:2244:2046:14
  50:12,1853:861:4
  66:15 101:22 102:3
  102:5 105:15
  106:13
away 80:4
a.m 1:17 115:19

## B

B3:14 10:15,21,21
  61:19,19 105:17
back 5:11 12:2323:18
  24:1026:335:7
  46:2149:278:11
  86:21,2487:1 99:4
  101:21 103:8 111:7
  113:1,5
background 59:15
  62:7
bad 29:3 73: 15
balance 68:14
Balkhouse 22:16 47:1
bankers 6:7
banker's 63:1
based 36: 11 106:20
bases 19:10,22
basically 60: 17 82:3
  113:7
basis 9:15 17:15 18:1
  19:820:12,13,24
  21:4,5,14,18,21
  22:1,3,1035:11
  37:20 43:7 44:7
  46:23 54:16 104:10
bates 29:24
bear 9: 17
became 36:3 55:6
Beckwith 104:17
become 35:24 60:2
becomes 9:8
before 1:185:525:13
  28:11 31:2,833:4
  37:1 61:1762:2
  64:1469:3,770:1
  74:6 76:3 78:8 80:5
  83:588:1 98:12
  99:24 101:5 103:6
  103:18 111:11
  116:8
beg81:1
begins 25:20 85: 19
behalf 2:2,9 53:1, 10
  53:1565:2496:6
being 4:3 30:4 3 1:9
  36:1345:1849:10
  64:775:1292:20
  102:5 110:2 118:13
believe 9:13 10:4 13:1

17:1529:1730:23

36:2437:354:11,19
55:966:1979:16
believed 64:7
bell 45: 17
below 7:22 68:2
benchmark 7:9
beneficial 35:22 36:1
  36:1,3,985:6,8
benefit 61:4,4 69:10
  70:1874:2293:7,8
  94:24
benefited 36:4
benefits 59:6
best 9 1:24 93:21
  94:15,16,17,1895:9
  95:11 100:16
  103:19
bet 79:9
better 59: 10 61:8
  69:1979:1080:6,21
  91:1893:15
between 2:19 13:6
  21:16,21 42:648:24
  96:1 97:18 104:9
  105:18 113:6
big 95:1
billing 89: 10, 14
binder 43:4
binders 42: 15
blank 66:9
Board 77:2 1,22
Bob 22:7 43:1 61:11
  76:1579:880:17
  104:14,19 109:18
  110:1,9
book 35:15 109:9
books 35: 11
boss 8:20
both 62:4 67:2 71:13
  78:480:19
bottom 24:7 27:7 3 1:6
bought 17:21 20:13
  20:1521:1637:21
  40:741:1347:1
  86:6 113:8,11
break 7:1 19:961:12
Brief 22:13 61:14
  112:13
bring 104:16
Britney 1:18 116:5
  117:7 118:6,17
broken 12:21
Brown 1:162:547:21
  48:13 50:4
budgets 6:3
buildings 7:24 19:20
  19:21,23
Bulkhouse23:1,15
  27:1 37:1 40:10

41:855:18,1956:16

58:6,10,13,16,23
60:23 67:3 70:20
74:9,1582:4,785:3
85:21 86:11 97:5
107:17 108:19
109:1
Bulkhouse's 71:13
bullet 27:8 71:5,16
  75:3
bunch 38:5
buried 39: 12
business 45:20 60:1
  96:1
Butler 23:2,5, 19
  24:1032:2338:19
  39:1742:748:11,21
  49:350:13,1952:3
  52:7,12,1772:1
Butt 10:15,15,18 12:4
  12:14,22 13:6,19,24
  16:3,14 17:1 96:17
  96:2497:5,11,19
buy 9:6 37:2,4 39:1
  49:1655:11,2356:5
  56:1457:21 58:4,5
  65:8 66:22 70:22
  71:1 72:475:676:5
  80:586:591:792:1
  92:1,2 4,5 9 1693:4
  93:994:2396:14
  99:20
buyer 34:1 94:11 95:4
buying 9: 10 36: 19
  37:2258:2,1985:2
  91:11 93:1094:7
buyout 43:5
buys 93: 12

C

C 68:7,7 105:17 116:1
  116:1
CA 85:11
calculation 114:5,10
calculations 24: 10
calendar 8:5
call 7:5 32:11 63:5
  106:4
called 25:21 43:4
  49:1456:8
calling 32:14
calls 30: 12 67:5
came 30: 16 33:8 5 1:5
  51:8
capable 62:5
capacity 4:22
capital 4:23 5:3,5,14
  5:176:1,2,3,20,23
  7:15,21,21 8:3,20
  9:6 10:3,4,5,627:13

29:8 78:20 80:9

care 65:18 67:7,8
carries 10:6
cart 74:6
case 1:7 10:1434:1
  98:7 100:23 102:20
  105:4,23 106:10,16
  118:4
cash 8:16,17 9:4 55:4
  60:2068:13,20,24
  77:14
cause 35:18 39:13
  116:20
caused 35:12 60:18
  85:23
cautioned 118:7
Center 1:16 2:6
certain 35:17 42:15
  42:1669:2399:9
  106:15 115:8
certainly 77:18 91:16
certification 60:6,7
certified 4:4 60:3
certify 116:7
cetera 8:1 32:2358:5
  65:2 78:20 80:9
chance 108:8
change 64: 13
changed 5:22,23
  35:1878:3
changes 8:10
characterize 73:1
charge 29:8
charged 16:23
check 17:17 19:13
  83:1785:1387:9,19
  90:7,13
Chief 77:24
choosing 45: 15
chose 11 1:18
Cincinnati 1:17 2:8
  32:21,22,24117:2
Cinque 2:10,12,12 4:7
  12:10,13,19 17:6
  22:11,1428:846:3
  46:449:6,751:7,9
  51:13,18,2052:1
  53:18,1961:13,16
  64:2265:1 75:14,16
  76:17,1979:5,9,11
  80:1881:1,3,20,24
  82:18,22,2384:5,11
  84:1286:2387:2
  98:2,6,10 101:7,9
  101:11 104:12,15
  104:20,24105:8,11
  105:13,14106:3,7
  107:1 108:3,16
  109:19,21,23 110:7
  110:10,13,18,20

112:11,14 115:6
118:13
Civil 1:142:23 106:14
  118:11
claim 10:14,1843:10
  44:1,2345:12
  104:11,12,13
  106:21
claiming 43: 11, 18
clarify 49:1
clear 38:13 40:6,7. 19
  41:11,1642:844:15
  48:16,1857:10
  66:2373:1476:6
  85:12 112:3
clearly 42:15
client 108:11,11
close 61:5 69:6 78:8
closed 85:21 86:10
  87:21 90:4 108:19
closing 5:12 59:6 69:2
  69:1772:2473:5,17
  74:1276:11,21 83:5
  83:7,13,1988:5
  89:16,2390:11,15
  90:21
Co 1:525:2089:4
  118:3
code 62:20,24
collaboration 62:12
  62:13
collect 112:12
college 4: 1 1
combination 8:19
  38:17
come 18:17 32:21,23
  33:1840:2145:15
  49:897:15 103:12
comes 9: 10 52:4
coming 8:8 24:21
  32:21
comment 85:10
commission 1 17:7
  118:21
commissioned 116:6
committee 8:20
communicate 107:22
communication 82:5
  82:1086:1
communications
  82:17
company4:21 11:14
  77:24
comparing 31:19
compelled 59:14
compensate 72:16
compete 39:4
competent 62:6
competing 39:8
complementing 86:7

complete 69:22

completely 47:3 110:2
complex 63:20 65:10
complicated 32:10
  35:837:1262:14
computation 22:1
compute 8:3
computer-aided
  116:16
computing 19:22
  20:2421:9
conceal 94: 10 95:3
concept 66: 16 75:23
concerned 35:21 41:1
  57:1661:762:8,22
  69:987:1788:11
concerning 95:24
  115:4
conclude 42:11,12
concluded 42:9 76:3
  88:5,13 115:19
conclusion 31:22
  40:12,15,1648:20
  49:23 67:6
conclusions 53:14
confused 86: 18
connection 11:2 24:22
  25:1 27:1 28:14
  45:11 50:20106:16
consideration 71:2
  73:3,4
considerations 35:3,6
  39:10
considering 92:16
conspiracy 104:13
constantly 34:22
consultants 6:7
consulted 29:5 3 1:9
consummate 13:20
consummated 13:18
contact 33: 17, 18
  99:19
contained 11:10
containing 3:16
contemplate 114:4
contemplated 22:17
contemplation 34:10
  58:393:1794:19
content 51:23
contention 45:7
contents 70: 16
continue 84:20
contract 13:5,9 18:13
  18:15,1839:1245:5
  58:14,1997:18,24
contracts 55:12,24
  57:22
controlled 97: 19
conversation 51:24
  107:23

conversations 106:19
  108:1
converting 85:3
convinced 37:23 38:1
  38:2,15,20
cooperate 1 1 1 :20
copy 118:9
Corp 1:829:1930:14
  118:4
corporate 54:17
corporation 6:2,21
correct 6:15 7:13
  11:16 14:4,7 15:1,4
  18:14,21 21:19
  24:18,1926:11
  28:1436:1237:6,9
  43:21 47:9,10,23
  48:1053:16,2055:2
  58:765:4,5,13 68:9
  80:1582:383:2,3
  83:10,2084:15
  86:1489:12,19,24
  90:5,16,2296:10
  110:23 111:4,9,17
  111:21 112:4,9
  113:21
cost 7:21,21 10:4,5,6
  34:2363:694:16
  95:2
costs 35:20
counsel 2:19 51:6.8
  51:15,1652:4,6
  107:14,23 108:1
  116:21
counterclaim 46:8,10
  46:1549:5
course 17:12
courses 59:16
court 1:1 43:24,24
  87:1 118:1,6
cover 64:13 99:3, 12
CPA 59:17,18
critical 78: 12 80:4
cross-examination
  1:132:223:11 4:6
crystal 44: 14
curiosity 103:1
curious 103:10
current 48:24
currently 78: 19
C-1-02-4391:7 118:4

D
02:33:1030:2468:8
  77:10
damages 11:13
date 5:18 14:878:12
  80:3,1382:13
dated 25:19 28:1 7
  30:2277:1085:17

89:298:15,18
  110:23
daughters 4: 12
day 8:10 2F:11, 16,17
  34:844:1057:10
  83:1784:1 98:9
  110:17 117:3
  118:18
days 16:20 43:23 70:2
  70:3 78:781:5
  118:10
deal 16:2 37:13, 16
  42:1982:796:17,23
  97:10 108:7 110:18
  114:19
dealing 91:22 109:23
  110:2
dealings 31:10 112:17
  112:18,23
deals 39:9 81:8
dealt 37:19 73:17
debt 8:10 9:7 21:3
  68:2,5,12,21 77:15
deceive 1 1 1 :4
deception 94: 19,22
decide 80:5
decided 13:369:18
  70:22,24 94:2
decision 8:17
decisions 6:9
deduct 64:4
deductions 60: 19
defendant 1:9,12 2:9
  118:5
deferred 7 1:8
DeFurioni 38:6,10,10
degree 59:22
deliberation 44: 18
department 107:6
depend 9:2
depending 8:10 21:15
deposed 4:5 50:15,18
  51:4.21 52:4
deposition 1:11 2:20
  2:243:5,1550:21
  51:2452:18,20
  81:2284:3 101:24
  102:4,7 105:16
  106:4115:19116:8
  116:11,13,15,17
  118:12
depositions 51:1
  53:11
depreciation 19:20,21
  21:15,20
deputize 109:4
derived 24: 14
describe 5:21 26:23
described 28: 19 32: 15
  39:24 40:23 48:7

57:1 115:9
describing 19:12
designed 62: 19
determine 42:8
device 81:13
differ 81:1
difference 80:2
different 5:15 35:10
  35:1667:4
diligence 16:18
direct 8: 13 92:2
directly 93:4, 13 95:1
  109:3
Director 5:5,17
disadvantages 75:2,3
disagree 110:12
disaster 67: 18,21
discount 43:7 114:7
  114:10,13
discovery 105:4
  108:10
discuss 25:21 31:11
  39:1441:1848:12
  52:666:1470:9
  71:24101:4,13,17
  101:20102:21
  112:5
discussed 24:2 25:4,6
  28:340:1,369:4
  74:1791:11 101:18
discussing 24:9 48:5
  72:7 75:22 76:2
  101:19
discussion 25:24
  31:1433:1542:6,18
  42:2348:969:15
  72:1874:11 75:10
  75:1791:2092:10
  92:1993:3 102:23
  115:2
discussions 38:19
  39:1940:5,2241:21
  42:3 45:1649:3
  76:4,9
dismissed 44:4
dispose 34:6
DISTRICT 1:1, 2
  118:1,1
division 1:36:3 118:2
divisions 6:8
document 3:16 6:7
  11:1336:1842:14
  43:1,3,748:15
  49:1961:2262:17
  67:2469:21,22,23
  69:2470:5,1598:20
  105:19 106:9,11
documentation 16:19
documented 50:16
documents 15:15

24:2225:1,4,7
37:1338:1839:12
40:1842:7,845:4
47:3 56:1757:2
76:4,6105:6 106:15
107:3,16 108:6,12
108:18 109:16
111:15
doing 28:3 37:6,10
  72:15,19
domiciled 13:1
done 23:20 28:4 34:21
  38:1547:677:1
  83:6 85:20 86:8,8
  95:10
double 10:2
doubt 30:20 102:16
  102:17
down 9:7 12:21 15:22
  26:668:2 109:21
draft 100:5
drafted 100:7,13
  105:3
drag 8 1:9
due 10:10 16:18
duly 4:3 116:5,9
  118:7
during 5:13 26:4
  69:1676:9 101:24
duties 5:20

E
£2:163:10,14 10:21
  23:1,1024:625:24
  68:7,877:11 109:14
  109:14 116:1,1
each 6:3 7:9 19:19
  35:2466:13
earlier 72:9 81:6
  99:21
early 12:2431:15
  62:21 91:7,12
earn 10:2
East 1:17 2:7
economic 23:4,6,15
  24:1626:336:15
  80:1593:8
economics 31:19 78:6
  78:9,1381:4
Ed 25:21 57:24
Edward 1:11 2:21
  3:124:2 115:17
  116:9,12 118:7,11
effective 72:5
effort 73:22
efforts 36: 13, 16, 18
eggs 32:2
either 101:7,9
Eleven 55:7
eliminated 41: 10,1 2

emanating 52:17
employed 4:20
employee 26:10
  116:21
empty 23:24
enclose 90:7
encumbrance 19:6
  41:2,8,2249:11
encumbrances 14:3,6
  39:940:19,2442:9
  48:7
end 34:8 36:20 37:24
  40:657:10,1063:20
  63:2469:3,773:14
  93:14 106:4
engage 54:4 104:23
engaged 28:1 64:15
  66:296:13
engagement 29:4,6
  30:1954:9,18,20
enjoys 7:14
enlighten 102:7
enormous 63:21
  65:11
enough 45:22 48:16
entered 61:15 93:23
entire 39:20
entirely 44:2
entirety 62:1 1
entitled 89: 18 108:6
entity 69: 11 97:19
entries 35:10,10
entrusted 109:16
equal 19:7,9
equally 62:5
equivalent 26:16
error 7:23
Esq 2:3,10 118:9,14
essence 40:4
estate 26: 14 27:4,5
  29:1062:9
et 7:24 32:22 58:5
  65:2 78:20 80:9
evacuated 12:24
even 19:923:739:10
  44:1890:19 100:21
event 67:18 83:8
ever 8:22 11:1 23:9
  24:3,2425:1328:10
  29:530:1937:15
  40:12,21 42:18
  43:1344:8.1245:10
  45:1546:752:16
  54:11 65:1666:14
  78:1592:1096:5,23
  97:9,1498:11 101:4
  101:20 102:10,12
  102:14 103:6
  107:15 108:17
  113:5 115:2

every 8:1031:14
   32:1076:7
everything 57:9
   108:24
evidence 105:2
exactly 15:1730:7
   71:9
examination 3:6
   116:18
examined 4:4 73:9
example 8:4,11,15
   25:15
excess 8:16,17 10:5
exercise 8:7 24:16
   43:5 56:1658:20
exercised 40:20 47:2
   97:8
exercising 42:15 75:7
Exhibit 23: 1,9 24:6
   25:15,18,24,2428:9
   28:10,1630:2233:3
   33:461:1769:20
   77:1081:2282:1
   83:1584:3,685:14
   85:1489:298:11,12
   98:14 101:9 112:7
   113:3
exhibits 3: 15 25: 13
   105:17
existed 62:20
existing 15:23 18:1
   19:2420:4,6,10
   21:2368:21
exists 13:6
expansion 97:6
expect 66:4 107:8
expectation 7:9 9:15
   9:16
expectations 6:6
expenditures 78:20
   80:9
expenses 6:19
expensive 34:21,23
experience 93:11
expert 11:627:4,4
   53:1,3,9,14
expertise 62: 1,0
expiration 66:13
expire 1 13:9
expires 117:7 118:21
explain 20:3 23:22
   84:23
explore 64:18
extensive 101:23
extracted 69:23
e-mails 3: 16

                F
F 25:15, 18,24 116:1
face 68:2

facilities 17:22 18:14
   18:1936:1780:10
facility 13:2 14:10
   17:10,21 '
fact 44:2 87:24 113:2
factor 20:23,24 21:2
factored 2 1:24
failure 7:20 105:5
fair 32:4 36:21 40:17
   49:666:11 72:23
   97:7 101:2
fairly 114:15
familiar 10:2223:11
   25:1529:960:10
   82:1,283:22
far 35:21 57:1558:3
   61:762:7,2269:9
   78:11 80:287:17
   88:11 91:13
favor 44:16
feasibility 72:19
featured 102:20
February 69:24 70:21
   71:2272:19,2373:7
   77:11 78:11
federal 1:13 2:22
   10:10106:14
   118:11
fee 54:23 82:7 87: 11
feeling 3 1:24 95: 15
fell 89: 19
felt 90:20 94: 10
few 25:10,11 33:13
   43:2344:10
Fifth 1:17 2:7
figure 24:4 37: 15 55:3
figures 10:3
file 25:18 30:24
   107:16,20 108:18
   109:1,9
filed 46: 15
final 47:4 77:20 100:6
finally 37:21 85:20
   86:6
finance 63:2
financial 6:5 27:4,5
   62:14 63:4 68:15
   77:24
financing 32:1 34:19
find 15:1347:748:19
   48:2256:18,23
fine 97:3
finish 91:6
firm 27:2247:21 50:4
   96:13
first 4:3 29:16 33:16
   62:16 1774:1075:3
   79:17 88:890:11
   116:9 118:6
firsthand 106:2

fiscal 8:4
Fisher 1:18 116:5
   117:7 118:6,17
five 38: 11
fixed 27:9
fixing 84:1
flat 54:23
Florida 4: 15
flow 9:5
folks 34:14 38:18
follow 25:21 45:5
following 60:6
follows 4:5
Foods 1:829:1930:14
   30:1671:1975:7
   118:4
foregoing 116:11
forever 81:10 86:6
forget 43:1
forgetting 38:7
form 6: 18 114:7
formally 8:8
forth 1:15 46:22
   53:15
forwarding 118:9
found 88:8
four 38:11 114:17
frame 48:3
free 9:4 41:10,16
   57:1066:2370:7
   76:6
Friday 3 1:8,24
from 8:7 12:23 16:24
   23:2,5,21 24:2
   25:14,1926:20
   27:1028:2,1729:10
   29:11,1930:14,16
   30:2332:3,1837:6
   37:2041:14,19,24
   50:1751:6,8,11,14
   52:4,17,1853:8
   59:1061:1969:23
   72:23 76:478:12
   80:1483:1885:15
   88:2092:1,2,4,11
   92:1394:1195:3
   98:16 17 100:12
   101:19
front 99:3
Frost 1:16 2:5 47:21
   48:13 50:4
full 44:1 62:17
fully 73: 8
function 31:17
funds 16:5,7
furnished 105:3
further 102:7 118:15

                G
028:9,10,1661:19

gain 19:1021:10,11
   21:1440:6
gave 70:11, 12,14
   109:5
Gee 6:1
general 6:22 107:14
generally 5:21
gentleman 26:7
getting 74:6 111:20
ghost 110:22,24 111:8
Giobbi 38:8,9 61:19
gist 40:4
give 40:19 50:6 53:22
   90:8,13 109:7
given 98:3,3 108:5
   116:12
giving 108:8 116:8
go4:12 10:6 12:822:8
   31:8,2332:2236:24
   37:3 45:2 46:2 64:9
   79:1291:1 92:20
   94:21 95:7 102:10
   103:2,7 104:23
   105:22 111:22
goes 63:19 75:6 78:18
   78:23 95:2 108:5,10
going 6: 17 24:20
   28:21 58:4,5,861:2
   79:2281:984:2
   92:8,1593:499:11
   99:15,23 104:16,20
   104:22,24 106:3,4
gone 15:20 16:1837:8
good 4:8,9,18 61:12
   61:13
gosh 7:11 14:1638:5
graduate 59:21
graduated 59:22
great 59: 18
grocery 13:1
growth 9:21
guess 16:21 57:2,3
   63:4 100:23
guessing 75:21 100:21
guy 11:5 53:5
guys 38:5, 11 98:8

                H
H 3:14 30:22
habit 103:16
hand 117:1
handing 22:24 25: 12
   28:9
handle 46: 19,21
hands 118:13
handshake 54:16
happen 58:9 61:7.2
happened 36:9
Hardly 110:18
having 25:23 32:13

48:1849:292:16
   93:8
head 74:19 77:5
headed 23:1
hear 45:10 51:4
heard 50:15 51:3, 11
   51:14
hearing 50:17
help 28:23 70:17
helped 86:8
her 3:2
hereinafter 1:15 4:4
hereunto 1 17:1
high 114:12
higher 6:18, 18 17:16
high/low 35:9
him 12:1426:18,21
   26:22 33:20,21 45:5
   49:251:11,23,24
   57:864:15,1665:16
   72:1684:886:7
   87:8,18,19,21 88:9
   88:1689:22,2390:8
   90:9,11,13,21,23
   91:7,2492:5,23
   93:5 94:4 95:8 96:2
   100:18 101:13
   102:10,12 103:3
   108:5 109:16
   111:15
himself 95:19 102:15
hired 11:5
history 31:1 8
hit 7: 18
h nun-ber 37:7
Hodge 2:16 25:20
   26:728:1829:4,12
   31:11 32:1460:21
   61:1562:3,582:21
   91:493:2398:17,21
   98:22,2399:14
   100:9,10101:5,18
   101:20 102:6,10,11
   103:7,17 110:23,24
   112:8 115:2
Hodge's 26: 12 82:4
holder 37:9
holes 66:6
honest 65:22
hope 91:5
hoped 47:5
horse 74:7
horse's 103:2
hurdle 75:8, 10,17,19
   7:22 10:1
H.E 10:15 12:22 16:3

                I
idea 93: 19,20 95:3
identification 81:23

84:4

identify 94 :11
identity 95:4
imagine 33:8
immediate 17 :18
impact 6:5
importance 79:24
important 45: 18,20
  45:21,2269:676:18
  78:2380:13,14
  100:23
incandescent 44: 15
include 30:13 55:21
  56:2,4,13,1557:15
  57:17,2266:20
  94:19
included 18:429:18
  43:356:2487:11
  97:7
income 6:21 10:10
  17:13 19:4,860:11
  60:18,23
increasing 68: 14
independent 23 :14
inflow 60:20
information 95:24
  107:22
inherent 10:7
initial 5: 10, 10
initials 77: 12
initiate 82:6
instances 8:22
instead 91:12
intangible 55: 12,24
intended 57:4 90: 14
intention 7:19
intentions 6:4
interest 34:24 36:19
  58:6,1067:368:13
  68:13 74:1 1585:21
  86:11 92:6,9 116:22
interested 33:24
interfere 39:1
interference 93:14,17
invested 8:17 9:2
investment 6:6,11,13
  6:17,20,237:9,24
  8:3 10:348:1763:1
investments 6:2 8:13
  9:7,11,24
invoice 87: 14 88: 1,22
  89:2,7 90:20
involved 5:9 10:18
  14:23 19:1822:15
  30:431:11,13,15
  63:788:695:1 96:6
  112:21
involvement 1 12:17
  112:18
in-house 109:6,8

issue 39:16 44:14

  105:19
issues 8:8 38:23
i.e 18:19

__J__

J 33:3,4
James 2: 16 25: 19
  28:1830:24
January 28: 17 29:2
  30:2332:24105:16
JDP 29:17 30:23
  77:12
Jen 82:5
Jesuit 4:13, 15
Jim 23:2,20 25:20
  26:2,727:329:11
  29:1231:7,11,23
  32:1457:761:19
  62:3,3,5 75:20 82:4
  82:21 85:1794:14
  98:1799:19 100:9,9
  100:10,15,18 101:5
  101:18 103:13 19
  110:22 113:7
Jim's 113:10
ioh 27:14
John 11:4
joint 62: 11, 13
Jonathan 10:20
Judge 104: 16
judgement 44:9 81:13
July 3:17 72:24 73:22
  74:1278:8,1279:1
  80:3,1482:5,10,12
  83:20,23 84:13
  85:2286:11,19
  87:22 88:5,14 89:24
  90:4,16,22 108:20
  117:8
jumping 48:24
June 33:9 54:5 61:18
  61:2364:1765:3
jurisdiction 3:3
jury 44: 18
just 4:11 5:21 13:22
  22:1926:2330:11
  31:439:2440:22
  43:1756:13,19,21
  56:22,24 59:2,13
  72:14,21 75:1480:1
  80:1681:1783:15
  84:1,2086:3,490:6
  102:23 104:22
  112:3 113:9
justice 109:24

__K__

K61:17
Kadish 24:8 27:8

92:21,2393:1,4,18

93:2494:6,7,11
95:4,17,1896:1,6
96:13,14,17,19,20
96:2397:10 19 19
98:1799:20111:4
113:3,6,10
Kentucky 1:20 116:2
  116:7 117:9
kills 81:8
kind 11:12 16:19
  38:23 50:7,1952:19
  67:18,2081:10
  114:5
knew 23:19 31:15
  41:459:261:2
  63:11 78:11 88:4,13
  88:18 89:1092:3,18
  93:21 96:2,297:1,3
  99:11,14,18,22
  102:8 111:7,19
know 10: 18,20,23,24
  11:4,7,18,20,24
  12:1,2,3,4,7,13:9,10
  13:13 15:5,1617:18
  18:1522:2224:13
  24:1525:5,627:9
  28:2430:15,18,21
  38:439:1042:2
  43:11 44:4,2345:7
  48:551:9,1052:24
  56:2059:1,3,861:1
  61:1262:663:10
  65:1467:7,2369:13
  69:1470:14,15,17
  70:21 71:8,11 72:3
  74:5 78:8,24 79:7
  79:1686:1287:18
  88:10,12,17,1890:4
  90:1592:2393:1
  94:7,2295:13,13,14
  95:1796:16,22
  97:12,17,23 98:7
  99:17 100:5,10,13
  100:21,24101:1
  102:19 104:1,4,5,6
  105:19 106:21
  107:4 108:1,6,9
  109:15 110:21
  111:1,3 112:24
  113:2,4
knowledge 23:12
  27:21 32:437:11
  52:360:2295:15,23
  96:4 104:10 106:2
  106:21
known 28:5
knows 12:14
Kroger 1:54:21 5:7
  5:10,206:227:14

8:2,13,15,2339:11

9:13,22 10:1,2,9,14
11:19,21,23 13:6,16
13:17,24 16:8,12
17:11 12 19:10
23:1824:925:20
26:10,1327:2329:1
32:1,4,634:10
35:2236:1,1642:19
44:13,1650:553:1
54:6,1555:11,22
57:21 58:2,461:5
62:1,2363:16,17,22
64:1865:2,7,12,24
66:8,1069:670:18
71:22,2372:673:8
75:6,776:577:19
78:13 84:785:7,15
89:492:13,1793:4
93:8,10,12,1994:1
94:6,795:1,8,17
105:19 106:9,13
107:2,9 115:3 118:3
Kroger's 16:1045:20
53:10,1565:366:18
71:1394:18

__L__

L 1:18 2:18 10:21
  27:11 69:2077:11
  109:14 116:5 117:7
  118:6,17
lack 47:8
land 19:20,21
large 19:14 116:4
last 8:2 14:18 15:8,9,9
  27:833:1378:6
  79:13 101:15,16
  103:5 104:7 111:12
  111:15
later 59: 14 72:9 89:22
law 107:6 108:4
lawful 4:3
Lawrence 98:16
lawsuit 13:17 16:11
  16:1243:1045:19
  46:1450:1353:2,10
  53:16
lawyer 25:3 100:22
  101:18,20,22
  102:24 103:2 104:6
  106:17 107:5,19
  108:5,9,10 109:5,7
  110:6 111:16
lawyers 43: 14, 15,23
  44:946:19,21 47:19
  47:2048:1 13 21
  98:4 102:22 105:5
  106:19
lawyer's 79:15 109:10

layperson's 84:24

leading 76: 10
league 4:17
learn 37: 18
learning 52:1 1
lease 5:11 29:2035:7
  36:2037:1,941:4:9
  43:549:1656:11
  57:2258:21 66:21
  66:21 67:2,1571:6
  71:1872:475:4
leases 55:12,23 57:21
  58:566:12,24
least 7: 12 34: 10
leave 71:6
left 66:21 68:21 77:12
  91:4
left-hand 29: 18
legal 16:18 67:6 73:9
  73:11 115:4
legally 111:20
legitimate 87:4
lengthy 69:22
less 36:1
let 8: 11 9:222:24
  46:19,2057:12
  61:11 64:1666:3
  95:16,18 106:21
  108:1,14 112:11
  113:9
letter 3: 17 25:22
  28:1729:4,630:19
  33:17,1952:2254:8
  54:2256:19,2357:5
  61:18,2264:13,17
  77:10,13 80:1284:6
  84:1385:1587:4,8
  88:1289:2390:7,14
  90:1895:21,23
  98:15 17 21 22 24
  99:3,3,11,12,14,22
  100:7,8,19 101:4,6
  101:23 102:1,6,11
  102:19 103:14
  104:2,11 105:3
  110:22 111:8 112:6
  112:6,7
letterhead 85: 15
  98:15
letters 103:17 105:17
let's 8: 12, 15 10:2
  13:15,22 16:11
  21:11 26:2435:4
  57:1271:1091:1
  94:17 104:8 112:24
level 62:8,10,10
liability 35: 18
Libbert 10:20 11:2,4
  53:6,7,8,17,18
life 45:20

like 7:24 18:730:8

31:1432:1833:21
54:1661:867:14,19
67:2271:1477:2
80:581:11 84:19
90:10 109:14
line 33:16 110:3
lines 64:1
Linn 25:20 27:1 1,13
27:1829:731:12
listening 22:7 80:23
litigation 107:3,11,18
LLC 1:162:5
loan 68: 14
logistics 27:17 31: 17
long 5:1,6 19:21 35:13
look 9:18 28:10,20,22
49:2457:1 68:16
70:7,1671:1083:15
83:21 84:2,989:1
90:10
looked 25:23,24 35:14
48:1464:7
looking 29:24 34:22
82:12
looks 67:14 71:14
82:284:19
loopholes 62:20,23
63:4,13
lose 72: 16
lot 19:19 100:20
low 114:11,15
lower 6: 19 29: 18 63:5
110:7.16
lowers 114:12
lowest 94: 16
Lurie77:11
Lynch 33:24 37:19
38:3,12,14,1839:15

39:1741:2242:4,6
47:18,2448:10,21
49:359:11 64:19
69:11 70:19 86:9
Lynch's71:14

**M**

M89:2 109:13
made 15:10 16:16
36:14,1647:462:17
73:2277:1778:5
79:23
Magistrate 106:5
108:7,14 110:5,19
mainly 40:3
make6:16,19 7:10,23
8:169:6 16:8.17
24:1539:11 57:9
80:285:12,2390:10
90:14,1797:18
113:12

makes 17:20 32:9

56:2263:1277:13
making 6:9 42: 16
Malease!8"29:19
30:14,1637:840:21
40:2441:2,19,23
42:12,13,2043:18
44:2,1446:11,15
49:10,1050:855:21
56:3,5,1457:15,19
58:8,9,11,1671:18
72:11,1373:3,4,10
73:12,16,2374:13
75:5,777:491:1,11
91:2292:3,6,9,17
93:999:20100:17
103:20 111:20
112:17,23 115:4
118:4
Malease's43:10
44:23 45:7,12,23
46:5,747:9,13
man 92: 18 20
manage 6:1
Management 4:24 5:4
5:5,14,186:1 27:14
29:8
manner 66:4
manufactured 87:6
many 30:9,9,10 32:19
62:18 112:20
man's 62:6
March 1:18 118:8
Marcos 10:19 12:22
13:3,7 14:1015:2
15:11,1418:19
22:1623:1,15 19
34:5,1636:1496:18
96:2497:11,20
margin 7:22
margins 6:18
mark 8.1:21
marked 3: 15 81:22
84:3,9 105:17
market 36:21 40:17
66:11 97:7
markets 8:10
Marshall 27:22 28: 18
29:1 30:9,2453:22
54:5,17,22 65:3
69:2470:1082:6
83:2,892:5,8,16
93:998:1599:2
master 29:20 37:9
41:4,943:549:16
56:1057:2258:20
66:2067:271:6,17
75:4
Master's 59:22,24
matter 6:22 61:5

may 2:21,24 3:7 26:4

28:1229:764:11
maybe 70:16 73:15
75:19
McMullen 27:19 78:3
mean 6:12 10:17
24:1427:3,2433:17
34:3,2438:2341:12
41:1544:1752:18
55:1656:657:4
59:866:967:13
68:3,10,19,2373:11
74:881:1691:9,23
92:5 96:7 99:23
106:11 114:8
means 6:16 55:14
59:2,460:1766:12
71:899:23
meant 44:6 59:9
73:1678:15
meeting 25:2,2
member 8:21
memo 23:9 25:18 27:8
30:2231:6,10,22
32:16,18,2084:14
memory 23: 14 70: 17
75:22
mentioned 6:11 10:1
merely 93: 18
merit 44:3 47:9
merits 47:8
Merrill 33:23 37: 19
38:3,12,14,1839:15
39:1741:2142:4,6
47:18,2448:10,21
49:359:11 64:18
69:11 70:1971:14
86:9
Messrs 50: 13
method 81:17 91:21
93:21 94:15,17,18
103:19
Michael 61:1 8 77:11
middle 82: 19
might 11:11 12:15
17:1924:325:4,10
25:1433:2334:20
39:3,1541:1942:3
42:1973:2093:6
Mike 38:9 78:2,3
mill 84: 19
million 8:16 13:14,23
14:2,19,21 15:9,22
16:24 17:12,22,23
18:2,14,19 19:6,17
19:17,1920:5,9,18
21:1848:1755:4
77:1585:12,13
97:22

mind 90:3 114:14

mine 71:15
minus21:14
minute 80:1 112:11
Mischaracterizes
94:13
misleading 84:20
misstatement 108:4
moment 13:15 57:13
94:18 112:5
money 9:1 17:2490:9
90:2492:9,1793:13
monitor 6:23 9:1 1,12
month 33:13
months 33:14
more 24:9 25: 10
35:2236:1,352:22
72:14,1693:13
110:16
morning 4:8,9 101:16
mort 14:9
mortgage 14:10,15,22
15:3,5 6,8 23,16 6,9
16:13,23 18:3,4,7,9
20:4,9,10,22,24
21:2324:1 47:4
68:5,1269:1 85:4
mortgages 14:7 19:24
20:19,2021:6,24
22:5 34:23
most 8:5 29:9 36:23
82:10 101:13
motion 44:9
motivated 34:14
mouth 58:18 103:3
move 81:13 104:11
much 13:23 18:5 80:2
85:8 110:16
municipal 10:11
must 66:8
myself 62:3 105:18

**N**

N1:11 2:18,21 3:10
3:124:227:11 11
83:15 115:17 116:9
116:12 118:7,11
name 10:22 43:1 62:7
109:10,15
names 38:7
native 103:1
naught 18:15
necessarily 60:9
necessary 62:10 66:3
90:21
need 13:2,3 94:4
104:18
needed 11:1257:9
needs 78:7
negotiate 64: 15 73:20

73:23

negotiated 88:19
negotiates 8 1:7 93: 12
negotiating 86:9 91:6
91:19
negotiation 81:11
100:17
neither 116:19
neutral 85:9
never 24: 17 33: 10
53:13 74:1796:11
97:18 112:4
new 2:14,14 80:9
news 53:23
next21:ll 66:568:15
71:11 104:22
Ninety-one 34: 12
Nodding 74: 19 77:5
None 37: 11
nonetheless 89:21
nonreturn 7:23
normal 16:17 17:11
notary 1:193:1 3,8
116:6 117:8 118:21
nothing 37:5 113:14
116:10
notice 43:4
notices 42:16
notified 118:8
notify 90:8
number 8:9 13:22
15:1626:328:4
55:6 114:11,12
numbers 7:18 24:7
35:13 113:15
nutshell 27:3

**O**

02:1861:19
object 22:19 63:13
Objection 12:8 17:2
19:1 39:545:146:1
48:2 51:5 57:18.23
64:967:569:12
94:12 20 111:5.22
obligated 16:8 85:2
obligation 106:14
obligations 73:13
85:1,4,4108:10
obstruction 109:24
obtaining 115:8
obviously 71:1
occupancy 63:6 66:21
occur 42:4 67:1,3
occurred 22: 18 24: 17
31:1483:1989:24
90:16,22 104:9
October 23:2 24: 11
25:19,2227:21
off 13:23 14:6 15:24

16:1,4,622:1228:6

28:7 64:23,24
Offendorpher38:9
offer 37:2,4 68:16
77:13 1778:7 18
81:5
offering 72:4 93:4
office 7:24 33:9 117:2
Officer 77:24
offices 1:15
official 28:2 117:2
often 7:4 94:23,24
oh 23:4 87:11 90:21
Ohio 1:2,17 2:8 117:2
118:1,21
okay 4:20,22 5:9,24
8:15.229:20.24
12:7 13:22 14:9
15:2016:1017:8
18:1720:321:9
22:11,2423:1324:6
24:17,2425:926:6
26:10,1227:7,11
28:1629:1330:13
30:2231:4,5,6,24
32:2033:3,1536:13
39:1441:7.1542:2
42:11,2246:18
47:11,2048:549:6
49:21 50:651:16
52:654:455:3,8,16
56:1859:560:2,10
60:1361:10,20
62:1563:10,12,19
65:1666:567:1
68:1869:14,2070:4
71:4,10,1674:3
75:276:1 77:6.10
78:5,1879:2281:20
82:12,2483:4,8,18
83:19,2484:685:1
85:6,14,2387:10,13
89:3,1391:893:3
95:796:498:5,11
98:1499:1,10,22
101:16,19 106:23
108:17 113:22
115:6
old 29: 10
once 66:2 69: 18 80:5
88:19 103:2 112:4
one 9:5 12:3 18:13,18
25:8 26:4 29:9,23
30:2,8,1031:24
38:9,10,1040:24
54:11 62:1 70:11,12
74:1780:2282:10
82:11.18.2084:9.11
89:1 95:1696:4
97:998:7 101:7

one-third 15:18

ongoing 9:15 37:20
only 20:22 44:1 58:5
97:1,2 100:24
104:10 105:4 110:3
114:6
operate 66:4
operating 6:8 12:22
opinion 50:7
opinions 53:14
opposed 3 5:23 93:9
114:18
opposite 80:17
option 36:22 40: 17,20
47:249:1556:10
58:10,11,2066:6
67:1675:897:8
options 23:22 24:1
36:11 56:16
order 82:13 89:14
115:11
original 23:20 35:20
63:7 68:4,5,12 96:7
118:13
originally 34:21
other 14:1 23:1334:7
34:1835:2436:14
36:1750:21 53:9,11
53:17,1855:12,24
57:2058:1261:4
71:1272:1080:23
81:1891:2396:2,5
96:7,9 102:5 103:8
112:23 113:16
ourselves 24:5 75:19
out 3:2,7 7:1 9:17
15:1324:1,432:21
32:2233:2234:2
37:15,2238:24
39:2340:741:13
42:1647:748:6,22
49:1656:5,1458:11
58:20 59:2 62:2
64:7,1465:2472:4
75:676:881:985:3
88:891:2,7,12
99:11,15,20,23
103:20110:3 113:8
113:11
outlay 71:18
outlines 46: 16
outrage 104:15
over 9:18 10:3 19:19
22:431:8,2332:22
35:1938:6,11,19
39:18,2040:1 77:12
88:19 103:3
overview 71:5
own 34:6,18 41:10
49:21 66:23 78:24

97:13 106:20

owner 97:6
owning 37:24 -
O'Brien 50:3,6 75:20

P

P2:18 98:11, 12,14,19
98:20101:9109:13
112:7 113:3,3,3
page 29:14,15, 16
54:21 55:1062:16
62:1666:568:15,16
71:11,17 101:9
pages 28:19 53:22
69:23
paid 14:6,20 15:24
16:1,3 17:13 18:6.8
19:1622:4,954:22
86:15,20
Pamela 11 8:20
papers 43:24
paragraph 55:4,10
56:1257:1459:5
62:1864:1 67:23
78:682:884:18
Pardon 5 1:7
Parmele109:ll.13
part 10:14 16:922:2
45:2064:13 100:23
102:3,3,6 105:3
106:9 107:17
participate 106:8
particular 8:4,9 15:6
15:732:1745:14
60:761:372:1,2
93:7 112:6
parties 2:20 108:9
116:20
partners 59:6 60:23
party 38:24 43:1 75:5
76:8
passed 21:16 36:3
past 7: 14 9: 18 43:22
44:1070:1,3
path 40: 18 42:8 76:7
Paul 109:1 1,13
pay 9:7 10:9 15:22
16:617:918:564:4
68:2485:293:13
payable 60: 19
paying 43:5 68:13
84:19
payment 14:18 15:8,9
15:10 16:8,17,23
24:1645:482:6
83:1,590:8
payments 35:9 42:16
47:4
people 38: 14 41: 18,20
65:2393:22 111:18

percent 7: 10, 15 9:14

9:20 114:17,19
percentage 7:2 15:16
perfectly 103:22
performed 97:6
performing 97,22
period 12:1839:18,21
40:1
permits 55: 12,23
person 11:2237:19
77:1995:14
personal 96:1
personally 47:8
pertains 105:23
phantom 60: 11, 23
Phillips 2:3 11:24
12:8,12.16 17:2,5
19:1 22:6,1928:6
39:543:1945:1
46:1 48:2,23 50:9
51:5,8,10,17,19,22
52:8,1353:1757:18
57:2361:1164:9,20
67:569:1275:12
76:1477:779:3,7
80:11,16,2282:14
82:16.2084:894:12
94:2098:1 101:6,8
102:21 104:8,14,18
104:21 105:7,9,12
105:18,21 106:18
107:21 108:15,2.1
109:17,20,22 110:1
110:8,12,15 111:5
111:22 115:10
118:9
phone 30:11 33:20
92:12
piece 91:6
pieces 9:8
place 16:1268:21
69:1 71:7,1873:1
75:476:791:14,15
116:12
placed 61: 17
Plaintiff 1:62:2 118:3
plan 91:13,15
planning 91:5,9
plans91:10
play 26:24
plays 26:24
please 67: 11 84:2,21
109:12
plus 17:24 43:7 77:14
114:21
PM 24:7
PM01 175 30:1
PNC 1:162:6
pockets 95:2
point 18:17 27:8 32:3

44:1549:961:12,13

67:15 71:6,1775:3
78:13 80:14 113:8
114:3
points 35:17 43:8
policy 6:23 9:4 54: 17
portion 15:21 16:22
69:21
position 5:2 26:12
27:1833:2437:23
40:8,942:1943:16
44:1345:2346:6,16
47:1,9,1450:14
71:773:1674:10,13
85:391:1992:17
93:5,999:21 108:13
115:4
possibility 39:23
possible 69:2 88:3
posturing 105:24
potential 11:13
potentially 72:3
precise 45: 15
premium 72:13 114:5
114:6
prepared 70: 18, 19
prepay 56:10
presence 3:2,7 118:18
present 2:15 43:6
114:1,2,9 118:12
presently 13:6
President 4:23 5:3,14
26:14
pressed 105:4
previous 27:14,15
60:18
previously 28: 19 48:7
115:9
price 13:10,12 23:3
23:2024:1025:19
27:9,2228:1729:1
29:1730:8,24,24
32:20,2333:17
48:21 50:13,1952:3
52:7,12,1753:21
54:4,17,2257:8
59:1061:1964:12
64:1665:367:15
68:1669:4,16,24
70:1071:1,3,4,24
72:9,11 77:1378:15
82:683:2,885:17
86:1,987:388:19
89:1090:1591:7,18
91:21 92:5,8,16,20
93:8,15,18,2494:16
95:7,17,1896:1,5
96:11,1397:998:8
98:15,1699:2,19
100:15 101:24

103:13,16,19 104:1

105:2,16 110:22
111:8 113:1,2,6,8
113:11,12 115:3
prices 67:10
Price's 62:24
primary 66:13
principal 68:3
prior 15:8 17:22,23
23:7,2424:21 34:11
36:1664:672:4
73:5,17,2276:10
87:1496:12 112:5
privilege 104:11
106:22 108:2,4,4
privileged 51:19
108:12
probabiles 100:20
probably 7:11 9:14
15:19 16:16,2029:3
29:11 42:546:17
54:1061:2466:12
75:1978:489:9
91:1892:11 98:6
99:3,6,7,12 100:1,2
100:14,18 101:1,21
111:10
problem 39: 16 111:20
problems 39:13
Procedure 1:142:23
106:15 118:11
proceed 48: 16 54: 15
94:2 111:19
proceeding 11:3 32:2
50:20
proceeds 16:24 17:14
procurement 6:4
produce 105:5 106:15
107:16108:11,18
108:24 109:16
producing 107:3
production 105:19
106:9.12
professional 66:4
profit 18:23 19:3
prohibition 37:10
prominently 102:20
promoted 5:16
proper 103:23
properties 14:22,23
18:8 19:1720:14
21:6,1029:21 37:24
39:255:11,2356:1
57:11,21 60:2463:3
66:10,2367:19,21
68:2076:579:1
85:2286:6,11 96:6
96:14
property 13:740:20
41:1055:1365:9

68:670:2271:1

96:18,2497:5
proposal 29:14,22
proposals 29: 19 30:14
30:16
proposed 30:5 68:16
provide 59:6
provided 63:21 65:11
public 1:19 116:6
118:21
public-court 3 : 1 ,4,8
PUBLIC-STATE
117:8
publish 8:8
punched 66:6
purchase 29:20 36:17
36:21 39:4,840:17
47:249:1556:16
58:11,2059:1066:6
66:8,1074:1 75:8
97:8
pure 18:23 19:3
purpose 70:23 87:7
purposes 16:2441:6
pursuant 1:13, 14 2:22
2:23 116:14118:10
put 11:12 16:11 30:11
41:5 53:1557:12
58:1767:2369:10
112:24
P.C2:12

| 0 |
qualification 79:16
qualified 116:6
qualify 101:2
question 12:11,12,14
17:2428:2329:3
37:2239:7,844:8
51:11 73:1576:15
79:6,886:21,23
98:1 101:3 102:9,12
104:22 105:12,22
106:1,20,24 107:24
108:15,22
questions 12:2028:22
31:18,21 32:11
84:21 105:10,22
110:3
quiet 109:19

| R |
R 10:21 68:777:11
109:13 116:1
raised 110:9,10
raises 114:11
range 9:14 113:14
rate 7:6,8,10,17,19,22
10:234:2443:7
63:3 114:7,10,11,12

114:13,15

rather 68: 12 69:22
re 25:19
reach 40: 12 48:20
49:22
read 23:13 26:1 31:1
31:433:8,10,12,13
37:1344:946:7
49:14,1750:24
52:1653:1356:13
65:21 67:1075:15
79:17,1984:2086:3
86:4,21,23 87:1
reading 38:18 42:7
49:22 65:24
ready 118:8
real 26: 14 27:3,5
29:1062:9
reality 9: 16
really 7:20 43:12 69:8
72:21 73:6 80:2
81:16 103:11 115:5
reason 34: 13 90:2,23
111:3,17,18
reasonable 113:8,11
113:17,18,20,23
114:1
recall 24:9 25:23 3 1:9
32:23 33:2 49:20
54:1461:2264:12
70:2372:1874:4
75:1076:11 112:20
recapture 7 1:7
receive 72:13 83:9
received 13:24 17:12
83:11
receiving 60:23
recent 82:10
recently 8:5 24:23
28:15 101:14
recess 22:13 61:14
112:13
recitation 46:11
recognize 29:22 84:16
recollection 23: 17
35:1576:23 112:22
reconsider 108:13
record 22:12 28:6,7
28:1649:1 64:23,24
74:23 77:887:1
98:3 105:1
records 83:22
reduce 34:22
refer 26:2
referable 15:14 19:5
reference 22:20 26:6
62:1763:1287:10
referenced 33:16
referencing 105:18
referring 20: 11 26:1

62:1598:23 107:24

refers 27:9
reflected 3 1:10
reflection 66:17
refresh 70: 17
refund 17:19
regard 45:19 46:12
71:21
regardless 17:10
regular 8:6 16:8
regularly 10:9
related 107:16,22
relates 77:4
relating 10:1544:14
55:13,2497:20
108:19 109:1
relationship 28:24
95:24
relative 116:19,21
relied 47: 11 48:22
94:14
relieve 41:19 42:9
relieved 41: 14,14,24
rely 47: 17 48:20
49:21
remaining 75:5
remember 23:5 26:2
29:1330:2,4,7
32:13,1435:1342:5
43:252:11 69:15
70:472:776:1
87:15 88:2,3 21
100:24 107:19
111:11 113:22
reminded 11 1:1 1,13
removed 66:24
renewal 66: 13
rent 35:15,16 43:6,6
63:364:571:8
72:1685:1,4114:1
114:2
repaying 34:23
report 11:1,8,9.13,15
11:17,2326:18
27:1650:1453:1,3
53:22 113:5
reported 27: 18
reporter 3:1,4,8 87:1
118:6
reports 53:9
reprehensible 110:14
represent 105:2
representative 63:17
require 44:18 58:15
77:21,22
required 77:23 107:3
107:16
reserve 115:10
resolved 44:16,17
respect 13:729:1

42:12,1349:460:24

96:17 104:10
respectful 110:16
respective 2:20
respects 1 16:14
responsibility 107:10
107:12
responsible 1 1 :23
107:2
result 13:24 116:22
retailer 13:1
retained 64:20,22,23
65:2
return 6:6,1 1,13, 18
6:21,237:158:3
9:11,13
returned 64: 18,21
review 6:3 8:14 11:15
11:1724:21,2425:6
62:2,6,1077:23
115:12 118:8
reviewed 28:13 73:12
78:4
reviewing 11:23 76:4
78:1980:8 111:14
ridiculous 110:2
right 4:18,19 5:17,19
18:20,2222:1,4,5
26:830:1833:8,11
34:11,17,1935:2
36:5,1041:2342:1
43:1844:2445:14
45:2446:12,20,24
47:12,1548:1,8
50:22 53:4 56:4,9
56:13 58:4,6,23
59:1964:866:8,10
66:1871:3,472:24
73:21 76:5 79:20
81:6,1982:7,18,22
83:9,1284:14,20
85:18,1986:14,18
87:7,12.20.23 88:15
88:1789:4,6,14,16
89:20,21 90:1 91:17
92:7,14,21 94:23
95:5,20 96:9 103:3
105:1 106:5 107:13
112:19 114:24
115:6
rights 40:21 42:13
50:755:18.21 56:2
57:15,19 58:5,15,16
73:13
ring 45: 17
risk 38:21, 22,23,24
48:17
Robert 2:10 118:13
Rodney 27: 19 78:2,3
role 5:15,16 26:23,24

room 7: 19,22 26:8

60:21 61:1591:4
93:23
roughly 15:18
round 13:23
rule 108:14 118:10
Rules 1:13 2:23
106:14 118:11
ruling 106:5
rulings 115:8
run 93:14,16,16

**S**

82:18,183:14
sale 5:10 13:621:22
35:7 97:20
sales 6: 18
same4:17 5:167:11
16:1321:462:8,9
74:1477:1 98:8
San 10:18 12:22 13:3
13:7 14:10 15:2,11
15:14 18:1922:16
23:1,15,1934:5,16
36:1496:18,23
97:11,20
Sandra 25:20 27: 11
27:13,1829:731:7
31:12,23 32:7,7,14
sandwich 71:6
satisfied 14:4,12 15:3
16:1349:973:8,13
saw 70:10 97:18 98:19
98:22 99:12,24
100:5,5
sayeth 118:15
saying 19:7 31:7 52:2
56:1258:1765:10
75:22 84:23 90:6
95:19 100:20

says 24:7 31:7 32:21
46:11 55:2257:20
59:5 79:4 80:7.12
schedule 19:21
Schlotman 78:3
school 4: 13, 16
Scott 2:3 23:2,5,19
38:1939:1742:6
48:11 118:9
seal 117:2
search 108:6
seated 26.7
second 29:14,15 54:21
55:1062:1663:24
71:578:684:18
secrets 105:1
see 11:1,723:924:7
25:1228:10,11 29:4
30:1349:1871:19
77:1578:2081:4

86:1089:798:20

99:2,4,20 106:5
107:20
seeing 61:22 70:4
100:12
seems 80:8
seen 25:13 31:2 33:3
54:11 62:770:1
98:11
select 94: 15
self-evident 53:13
sell 16:3 18:13,18
21:1041:1759:14
96:2397:11
sellers 94:24
selling 33:24 70: 19
send 65:23 87:14
115:11
sending 29:4 90:23
senior 26:15,17
sent 62:2 64:7,14
83:1687:8,1988:1
90:1999:24110:23
111:4 113:1,3
sentence 65:22 78:6
78:1679:1481:4
sentences 86:4
September 98: 16, 18
99:4,15 100:8 101:8
101:21 102:6103:8
110:23 111:7 112:6
112:7,16 115:1
series 24:7 105:17
served 44:10
services 27:23 28:1
86:1689:11,15
set 1:15 16:243:23
81:8 117:1
settle 45:21
settling 40: 18
shareholders 6:10
shirttai!41:5 43:6
shock 103: 12
show 8:9 22:24 24:20
83:2089:1
showed 104:6 111:15
111:16
side 29:18 73:8 81:18
sign 54:8 103:17
signature 3:6,7
100:12 115:11
116:19 118:8,12
signed 30: 19 100:11
significant 73:4
similar 70:14 76:12
simplifying 59:7
simply 63:2 85:3
92:2094:1495:16
simultaneous 58:24
59:1,3

simultaneously 16:13

45:11,1349:1867:2
76:1277:2
since 5:4,8 9:19 24:3
29:1730:933:7,10
33:12,21 34:1035:4
61:9
sir 10:12 88:4 105:2
105:15 108:17
110:21 112:15
sit 24: 13 30: 15 44:22
96:22 110:21
sitting 23:23 103:3
situation 19:9 35:12
36:249:1059:7
situations 59:13
six 85:20
sixth 76: 15
sold 16:14 17:10
21:12,13,1798:8
sole 52:2
solely 41:6
some6:207:19 11:12
16:1825:333:9
35:1937:1039:9,11
48:653:2267:18,20
72:976:12,1279:24
84:21 85:798:6
105:24 111:14
somebody 39:3
someone 11:627:19
27:2047:11 51:20
57:13 66:6 109:4
something 8: 18 18:7
28:1334:939:23
48:657:1 58:3
67:19,2269:470:14
73:2080:686:12
87:18 88:17 109:14
sometimes 7:24 30: 11
somewhere 9:14
15:15
soon 69:2 104:17
sooner 61:7 69:19
72:1580:6,2099:21
sorry 14:21 20:6
74:2498:22 101:17
112:16 113:1
sort 75:21
sounds 83:22
source 16:5,7 52:2
SOUTHERN 1:2
118:1
Spangler 118:20
speak 32: 17 65:6
specialty 60:6
specific 42:6 52:23
specifically 69:5
77:13
specifics 43:20

Specify 12:16

speeches 104:21
105:10,23
spell 109: 12, 15
spelling 68:7
split 9:6,7 14:24
spoke 47:24
spot 66: 12
SSI 16:3
starting 35:4 63:11
starts 55: 11
state 1:19 10:10 116:2
116:4,7 118:21
statement 50:14
52:17,19,21 63:22
63:2365:1266:14
66:1568:1972:1
75:13,1478:579:23
statements 50:18
85:24 86:2,3
states 1: 1 29:1830:13
31:2362:1863:20
64:1771:6,17 118:1
stationery 84:7
status 73:9, 12
stays 71:18 75:4
stenotypy3:1 116:15
steps 32:22
still 37:24 90:20 9 1:2
91:5,8
stimulate 81:1 7
stipulate 80: 11
stipulated 2:19
stipulations 1:15
stock 9:6, 10, 13,22
10:6,7
stop 104:21 105:7,9
105:10 106:18
107:21 109:17.20
109:22
stopped 23: 18
stopping 37:5
stream 114:2.2
Street 1:17 2:7
structure 17:17 32:3
34:462:14,1963:20
63:21 65:11 100:15
struggling 32:7
studied 59: 16
stuff 16:1946:20
subject 39:24 40:2
48:968:20 101:23
115:8
sublease 23:24
subleased 12:23 13:4
submitted 3:5 11:2
43:2350:13,1953:1
53:10,22 88:22
116:18
subordinate 26: 1 5

subscribed 118:18

subsequent 1 12:15
115:1
substance 43:24
44:13 96:12
substitute 76: 12
Sue 11 8:20
suggested 103:13
sum 14:20
summarily 44:3,16,17
summary 29:19 30:14
44:962:1664:13
Summer 5:18
superiors 77:23
supervision 107:10
116:17
support 60:20
supposed 13:20
sure 10:17,23 13:8
15:1922:2023:8
26:527:19,2428:21
30:21 33:534:12
37:4,12,1739:11
44:5,1948:1449:24
57:3,961:1363:18
65:15 70:13,23
73:11 75:1 79:24
81:1582:8,2294:3
97:1899:8,13
100:14 102:9
103:24 104:4
105:11,13 109:13
111:3 113:4,12
surplus 24:5 34:5,15
surprise 54:13
sworn 4: 1,4 116:9
118:7,18

**T**

12:18,183:14,16

10:15,16,21 68:7
81:2282:1 116:1,1
table 70: 16
take 19:19,23 28:10
53:2358:11,2059:2
61:1262:1970:16
83:15,1884:289:1
103:20 112:11
113:1
taken 1:122:21,24
21:21 68:20 116:13
116:15
taking 2 1:6 44: 13
62:23
talk 8:7 104:8
talked 23:21 25:3
29:11 30:832:19
33:2038:6,11 57:7
72:3,21 92:11 103:2
113:15

talking 9:21 20:723:5
26:235:1 36:7
38:1739:2240:10
41:2247:20,2449:4
53:6 78:9 80:8 82:9
114:22
talks 32:20 75:4
tax 7:10,16 9:15 17:13
17:15 19:5.835:3.6
35:10,12,15,1836:2
38:2339:941:5
59:7,1360:1861:3
62:20,23 63:4,21
65:11,1571:7
taxation 59:16,16
taxes 10:10
tell 5:22 11:9 12:1,15
22:825:1433:15
44:1251:14,16
56:24 59:1269:20
70:13 80:1890:21
93:18,2494:595:8
97:2,998:399:17
100:22 102:14
104:5 116:10
telling 38:13 43:24
81:1287:3,13,18,21
88:1689:2390:11
94:5
ten 38:19 53:22
tender 45:5
tendered 118:13
term 9:12 60:10,14
63:1466:13,14
94:23
terminate 67: 15
termination 22: 16,20
22:2223:2.1524:16
37:1.67:10.17
terms 7:2 21:9 68:17
84:24 113:18
terrible 78: 14
testified 80:16
testifies 118:7
testify 106:18
testimony 19:2 24:22
25:1 28:1490:2
94:13 101:23 103:4
112:3
Texas 13:2
their 6:3,4,5,6 19:18
29:2033:2437:22
40:7,950:21 53:11
55:13 56:1 59:7
97:7 105:5 116:21
themselves 57:2
thereabouts 7:15
18:11 33:1 89:12
thing 46:20,24 56:8
81:1397:1,2 113:9

things 9:5 39:13 65:24
73:877:1 93:12,13
94:23 98:6
think 5:19 9:19 10:24
11:11 13:13 17:7,18
17:19 18:6 19:14
32:6,733:2240:2
41:2346:9,2049:14
50:11 53:1254:12
55:15,1756:2058:1
58:1259:965:21
66:3,7,967:9,16,17
73:1276:17,1879:5
79:1980:19,22
83:1487:1688:7,8
88:2391:2495:1,11
95:18 100:3.4
102:18 103:18,22
104:3 107:5,7,14
111:15 112:1
thinking 46:24
third 2:13 71:16
thirty-one 118:10
though 57:6 67: 17
70:1372:678:4
80:890:19
thought 6: 14 22:2
36:1939:348:15
51:2364:2268:24
73:2075:2383:6
88:1693:2097:4
113:19.23,24.24
thoughts 112:12
three 9:5,8 14:22,23
14:2415:12,13
17:22 18:8 19:17,23
20:1321:6,7,10
28:19,2029:20
55:11.23 57:21 64:1
82:14,1685:21
86:11 89:21 114:17
through 15:21 16:18
37:2058:11 72:24
89:19
throughout 28:4
32:18 110:17
time 8:2.7.7 10:3
12:18 14:18 16:14
18:1620:2021:16
21:21 23:5,5,21,21
24:2,225:7,14,14
26:20,20,22 28:2,3
29:11,1230:631:16
31:2032:5,10,18,18
33:9,23 34:21 35:14
35:17.1936:3.11
38:648:249:955:1
55:2258:4,2260:7
64:665:1967:16
70:1072:1,273:4

73:21 74:12,12,14
76:10,15,20,2077:2
81:795:2296:12
97:10 103:6113:9
114:3 115:7 116:12
timely 78:19
times 26:4 30:9 32:19
67:4
title 16: 19 40:7. 19
41:14,17,19,24
48:1857:11 73:14
76:6
today 5:22 24: 13
28:11.1430:1531:2
44:2267:870:1
84:1996:22 101:5
103:6 110:22
Todd 1:16 2:5
together 4: 17 11:12
told 11:11 33:20 21
33:2348:1453:14
53:21 80:1 91:24
96:11 102:17
103:18 107:15
Tom 50:3 75:20
tone 109:21 110:4,13
110:15
tool 70: 19
top 66:5 82:11
total 63:5 103:12
touched 8 1:5
toward 24:6 63:20.24
town 4: 12
training 4: 18
transaction 5:10
10:15 12:5,17,17,18
13:18 14:1,23 15:20
16:9 19:5.11 22:17
22.1723:7 2030:5
30:531:15,1932:8
32:1533:2234:3,7
34:2035:8,17,20
37:1238:1539:20
41:842:1747:4
54:1655:1858:24
61:663:865:8
68:11 73:575:5
76:882:488:13
89:1991:693:21
95:10,1296:8
100:16,18 107:17
108:19 109:1
transactions 26:21
27:228:3,429:10
35:23 36:8,23,23
112:23
transcribed 3:2,5
116:16,17
transcript 50:24
118:8,9,13

transcription 116:16
transpired 113:6
tried 42: 7 45:4
true 88:4 94:11 95:4
truth 94:9 116:10,10
116:11
try 7:18 39:3 81:8
trying 7:20 15:1324:4
35:1247:748:19.22
55:2058:1781:17
85:5,2090:17
105:24
turn 58: 15
Twelve 114:20,21
Twenty 18:10 20:8
twenty-one 18:10
two 5:4,4 17:22,23
19:1925:5,8,11
29:1930:1434:7,18
36:1742:2443:6
86:3 114:22,22
two-party 49: 15, 17
49:2256:772:5,15
type 39:15 105:24
typical 10:1
typically 7:149:1
10:254:1565:23

_____ U _____
U2:183:17 10:15
77:11 84:2,3,6
uh-huh 7:3 9:23 18:12
20:1 26:935:2
40:11 54:2455:5
60:1565:967:12
72:1283:1784:17
84:2285:16
ultimate 107:9,12
um-hmm36:1248:ll
53:2459:2066:19
68:2270:871:20
75:977:1691:3
102:2
under 63:19 66:6
67:1068:2,1671:5
71:1675:2 106:13
106:14 116:16
undersigned 116:5
understand 22:21
43:15,1744:1,6,7
45:346:5,23 55:14
57:1658:2259:4
113:13
understanding 55:22
56:260:13.1666:22
68:11
understands 32:1
understood 41:3
unencumbered 66:1 1

UNITED 1:1 118:1
until 36:20 37:13
91:12
unusual 81:10
unwind 24:5 34:4
35:22 100:17
unwinding 30: 10
35:1636:7
unwound 47:3 76:7
use 7:8 9:12 13:22
55:1356:1 63:3
84:11 93:14 113:16
used 9:5 15:2245:11
114:7
uses 55:3
using 23:18 63:3
76:11
usually 9:7 62: 13 66:2
81:8

_____ V _____
vague 12:8, 13, 16
vaguely 10:22
value 6:9 9:21 10:7
36:2140:1743:6
66:11 68:597:7
114:1,2,9
vantage 32:3
various 26:21 27:1
versus 24:8 59:14
very 19:1435:8
114:11.11
Vice 4:23 5:3,14
26:14
view 78: 13 80: 14
vis-a-vis 58:16
voice 110:7,8,1 1,15
VS1:7 118:4

_____ W _____
W2:10 118:13
wait 36:4,20 73:18, 19
98:1
waiting 91: 12
waived 3:4
Waldvogel 1 : 1 1 2:21
3:124:2.822:15
25:21 57:14115:17
116:9,13 118:7,11
walk 57: 13 80:4
walking 32:2
want 25:5,6 28:22
31:1,742:248:24
63:2,473:1 84:8
92:1 97:17 100:22
100:24 113:7.11.12
wanted 3 1:23 34:6,6
34:1838:21 57:8,8
74:985:1299:19
wanting 86:5

wants 79: 16 100:15
warehouse 10:19
12:2323:19,2324:4
wasn't 39:7,11 80:4
85:888:689:18
90:8,1091:15 way
10:13 20:23 21:2424:21
33:22 35:1343:946:10
49:857:1274:17
85:790:3,21 95:9
95:10,11,1696:5

97:9 98:14 106:8
111:19 112-24
ways 34:22
Wednesday 1:18 118:8
week25:3 101:15.16
103:5 104:7 111:12
111:15 weeks 88:1
89:22

well 7:5 12:15 13:13
19:427:1431:16
37:938:1740:16
50:1 57:564:12
66:21 69:1870:24
80:782:885:19
88:11 98:21 100:14
114:9 went4:ll, 15
35:24
59:19
were 5:9,13,20 13:20
14:3,7 19:1720:19
21:1022:1523:22
23:2424:1428:2
29:530:11 31:10
34:735:3,6,10,16
35:21 36:6,7,13,15
38:11 41:1,2442:3
48:550:15,1751:3
51:2352:357:13.15
59:1360:2261:4
62:8,19,22 63:5,7
65:3,1569:971:12
71:1273:7,1377:19
87:17,18,21 88:11
88:1690:1192:15
92:1694:10103:10
107:15,15 108:17
112:20,21 113:10
weren't 30:10 37:11
37:1285:12 WESTERN
1:3 118:2
we'll 13:2351:12
80:11 81:1 104:11
106:21 108:7
115:10
we're 4:17 7:20 20:6
34:2258:1961:7
72:1578:1981:9

85:3 90:23 104:22
105:21 109:23 110:1,2
we've 24:4 28:3,5
30:836:1448:23 66:2
WHEREOF 11 7:1
while 84: 19 106:6
whole 11 6: 10 willing
91: 17 window 78:7
81:5,8 wish 108:13

Withdrawn 8:12 9:2
13-1646-13 73-1
95:21 witness 1:12 2:21
3:3 3:6,114:1,3 17:4
80:20,2482:15,21 98:5
106:1,23 109:18
115:7,12 116:18 117:1
118:7

118:11
word 45:10,14,15,17
66:7,876:11,13 113:17
words 14:1 35:24

41:2449:1857:20
58:12,1871:12
72:1096:11 112:24
113:10,16
work 26:20,22 27:5,6
28:2
worked 16:15 23:6
27:13,1535:1360:8
working 29:8 31:17
61:8 works 91:10,24
92:3 wouldn't 9:12
54:13 94:6 write 57:5
100:18

102:11.15
writing 30:11 85:13
89:22 103:16
written 50:7.18 52:16
52:19,21 54:8,18,19
111:8 wrong 6: 15 46:12
88:24 111:18 112:4
wrote 33:19 88:9,12

90:3 95:22 103:10
103:13 104:1
110:22,24,24

_____X_____
X3:10,14
Xavier4:1059:19

_____Y_____
yeah 4:14 20:16 23:17
29:1657:2059:17

61:2470:679:18 94:8
100:3 101:7 113:3 year
5:13 8:5,5 35:24
69:3,7,16 years 5:4,4,8
7:12,14 9:19 17:22,23
19:19
28:538:11,2039:18
39:21 40:143:6 85:20
114:22,23 York
2:14,14

_____S_____
$108-16 14:19,21
15:9 $100,000 54:23
82:7
83:1,987:989:5,18
$11 13:14,23 14:2
15:22 16:24 17:12
18:14,19 19:6,18 97:22

$18.377:14
$2120:9,21
$3017:22,23 18:2
19:1620:421:18 48-
1785:11,13
$31 19:1720:1721:7
21:12,13,14
$50,291,00068:3
$8,700,00077:14
$9 55:4

_____1_____
137:21 55:4 101:9
1st 14:5,13,14 15:2,10
15:21 16:2,1747:5
78:8,1279:1 80:3
80:1491:12 1,372,500
24:8
107:12,149:14,18,20
19:18
10/1000 69:3
10043:7
100222:14
117:15 18:6,822:9
11.37:10
11:35115:19
117,50024:9
12114:19
12th 28:17 29:2
12078:781:5 13th
98:18 99:15 100:8
101:8 102:6
110:23 112:6
149:14
157:12,149:19,20
15th 77: 11
17118:8
17th 25:22 98: 16
112:7

1922:5 1975 59:23
1976 60:4 19775:8
198062:24 1980s
62:21
198337:2045:696:9
198663:11 19889:19
199023:18
199130:933:21 35:4
35:2361:9

199332:19
199522:18,2323:2,7
24:11 25:1927:10
27:12,16,17,18,22
32:19
199628:1730:23
32:2434:10
199732:19

_____2_____
2101:10 2-year 1
14:2
2018:720:7,922:9
28:5
200033:936:1637:20
40:3 48:24 49:2
54:5 59:5 60:22
61:6,18,2364:18
69:3,7,16,1799:15
20013:175:13,19,21
35:2336:1040:3,3
59:769:2470:21
71:2272:2073:7,23
74:1375:2277:11
78:8,12 80:3 82:6
83:2084:1385:17
85:22 86:12 89:2
90:1695:2396:12
96:1698:16,1899:5
101:21 102:6 103:8
108:20 110:23
111:8 112:6,7,16
115:1 2003 13:21
14:15 15:21
47:575:7 91:12
2004 1:18 105:16

117:3 118:8,8,18
2005117:8
2007 118:22
201 1:162:7
21 18:7,9
22nd 83:16 105:16
2200 1:162:6
2382:15
24th 73:23 74: 12
83:20,23 85:22
86:12,1987:2288:5

88:1489:2490:5,16
90:22 2582:15 25th
25:19 82:5, 12, 17 26th
61:18 64:17 89:22
275:882:1595:23 27th
82:10 85:17,24 86:13
87:1488:1,9
90:4,1291:21 96:12
96:16 29118:22

_____3_____
3 1:1855:1056:12
57:14 117:8 3-page 6
1:21
3016:2020:1721:7
22:4,8,1070:1,3 84:19
30th 3:17 30:23 84:13

30)E118:11
3122:10
350,000 24:8
360-day 43:4

_____4_____
43:1259:5
45202 2:8

_____5_____
546:15
5-year 78:20 80:9

_____6_____
6th 89:2,8,1 190:20
6-page 46: 15 60
16:20 610,000 24:8

_____7_____
7114:18

_____8_____
80s 29:10
813:16
843:17
8452:13

_____9_____
9:101:17 9:33
82:20 90s 12-
2426-4
91 23-18 36-8
9629:232:24