C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Kroger Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:02-CV-439 |
| | ) | |
| vs. | ) | |
| | ) | |
| Malease Food Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

O R D E R

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff The Kroger Company ("Kroger") (Doc. No. 42) and Defendant Malease Food Corporation ("Malease") (Doc. No. 45).  For the reasons set forth below, Kroger's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**; Malease's motion for summary judgment is not well-taken and is **DENIED**.

I. Background

The operative facts of this case appear to be undisputed and are as the Court recounted them in ruling on Malease's motion to dismiss for lack of jurisdiction over the person:

> According to the complaint, on April 1, 1983, Plaintiff The Kroger Company ("Kroger"), an Ohio corporation, executed three sale-leaseback transactions with Balkhouse Properties Corporation, a Tennessee corporation, involving industrial complexes located in Bowling Green, Kentucky, Murfreesboro, Tennessee, and San Marcos, Texas.  Complaint ¶ 11.  In a sale-leaseback transaction, the owner sells the property to the buyer and then leases the same property from the owner.  Id.  The sale-leaseback contracts contained provisions which allowed Kroger to re-purchase these

properties at fair market value on April 1, 2003.  <u>See</u> <u>id.</u> ¶ 16.

On June 1, 1983, Balkhouse Properties conveyed each of its interests in the properties to Balkhouse Associates, a Tennessee limited partnership, in fee simple title.  <u>Id.</u> ¶ 17.  Then, Balkhouse Properties entered into a lease agreement ("the June lease") wherein it leased the properties from Balkhouse Associates.  <u>Id.</u>  Simultaneously, Balkhouse Properties assigned all of its rights under the June lease to Defendant Malease Foods Corporation ("Malease"), a Tennessee corporation with its principal place of business located in New York.  <u>Id.</u>

Then, also on June 1, 1983, Malease and Balkhouse Associates entered into three agreements, each entitled "Two Party Agreement," in which the parties agreed that Malease would become Kroger's landlord under the terms of the leases entered into by Kroger and Balkhouse Properties.  <u>See</u> <u>id.</u> ¶ 20.  According to Kroger, under the Two Party Agreements, Malease was to receive all of the rent payments from Kroger.  <u>Id.</u>  Moreover, Kroger alleges, the Two Party Agreements required Malease to acknowledge Kroger's right to repurchase the properties at the expiration of the leases.  <u>Id.</u>

As if this series of transactions were not already complicated enough, the complaint alleges that on June 24, 2001, Kroger acquired from Balkhouse Associates fee simple title to each of the properties and also acquired by assignment all of Balkhouse Associates' interest in the Two Party Agreements between Malease and Balkhouse Associates.  <u>Id.</u> ¶ 24.  If the Court understands this series of transactions correctly, the upshot was that eventually Kroger was paying rent on the properties to Malease by virtue of its original leaseback with Balkhouse Properties and the Two Party Agreements, but because Malease had become Balkhouse Associates' tenant after Balkhouse Properties assigned its least to Malease, Malease in turn became Kroger's tenant after Balkhouse Associates transferred fee simple interest in the properties to Kroger.  In other words, Malease was Kroger's landlord, but at the same time Kroger was Malease's landlord.

On February 18, 2002, Kroger notified Malease by letter that it intended to repurchase the properties under the terms of the original lease between Kroger and Balkhouse Properties at the expiration of the lease on April 1, 2003.  Complaint ¶ 25.  Malease, however,

> rejected Kroger's attempt to exercise its repurchase
> options, stating that by purchasing the properties from
> Balkhouse Associates, Kroger had acted outside the
> scope of its rights under the agreements and had
> violated certain rights of Malease under the series of
> agreements. Id. ¶ 27; Complaint Ex. 2.

See Doc. No. 22, at 1-3.

The purchase option granted to Kroger under the terms

of the original lease agreements provides:

> Lessee's Purchase Option. Provided no Event of Default
> has occurred which has not been waived on or prior to
> April 1, 2003, or the date of expiration of any renewal
> term hereof for which Lessee has exercised its renewal
> option, as the case may be, and provided further, that
> this Lease is in full force and effect on such date, on
> the day following the expiration date of the Fixed Term
> or any renewal term of this Lease for which Lessee has
> exercised its option, Lessee may, at its option, upon
> at least three hundred sixty (360) days' prior notice
> to Lessor, purchase the Leased Property on such date
> for an amount equal to the fair market value thereof
> determined without regard to this Lease established by
> appraisal as set forth in Article XXXVI. Any such
> purchase shall be completed in the manner provided in
> Article XIX.

See Doc. No. 42, Ex. A1, at 50-51 (Lease Art. XXXV). The Two

Party Agreements, which the Court notes are between only

Balkhouse Associates[1] and Malease, provide in pertinent part:

> 3. If Purchase Option Exercised. If a Purchase Option
> is exercised pursuant to Article XXXV of the Occupancy
> Lease, Partnership [Associates] shall be obligated to
> sell and convey Partnership's interest in the Premises
> to Occupancy Tenant [Kroger] simultaneously with the
> sale of the Master Lessee's [Malease] Interest in the
> Premises to Occupancy Tenant by the Master Lessee.
> Partnership and Master Lessee shall execute and deliver
> a partial surrender of lease to release the premises
> from the Master Lease. Partnership's Interest and
> Master Lessee's Interest in the Premises shall be sold

---

[1]     Hereinafter, for ease of reference, the Court will
refer to Balkhouse Associates as simply "Associates."

3

and conveyed in accordance with Article XIX of the Occupancy Lease[.]

Doc. No. 42, Ex. H1, at 9-10.

The main issue presented in this case is whether Malease is required to convey its leasehold interests back to Kroger.  Kroger maintains that pursuant to Article XXXV of the lease, it gave appropriate notice to Malease of its intention to exercise the purchase options and that, therefore, Malease has no choice but to convey its leasehold interests to Kroger.  Malease's position is that because Kroger acquired Associates' fee simple interests in the properties in advance of the time provided for by the lease agreements, Kroger could not then at a later time purport to exercise the options to purchase the properties and, as a consequence, compel Malease to surrender its leaseholds.  Malease argues that the Two Party Agreements contemplate a simultaneous transfer of the fee simple and leasehold interests in the properties in the event that Kroger exercised the purchase options.  Because Kroger acquired Associates' fee simple interests prematurely, the conveyance of the fee simple and leasehold interests could not have occurred simultaneously, as Malease contends the Two Party Agreements provide.  Therefore, Malease argues, it does not have to convey its leasehold interests to Kroger and in fact that the leases automatically renewed for additional five year terms.

Kroger initiated this litigation by filing a three count complaint against Malease.  Count I of the complaint seeks

4

a declaratory judgment that Kroger validly exercised its rights under the purchase options to acquire properties at issue. Kroger also seeks a declaratory judgment that it has never defaulted on any of its obligations under the leases and that Malease is in material breach of the leases by failing to convey its interests to Kroger.  Count II of the complaint seeks specific performance of the leases compelling Malease to convey its leasehold interests to Kroger.  Count III of the complaint asserts a claim for money damages against Malease for actual and anticipatory breach of the lease agreements.  Count IV of the complaint states a claim for unjust enrichment.

Malease filed an amended answer and counterclaim to the complaint.  Doc. No. 32.  Malease's counterclaim also seeks a declaratory judgment.  Malease seeks a declaratory judgment that Kroger did not validly exercise its purchase options, that the master leases automatically renewed for a new five year period, and that Kroger is required to pay Malease rent for the five year renewal term.  Malease also asserts a claim for unjust enrichment and for the imposition of a constructive trust.  As discussed further below, this claim is related to a contention that Kroger usurped a business opportunity from Malease.  Finally, Malease also asserts a claim against Kroger to recover back rent due for the alleged renewal period of the lease.

Kroger moves for summary judgment on its claims for a declaratory judgment, breach of contract, and unjust enrichment. Kroger also moves for summary judgment on each of Malease's

5

counterclaims.  Malease moves for summary judgment on its
declaratory judgment claim and on its claim for recovery of back
rent.

The subject matter of the Court is based on diversity
of citizenship in that the parties are citizens of different
states and the amount in controversy is in excess of $75,000.

## II.  Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The evidence presented on a motion for summary judgment
is construed in the light most favorable to the non-moving party,
who is given the benefit of all favorable inferences that can be
drawn therefrom.  United States v. Diebold, Inc., 369 U.S. 654
(1962).  "The mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact."  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The
Court will not grant summary judgment unless it is clear that a
trial is unnecessary.  The threshold inquiry to determine whether
there is a need for trial is whether "there are any genuine
factual issues that properly can be resolved only by a finder of

6

fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id.

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477

7

U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. Id.; Anderson, 477 U.S. at 250. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. Id. Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a

8

dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

#### A. Declaratory Judgment Standard

Both parties seek declaratory judgments regarding the validity of Kroger's exercise of the purchase options.  In determining whether a case is appropriate for a declaratory judgment, the trial court traditionally considers five factors: 1) whether the judgment would settle the controversy; 2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; 3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; 4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and 5) whether there is an alternative remedy that is better or more effective. Bituminous Casualty Corp. v. J&L Lumber Co., __ F.3d__, No. 03-5217, 2004 WL 1440861, at *5 (6th Cir. June 29, 2004).

The Court finds that these prerequisites are met in this case.  A declaratory judgment would both settle the controversy between the parties and clarify the legal relations at issue.  This is evidenced by the fact that both parties seek a declaratory judgment on the same clause of the leases at issue. Although there was some initial skirmishing over issues of

9

personal jurisdiction, the Court is satisfied that the case was not filed for purposes of procedural fencing or a race to res judicata.  Clearly, at the time the suit was filed, a full blown controversy had arisen regarding Kroger's exercise or attempted exercise of its purchase options.  The Court is not aware of any related state court proceedings or uncertain questions of state law.  Therefore, a declaratory judgment action will not create friction between federal and state courts.  See id. at *5-*7. Finally, the Court cannot conceive of a better alternative remedy to declaratory judgment in order to resolve the controversy presented here.  Accordingly, the Court finds that it may proceed to rule on the competing claims for a declaratory judgment.

### B. Choice of Law

This is a diversity case, so the Court is required to apply the choice of law principles of the forum state, Ohio. Tele-Save Merchandising Co. v. Consumers Dist. Co., Ltd., 814 F.2d 1120, 1122 (6th Cir. 1987).  In Ohio, where the parties have included a choice of law provision in their contract, the district court should apply the law selected by the parties, unless the application of another state's law is repugnant to Ohio public policy.  Id.  In this case, the leases at issue provide that they shall be governed by the law of the state in which the property is located.  See Doc. No. 42, Ex. A1, at 53 (Lease Art. XXXVIII).  The properties in this case are located in Texas, Tennessee, and Kentucky; thus, the laws of three different states are implicated.  The parties, however, appear to agree

10

that the contractual principles at issue are the same or similar under each state's law and Malease limits itself to discussing Texas law.  The Court, therefore, finds that it would likewise be appropriate to apply Texas law to the interpretation of all three leases.

C. <u>Analysis of Claims</u>

The courts of Texas apply the fairly uniform standards of contract interpretation:

> The question of whether a contract is ambiguous is one of law for the court. <u>The City of Pinehurst v. Spooner Addition Water Co.</u>, 432 S.W.2d 515 (Tex. 1968); <u>Myers v. Gulf Coast Minerals Management Corp.</u>, 361 S.W.2d 193 (Tex. 1962). In the interpretation of contracts the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. <u>Citizens Nat. Bank in Abilene v. Texas & P. Ry. Co.</u>, 136 Tex. 333, 150 S.W.2d 1003 (1941). To achieve this object the Court will examine and consider the entire instrument so that none of the provisions will be rendered meaningless. <u>Southland Royalty Co. v. Pan American Petroleum Corp.</u>, 378 S.W.2d 50 (Tex. 1964); Steeger v. Beard Drilling, Inc., 371 S.W.2d 684 (Tex. 1963). If a written instrument is so worded that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. On the other hand, a contract is ambiguous only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of the two meanings is the proper meaning. <u>Universal C.I.T. Credit Corp. v. Daniel</u>, 150 Tex. 513, 243 S.W.2d 154 (1951); <u>Lewis v. East Texas Finance Co.</u>, 136 Tex. 149, 146 S.W.2d 977 (1941). If after applying the established rules of interpretation, a written instrument remains reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the instrument.

<u>R&P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.</u>, 596 S.W.2d 517, 518-19 (Tex. 1980).

11

The facts underlying this case, as noted, are undisputed: Kroger purchased Associates' fee simple interests in the subject properties before the time it could have exercised its purchase options under the leases; Kroger provided Malease with notice of its intent to exercise its purchase options which, disregarding for a moment Kroger's direct purchase of the fee simple interests, complies with the leases; Malease has refused to convey its leasehold interests to Kroger.  The question presented is what is the effect, if any, of Kroger's direct purchase of the fee simple interests from Associates on its ability to exercise the purchase options?

In examining the leases at issue, the Court observes that nothing in them prevents the lessee from acquiring any fee interest in the properties in advance of the time that it could otherwise have exercised the purchase options.  A purchase option only imposes a mandatory duty on the lessor to sell the property if the lessee provides proper notice of its intent to purchase the property.  See Sinclair Refining Co. v. Allbritton, 218 S.W.2d 185, 188 (Tex. 1949) ("[I]n the usual case, whatever the practical object of the notice requirement, the act of delivering notice, if performed within the time limit and not otherwise invalid, forthwith converts the option into a contract of purchase and sale.").  A purchase option is not, however, a restriction or limitation on the parties' ability to reach an agreement to convey the property at an earlier time.

12

Moreover, although certainly an exercise in metaphysics, nothing legally precludes Kroger, as lessee of the properties, from giving Kroger, as fee simple owner of the properties, notice of its intention to exercise the purchase options. As Kroger correctly points out, the leases contain a "no merger of title" clause which specifically recognizes that different property interests may reside in the same person or entity without merging. See Doc. No. 42, Ex. A1, at 49 (Lease Art. XXXI). Indeed, under Texas law, the doctrine of merger of titles is disfavored, particularly where it is the intention of the parties that it should not apply. Montgomery v. Browder, 930 S.W.2d 772, 781 (Tex. Ct. App. 1996). Therefore, Kroger the lessee could properly exercise the purchase options against Kroger the fee simple owner of the properties.

Malease, however, contends that the Two Party Agreements contemplate a simultaneous conveyance of the fee simple interests and leasehold interests in the event the purchase options are exercised. The Court notes, however, that the Two Party Agreements are only between the fee holder and the master lessee and do not impose any obligations on Kroger as the lessee of the properties. As Kroger again properly points out, the recitals to the Two Party Agreements specifically recognize that "Article XXXV of the Occupancy Lease grants the Occupancy Tenant a purchase option which the Master Lessee may not reject[.]" Doc. No. 42, Ex. H1, Two Party Agreement, at 2 (emphasis added). Thus, under the Two Party Agreement, Malease

13

had no choice but to convey its leaseholds to Kroger upon its exercise of the purchase options. Moreover, to the extent that the Two Party Agreements contemplate that any actions be taken simultaneously, it compels a simultaneous <u>sale and conveyance</u> of the fee and leaseholds, but do not on their face require a simultaneous <u>exercise of the options by the lessee</u>. <u>See</u> <u>id.</u> at 9. Moreover, because a purchase option generally exists for the benefit of the optionee, or option holder, <u>Sinclair Refining</u>, 218 S.W.2d at 188, a decision to forego simultaneous conveyance of titles, to the extent that provision might be construed to bind Kroger in some way, works no detriment to Malease because the only thing it can do is convey its leasehold.

Malease cites a number of Texas cases for the proposition that an optionee must strictly comply with terms of the option in order to validly exercise the option. <u>See</u> Doc. No. 45, at 13. As far as it goes, this is undoubtedly a correct statement of the law. Malease overlooks, however, that as to Malease, Kroger did strictly comply with the terms of the options by providing notice of its intent to exercise the options prior to the deadline established by the leases. As noted earlier, the Two Party Agreement does not require simultaneous exercise of the options, only a simultaneous conveyance of titles in the event the options are exercised. Therefore, these cases do not in fact support Malease's argument against the validity of Kroger's exercise of the options.

14

Malease also argues that actions Kroger took before it formally notified Malease that it intended to exercise the purchase options indicates that Kroger did not believe that it still had valid purchase options after acquiring the fee simple interests from Associates. Specifically, Malease points to evidence that Kroger enlisted the services of a broker named James Price, who also happened to be a friend of Malease president Lawrence Kadish, to approach Malease about acquiring Malease's leaseholds prior to the time Kroger could have otherwise exercised the options. To Malease, this action signals that Kroger did not actually believe that it had valid purchase options after acquiring the Associates fee interest.

Malease also contends that Price was in fact a double agent and that he did not disclose to Kadish that he was working on behalf of Kroger. Kadish claims that he was confiding to Price his plans to acquire the Associates fee interests for himself and that Price was then feeding this information to Associates and Kroger to be used against him. Thus, Kadish contends that Kroger and Associates cheated him out of a business opportunity to further convey the fee interest to another third party at a substantial profit. This contention is evidently the basis for Malease's unjust enrichment claim. The Court respectfully disagrees with both of these contentions, however.

With regard to the first argument, the Court does not believe that Kroger's offer to buy out Malease's leasehold interests early signals a belief that it no longer possessed

15

valid purchase options.  First, it is apparent both on this record and from reading the various agreements that there were few if any restrictions on alienating the properties or the various estates that comprised the bundle of property rights.  Indeed, it was the absence of restrictions on alienation that permitted the bundle of rights to be parsed out and transferred among the various entities and which allowed the parties to establish the tax shelter they were seeking.  In fact, it is clear that in planning to acquire Associates' fee interests for himself, Kadish too was relying on the fact that the property interests were freely transferrable among the parties.  Moreover, the anti-merger clause of the lease also contemplates that various estates could, and indeed might, reside in the same person or entity.  Finally, the Court notes that Texas law permits parties to agree to modify their agreement, including by oral modification, even where the agreement contains a no oral modifications clause.  Group Hosp. Serv., Inc. v. One and Two Brookriver Center, 704 S.W.2d 886, 899 (Tex. Ct. App. 1986).  Thus, the Court does not believe an offer to purchase from Kroger, which otherwise might operate as a modification to the underlying agreement if accepted by Malease, is an admission that the purchase options were invalid as a result of Kroger's acquisition from Associates of its fee interests.

Malease's second contention, that Price, Kroger, and Associates swindled Kadish out of a business opportunity, rests on several faulty assumptions, even assuming that Price was a

16

turncoat agent. The first faulty assumption is that Kadish would
have in fact been able to acquire Associates' fee interests
absent Price and Kroger's alleged treachery. Nothing, however,
compelled Associates to sell its interests to Kadish. Although
Kadish assumes that he was the logical buyer of the properties
because of his familiarity with the structure of the
transactions, obviously the ease with which the property
interests could be transferred did not preclude the possibility
that Associates could have found a buyer other than Kadish. The
second and more obvious flaw in this argument is that, assuming
that Kadish would have been able to acquire Associates' fee
interests, he still would have owned the fee interests subject to
Kroger's purchase options. Thus, Kadish had no guarantee that he
would have been able to convey the properties to a third party
even had he acquired Associates' interests. Finally, to the
extent that any of this alleged bad faith or double-dealing is
relevant, it did not deprive Kadish of the benefit of any of
these bargains. The benefit of the agreements to Malease was the
revenue stream of the lease payments, always subject, however, to
Kroger's option to purchase the properties out from under it.
The benefit of the bargain was not, however, that Kadish would be
able to parlay an inherent and recognized weakness in the
structure of the transactions[2] into further profit for himself.

---

    [2]    The inherent weakness in the transactions was that at
some point in the life of the leases, the tax liabilities would
be greater than the revenue stream produced by the leases. See
Kadish Dec. (Doc. No. 46) ¶¶ 20-21. Thus, at the point where the

Although Kadish claims that the simultaneous conveyance provisions of the Two Party Agreements was intended to give him an edge over Kroger in acquiring the fee interests from Associates, the fact of the matter is that his actual ability to take advantage of this alleged advantage was always speculative. Therefore, what Kadish believed to be the intent of the simultaneous conveyance clause is not relevant.

Furthermore, because Malease's ability to purchase the Associates fee interests is in fact entirely speculative, Malease's unjust enrichment and constructive trust claims are untenable. A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. <u>Heldenfels Bros., Inc. v. City of Corpus Christi</u>, 832 S.W.2d 39, 41 (Tex. 1992). Because Kadish's ability to acquire Associates' fee interests was speculative, Kroger did not obtain a benefit that rightfully belonged to Malease. Therefore, the record does not support a claim for unjust enrichment. Accordingly, Kroger's motion for summary judgment Malease's claims for unjust enrichment and the imposition of a constructive trust is well-taken and is **GRANTED**.

Accordingly, for the reasons stated, Kroger's motion for summary judgment on its prayer for a declaratory judgment is well-taken and is **GRANTED**. Malease's motion for summary judgment

---

transaction "crossed the line," it behooved the partnership to divest itself of the property. <u>Id.</u>

on its prayer for a declaratory judgment is not well-taken and is **DENIED**. The Court finds that Kroger gave timely notice to Malease of its intent to exercise its purchase options under the subject leases and that its exercise of the purchase options was valid. The Court finds that Kroger has not committed any material breaches of its obligations under the leases by directly purchasing Associates' fee interests in the subject properties. The Court further finds that Malease is therefore compelled under the leases to sell its leasehold interests in the subject properties to Kroger. Finally, the Court finds that Malease has breached its obligation to convey the subject leaseholds to Kroger upon proper exercise of the purchase options. Because Kroger validly exercised its purchase option, it is also entitled to judgment on Malease's claim that the lease agreements automatically renewed and Malease's claim that it is entitled to back rent. Therefore, Kroger's motion for summary judgment on these two aspects of Malease's counterclaim is well-taken and is **GRANTED**. The Court also concludes that as a result of this decision, rent payments paid into escrow by Kroger should be returned to Kroger. Accordingly, the Clerk of Court is **DIRECTED** to return Kroger's escrow payments forthwith. <u>See</u> <u>e.g.</u> Doc. Nos. 24 & 42.

The Court also believes that the above findings compel a conclusion that summary judgment is appropriate on Count II of Kroger's complaint, which seeks specific performance of the purchase options, and Count III of Kroger's complaint, which

19

claims that Malease breached its obligation to convey the leases to Kroger upon exercise of the purchase option. Accordingly, Kroger's motion for summary judgment on Counts II and III of the complaint is well-taken and is **GRANTED**.

Although Kroger also moved for summary judgment on its unjust enrichment claim, it did not otherwise address this claim in its brief. Therefore, Kroger has failed to demonstrate the absence of any material fact on this claim which would entitle it to judgment. Accordingly, Kroger's motion for summary judgment on its unjust enrichment claim is not well-taken and is **DENIED**.

On a related topic, however, as explained above, Malease's unjust enrichment and constructive trust claims are based on an entirely speculative set of circumstances. Accordingly, Kroger's motion for summary judgment on these claims is well-taken and is **GRANTED**.

Finally, although Kroger moves for summary judgment on the issue of its damages. The Court believes that a more appropriate course is to set the matter for trial on the issue of damages. Accordingly, the Court directs the case administrator to set this matter for trial on the issue of damages at the earliest practicable time.

**IT IS SO ORDERED**

Date _July 27, 2004_        ___s/Sandra S. Beckwith___
                            Sandra S. Beckwith
                         United States District Judge

20