# H

Case 1:02-cv-00439-SSB-TSB    Document 54-9    Filed 09/16/2004    Page 1 of 18

Page 1

1            UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF OHIO
3                 WESTERN DIVISION

**COPY**

4                      - - -

5   THE KROGER CO.,              :
6            PLAINTIFF,:
7   -VS-                          : CASE NO.:  C-1-02-439
8   MALEASE FOODS CORP.,          :
9            DEFENDANT.:
10                     - - -

11        Deposition of JONATHAN D. LIBBERT, CPA,
12   CFE, a witness herein, taken by the defendant as
13   upon cross-examination pursuant to the Federal
14   Rules of Civil Procedure, and pursuant to agreement
15   and stipulations hereinafter set forth at the
16   offices of Frost, Brown & Todd, LLC, 2200 PNC
17   Center, 201 East Fifth Street, Cincinnati, Ohio at
18   1:48 p.m. on Wednesday, March 3, 2004, before
19   Britney L. Fisher, a notary public within and for
20   the State of Kentucky.
21                     - - -
22
23
24

```
 1    APPEARANCES:
 2       On behalf of the Plaintiff:
 3              Douglas R. Dennis, Esq.
 4                    and
 5              Scott D. Phillips, Esq.
 6                 of
 7              Frost, Brown & Todd, LLC
 8              2200 PNC Center
 9              201 East Fifth Street
10              Cincinnati, Ohio   45202
11       On behalf of the Defendant:
12              Robert W. Cinque, Esq.
13                 of
14              Cinque & Cinque, P.C.
15              845 Third Avenue
16              New York, New York   10022
17                       -  -  -
18                 S T I P U L A T I O N S
19         It is stipulated by and between counsel
20   for the respective parties that the deposition of
21   JONATHAN D. LIBBERT, CPA, CFE, a witness herein,
22   may be taken as upon cross-examination pursuant to
23   the Federal Rules of Civil Procedure, and pursuant
24   to agreement; that the deposition may be taken in
```

1  stenotypy by the notary public-court reporter and
2  transcribed by her out of the presence of the
3  witness; that the jurisdiction of the notary
4  public-court reporter is waived; and that the
5  transcribed deposition is to be submitted to the
6  witness for his examination and signature, and that
7  signature may be affixed out of the presence of the
8  notary public-court reporter.
9                          - - -
10                       I N D E X
11 WITNESS                              CROSS-EXAMINATION
12 Jonathan D. Libbert, CPA, CFE                4
13                         - - -
14                      E X H I B I T S
15 DEPOSITION EXHIBITS                          MARKED
16 Y, report of Mr. Libbert.                      5
17                         - - -
18
19
20
21
22
23
24

1                                    (Witness sworn.)
2              JONATHAN D. LIBBERT, CPA, CFE
3  of lawful age, a witness herein, being first duly
4  sworn as hereinafter certified, was examined and
5  deposed as follows:
6                     CROSS-EXAMINATION
7  BY MR. CINQUE:
8         Q.    Mr. Libbert, who engaged you on
9  behalf of Kroger?
10        A.    The law firm of Frost, Brown & Todd.
11        Q.    Which person in the law firm?
12        A.    It's been a while, I believe it may
13 have been Mr. Phillips.
14        Q.    Is this the first time you've done
15 any work with Mr. Phillips' law firm?
16        A.    No.
17        Q.    How many times have you done work
18 with the Frost, Brown firm?
19        A.    Probably four or five times.
20        Q.    And you're receiving a fee of $175
21 per hour; is that correct?
22        A.    Yes, at the time I was engaged.  We
23 update that the first of the year each year.
24        Q.    Well, how much?

1      A.    $190.

2      Q.    Bargain.  How much have you billed so
3  far?

4      A.    It's been pretty minimal.  I didn't
5  bring the billing records, but my guess would be
6  six, eight hours.

7      Q.    And in connection with the
8  preparation of your report, which I happen to have
9  here, we'll mark that as our next exhibit.
10  (Deposition Exhibit Y was marked for
11  identification.)
12  BY MR. CINQUE:

13      Q.    Okay.  This is your report, correct?
14      A.    Yes.
15      Q.    Who typed it?
16      A.    I did.
17      Q.    So that's your Word processor?
18      A.    Yes.
19      Q.    All right.  And did you review any
20  documents in connection with this report?
21      A.    Yes.
22      Q.    Okay.  What did you look at?
23      A.    Well, it's stated right here in my
24  report I reviewed the complaint, the sale lease

1    back document, and that there were other items that
2    were furnished to me.
3                (Mr. Phillips left the room.)
4        Q.   Okay.  Now, you state here on the
5    second page or the page with your opinions if the
6    lease for the San Marcos property had been renewed
7    under normal business conditions, basically the
8    rent would have been substantially higher, et
9    cetera.  Do you see that?
10       A.   Yes.
11       Q.   Did you review the lease?
12       A.   I believe I did.
13       Q.   You believe you did or did you?
14       A.   Well, there's a complete copy of my
15   file that's here, we can look at the file.
16       Q.   I want to know what you remember?
17       A.   I believe that I did.
18       Q.   Okay.  And what did you determine
19   when you reviewed the lease with respect to this
20   finding?
21       A.   There was what I call the original
22   sublease under the renewal for that sublease, that
23   the monthly rent was a little bit over $8,200 per
24   month.

1    Q.    Okay. And, therefore, what did you
2    conclude?
3    A.    That beginning April 1st of 2003
4    there was an additional agreement between Kroger
5    and the H.E. Butt Company that provided for the
6    payment of $48,125 per month.
7    Q.    Okay. So that's almost a reduction
8    of 50 percent, correct?
9    A.    It's probably about 40 percent.
10   Q.    Okay.
11   A.    I think it's closer to 50, but my
12   arithmetic may be wrong.
13   Q.    And what was the reason for that
14   reduced rent?
15   A.    It was my understanding that this was
16   in recognition of, I'll call it, the deal to sell
17   the property not being able to be closed.
18   Q.    What's the basis of your
19   understanding.
20   A.    The basis was conversations with
21   people from Kroger.
22              (Mr. Phillips entered the room.)
23   Q.    Which people?
24   A.    Primarily Ed Waldvogel.

```
 1              Q.    What did he tell you?
 2              A.    He told me that was the reason why
 3   they reduced the rent.
 4              Q.    What did he say?
 5              A.    I think I just answered that.
 6              Q.    You can answer it again.  I don't
 7   know that I heard your answer entirely, but go
 8   ahead.
 9              A.    He said that's the reason the rent
10   was reduced, because as it states right here on the
11   document failure -- decrease in rent due to failure
12   to close.
13              Q.    So you're basing your opinion on
14   information that Waldvogel gave you; is that
15   correct?
16              A.    Well, I did review the documents
17   myself as well.
18              Q.    Okay.  And did your review of the
19   documents furnish you with any information that you
20   used in your conclusion?
21              A.    Well, it was a result of all of the
22   work that I've done, both the conversation and the
23   review of the documents.
24              Q.    Okay.  Is there anything in the
```

```
 1   document that led you to believe that the reason
 2   the rent was reduced was dependency of the
 3   transaction?
 4            A.   I would have to go back and look at
 5   the document.
 6            Q.   Go ahead.
 7                 THE WITNESS:  Do we have it here?
 8                 MR. PHILLIPS:  Yeah.
 9                 THE WITNESS:  Are these the
10   documents from my file?
11                 MR. DENNIS:  I think so.
12                 THE WITNESS:  I don't see the
13   document I'm looking for here.
14                 (Mr. Phillips left the room.)
15   BY MR. CINQUE:
16            Q.   What document are you looking for?
17            A.   I'm looking for the document that was
18   the agreement effective April 1st, 2003.
19            Q.   Is that something that you looked at
20   to form the basis for your conclusion about the
21   reduction in rent?
22            A.   That was one of the documents that I
23   looked at, yes.
24            Q.   You don't have it here?
```

1    A.    I don't see it here.
2    Q.    Okay.  The annual threshold rate that
3  you reflect on your report, did you put those
4  quotations around threshold?
5    A.    Yes.
6    Q.    Why did you do that?
7    A.    That's the terminology that Mr.
8  Waldvogel used.
9    Q.    What does it mean?
10   A.    Well, it can mean a couple of
11 different things.
12   Q.    What did it mean to you in your
13 report?
14   A.    The rate that was used here was an
15 attempt to kind of hit the middle ground between
16 what Kroger would use when they invested the money
17 to build new properties, and the rates that they
18 were paying on current debt.
19   Q.    Twelve percent, is that what you're
20 saying?
21   A.    That's the number that's on this
22 piece of paper.
23   Q.    I'm trying to understand.  Explain
24 the relationship between the so-called threshold

```
 1   rate and any calculations to which it applies?
 2         A.   Well, once again, the 12 percent is
 3   sort of the middle ground between what Kroger
 4   normally would achieve in investing new money,
 5   which I believe is around 18 percent.
 6         Q.   So you're basing your conclusion on
 7   the fact that invariably when Kroger has money to
 8   invest, it earns a yield of what?
 9         A.   Well, they have told me it was 18
10   percent.
11         Q.   Did you do anything to independently
12   verify that?
13         A.   Not at this time.
14         Q.   Okay.  Now, you use the figure $11
15   million, do you see that?
16         A.   Yes.
17         Q.   Where did you get that figure?
18         A.   I believe that was from a document
19   for the sale of that property.  I believe there
20   were three different properties in the sale
21   agreement, and each price was spelled out
22   separately.
23         Q.   Did somebody give you that number or
24   did you find it somewhere?
```

1         A.    I think both.  I think somebody gave
2    it to me and it was in the documents.
3         Q.    And who's that someone, Waldvogel?
4         A.    Yes.
5         Q.    Now, the $11 million figure, what
6    does that represent?
7         A.    I was told that was the selling price
8    of the warehouse in San Marcos, Texas.
9         Q.    Did you factor in any income tax
10   consequences in any of these calculations?
11        A.    No.
12        Q.    So the way you did this is you
13   assumed that, if it sold for $11 million, Kroger
14   would have the $11 million available for
15   investment; is that correct?
16        A.    Yes.
17        Q.    Why didn't you consider income tax
18   consequences?
19        A.    I didn't think it was appropriate.
20        Q.    And what made you not think it was
21   appropriate?
22        A.    If Kroger had been able to sell this
23   warehouse when they thought they were going to,
24   they would have had the $11 million in cash.  And

1   they would have been able to invest that money or
2   to pay off the existing debt.
3         Q.   And when was this money to be
4   available to Kroger as you've just described it?
5         A.   I believe it would have been some
6   time around April 1st of 2003.
7         Q.   And we're sitting here in the
8   beginning of March of 2004, are there any income
9   tax consequences involved in the receipt of that
10  $11 million, as you sit here today?
11        A.   I'm not a tax expert, but I'm sure
12  there would be.
13        Q.   Okay.  You didn't factor in anything
14  for income tax one way or the other, correct?
15        A.   That's correct.
16        Q.   In your experience has Kroger ever
17  lost any money on any investment its ever made?
18        A.   I've never had any previous dealings
19  with Kroger.
20        Q.   So what is your assumption then that
21  Kroger would have earned how much on $11 million,
22  is it 12 percent?
23        A.   Yes, it is.
24        Q.   Okay.  And that's based simply upon

1   the discussion you had with Waldvogel, correct?
2        A.   Primarily, yes.
3            MR. CINQUE:  All right.  That's all
4   I have for the witness.
5            MR. DENNIS:  Okay.
6            MR. CINQUE:  Thank you.
7
8
9
10
11           JONATHAN D. LIBBERT, CPA, CFE
12                    -  -  -
13         DEPOSITION CONCLUDED AT 2:03 P.M.
14                    -  -  -
15
16
17
18
19
20
21
22
23
24

1                C E R T I F I C A T E

2   STATE    OF   KENTUCKY:

3                          :  SS

4   STATE AT LARGE         :

5        I, BRITNEY L. FISHER, the undersigned, a duly

6   qualified and commissioned notary public within and

7   for the State of Kentucky, do hereby certify that

8   before the giving of his aforesaid deposition, the

9   said JONATHAN D. LIBBERT, CPA, CFE was by me first

10  duly sworn to tell the truth, the whole truth and

11  nothing but the truth; that the foregoing is the

12  deposition given at said time and place by the said

13  JONATHAN D. LIBBERT, CPA, CFE; that said deposition

14  was taken in all respects pursuant to agreement;

15  that said deposition was taken by me in stenotypy

16  and transcribed by computer-aided transcription

17  under my supervision; that the transcribed

18  deposition is to be submitted to the witness for

19  his examination and signature; that I am neither a

20  relative of nor attorney for any of the parties to

21  this cause, nor relative of nor employee for any of

22  their counsel, and have no interest whatever in the

23  result of the action.

24

Page 16

1        IN WITNESS WHEREOF, I hereunto set my hand
2   and official seal of office at Cincinnati, Ohio,
3   this           day of                  , 2004.
4
5
6
7   MY COMMISSION EXPIRES:    BRITNEY L. FISHER
8   JULY 3, 2005.             NOTARY PUBLIC-STATE OF
9                             KENTUCKY
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 17

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION
                        -   -   -
 3    THE KROGER CO.,             :
              PLAINTIFF,:
 4      -VS-                      : CASE NO. C-1-02-439
      MALEASE FOODS CORP.,        :
 5            DEFENDANT.:
                        -   -   -
 6
           Britney L. Fisher, a court reporter, first
 7    duly cautioned and sworn, testifies and affirms
      that JONATHAN D. LIBBERT, CPA, CFE, a witness
 8    herein, was notified that the transcript was ready
      for review and signature on Wednesday, March 17,
 9    2004 2004, by forwarding a copy of the transcript
      to Mr. Scott Phillips, Esq.
10
           Within thirty-one days (pursuant to Rule
11    (30)E of the Federal Rules of Civil Procedure),
      JONATHAN D. LIBBERT, CPA, CFE, a witness herein,
12    did not present signature of said deposition.
13         The original transcript is now being
      tendered into the hands of Mr. Robert W. Cinque,
14    Esq.
15         Further affiant sayeth naught.
16
                         _____
17                       Britney L. Fisher
18    Sworn to me and subscribed in my presence this
           day of                  , 2004.
19
20                       _____
                         Pamela Sue Spangler
21                       Notary Public: State of Ohio
                         My commission expires:
22                       April 29, 2007
23
24
```