I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Kroger Co., | : | Case No.: 0-1-02 439 |
| | : | |
| Plaintiff, | : | Judge Beckwith |
| | : | |
| v. | : | MALEASE FOODS CORP.'S CROSS- |
| | : | MOTION FOR SUMMARY JUDGMENT |
| Malease Foods Corp., formerly | : | AND MEMORANDUM IN SUPPORT |
| known as Malese Foods Corp., | : | |
| | : | |
| Defendant. | : | |

Malease Foods Corp. ("Malease") submits this cross-motion in opposition to the Kroger motion for summary judgment on its counterclaim and in support of Malease's request for a declaratory judgment that Kroger failed to exercise certain purchase options strictly in accordance with their terms and therefore by reason of Article XX of the Master Lease and the failure of Kroger to give at least 330 days notice prior to expiration the Leases for each of the three sites are automatically renewed, and Kroger is now obligated to pay rent until at least April of 2008.

Malease requests equitable relief of a declaratory judgment and a reference of this matter for a hearing on the amount of its damages.

This cross-motion for summary judgment is supported by the attached declaration of Lawrence Kadish, President of Malease who was directly involved in the negotiation and preparation of the 1983 documents which give rise to this dispute together with the attached

memorandum in support, deposition testimony, exhibits and expert report.

Respectfully submitted,

_____

R. Gary Winters 0018680
Attorneys for Defendant
McCASLIN, IMBUS & McCASLIN
Suite 900 Provident Bank Building
632 Vine Street
Cincinnati, Ohio 45202-2442
Telephone No.: 513-421-4646
Telefax No.:    513-421-7929
Email:    RGWinters@mimlaw.com

Of Counsel:

Robert W. Cinque, Esq.
CINQUE & CINQUE, P. C.
845 Third Avenue
New York, New York 10022
Telephone No.: 212-759-5515
Telefax No.:    212-759-7737
Email:          CINQUE845@aol.com

## MEMORANDUM IN SUPPORT

**I.    Summary**

This cross-motion is predicated upon the undisputed failure of Kroger to comply with the terms of an option to purchase the interests of Malease as Master Lessee of the three sites involved in the dispute. The plain language of the operative documents shows that in order to be effective, Kroger's option exercise had to occur simultaneously with its acquisition of the Balkhouse Partnership's interest in the premises as well as that of the Master Lessee.

Submitted herewith is the declaration of Lawrence Kadish, the President of Malease who was directly involved in the negotiation of the option provision at issue. As Mr. Kadish explains, it was the clear intent of the parties that there was a single option to purchase the interests of both Balkhouse and Malease and in order to be effective, both property rights were to be transferred simultaneously.

In this case, Kroger exercised an option to purchase the Balkhouse interests only the closing of which occurred on July 24, 2001. Under the operative agreements, Kroger was not entitled to acquire either the Balkhouse or the Malease interests in the sites until April 2, 2003. Knowing that there were substantial tax savings and related economic advantages to an early purchase, Kroger decided to acquire the Lease Properties outside the terms of the options some two years before its right to do so arose. In order to accomplish this, Kroger conducted a negotiation with Balkhouse for a Modification Agreement which led to an early purchase. While Kroger was perfectly free to do the same with Malease, it chose to forego the opportunity.

In recognition of the fact that it no longer had an enforceable option to purchase the Malease interest under the terms of the operative agreements, Kroger and its agent Jim Price embarked upon a plan and scheme to have Price use his long standing friendship and relationship of trust and confidence with Kadish to persuade him to sell the Malease interest outside the scope of the option.

3

In order to accomplish this goal, Kroger and Price provided Kadish with false documentation which they then attempted to conceal and suppress during the discovery phase of this lawsuit. In addition, Price deliberately gave false and evasive answers during his deposition concerning his true role in the attempt to deceive Kadish.

On this motion, Malease seeks summary judgment declaring that by failing to act strictly in accordance with the terms of the option, Kroger has forfeited the right to purchase the interest of Malease as Master Lessee, and the operative leases continue in full force and effect.[1]

## II.    Undisputed Facts

The rights, duties and obligations of Balkhouse Properties, Balkhouse Associates, Kroger and Malease under each of the Occupancy Leases (Kroger Ex. A) and related Two-Party Agreements (Kroger Ex. H) could not be modified or changed without their written consent. This is especially true of the exercise of the Purchase Option embodied in paragraph XXXV of the Occupancy Leases which provides:

> 35. Lessee's Purchase Option.  Provided no Event of Default has occurred which has not been waived on or prior to April 1, 2003, or the date of expiration of any renewal term hereof for which Lessee has exercised its renewal option, as the case may be, and provided further, that this Lease is in full force and effect on such date, on the day following the expiration date of the Fixed Term or of any renewal term of this Lease for which Lessee has exercised its option, Lessee may, at its option, upon at least three hundred sixty (360) days' prior notice to Lessor, purchase the Leased Property on such date for an amount equal to the fair market value thereof determined without regard to this Lease established by appraisal as set forth in Article XXXVI.  Any such purchase shall be completed in the manner provided in Article XIX.

---

[1]    Should the Court grant Malease's motion, then Malease respectfully requests that an inquest be held to determine the amount of rent and other monetary damages owed by Kroger to Malease.

The Leased Property is defined in each of the Occupancy Leases as "all of the Lessor's rights and interest" in the particular parcel involved.

The provisions concerning the Purchase Option embodied in each of the Occupancy Leases are wholly consistent with and must be read in conjunction with the Two-Party Agreements between Malease in its capacity as "Master Lessee" and Balkhouse Associates (to be distinguished from Balkhouse Properties - the lessor under the Kroger Occupancy Lease) which at paragraph 3 provides in relevant part:

> 3.  If Purchase Option Exercised.  If a Purchase Option is exercised pursuant to Article XXXV of the Occupancy Lease, Partnership shall be obligated to sell and convey Partnership's Interest in the Premises to Occupancy Tenant simultaneously with the sale of the Master Lessee's Interest in the Premises to Occupancy Tenant by the Master Lessee....

Kroger failed to exercise the Purchase Option provided for in the Lease strictly in accordance with the terms of the Agreements among Malease, Balkhouse Associates and Balkhouse Properties as required by applicable law.  For example, paragraph 3 of the Two-Party Agreement specifically provides that a valid exercise of a Purchase Option must occur "simultaneously with the sale of the Master Lessee's [Malease's] Interest in the Premises to Occupancy Tenant [Kroger] by the Master Lessee."

Rather than exercise the Purchase Option which, regardless of when exercised, could not cause the purchase to be consummated prior to April 2, 2003, and acquire the Leased Properties in accordance with the provisions of the various governing agreements, on July 24, 2001 Kroger purported contemporaneously to enter into a series of transactions with Balkhouse Associates. Kroger purchased Balkhouse Associates' interest in each of the Leased Properties, together with an assignment of the Landlord's interest in the Master Lease and in each of the Two Party Agreements.  That made Kroger both the tenant and the landlord of Defendant.  Malease was not notified of the contemplated transaction nor was it given copies of any of the operative documents.

As alleged in paragraph 25 of the complaint (Kroger Ex. K), despite the fact that Kroger had secretly purchased the three Leased Properties and the Landlord's interest in the Master Lease, Kroger again attempted to exercise "all of the Kroger Purchase Options" on February 18, 2002 and unilaterally "informed Defendant Malease of the contractually determined purchase

price to be paid by Kroger to Defendant Malease" (Complaint 25, Ex. 1). By notice dated March 14, 2002, Malease rejected Kroger's attempted exercise of the Purchase Options. In relevant part, Malease's notice of rejection informed Kroger that:

> By your actions in purchasing these properties, and without regard to and outside the scope of the Purchase Options, and in disregard of the interests of Malese Foods Corp., you negated and repudiated and rendered the Purchase Options meaningless, null and void. We regard your purported exercise of these Purchase Options as no more than an attempt to avoid the consequences of your actions in previously purchasing the properties, and to frustrate the rights and options of Malese Food Corp. (as Assignee) Tenant under the Leases dated as of April 1, 1983 ("Master Leases").

(Complaint 27, Ex. 2).

As explained in detail in the Kadish declaration, at all relevant times, it was the intent of the parties that if a Purchase Option were exercised in accordance with paragraph 3 of the Two-Party Agreement as provided in Article XXXV of the Occupancy Lease, then in order to be valid, such a transaction had to occur simultaneously with the sale of the Master Lessee's Interest in the premises to the Occupancy Tenant by the Master Lessee, i.e., Malease, and had to cover the entire estate owned by Balkhouse Properties Corp. at the time of the creation of the Operating Lease, to wit: the combined estate owned by both Plaintiff and Defendant.[2] Moreover, in order to be effective, the Purchase Option must have been exercised strictly in accordance with the notice and timing provisions which were conditions precedent to a valid exercise of the option.

Kroger failed to comply with the terms of the provisions of the various documents and has, therefore, repudiated, abrogated, waived and forfeited its Purchase Option.

As in the case of its dealings with Balkhouse, had Kroger sought to modify the option to accelerate its purchase of the Malease interest, the written consent of Malease would have been required since this represented a modification or alteration of the terms of the Occupancy Leases and the Two-Party Agreements. Such consent was never requested or obtained and could not

---

[2] Kadish was directly involved in the negotiation and consummation of the 1983 transactions and has personal knowledge. None of the Kroger personnel involved has submitted any declaration to rebut Kadish's statements.

have been obtained, because at the time Malease was in negotiation with Balkhouse to purchase the fee interest in the subject properties..

Believing that Price was his friend and confidant, Kadish disclosed all of the confidential details of his attempted negotiation with Balkhouse. As discovery in this action has now shown, unbeknownst to Kadish and in breach of that relationship of trust, Price was secretly working as Kroger's exclusive agent and attempting to help Kroger acquire the very same Balkhouse interests.

Malease was in negotiations with Balkhouse for the purchase of the Balkhouse estate in the Leased Properties before Kroger acquired them on July 24, 2001. In fact, Malease entered into a written agreement ("Agreement Related to Sublease") for the sale of the San Marcos, Texas property to H. E. Butt Grocery Company (the occupant of the Leased Property under a sublease from Kroger - hereinafter "Butt," Kadish Dec. Ex. A) if Malease were to acquire such Leased Property from Balkhouse. Butt approached Malease concerning such Leased Property at the time it was in negotiations with Balkhouse for the purchase of the Leased Properties. Kroger did not acquire the Balkhouse estates pursuant to the options contained in Article XXXV of the Leases (a) because under such Article, Kroger could not acquire such estates earlier than April 2, 2003, and (b) because Kroger did not pay the fair market value for such purchase. Malease was demonstrably prepared at such time to pay substantially more for the Balkhouse estates, particularly in the face of its agreement to resell the San Marcos, Texas property to Butt. Malease acted to its monetary detriment in reliance on the fact that the Kroger could not exercise the purchase options so as to cause the sale of each of such Leased Properties prior to April 2, 2003.

The Agreement Related to Sublease dated as of November 15, 1999, between Malease and Butt, expressly provided at Section 4(b) as follows:

> (d)  HEB shall not at any time prior to April 1, 2003 exercise any right or direct the exercise by Kroger or any other person or entity of any right that would interfere with or prevent the purchase of the Premises by Malese and the exercise or performance by Malese of its rights or obligations under this Agreement; provided, however, nothing in this sentence contained shall limit the right of HEB to acquire the Premises from Malese pursuant to the terms of this Agreement. In the event either (A) Malese acquires the Premises or enters into a contract of sale to acquire fee title to the Premises at any time prior to November 1, 2001, but (i) Malese

does not require HEB to purchase the Premises from Malese, and (ii) HEB does not require Malese to sell the Premises to HEB, in either instance, pursuant to this Agreement, or (B) Malese fails to acquire fee title to the Premises or fails to enter into a contract of sale to acquire fee title to the Premises, in either case prior to November 1, 2001, then and in either such event, nothing contained herein shall impair the rights of HEB to exercise the Purchase Option (as hereinafter defined) or to enter into negotiations and to acquire the Premises at any time on or after November 1, 2001.

By Agreement Regarding Additional Facility dated as of November 1, 1999, among Balkhouse, Malease, Kroger and Butt (Kadish Dec. Ex. B), the parties (other than Butt) (i) consented to Butt's construction on the San Marcos, Texas property of an Additional 268,000 square foot Warehouse Facility, subject to Butt's duty to comply with the provision of Article 16 of the Sublease to Butts, governing construction of additions and alterations; (ii) confirmed to Butt that the Occupancy Lease was in effect and there were no existing defaults by Lessee under the Occupancy Lease, and (iii) agreed to modify the Lease as follows:

5. **MODIFICATION OF OCCUPANCY LEASE**

The Occupancy Lease is hereby modified and supplemented, effective as of the date hereof, by adding the following at the end of Article XXXV:

Notwithstanding anything to the contrary contained herein, and solely for purposes of this Article XXXV and Article XXXVI of this Lease if the Additional Warehouse Facility is constructed, the fair market value of the Leased Property shall be an amount equal to the greater of:

(i) the appraised value (as determined by Article XXXVI below) of the Leased Property, determined as if the Additional Warehouse Facility (as defined below) did not exist and had never been erected on the Land, and

(ii) the appraised value (as determined by Article XXXVI below) of the Leased Property, inclusive of the Additional Warehouse Facility (but excluding the value of any Lessee's Equipment, as defined in Section 6.2 of this Lease), minus the Costs of Construction (as hereinafter defined) incurred by or on behalf of H.E. Butt Grocery Company in connection with

constructing the Additional Warehouse Facility.

This meant that Article XXXV of the Occupancy Lease, which contained the Kroger Purchase Option was modified by changing the manner in which the purchase price payable upon the exercise of the Option was computed in such a way that the purchase price could not be reduced, but might well be increased, by reason of Butt's construction of the addition. By purchasing the Leased Properties outside the option, Kroger avoided the effect of the Agreement Regarding Additional Facility upon the purchase price calculation under Article XXXV of the Operating Lease.

Balkhouse acquired its estates in the Leased Properties in 1983, as part of a tax shelter syndication transaction. As explained in the Kadish declaration and confirmed by the internal Kroger/Price/Merrill Lynch documents, by April, 2001 the Balkhouse investors were facing phantom income on their investment, since the mortgage loans affecting the Leased Properties now called for heavy amortization payments and there was no longer sufficient depreciation to shelter the rental income from the Leased Properties required to service such amortization payments. This meant that the investors would now be charged with taxable income for which they would not receive corresponding cash distributions, and would therefore have no source of funds to pay the tax. This situation would continue and grow worse. It therefore made both economic and tax sense for Kroger to accelerate its acquisition of the Balkhouse interest.

Malease does not contend that the existence of the option contained in Article XXXV of the Leases prevented Kroger from purchasing the Balkhouse estates in the Leased Properties, but does assert that having purchased the Balkhouse Estates outside the option, Kroger repudiated, abrogated, waived and forfeited the option and is estopped from thereafter attempting to exercise the option or asserting the provision of Section 3 of the Two Party Agreement.

## III.    Argument

On this motion, Kroger completely misinterprets Malease's position. Thus, at pages 11-12 of its memorandum, Kroger places principal reliance upon the provisions of Article XXI of the April 1983 Lease relating to merger of title and argues that because the property interest of Kroger as "Fee Interest Owner" is not the same as Kroger as "Occupying Tenant" under the 1983 Leases these interests are kept expressly separate. From this premise, Kroger then argues

that the only restriction or provision with which the Court must concern itself in analyzing the April 1983 Leases was that "the lessor interests be kept separate and distinct from the lessee interests unless purchased back by the Occupying Tenant." (Kroger Mem., p. 12).

This argument springs from the analysis found in paragraphs 9, 11, 12 and 21 of the Butler-Price report (Kroger, Ex. D). Neither Butler nor Price is an attorney let alone an expert on principles of real estate law or the intent of the parties. The statements and legal conclusions of these lay persons are completely rebutted in the expert report of Robert D. Howard, Esq. dated December 15, 2003 (a copy of which is annexed hereto as Exhibit "A" to this memorandum).

First and foremost, as the Howard report explains, the doctrine of merger of title (also known as merger of estates) which forms the linchpin for the Butler-Price contentions has no relevance or significance to the determination of the issues in this case.

In its memorandum, Kroger misunderstands and misstates the definition of "Leased Property" under the Occupancy Lease. Likewise, Kroger misconstrues and misstates the relationship between the Occupancy Lease and the Two Party Agreement. Similarly, Kroger's references to "rejectable offers" (Mem., p. 11) are irrelevant. Thus, Kroger points to the provisions of Article XXXV of the Occupancy Lease incorporated by reference in the Two-Party Agreement.

Under the Occupancy Lease in the event of fire, condemnation or economic abandonment, the tenant (Kroger) is required to make an offer which the Landlord (originally Balkhouse Properties Corp. and subsequently Malease and Balkhouse Associates in that order) may accept or reject. Under the Two-Party Agreement, all rejectable offers (fire, condemnation, economic abandonment) could not be rejected unless security was provided for the discharge of the mortgage debt contemporaneous with the termination of the Occupancy Lease resulting from the rejection of the offer.

The landlord at the time of the creation of the Occupancy Lease was a single entity owning the entire estate comprising the "Leased Property." Subsequently, the landlord's interest

was bifurcated into the Master Lease (now owned by Malease) and the fee interest (now owned by Balkhouse Associates). The only thing the Two Party Agreement does is express and implement the mechanics to preserve as against the Occupancy Tenant the same duties and rights contained in the Occupancy Lease. The "Option" created under Article XXXV of the Occupancy Lease to which Kroger refers is separate and distinct from the provisions of the Occupancy Lease that address fire, condemnation and economic abandonment. Thus, the latter have no factual or legal relevance to the issues in this case.

Kroger's argument based upon the "No Merger of Title" of Article XXXI of the April 1983 Lease is likewise irrelevant and misleading. First of all, there has not been and cannot have been any merger of title because the two property interests to which Kroger refers (the occupancy interest owned by Kroger and the fee interest owned by Balkhouse) are and at all times have been separated by the existence of the Master Lease, an independent interest in the property that was owned by Malease. Second, the essential issue in this case is not whether there was a merger of title but rather whether Kroger's 2001 purchase of the interest of Balkhouse Associates extinguished its right to exercise the option under Article XXXV of the Occupancy Lease and thereby acquire the Leased Property.

Kroger forfeited any right that it might have had to exercise the Option upon its acquisition of the position of Balkhouse Associates. This is so because the definition of "Leased Property" required that the option be exercised once -- simultaneously against the entirety of the interests of both Malease and Balkhouse.

This conclusion is confirmed in the declaration of Lawrence Kadish, the principal of Malease who has actual knowledge of the facts and transactions as a result of his direct involvement in them in 1983.

The provisions concerning the Purchase Option embodied in the Occupancy Lease are wholly consistent with and should be read in conjunction with the Two Party Agreement between Malease in its capacity as "Master Lessee" and Balkhouse Associates (to be

11

distinguished from Balkhouse Properties - the lessor under the Kroger Occupancy Lease) which at paragraph 3 provides in relevant part:

> If Purchase Option Exercised.   If a Purchase Option is exercised pursuant to Article XXXV of the Occupancy Lease, Partnership shall be obligated to sell and convey Partnership's Interest in the Premises to Occupancy Tenant simultaneously with the sale of the Master Lessee's Interest in the Premises to Occupancy Tenant by the Master Lessee.... (emphasis added).

As the Kadish declaration and relevant provisions make clear, it was always the intent of the parties that if a Purchase Option were exercised in accordance with paragraph 3 of the Two Party Agreement as provided in Article XXXV of the Occupancy Lease, then in order to be valid, such a transaction had to occur simultaneously with the sale of the Master Lessee's Interest in the Premises to the Occupancy Tenant by the Master Lessee, i.e., Malease, and had to cover the entire estate owned by Balkhouse Properties Corp. at the time of the creation of the Operating Lease.

Had the parties intended, they could have provided for a series of options exercisable at whatever times and upon whatever conditions were agreed.  However, they did not do this.

The principles of law applicable here are uniform and well-settled.[3]  An optionee must exercise the option "in accordance with its terms within the time and in the manner specified in the option." *[1 Williston Contracts §61(b) 3d Ed. 1957]*; *Restatement [2d] of Contracts §25.*  As noted by the Court in *West Texas Transmission, LP v. Enron Corp.*, 907 F.2d 1554, 1565 (5th

---

[3]  The three sites are in Texas, Kentucky and Tennessee, and the operative agreements provide that they are governed by the law of the situs of each.  The law relating to exercise of

Cir. 1990):

> Like the acceptance of any other offer, the exercise of an option,
> must be unqualified, absolute, unconditional, unequivocal,
> unambiguous, positive, without reservation and according to the
> terms or conditions of the option.

If an attempted option exercise varies from the terms which govern it, the optionee will lose his bargain. *Zeidman v. Davis*, 161 Tex. 496, 342 S.W.2d 555 (1961).

Of direct relevance is the holding in *Austin Presbyterian Theological Seminary v. Moorman*, 391 S.W.2d 717 (Tex.) *cert. den.*, 382 U.S. 957, 86 S. Ct. 434, 15 L.Ed.2d 361 (1965): "[a] purported acceptance which leaves the property owner 'as well off' as a third party offer, but which modifies, adds to or otherwise qualifies the terms of the offer, generally constitutes a rejection of the option and a counteroffer." Kroger's counteroffer was never accepted.

Malease's position is quite simple and strictly accords with the teaching of the foregoing authorities. Under the applicable agreements, the only option reserved to Kroger to purchase the property is contained in the Occupancy Lease, and that option was a single option to purchase the entire Leased Property as that term has been defined. As a matter of law, strict compliance by Kroger with the provisions of the Option was required. When Kroger purchased only the interest of Balkhouse Associates outside of the option (in order to realize substantial savings upon the cost of such acquisition), it was within its right to do so. However, by its failure to strictly comply with the requirement of a simultaneous transaction, Kroger was in no position to exercise a second option at a different time.

---

options is the same in all three states.

13

**IV.    Kroger's Subsequent Conduct Following the Balkhouse
Closing Underscores The Fact That It Knew It No Longer
Possessed an Option to Acquire The Malease Interest**

As explained in detail in the Kadish Declaration, for many years prior to the events

giving rise to this lawsuit, James D. Price, the senior partner of Price & Marshall, Inc. whose

firm received a $100,000.00 fee for structuring and advising Kroger on the partial acquisition

from Balkhouse had been a trusted business adviser and confidant of Kadish.  Unbeknownst to

Kadish, at the very same time he was confiding in Price about his attempts at buying the

Balkhouse position, Price was secretly representing Kroger.  It is fair to assume that Price was

imparting the confidential information about Malease's plans to Kroger.

As we know, with the assistance and guidance of Price, Kroger acquired the fee owner

interest to each of the three sites from Balkhouse Associates on July 24, 2001 together with an

assignment of the rights of Balkhouse under the Two-Party Agreements (Kroger Ex. I).

At the time of this transaction between Kroger and Balkhouse, Kroger knew that it had

failed to exercise the Purchase Option in accordance with Article XXXV of the Occupancy

Lease and paragraph 3 of the Two-Party Agreement simultaneously with the sale of the

Balkhouse interests.  As discovery in this action has now shown, recognizing that Kroger was no

longer in a position to compel Malease to sell its interests, Price and Kroger jointly embarked

upon a plan to have Price use his influence over Kadish through deception.  During the course of

discovery, in response to a subpoena Price produced a letter from him to Kadish dated

September 17, 2001 (Price & Marshall Document Production No. PM00576 to which was

attached a September 13, 2001 letter from James E. Hodge of Kroger to Price (PM00575).

Copies of these letters are collectively attached as Exhibit "B" hereto.  Neither of these two

letters was produced by Kroger in response to Malease's Rule 34 request.

One in the position of Kadish reading the Price and Hodge September 17, 2001 letters would never have realized that Price was Kroger's chief adviser and the architect of the Balkhouse transaction. Rather, the impression these letters created was that Price had just learned about the Kroger acquisition and was simply being asked to do Kroger a favor. Obviously, if Kadish found out that Price had been secretly working for Kroger, he would have hit the roof.

At his deposition, represented by the attorneys for Kroger, Price admitted that he did not disclose to his friend Kadish his role as Kroger's advisor or the fact that he had just received a $100,000.00 fee. Price was asked whether he had any involvement in the preparation of the text of the Hodge letter to which he responded "might have discussed it on the phone, I don't remember." (Tr. 186:2-187:18, Ex. "C" hereto). Price was less than candid in his testimony.

Following Price's deposition, and in response to complaints from counsel for Malease concerning its deficient document production, Kroger made a supplemental production under cover of its attorney's February 15, 2004 letter. Annexed hereto as Exhibit "D" is a copy of Mr. Dennis' letter together with the facsimile cover sheet from Price to Hodge dated September 13, 2001 (KSUPP000180) which accompanied a draft of the Hodge letter together with the September 14, 2001 memo from Hodge's secretary showing that the letter Price drafted had been retyped on Kroger's stationery. These documents had not been previously produced by Kroger either as part of its mandatory disclosure requirements or in response to Malease's Rule 34 request. It thus was not available for impeachment of Price at the time of his deposition.

Following production of these additional documents, Hodge gave a deposition. Annexed

15

hereto as Exhibit "E" are copies of the relevant pages of the Hodge deposition (Tr. 60:3-87:16) in which he admits that he asked Price to draft the letter to Kadish making it appear that Price had just learned from Hodge of the closing and that Price was innocently being asked to help Kroger out.

Review of the Hodge testimony in its entire context shows that both he and Waldvogel were working closely with Price to deceive Kadish and persuade him to agree to Kroger's exercise of a purchase option out of time.

If as Kroger now contends, the word "simultaneously" found in Article XXXV of the Occupancy Lease and paragraph 2 of the Two-Party Agreement really had no meaning and that Kroger could willy nilly exercise purchase options separately at its choosing, then why would Kroger and Price have gone to such great lengths to deceive Kadish?

Obviously, at the time it prepared its motion, Kroger knew of these facts but chose not to address them or to in any way offer an explanation for this behavior. Kroger was directly involved in Price's betrayal of Kadish. Through Price, Kroger had a direct insight into Kadish's attempts to purchase the Balkhouse interest from Merrill Lynch at the very same time that Kroger was attempting to do so. This goes well beyond sharp business practice, and we respectfully submit that under the totality of circumstances, the conclusion to be drawn is that Kroger recognized it no longer has a contractual option to purchase the Malease interests and therefore resorted to trickery and deception to accomplished its objective.

## V.    Kroger is Not Entitled to Any Relief on its Summary Judgment Motion

Malease respectfully submits that it is entitled to summary judgment which if granted by the Court would render the Kroger's claims for relief moot. However, should the Court for any

16

reason address the merits of the Kroger claims, we submit the following observations and refutation.

Kroger has two monetary claims which proceed from the entirely unsupported hearsay report of Jonathan Libbert, C.P.A. Kroger has not presented even a shred of evidence in admissible form to support its claim for monetary damages. We address them in the order presented at page 16 of Kroger's memorandum.

The two Kroger claims proceed from the entirely unsupported hearsay report of Jonathan Libbert. We address them in the order presented at page 16 of Kroger's memorandum:

First, Libbert states that if the sublease between Kroger and Butt had been renewed "under normal business conditions" for the San Marcos property, Kroger would have received $237,267.94 in additional rent between April 1, 2003 and October 30, 2003. There is absolutely no support for this hearsay conclusion. Indeed, at his deposition Libbert did not review any documents or independently verify anything but rather relied upon naked statements made by Ed Waldvogel of Kroger (Tr. 6:18-8:3 - Exhibit "F").

Just what "normal business conditions" Libbert and Waldvogel discussed is a complete mystery. There are no appraisals or expert reports as to the fair market rent that should have been paid by a tenant in an arm's length transaction nor is there any analysis of the condition of the property, the length of the proposed lease the nature of the use, the availability of a percentage rent formula, etc. Most importantly, there is no recognition of the fact that as a result of its acquisition of the Balkhouse interests, since July of 2001, Kroger was free to make a conveyance of this valuable property interest to Butt. Such a transaction would have had a profound effect on the amount of rent which might be fair or reasonable.

17

Second, Kroger claims the sum of $433,125.00 based upon Libbert's contention that the entire $11 million to be received from Butt would be available for Kroger to invest at a guaranteed rate of 12%. At his deposition, Libbert admitted that although he was sure that there would be income tax consequences to Kroger involved in the receipt of that $11 million he did not take them into account and simply issued a report upon the assumption that the $11 million would be tax free to Kroger.

It is difficult if not impossible to understand how a CPA who claims to be an expert can present a statistical analysis of this type which completely ignores Kroger's tax obligations. Moreover, Libbert does not take into account the fact that since July of 2001 Kroger could have conveyed the Balkhouse interest which it acquired from Merrill Lynch directly to Butt for a substantial consideration. The second branch of the Libbert analysis, i.e., that Kroger could have earned a guaranteed 12% annual rate of return on sale proceeds for which it would pay no tax is based solely upon something Libbert claims Waldvogel told him (Tr. 12:5-14:2 - Exhibit "F"). Again, there is no history of Kroger's overall experience in its managing money nor are there any investment analyses, annual reports, financial statements or any data of any kind from which one might draw any conclusions.

With respect to both categories, had Kroger presented any hard data, given the nature of the expansive claims made and the manifest bias and lack of expertise on the part of Libbert, it is a certainty that material issues of fact would exist concerning the validity and underpinnings of the data and his conclusions.

## VI.    Conclusion

Malease respectfully requests judgment against Kroger as follows:

18

(a) that by its conduct in purchasing the Balkhouse interest outside the option and in plain violation of the language of the operative agreements, Kroger has forfeited, abrogated and waived its right to maintain this action for a declaratory judgment;

(b) that Malease is entitled to a declaration that each of the leases for the three sites automatically renewed on April 1, 2003 and that Kroger is obligated to pay the rent due Malease to be established at a hearing to be held on the issue of damages;

(c) that this Court sever Malease's third counterclaim and direct a hearing on the issue of damages for unjust enrichment and imposition of a constructive trust against Kroger by reason of its wrongful use of confidential information imparted by Kadish to Price and then used by Kroger in connection with the Merrill Lynch/Balkhouse and Butt transactions;

(d) that the Kroger complaint should be dismissed in its entirety together with an award of reasonable attorneys' fees and such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_____
R. Gary Winters 0018680
Attorneys for Defendant
McCASLIN, IMBUS & McCASLIN
Suite 900 Provident Bank Building
632 Vine Street
Cincinnati, Ohio 45202-2442
Telephone No.: 513-421-4646
Email:    RGWinters@mimlaw.com

Robert W. Cinque, Esq.

19

CINQUE & CINQUE, P. C.
845 Third Avenue, Suite 1400
New York, New York 10022
Telephone No.: 212-759-5515
Telefax No.:    212-759-7737
Email:         CINQUE845@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April, 2004 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ R. Gary Winters
R. Gary Winters   0018680
Attorney for Defendant
Suite 900 Provident Building
632 Vine Street
Cincinnati, OH 45202-2442
(513) 421-4646 Telephone
(513) 421-7929 Facsimile
rgwinters@mimlaw.com

EXHIBITS FOR MEMO OF LAW

Exhibit "A"          -   Howard's expert report

Exhibit "B"          -    Price & Marshall Document Production No. PM00576 to which
                         was attached a September 13, 2001 letter from James E. Hodge
                         of Kroger to Price (PM00575).

Exhibit "C"          -   Price Tr. 186:10 - 187:18

Exhibit "D"          -   KSUPP0180 which is a facsimile cover sheet from Price to Hodge
                         dated September 13, 2001

Exhibit "E"          -   Pages 60-62 Hodge dep.

Exhibit "F"          -   12:5-14:2 of Libbert dep. & Tr. 12:5-14:2