# EXHIBIT B

*EXECUTION*

AGREEMENT OF PURCHASE AND SALE

Dated as of June 29, 2001

Between

BALKHOUSE ASSOCIATES, a Tennessee limited partnership, Seller

and

THE KROGER CO., an Ohio corporation, Buyer

<u>TABLE OF CONTENTS</u>

<u>Section</u>                                                                                                                                    <u>Page</u>

1.    Agreement to Purchase and Sell; Down Payment; Payment of Purchase Price ........................... 1

2.    Other Items Included in Purchase and Sale ......................................................... 1

3.    Documents Furnished by Seller; Confidentiality ..................................................... 2

4.    Title.............................................................................................................. 2

5.    Buyer's Conditions ....................................................................................... 3

6.    Representations and Warranties .................................................................... 3

7.    Conditions Precedent ................................................................................... 4

8.    Closing ......................................................................................................... 5

9.    Prorations .................................................................................................... 6

10.   Expenses and Allocation of Purchase Price .................................................. 6

11.   Risk of Loss; Casualty and Eminent Domain ................................................ 7

12.   Broker's Commissions .................................................................................. 7

13.   Seller's Covenants ........................................................................................ 7

14.   Defaults ........................................................................................................ 7

15.   Notices ......................................................................................................... 8

16.   Assignment .................................................................................................. 8

17.   General Provisions ....................................................................................... 9

<u>EXHIBITS</u>

Exhibit "A" -    The Properties
Exhibit "B" -    Mortgage Loan Documents
Exhibit "C" -    Operating Leases

NYB 1251892.3

AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement") made as of the 29th day of June 2001, between BALKHOUSE ASSOCIATES, a Tennessee limited partnership, having an office at c/o Merrill Lynch & Co., Inc., World Financial Center – South Tower, 225 Liberty Street, 7th Floor, New York, New York 10080 ("Seller"), and THE KROGER CO., an Ohio corporation, having an office at 1014 Vine Street, Cincinnati, Ohio 45202-1100 ("Buyer").

1.        Agreement to Purchase and Sell; Down Payment; Payment of Purchase Price

    1.1    Agreement to Purchase and Sell.    Subject to and upon the terms and conditions contained in this Agreement, Seller agrees to sell and convey to Buyer and Buyer agrees to purchase from Seller all right, title and interest of Seller in and to those certain parcels of real property located in San Marcos, Texas, Murfreesboro, Tennessee, and Bowling Green, Kentucky, and more particularly described in Exhibit "A" attached hereto, together with all buildings and improvements thereon (individually, a "Property" and collectively, the "Properties"), for the Purchase Price (hereinafter defined).

    1.2    Down Payment; Payment of Purchase Price.    The Purchase Price shall be paid as follows:

        1.2.1        Contemporaneously with the execution and delivery of this Agreement, Buyer has paid a good faith deposit in the amount of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00) (the "Down Payment") to Seller. The Down Payment constitutes a deposit to be applied, subject to the provisions of this Agreement, toward the payment of the Purchase Price.

        1.2.2        The total purchase price for the Properties (the "Purchase Price") shall be paid as follows:

            a.        an amount equal to the then aggregate unpaid principal balance of those certain first mortgage loans originally made by Merrill Lynch Corporate Pass-Through Securities, Inc. to Seller in the original aggregate principal amount of $26,729,666.50 (collectively the "Mortgage Loans") by Buyer's assumption of the Mortgage Loans at the Closing (hereinafter defined) . The Mortgage Loans are evidenced and secured by those certain documents more particularly described in Exhibit "B" attached hereto (the "Mortgage Loan Documents"). The above amount to be so assumed by Buyer is hereinafter referred to as the "Outstanding Balance"; and

            b.        an amount equal to TEN MILLION FOUR HUNDRED FIFTY THOUSAND ($10,450,000) less the Down Payment, plus or minus net prorations provided for in this Agreement (the sum of the amounts described in this Section 1.2.2(b) is hereinafter referred to as the "Closing Payment").

        1.2.3        Buyer shall pay the Closing Payment to Seller in immediately available funds at the Closing (hereinafter defined).

2.        Other Items Included in Purchase and Sale

    In addition to the Properties, all right, title and interest of Seller, if any, in and to the following, to the extent that the same apply to any one or more of the Properties and are transferable or assignable, shall be included within the term "Properties" and shall be transferred from Seller to Buyer at the Closing:

    2.1    all easements, rights of way, privileges, licenses, appurtenances and other rights and benefits running with any one or more of the Properties;

2.2    all fixtures, machinery, equipment and other tangible personal property owned by Seller and used in connection with the operation of the Properties and attached and appurtenant to, or forming part of, any one or more of the Properties (collectively, the "Personal Property");

2.3    all consents, authorizations, variances, licenses, permits and certificates of occupancy, if any, issued by any governmental authority with respect to any one or more of the Properties; and

2.4    Seller's interest, as fee owner and lessor, in (i) that certain Lease dated as of June 1, 1983 (the "Lease"), now between Seller and Malese Foods Corp., a Delaware corporation ("Master Lessee") and successor by assignment to Balkhouse Properties Corp., (ii) that certain Two Party Agreement dated as of June 1, 1983, between Master Lessee and Seller and recorded in the Clerk's Office of Warren County, Kentucky, in Deed Book 520, page 695, (iii) that certain Two Party Agreement dated as of June 1, 1983, between Master Lessee and Seller and recorded in the Deed Records of Hays County, Texas, in Book 395, page 248, and (iv) that certain Two Party Agreement dated as of June 1, 1983, between Master Lessee and Seller and recorded in the Register's Office for Rutherford County, Tennessee, in Book A381, page 88 (the Lease and the Two Party Agreements described in items (ii), (iii) and (iv) above are hereinafter collectively referred to as the "Master Lease").

3.    Documents Furnished by Seller; Confidentiality

Seller shall deliver to Buyer copies of the Master Lease and the Mortgage Loan Documents (collectively, the "Review Materials").  The Review Materials and all materials, books and records examined by or on behalf of Buyer pursuant to this Agreement shall: (i) be held in strict confidence by Buyer or its lenders, attorneys, employees, agents, engineers, consultants and representatives (collectively, "Buyer's Agents"); (ii) not be used for any purpose other than the investigation and evaluation of the Properties by Buyer and Buyer's Agents; and (iii) not be disclosed, divulged or otherwise furnished to any other person or entity except to Buyer's Agents or as required by law.  If this Agreement is terminated for any reason whatsoever, Buyer shall return to Seller all of the Review Materials.  The provisions of this Section shall survive the termination of this Agreement.

4.    Title

4.1    Title.  Seller has caused Lawyers Title Insurance Corporation (the "Title Company") to issue a separate title insurance commitment for each Property (individually, a "Title Commitment").  Each title insurance policy to be issued at the Closing by the Title Company pursuant to a Title Commitment (individually, a "Title Policy") shall be a standard form of owner's title insurance policy. Seller shall cause each Title Policy to be issued to Buyer subject to the Permitted Exceptions (hereinafter defined) but free and clear of all other standard or general exceptions contained in the Title Commitment which the Title Company is permitted by applicable law to remove or modify upon delivery of standard title affidavits from Seller.

4.2    Title Defects.  Within seven (7) days after the date hereof (the "Review Period"), Buyer shall give Notice to Seller (the "Defects Notice") of any claim, lien or exception or other matter contained in any Title Commitment materially and adversely affecting title to any Property and which Buyer is not willing to waive (each, a "Defect").  Seller shall have the right, but not the obligation, to cure any Defect within twenty (20) days after its receipt of the Defects Notice, or in the case of any Defect which cannot with due diligence be cured within such 20-day period, such later date by which such Defect can reasonably be cured, provided that Seller commences to cure such Defect within such 20-day period and thereafter continues diligently and in good faith to cure the Defect.  The Closing shall be extended, if necessary, in order to permit the cure described above, but in no event shall the date of the Closing be extended for more than sixty (60) days.  In the event that Seller elects not to cure any such Defect or will require more than twenty (20) days to make such cure, Seller shall notify Buyer of such election within five (5) business days after its receipt of the Defects Notice.  Seller shall have no obligation to cure any Defect created solely by any acts or omissions of Buyer, and Seller's failure to cure any such Defect shall not relieve Buyer from its obligation to close under this Agreement.  If Seller elects not to cure any Defect as set forth above or, if by the expiration of the cure period provided for above, Seller has failed to cure all Defects (other than any Defects created

2

NYB 1251892.3

solely by any acts or omissions of Buyer), Buyer may, at its option, either (i) proceed to close subject to any such Defects, with no offset against, or reduction in, the Purchase Price or (ii) terminate this Agreement by written notice given to Seller within five (5) business days after the later of (x) the expiration of the cure period or (y) Buyer's receipt of Seller's notice of election not to cure any Defect. In the event this Agreement is so terminated by Buyer, the Down Payment shall be returned to Buyer and the parties shall be released from all further obligations and liabilities hereunder, except with respect to the covenants and indemnities set forth in Sections 3, 5.1 and 5.3.

      4.3   <u>Permitted Title Exceptions</u>. The Mortgage Documents, the Master Lease, those certain Leases with Buyer more fully described in <u>Exhibit "C"</u> attached hereto (the "Operating Leases"), all title matters existing as of the date Seller acquired title to the Properties, and all other items set forth in each Title Commitment (other than Defects specified in the Defects Notice), shall be deemed "Permitted Exceptions."

5.     Buyer's Conditions

      Buyer acknowledges that, other than the period commencing as of January 1991 for the Property located in San Marcos, Texas and subleased by B uyer to H.E. Butt Grocery Company as of such date, Buyer has been in occupancy of and has operated the Properties throughout the period of Seller's ownership thereof. As a material inducement to Seller to execute this Agreement, Buyer acknowledges, represents and warrants that, as of the Closing (i) Buyer will have fully examined and inspected the Properties, each Title Commitment, the Review Materials and such other documents and materials with respect to the Properties that Buyer deems necessary or appropriate in connection with its investigation and examination of the Properties, (ii) Buyer will have accepted and will be fully satisfied in all respects with the foregoing and with the physical condition, value, presence/absence of hazardous or toxic materials, financing status, use, leasing, operation, tax status, income and expenses of the Properties, (iii) the Properties will be purchased by Buyer on an "AS IS", "WHERE IS" and with all faults basis, and (iv) Buyer will have decided to purchase the Properties solely on the basis of its own independent investigation. Except as expressly set forth herein or in any document executed by Seller and delivered to Buyer pursuant to Section 8.2 ("Seller's Documents"), Seller has not made, does not make, and has not authorized anyone else to make any representation as to the present or future physical condition, value, presence/absence of hazardous or toxic materials, financing status, leasing, operation, use, tax status, income and expenses or any other matter or thing pertaining to the Properties, and Buyer acknowledges that no such representation or warranty has been made and that in entering into this Agreement it does not rely on any representation or warranty other than those expressly set forth in this Agreement or in Seller's Documents. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN SELLER'S DOCUMENTS, SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTIES. Seller shall not be liable for or bound by any verbal or written statements, representations, real estate broker's "setups" or information pertaining to the Properties furnished by any real estate broker, agent, employee, servant or any other person unless the same are specifically set forth in this Agreement or in Seller's Documents. The provisions of this Section 5 shall survive the Closing.

6.     Representations and Warranties

      6.1   <u>Representations and Warranties of Seller</u>. Seller makes the following representations and warranties to Buyer, which representations and warranties shall be true and correct in all material respects on the day of the Closing:

        6.1.1   Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Tennessee.

        6.1.2   The execution, delivery and performance of this Agreement and all other documents, instruments and agreements now or hereafter to be executed and delivered by Seller pursuant to this Agreement are

NYB 1251892.3

within the partnership power of Seller and has been duly authorized by all necessary or proper partnership actions and consents.

6.1.3    Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

6.1.4    As of the date hereof, to the actual knowledge of Seller, there is no pending suit or action against Seller which, if adversely decided, would prevent the consummation of the transaction contemplated by this Agreement.

6.1.5    The Mortgage Loan Documents are in full force and effect and have not been further amended or modified in any material respect. Seller has not received any written notice of a default thereunder that remains uncured.

6.1.6    The Master Lease is in full force and effect, and has not been further amended or modified in any material respect. Seller has not given, nor has Seller received, any written notice of a default thereunder that remains uncured.

6.2    <u>Limitation of Seller's Representations</u>.  The representations and warranties of Seller contained in Section 6.1 are made as of the date hereof. Buyer's obligations hereunder are contingent upon Seller's representations and warranties made in this Agreement being true in all material respects on the date of the Closing. Prior to the date of the Closing, Seller shall notify Buyer of any manner in which such representations are not true in any material respects. Seller's representations and warranties set forth in this Agreement shall survive the Closing to the date (the "Representation Termination Date") occurring six (6) months after the date of the Closing, at which time such representations and warranties shall terminate and be of no further force or effect. Where representations and warranties are made in this Agreement to the "actual knowledge of Seller" such phrase shall mean and be limited to the actual knowledge of Michael V. Mingione (the "Officer"). For purposes of the representations and warranties made by Seller in this Agreement and/or Seller's Documents, (1) "Seller's knowledge" shall not include that of any independent contractor hired by Seller and (2) notices received by any independent contractor hired by Seller and not delivered by such contractor to the Officer shall not be deemed to have been received by Seller.

6.3    <u>Representations and Warranties of Buyer</u>.  Buyer makes the following representations and warranties to Seller, which representations and warranties shall be true and correct in all material respects on the date of the Closing:

6.3.1    Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio.

6.3.2    The execution, delivery and performance of this Agreement and all other documents, instruments and agreements now or hereafter to be executed and delivered by Buyer pursuant to this Agreement are within the corporate power of Buyer and have been duly authorized by all necessary or proper corporate action.

The representations and warranties of Buyer contained in this Section 6.3 shall survive the Closing.

7.    Conditions Precedent

7.1    <u>Buyer's Conditions</u>. Buyer's obligation to close the transaction contemplated by this Agreement is subject to the satisfaction, at or prior to Closing, of the following conditions precedent:

7.1.1    <u>Review of Documents</u>.  Buyer's satisfaction with the Review Materials.

4

NYB 1251892.3

7.1.2    <u>Officer's Certificate from Master Lessee</u>. The execution and delivery by Master Lessee of an Officer's Certificate in the form prescribed under Section 26 of the Lease, dated on or after the date of this Agreement.

7.1.3    <u>Estoppel Certificate from Lender</u>. The execution and delivery of an estoppel certificate from the holder of the Mortgage Loan Documents confirming (i) that the Mortgage Loan Documents are in full force and effect and, to Lender's actual knowledge, no default exists thereunder and (ii) the Outstanding Balance as of the date the Closing.

7.2    <u>Failure of Buyer's Conditions</u>. If the condition precedent set forth in Section 7.1.1 is not satisfied on or prior to the expiration of the Review Period, then Buyer may elect, by written Notice given within two (2) business days after the expiration of the Review Period, to terminate this Agreement, in which event the Down Payment shall be promptly returned to Buyer and the parties shall be released from all further obligations and liabilities hereunder, except with respect to the covenants and indemnities set forth in Sections 3, 5.1 and 5.3. If any of the conditions precedent set forth in Sections 7.1.2 and 7.1.3 is not satisfied on or prior to the date set for Closing then Buyer, may at its option, elect to terminate this Agreement, in which event the Down Payment shall be promptly returned to Buyer and the parties shall be released from all further obligations and liabilities hereunder, except with respect to the covenants and indemnities set forth in Sections 3, 5.1 and 5.3.

8.    Closing

8.1    <u>Time and Place</u>. The closing contemplated by this Agreement (the "Closing") shall occur on or before July 24, 2001. On or before the date of Closing, Seller and Buyer shall provide separate written escrow instructions to the Title Company, which shall be consistent with this Agreement and shall provide for delivery of Seller's Documents identified in Section 8.2 below, delivery of Buyer's documents identified in Section 8.3 below, payment of the Closing Payment and the issuance of a Title Policy for each Property, all in accordance with the provisions of this Agreement.

8.2    <u>Seller's Closing Documentation and Requirements</u>. At the Closing, Seller shall deliver the following to Buyer:

8.2.1    a special warranty deed for each of the Properties, duly executed and acknowledged and in recordable form, conveying fee simple title to each of the Properties to Buyer and containing "anti-merger" provisions, subject to the Permitted Exceptions;

8.2.2    a special warranty bill of sale, duly executed and acknowledged, transferring to Buyer all of the Personal Property;

8.2.3    an assignment, duly executed and acknowledged, of those items referred to in Sections 2.1 and 2.3;

8.2.4    an assignment and assumption of lease (the "Assignment of Lease"), duly executed and acknowledged and in recordable, assigning and transferring to Buyer all right, title and interest of Seller in and to, and all post-Closing obligations of the Seller under, the Master Lease;

8.2.5    an affidavit by Seller stating, under penalty of perjury, its United States taxpayer identification number and that it is not a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended, and otherwise in the form prescribed by the Internal Revenue Service;

8.2.6    a certificate, dated as of the Closing, of the Secretary or an Assistant Secretary of the general partner of Seller with respect to (i) the resolutions adopted by its Board of Directors approving this

5

Agreement and the transaction contemplated hereby and (ii) the incumbency and specimen signature of any officer executing this Agreement and the documents set forth in this Section 8.2;

8.2.7    a written notice, duly executed by Seller and addressed to the Master Lessee, indicating that the Properties have been sold to Buyer and the Master Lease has been assigned to Buyer; and

8.2.8    such other documents and instruments as Buyer may reasonably request in order to consummate the transaction contemplated hereby.

8.3    Buyer's Closing Documentation and Requirements.  At the Closing, Buyer shall pay the Closing Payment in accordance with the provisions of this Agreement and shall deliver the following to Seller:

8.3.1    the Assignment of Lease, duly executed and acknowledged;

8.3.2    all documents required under Section 5.2 of the Deed of Trust (as described in Exhibit "B" attached hereto) to be delivered to the holder of the Mortgage Loans in connection with the assumption of the Mortgage Loans;

8.3.3    a certificate, dated as of the Closing, of the Secretary or an Assistant Secretary of Buyer with respect to (i) the resolutions adopted by the Board of Directors of Buyer approving this Agreement and the transaction contemplated hereby and (ii) the incumbency and specimen signature of each officer of Buyer executing this Agreement and the documents set forth in this Section 8.3; and

8.3.4    such other documents and instruments as Seller may reasonably request in order to consummate the transaction contemplated hereby.

8.4    Form.  All documents and instruments required hereby shall be in form and substance reasonably acceptable to Seller and Buyer.

9.    Prorations

9.1    Prorations.  The following shall be prorated between the parties as of 11:59 p.m. of the day immediately preceding the date of the Closing: (a) rent payments (including prepaid rent) under the Master Lease and (b) interest and other charges payable under the Mortgage Loan Documents.

9.2    Errors.  If any errors or omissions are made at the Closing regarding adjustments or prorations, the parties shall make the appropriate corrections promptly after the discovery thereof. The provisions of this Section shall survive the Closing.

10.    Expenses and Allocation of Purchase Price

10.1    Expenses of Buyer.  Buyer shall pay: (a) the escrow fees charged by the Title Company; (b) the cost of any survey of the Properties obtained by Buyer; (c) the cost of each Title Policy; (d) any assumption fee or other charges required to be paid to the holder of the Mortgage Loans in connection with the assumption of the Mortgage Loans, (e) all state and county excise and transfer taxes and recording fees with respect to the conveyance of the Properties to Buyer; and (f) Seller's attorneys' fees with respect to the transaction contemplated by this Agreement.

10.2    Allocation of Purchase Price .  For tax purposes only, the Purchase Price shall be allocated as follows: (a) eighty percent (80%) of the Purchase Price shall be attributable to the San Marcos, Texas Property; (b) eleven percent (11%) of the Purchase Price shall be attributable to the Mufreesboro, Tennessee Property; and (c) nine percent (9%) of the Purchase Price shall be attributable to the Bowling Green, Kentucky Property.

6

11.    Risk of Loss; Casualty and Eminent Domain

11.1    Casualty. If, prior to the Closing, any Property is damaged by fire, vandalism, acts of God or other casualty or cause, Buyer shall promptly give Seller notice of any such damage (the "Damage Notice"), together with Buyer's good-faith estimate of the cost and time period for completion of the repair and restoration. In any such event: (a) in the case of damage to any Property of less than $1,000,000 and from a risk covered by insurance maintained with respect to such Property, Buyer shall take such Property at the Closing as it is together with any applicable insurance proceeds or the right to receive the same; or (b) in the case of either (i) damage to any Property of $1,000,000 or more or (ii) damage to any Property in excess of $1,000,000 from a risk not covered by insurance, Buyer shall have the option of (x) taking the Property at the Closing in accordance with item (a) above or (y) terminating this Agreement. If, pursuant to the preceding sentence, Buyer is either obligated or elects to take any Property as it is together with any applicable insurance proceeds or the right to receive the same, Seller agrees to cooperate with Buyer in any loss adjustment negotiations, legal actions and agreements with the insurance company, and to assign to Buyer at the Closing its rights to any such insurance proceeds with respect to such claim and will not settle any insurance claims or legal actions relating thereto without Buyer's prior written consent, which consent shall not be unreasonably withheld or delayed.

11.2    Eminent Domain. If, prior to the Closing, all or substantially all of any Property is taken by eminent domain, this Agreement shall be terminated without further act or instrument.

11.3    Termination. If this Agreement is terminated pursuant to this Section 11, the Down Payment shall be promptly returned to Buyer and the parties hereto shall be released from all further obligations and liabilities hereunder, except with respect to the covenants and indemnities set forth in Sections 3, 5.1 and 5.3.

12.    Broker's Commissions

Buyer and Seller represent and warrant to each other that neither they nor their affiliates have dealt with any broker, finder or the like in connection with the transaction contemplated by this Agreement. Buyer and Seller each agrees to indemnify, defend and hold the other harmless from and against all loss, expense (including reasonable attorneys' fees and court costs), damage and liability resulting from the claims of any broker or finder (including anyone claiming to be a broker or finder) on account of any services claimed to have been rendered to the indemnifying party in connection with the transaction contemplated by this Agreement. The provisions of this Section shall survive the Closing or the earlier termination of this Agreement.

13.    Seller's Covenants

Between the date of this Agreement and the date of the Closing, Seller shall not enter into any amendment or modification of the Master Lease or the Mortgage Loan Documents without the prior written consent of Buyer.

14.    Defaults

14.1    By Buyer. If Buyer fails to perform its obligations at Closing according to the terms of this Agreement, and such failure is not cured or remedied within ten (10) business days after receipt of written notice thereof given by Seller to Buyer, Seller may, at its option, terminate this Agreement and retain the Down Payment as liquidated damages, in which event this Agreement shall be deemed null and void and the parties shall be released from all further obligations and liabilities under this Agreement, except with respect to the covenants and indemnities set forth in Sections 3, 5.1 and 5.3. It is recognized by Seller and Buyer that the damages Seller will sustain by reason of Buyer's default, breach or failure will be substantial, but difficult, if not impossible, to ascertain. The Down Payment has been determined by the parties as a reasonable sum for damages.

14.2    By Seller. If Seller fails to perform its obligations at Closing according to the terms of this Agreement, and such failure is not cured or remedied within ten (10) business days after receipt of written notice

7

NYB 1251892.3

thereof given by Buyer to Seller, Buyer may either (a) terminate this Agreement, in which event the Down Payment shall be returned to Buyer and the parties shall be released from all further obligations and liabilities under this Agreement, except with respect to the covenants and indemnities set forth in Sections 3, 5.1 and 5.3, or (b) obtain specific performance. The remedies set forth above shall be Buyer's sole remedies arising from a default, breach or failure to perform by Seller.

15.    Notices

Any notice, demand, consent, authorization or other communication (collectively, a "Notice") which either party is required or may desire to give to or make upon the other party pursuant to this Agreement shall be effective and valid only if in writing, signed by the party (or its attorneys) giving such Notice, and delivered personally (upon an officer of the other party or to such individual as may be noted in the addresses stated below) to the other party, or sent by express courier or delivery service or by registered or certified mail of the United States Postal Service, return receipt requested, and addressed to the other party as follows (or to such other address or person as either party may by Notice specify) or sent by facsimile transmission to the fax number shown below and simultaneously mailed by first-class mail of the United States Postal Service:

|  |  |  |
|---|---|---|
| To Seller: | Balkhouse Associates | |
| | c/o Merrill Lynch & Co., Inc. | |
| | World Financial Center – South Tower | |
| | 225 Liberty Street, 7th Floor | |
| | New York, New York 10080 | |
| | Attention: | Mr. Michael V. Mingione |
| | | Director and Vice President, Asset Recovery Department |
| | Telephone: | (212) 236-6289 |
| | Facsimile: | (212) 236-6460 |

with a copy to:

|  |  |  |
|---|---|---|
| | Clifford Chance Rogers & Wells LLP | |
| | 200 Park Avenue, 51st Floor | |
| | New York, New York 10166 | |
| | Attention: | Jeffrey H. Weitzman, Esq. |
| | Telephone: | (212) 878-8258 |
| | Facsimile: | (212) 878-8375 |

|  |  |  |
|---|---|---|
| To Buyer: | The Kroger Co. | |
| | 1014 Vine Street | |
| | Cincinnati, Ohio 45202-1100 | |
| | Attention: | Mr. James E. Hodge and Thomas P. O'Brien, Jr., Esq. |
| | Telephone: | (513) 762-4214 |
| | Facsimile: | (513) 762-4012 |

Unless otherwise specified, notices shall be deemed given when received, but if delivery is not accepted, on the earlier of the date delivery is refused or the third day after the same is deposited with the United States Postal Service.

16.    Assignment

8

This Agreement and all rights of Buyer arising hereunder shall not be assigned, sold, pledged or otherwise transferred (an "Assignment") by Buyer in whole or in part, without the prior written consent of Seller. Notwithstanding the foregoing, Buyer shall have the right, without the consent of Seller, to assign this Agreement and all of its rights and obligations hereunder, to any affiliate of Buyer. Any assignment permitted or consented to hereunder shall be effected by a written assignment and assumption agreement between Buyer and its assignee (with a fully executed counterpart thereof to be delivered to Seller at or prior to the Closing).

17.     General Provisions

17.1     Successors and Assigns. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto.

17.2     Gender and Number. Whenever the context so requires, the singular number shall include the plural and the plural the singular, and the use of any gender shall include all genders.

17.3     Entire Agreement. This Agreement contains the complete and entire agreement between the parties respecting the transaction contemplated herein and supersedes all prior negotiations, agreements, representations and understandings, if any, between the parties respecting such matters.

17.4     Counterparts. This Agreement may be executed in any number of original counterparts, all of which evidence only one agreement and only one of which need be produced for any purpose.

17.5     Modifications. This Agreement may not be modified, discharged or changed in any respect whatsoever, except by a further agreement in writing duly executed by Buyer and Seller. However, any consent, waiver, approval or authorization shall be effective if signed by the party granting or making such consent, waiver, approval or authorization.

17.6     Exhibits. All exhibits referred to in this Agreement are incorporated herein by reference and shall be deemed part of this Agreement for all purposes as if set forth at length herein.

17.7     Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of New York. Seller and Buyer hereby irrevocably agree that all actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement shall be litigated in courts having situs within the State of New York. Seller and Buyer hereby consent and submit to the jurisdiction of any state court located within the County of New York or Federal court located within the State of New York. Each party hereby irrevocably waives any right it may have to transfer or change the venue of any litigation brought against it by the other party in accordance with this Section.

17.8     No Recordation. This Agreement shall not be recorded. Violation of this provision by Buyer shall automatically terminate this Agreement and entitle Seller to receive the Down Payment without further action, consent or release from Buyer first being required, and to such other remedies available at law or in equity.

17.9     Captions. The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope, meaning or intent of this Agreement.

17.10     Severability. The invalidation or unenforceability in any particular circumstance of any of the provisions of this Agreement shall in no way affect any of the other provisions hereof, which shall remain in full force and effect.

17.11     No Joint Venture. This Agreement shall not be construed as in any way establishing a partnership, joint venture, express or implied agency, or employer-employee relationship between Buyer and Seller.

9

NYB 1251892.3

17.12    No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto, their respective successors and permitted assigns, and no other person or entity shall be entitled to rely upon or receive any benefit from this Agreement or any term hereof.

17.13    Survival.  Except as otherwise expressly set forth herein, the covenants, warranties, representations and indemnities of Seller and Buyer contained in this Agreement shall not survive the Closing.

17.14    No Personal Liability. No officer, director or stockholder of Seller, no disclosed or undisclosed principal of Seller, and no person or entity in any way affiliated with Seller shall have any personal liability with respect to this Agreement, any instrument delivered by Seller at Closing, or the transaction contemplated hereby, nor shall the Properties of any such person or entity be subject to attachment, levy, execution or other judicial process.

17.15    Execution.  The submission of this Agreement for examination does not constitute an offer by or to either party.  This Agreement shall be effective and binding only after due execution and delivery by the parties hereto.

17.16    Confidentiality; Publicity.  The parties agree to keep the terms and provisions of this Agreement confidential and not to disclose the terms hereof to third parties other than (i) to their respective auditors, attorneys, accountants, lenders, investment bankers, consultants, and other persons acting in similar types of capacities; (ii) as required by any applicable law, rule or regulation or the rules or requirements of any applicable law, rule or regulation or the rules or requirements of any national securities exchange, as determined in good faith by the affected party; (iii) in connection with the enforcement of this Agreement; (iv) if such information is generally known or available, other than as a result of a breach of this Section 17.16 by one of the parties hereto; (v) to Seller's limited partners; and (vi) as required or necessitated by the provisions of this Agreement.

*[The remainder of this page has been intentionally left blank]*

10

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**

BALKHOUSE ASSOCIATES,
a Tennessee limited partnership

By:    ML Balkhouse Properties Corp.
       its general partner, a Delaware corporation

      By:_____
         Name: Michael V. Mingione
         Title: President

**BUYER:**

THE KROGER CO.,
an Ohio corporation

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

SELLER:

BALKHOUSE ASSOCIATES,
a Tennessee limited partnership

By:     ML Balkhouse Properties Corp.
        its general partner, a Delaware corporation


        By:_____
            Name: Michael V. Mingione
            Title: President




BUYER:

THE KROGER CO.,
an Ohio corporation

By: _____
    Name:       James E. Hodge
    Title:      Vice President

Exhibit "A"

The Properties

San Marcos, Texas Property:

All that certain tract or parcel of land, lying and being situated in Hays County, Texas, and being Lot One (1), San Marco Distribution Center, according to the map or plat thereof recorded in Volume 2, Page 272, of the Plat Records of Hays County, Texas; SAVE AND EXCEPT that portion deeded to the State of Texas by Deed dated October 1, 1998, recorded in Volume 1501, page 93, of the Official Public Records of Hays County, Texas.

Murfreesboro, Tennessee Property:

LAND in Rutherford County, Tennessee, being Lot No. 1, on the Plan of Section I, Molloy Subdivision, as shown on plat of record in Plat Book 7, page 184, in the Register's Office of Rutherford County, Tennessee, to which plat reference is hereby made for a more particular description.

BEING the same property conveyed to Balkhouse Associates, a Tennessee limited partnership, by Deed of Record in Book 322, page 26, Register's Office for Rutherford County, Tennessee.

Bowling Green, Kentucky Property:

A certain parcel of land located on Pioneer Drive in Bowling Green, Kentucky, and being more particularly described as follows:

Beginning at an iron pin corner monument on a corner common to the subject tract and the lands of The Louisville and Nashville Railroad Company in the southern section of the City of Bowling Green, Warren County, Kentucky, said point of beginning being located on the northern right-of-way line and at the present end of Pioneer Drive and referenced 30.00 feet northeasterly from the centerline of Pioneer Drive and N 47 deg. 21 min. 34 sec. W 790.18 feet from the intersection of the centerline of the Green River Parkway with the centerline of The Louisville and Nashville Railroad Mainline; thence along the Western boundary line of said Louisville and Nashville Railroad Company; thence along the Western boundary line of said Louisville and Nashville Railroad Company parcel, N 24 deg. 34 min. 00 sec. E 1,097.10 feet to an iron pin corner monument on a corner common to the subject tract and another tract of the lands of The Louisville and Nashville Railroad Company; thence along the southern boundary line of said tract N 46 deg. 49 min. 27 sec. W 1,021.09 feet to an iron pin corner monument on a corner common to the subject tract and on the southern boundary line of said tract of the lands of The Louisville and Nashville Railroad Company; thence with two (2) new lines severing the lands of The Kroger Company, an Ohio Corporation, S 09 deg. 51 min. 00 sec. W 551.69 feet to an iron pin corner monument; thence S 45 deg. 00 min. 00 sec. W 708.96 feet to an iron pin corner monument on a corner common to the subject tract and on the northern right-of-way line of Pioneer Drive, said iron pin being located northeasterly 30.00 feet from the centerline of said Pioneer Drive; thence with the chord of a 01 deg. 8 min. 14 sec. curve to the left, (arc length 1,068.57 feet, delta 13 deg. 56 min. 05 sec., radius 4,393.66 feet) S 53 deg. 17 min. 00 sec. E 1,065.94 feet to an iron pin corner monument; thence S 63 deg. 27 min. 00 sec. E 32.98 feet to the point of beginning containing 25.268 acre/10.2255 hectares, more or less, according to this survey made in November, 1982, by Smith and Associates, Surveyors, Dennis D. Smith, PLS 2062, Kenney Lee, Byron Karr, Tim Williams and Barry Hall; subject to existing rights-of-way and easements.

Being the same property conveyed to Balkhouse Associates, a Tennessee limited partnership, by deed dated June 1, 1983, and of record in Deed Book 520, Page 607, in the Warren County Clerk's office.

A-1

Exhibit "B"

Mortgage Loan Documents

Unless otherwise noted, all documents are dated as of April 1, 1983

## San Marcos, Texas Property

1. 6% Secured Promissory Note made by Balkhouse Properties Corp. ("Balkhouse Corp."), in favor of SunTrust Bank, Nashville, N.A., successor to Third National Bank in Nashville, as trustee (in such capacity, "Trustee"), in the original principal amount of $17,331,000.

2. Deed of Trust made by Balkhouse Corp., to Neil E. Newsom, as trustee, for the benefit of Merrill Lynch Corporate Pass-Through Securities, Inc. ("ML CPTS"), recorded in Volume 308, page 786-831, of the Deed of Trust Records of Hays County, Texas, as assigned:

    (a) by ML CPTS to Buyer, pursuant to First Assignment of Deed of Trust dated as of April 6, 1983 and recorded in Volume 308, page 832-835, of the Deed of Trust Records of Hays County, Texas; and

    (b) by Buyer to Trustee, pursuant to Second Assignment of Deed of Trust dated as of April 6, 1983 and recorded in Volume 308, page 836-838, of the Deed of Trust Records of Hays County, Texas;

3. Consent to Conveyance Agreement dated August 1998, among Seller, Trustee, Master Lessee, Buyer, and H.E. Butt Grocery Company, recorded in Volume 1501, page 86, of the Deed of Trust Records of Hays County, Texas.

4. Assignment of Lease from Balkhouse Corp. to ML CPTS, as assigned:

    (a) by ML CPTS to Buyer, pursuant to First Assignment of Assignment of Lease and Consent and Agreement dated as of April 6, 1983; and

    (b) by Buyer to Trustee, pursuant to Second Assignment of Assignment of Lease and Consent and Agreement dated as of April 6, 1983.

5. UCC Financing Statements made by Seller in favor of Trustee.

## Bowling Green, Kentucky Property

6. 6% Secured Promissory Note, made by Balkhouse Corp, in favor of Trustee, in the original principal amount of $18,198,000.

7. Mortgage made by Balkhouse Corp. to ML CPTS, recorded in Mortgage Book 445, page 74, at the Warren County Clerk's Office, as assigned:

    (a) by ML CPTS to Buyer, pursuant to First Assignment of Mortgage dated as of April 6, 1983 and recorded in Mortgage Book 445, page 70, at the Warren County Clerk's Office; and

    (b) by Buyer to Trustee, pursuant to Second Assignment of Mortgage dated as of April 6, 1983 and recorded in Mortgage Book 445, page 66, at the Warren County Clerk's Office.

8. Assignment of Lease from Balkhouse Corp. to ML CPTS, recorded in Deed Book 516, page 399, at the Warren

B-1

County Clerk's Office, as assigned:

    (a)    by ML CPTS to Buyer, pursuant to First Assignment of Assignment of Lease and Consent and Agreement dated as of April 6, 1983 and recorded in Deed Book 516, page 421, at the Warren County Clerk's Office; and

    (b)    by Buyer to Trustee, pursuant to Second Assignment of Assignment of Lease and Consent and Agreement dated as of April 6, 1983 and recorded in Deed Book 516, page 425, at the Warren County Clerk's Office.

9.    UCC Financing Statements made by Seller in favor of Trustee.

**Murfreesboro, Tennessee Property**

10.    6% Secured Promissory Note, made by Balkhouse Corp, in favor of Trustee, in the original principal amount of $14,762,000.

11.    Trust Deed made by Balkhouse Corp., to C. Dewees Berry, IV, as trustee, for the benefit of ML CPTS, recorded in Book A375, page 344, at the Register's Office for Rutherford County, Tennessee, as assigned:

    (a)    by ML CPTS to Buyer, pursuant to First Assignment of Trust Deed dated as of April 6, 1983;

    (b)    by Buyer to Trustee, pursuant to Second Assignment of Trust Deed dated as of April 6, 1983 and recorded in Book A375, page 377, at the Register's Office for Rutherford County, Tennessee.

12.    Assignment of Lease from Balkhouse Corp. to ML CPTS, recorded in Book A375, page 344 at the Register's Office for Rutherford County, Tennessee, as assigned:

    (a)    by ML CPTS to Buyer, pursuant to First Assignment of Assignment of Lease and Consent and Agreement dated as of April 6, 1983; and

    (b)    by Buyer to Trustee, pursuant to Second Assignment of Assignment of Lease and Consent and Agreement dated as of April 6, 1983 and recorded in Book A375, page 381 at the Register's Office for Rutherford County, Tennessee

13.    UCC Financing Statements made by Seller in favor of Trustee.

NYB 1251892.3

Exhibit "C"

Operating Leases

All documents are dated as of April 1, 1983

1.      Lease now between Seller and Buyer, demising the property located in Bowling Green, Kentucky and described in Exhibit "A."

2.      Lease now between Seller and Buyer, demising the property located in San Marcos, Texas and described in Exhibit "A."

3.      Lease now between Seller and Buyer, demising the property located in Mufreesboro, Tennessee and described in Exhibit "A."

C-1